IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROGER P. JACKSON, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| NUVASIVE, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Roger P. Jackson, M.D. (hereinafter "Plaintiff" or "Dr. Jackson" or "Plaintiff Dr. Jackson"), an individual, by and through his attorneys, for his Complaint against NuVasive, Inc., a Delaware corporation (hereinafter "Defendant" or "NuVasive" or "Defendant NuVasive") hereby alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Roger P. Jackson, M.D. is an individual residing at 4706 W. 86th Street, Prairie Village, Kansas 66207.

2.     Defendant NuVasive is a Delaware corporation, with its principal place of business located at 4545 Towne Center Court, San Diego, California 92121.  According to the most recent SEC 10K filing, dated December 2019, the "principal executive offices" of NuVasive are located at 7475 Lusk Blvd., San Diego, California 92121.  According to that same filing, NuVasive's "primary self-manufacturing facility, which produces spinal implants and fixation products," is located in West Carrollton, Ohio.  *See* NuVasive "Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, Form 10-K for the Year Ended December 31, 2019" (hereinafter "NuVasive 10-K"), p. 4, ir.nuvasive.com/node/19716/html (retrieved September 24, 2020).

3.     This action arises under the patent laws of the United States, Title 35 of the United States Code, 35 U.S.C. §§ 1 *et seq.*  Consequently, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) or (2).  Venue is also proper in this Court pursuant to 28 U.S.C. § 1400(a) and (b).

5.      NuVasive is subject to personal jurisdiction in this Court under 28 U.S.C. § 1391(c)(2) as NuVasive's principal place of business is within this district.

## THE ASSERTED PATENTS

6.      Plaintiff Dr. Jackson is a pioneering surgeon who focuses on maladies of the spine and is also a prolific inventor in the spinal implant industry.  Dr. Jackson has been awarded over three hundred twenty United States patents during a career spanning four decades.  Among his many innovations in the field of spinal surgery, Dr. Jackson has developed state-of-the-art patient positioning technologies and multiple spinal implant systems, including those that feature bone screws incorporating his patented enabling technologies, as well as instruments and methodologies for using the same.  In particular, Plaintiff Dr. Jackson is the named inventor and sole owner of certain patents, specifically: U.S. Patent No. 8,353,932; U.S. Patent No. 8,696,711; U.S. Patent No. 9,788,866; U.S. Patent No. 10,335,200; U.S. Patent No. 10,561,444; U.S. Patent No. 10,722,273; U.S. Patent No. 9,808,292; and, U.S. Patent No. 10,441,319.   Collectively, these patents will be referred to herein as the "Asserted Patents."

7.      The Asserted Patents generally relate to spinal implants and systems used to fixate or align vertebrae of a patient.  Each of the Asserted Patents has been duly and legally issued, is valid and enforceable pursuant to 35 U.S.C. § 282 and all right, title and interest is solely owned by Plaintiff Dr. Jackson.

8.      Plaintiff Dr. Jackson has satisfied the requirements of 35 U.S.C. § 287(a).  As Dr. Jackson does not manufacture and sell products covered by the Asserted Patents, he himself does not have an obligation under § 287(a) to mark.  However, Dr. Jackson has granted licenses to certain of the Asserted Patents and those licensees are obligated to mark products they manufacture or sell covered by the licensed patents, and to Dr. Jackson's knowledge do so.  Moreover, Dr. Jackson, as detailed below, provided actual notice to Defendant on or before March 7, 2019.

75062127.4

9.      Furthermore, Plaintiff Dr. Jackson provided actual notice of the Asserted Patents to Defendant NuVasive prior to the filing of this Complaint, as detailed below.

### *U.S. Patent No. 8,353,932*

10.     Plaintiff owns all right, title and interest in U.S. Patent No. 8,353,932 (the `932 patent), entitled "Polyaxial Bone Anchor Assembly with One-Piece Closure, Pressure Insert and Plastic Elongate Member." The `932 patent duly and lawfully issued on January 15, 2013, with Roger Jackson as the sole named inventor. The `932 patent issued from Application No. 12/229,207, which was filed on August 20, 2008 and on its face ultimately claims priority to a collection of non-provisional applications and provisional applications, the earliest of which is U.S. Provisional Application 60/722,300, filed on September 30, 2005. A true and correct copy of the `932 patent is attached hereto as **Exhibit 1**.

### *U.S. Patent No. 8,696,711*

11.     Plaintiff owns all right, title and interest in U.S. Patent No. 8,696,711 (the `711 patent), entitled "Polyaxial Bone Anchor Assembly with One-Piece Closure, Pressure Insert and Plastic Elongate Member." The `711 patent duly and lawfully issued on April 15, 2014, with Roger Jackson as the sole named inventor. The `711 patent issued from Application No. 13/507,802, which was filed on July 30, 2012 and on its face ultimately claims priority to a collection of non-provisional applications and provisional applications, the earliest of which is U.S. Provisional Application 60/722,300, filed on September 30, 2005. A true and correct copy of the `711 patent is attached hereto as **Exhibit 2**.

### *U.S. Patent No. 9,788,866*

12.     Plaintiff owns all right, title and interest in U.S. Patent No. 9,788,866 (the `866 patent), entitled "Polyaxial Bone Screw with Shank Articulation Pressure Insert and Method." The `866 patent duly and lawfully issued on October 17, 2017, with Roger Jackson as the sole named inventor. The `866 patent issued from Application No. 15/401,618, which was filed on January 9, 2017 and on its face ultimately claims priority to U.S. Application No. 11/140,343, filed on May 27, 2005. A true and correct copy of the `866 patent is attached hereto as **Exhibit 3**.

75062127.4

*U.S. Patent No. 10,335,200*

13.     Plaintiff owns all right, title and interest in U.S. Patent No. 10,335,200 (the `200 patent), entitled "Pivotal Bone Anchor Assembly with Twist-In-Place Insert Having Alignment Notches."  The `200 patent duly and lawfully issued on July 2, 2019, with Roger Jackson as the sole named inventor.  The `200 patent issued from Application No. 15/940,343, which was filed on March 29, 2018 and on its face ultimately claims priority to U.S. Provisional Application No. 60/995,083, file on September 17, 2007.  A true and correct copy of the `200 patent is attached hereto as **Exhibit 4**.

*U.S. Patent No. 10,561,444*

14.     Plaintiff owns all right, title and interest in U.S. Patent No. 10,561,444 (the `444 patent), entitled "Pivotal Bone Anchor Assembly With Twist-In-Place Insert Having Radially Offset Receiver Engaging Structures."  The `444 patent duly and lawfully issued on February 18, 2020, with Roger Jackson as the sole named inventor.  The `444 patent issued from Application No. 16/411,826, which was filed on May 14, 2019 and on its face ultimately claims priority to U.S. Provisional Application No. 60/994,083 filed on September 17, 2007. A true and correct copy of the `444 patent is attached hereto as **Exhibit 5**.

*U.S. Patent No. 10,722,273*

15.     Plaintiff owns all right, title and interest in U.S. Patent No. 10,722,273, the (`273 patent), entitled "Bone Anchor Assembly with Twist-In-Place Pressure Insert."  The `273 patent duly and lawfully issued on July 28, 2020, with Roger Jackson as the sole named inventor.  The `273 patent issued from Application No. 16/371,423, which was filed on April 1, 2019 and on its face ultimately claims priority to Application No. 11/140,343, filed on May 27, 2005.  A true and correct copy of the `273 patent is attached hereto as **Exhibit 6**.

*U.S. Patent No. 9,808,292*

16.     Plaintiff owns all right, title and interest in U.S. Patent No. 9,808,292 (the `292 patent), entitled "Cannulated Polyaxial Screw."  The `292 patent duly and lawfully issued on November 7, 2017, with Roger Jackson as the sole named inventor.  The `292 patent issued from

4

75062127.4

Application No. 14/868,213, which was filed on September 28, 2015 and on its face ultimately claims priority to Application No. 10/464,633, filed on June 18, 2003. A true and correct copy of the `292 patent is attached hereto as **Exhibit 7**.

### *U.S. Patent No. 10,441,319*

17.     Plaintiff owns all right, title and interest in U.S. Patent No. 10,441,319 (the `319 patent), entitled "Pivotal Bone Anchor with Tool Engagement Grooves and Break-Off Extensions." The `319 patent duly and lawfully issued on October 15, 2019, with Roger Jackson and James Surber as the named inventors. The `319 patent issued from Application No. 15/663,316, which was filed on July 28, 2017 and on its face ultimately claims priority to a collection of non-provisional applications and provisional applications, the earliest of which is U.S. Provisional Application No. 61/268,708, filed on June 15, 2009. A true and correct copy of the `319 patent is attached hereto as **Exhibit 8**.

### **NUVASIVE'S UNAUTHORIZED USE OF THE ASSERTED PATENTS**

18.     NuVasive is a publicly traded medical device company listed on the NASDAQ and based in San Diego, California.

19.     According to the NuVasive 10-K, dated December 31, 2019, NuVasive is "a leading medical device company in the global spine surgery market, focused on developing minimally disruptive surgical products and procedurally integrated solutions for spine surgery. [NuVasive's] currently marketed product portfolio focuses on applications for spine fusion surgery, including ancillary products and services used to aid in the surgical procedure." *See* NuVasive 10-K, p. 44.

20.     NuVasive's website states that "[t]hrough the integration of industry-leading procedures and enabling technologies, we advance the standard of care to help hundreds of thousands of patients each year. Our commitment is to deliver the safest, most efficient technology in the OR to help improve clinical and economic outcomes." *See* "Transform outcomes through best-in-class technology," nuvasive.com/about (retrieved September 24, 2020).

75062127.4

21.     NuVasive's business strategy centers on the "Maximum Access Surgery" platform, referred to by NuVasive as the "MAS" platform.  According to the NuVasive 10-K filing, NuVasive's "procedurally integrate[d] solutions use innovative, technological advancements and a minimally disruptive surgical platform called Maximum Access Surgery, or MAS, to provide surgical efficiency, operative reliability, and procedural versatility.  For the year ended December 31, 2019, [NuVasive] generated global revenues of $1.17 billion, including sales in more than 50 countries."  *See* NuVasive 10-K, at p. 3.

22.     Of NuVasive's 2019 revenue of $1.17 billion dollars, approximately $850 million dollars of revenue was generated by NuVasive's "Spinal Hardware," which NuVasive describes as including NuVasive's "implants and fixation products."  *See* NuVasive 10-K, at p. 50.

23.     While the MAS platform has many complementary components, crucial components of the system include implants: "[NuVasive] offer[s] a range of implants for spinal surgery, which include … fixation products such as customizable rods, plates and screws."  *See* NuVasive 10-K, at p. 3.  NuVasive further explains that it has "many implants and fixation products designed to be used with our MAS platform….  Our fixation offerings include our VuePoint, Armada, Precept and Reline posterior fixation portfolios."  *See Id.*, at p. 7.

24.     Central to NuVasive's strategy, NuVasive plans to "[e]stablish our MAS Platform as the Standard of Care," while at the same time "Continu[ing] to Develop and Introduce Procedurally Integrated Solutions and New Innovative Products" with a focus on "protect[ing] and defend[ing] the intellectual property related to our innovative products."  *See* NuVasive 10-K, at p. 4.

25.     However, NuVasive recognizes and accepts that its supposedly "innovative products" may include components and enabling technologies and methodologies that may be covered by the intellectual property of third parties, in particular, competitors: Nuvasive "products and methods may be covered by patents held by our competitors."  *See* NuVasive 10-K, at p. 11.  To mitigate this risk, NuVasive strategically attempts to "Selectively License or Acquire Complementary Products and Technology."  *See Id.*, at p. 5.

26.     Indeed, in 2008 NuVasive executed a "Development and License Agreement" with Dr. Jackson covering certain aspects of the intellectual property developed by Dr. Jackson or licensed by Dr. Jackson.   Under this agreement, Dr. Jackson granted NuVasive patent rights relating to certain polyaxial screw components, certain minimal and less invasive surgery tools and techniques as well as relating to certain implants incorporating closure tops having helical flanges and with or without break-off extensions or tabs.   These patent rights were granted in exchange for an upfront royalty payment and a running royalty based on net sales.

27.     In 2014, the "Development and License Agreement" was replaced with the "Amended and Restated Development and License Agreement."   Under this new agreement, Dr. Jackson assigned some patent rights to NuVasive that Dr. Jackson had only licensed to NuVasive under the 2008 agreement.   Further, Dr. Jackson granted NuVasive additional licenses generally relating to "Helical Flange" products, to "BOT Implant" products and to "Instruments and Methodologies," as those terms and embodiments are defined in the new agreement.   Additionally, Dr. Jackson granted NuVasive covenants not-to-sue either NuVasive or its direct and indirect customers relating to its spinal systems and products incorporating and utilizing the MIS (Tools) IP, Top Notch (Receivers) IP, Helical Flange, BOT Implants, Instruments, Methodologies, Polyaxial Screw (with Compound Articulating Retainers) IP or "Related System Components," as those terms and embodiments are defined by the new agreement.   In exchange for these rights, NuVasive made a one-time payment to Dr. Jackson, but was no longer required to pay a running royalty.

28.     Neither the original 2008 agreement nor the later 2014 agreement granted NuVasive rights to *all* of Dr. Jackson's enabling device technologies for certain spinal implants. For example, the Asserted Patents involve enabling device technologies not covered by either the 2008 or 2014 agreements.   And, on March 7, 2019, Dr. Jackson offered NuVasive additional license rights to the technologies and embodiments claimed by the Asserted Patents in a letter sent to Michael Doyle, then NuVasive's Vice President and Chief Intellectual Property Counsel.

29.     In that March 7, 2019 letter, Dr. Jackson specifically offered to license "various patent families" directed to a "non-threaded, twist-in-place insert for a polyaxial screw ('TIP Insert Technology') and a cannulated polyaxial screw ('Cannulated Polyaxial Screw Technology')."

30.     By March 7, 2019, Dr. Jackson had become aware that his enabling TIP Insert Technology was being used in *at least* the Armada, Precept and Reline product line systems of NuVasive and for which NuVasive required a license.

31.     The March 7, 2019 letter specifically identified: U.S. Patent No. 8,353,932; U.S. Patent No. 9,788,866; U.S. Patent No. 10,335,200; U.S. Patent No. 9,808,292; and, U.S. Patent No. 10,441,319; among others.  These patents were directly and specifically called out by patent number or by application serial number.

32.     Other patents were identified more indirectly.  In the case of U.S. Patent No. 10,561,444 and U.S. Patent No. 10,722,273, these patents were identified indirectly as they are members of Dr. Jackson's "various patent families" relating to "TIP Insert Technology." Moreover, these patents are the descendants of other patents that were specifically identified by serial number.  For example, U.S. Patent No. 8,696,711 is based on a continuation of U.S. Patent No. 8,353,932.  Likewise, U.S. Patent No. 10,561,444 is based on a continuation of U.S. Patent No. 10,335,200.  Similarly, U.S. Patent No. 10,722,273 is based on a continuation of U.S. Patent No. 9,788,866.

33.     NuVasive declined to discuss additional license rights with Dr. Jackson. Accordingly, NuVasive lacks the necessary additional license rights offered by Dr. Jackson that would allow NuVasive to lawfully manufacture, distribute and offer for sale and sell certain of its implant products, such as the products accused of infringement herein.

34.     Collectively, at this time, the NuVasive Armada, Precept, Reline, SpheRx, SpheRx II, SpheRx III and VuePoint screw products constitute the known "Accused Products" and infringe one or more claims of the Asserted Patents as set forth below.

35.     Generally, each of the Accused Products known to Dr. Jackson at this time, is designed, manufactured and sold by NuVasive to treat one of several spinal conditions, such as

75062127.4

Cervical and Lumbar Degenerative Disc Disease, Lumbar Spinal Stenosis, Degenerative and Lytic Spondylolisthesis, Degenerative Scoliosis and other Deformities, Back Pain and Early Onset Scoliosis, trauma and other spinal conditions.   One common denominator in each of these conditions, as well as some additional conditions, is that each can potentially be treated through the mechanical stabilization or fixation of one or more vertebrae of a patient involved in these types of spinal conditions.

36.     Importantly, one or more of the Accused Products can be sold in at least two states of relative assembly — "modular" and "fully assembled."   Modular screws are those assemblies that are shipped from NuVasive with a receiver assembly having an installed retainer and a twist-in-place insert engageable with a rod, while the shank is not attached to the receiver assembly. This permits the surgeon to utilize shanks of different types or lengths with the pre-assembled receiver, retainer and insert.   Among other benefits, this modular assembly saves time by not requiring the surgeon to assemble various components, while retaining some flexibility as to the shank, cannulated or not.   Alternatively, fully assembled screws sold by NuVasive include a pre-assembled shank in addition to the receiver, retainer and insert.   This fully assembled screw saves the surgeon additional time with the trade-off of some flexibility.   Fully assembled screws can more readily provide a pre-lock friction fit feature with the twist-in-place insert engaging the shank.

37.     As detailed below, both the modular and fully assembled states infringe the asserted claims.   As detailed below, fully assembled screws directly infringe all claims pursuant to 35 U.S.C. § 271(a) while the modularly assembled screws directly infringe certain claims under § 271(a), while indirectly infringing other claims under § 271(b).

### The NuVasive Armada Product:

38.     NuVasive describes the "Armada spinal system [as being] designed for surgeons treating multiple pathologies, ranging from low-back, degenerative conditions to complex spinal deformities."   *See* NuVasive's "Armada Vertebral Body Derotation Technique Guide", attached hereto as **Exhibit 9**, at p. 1.   According to NuVasive, "Armada provides sophisticated instruments

and implants that integrate seamlessly to work in concert with the most advanced surgical techniques." *See* Id.  The Armada "system is designed to be extremely rigid, yet easily assembled and disassembled to adapt to surgeons' various techniques in the correction of rotational deformities." *See* Id.  The Armada spinal system provides a wide array of screw implant offerings, including modular and fully assembled screws some with a pre-lock friction fit feature.

39.    NuVasive manufactures, offers for sale and sells the Armada system in a series of "Instrument Trays," where each tray is designed to include the various implants, instruments and components necessary to perform a variety of spinal procedures, as shown below:



**EQUIPMENT REQUIREMENTS**
- Armada 5.5mm Degenerative Instruments, Tray One
- Armada 5.5mm Degenerative Instruments, Tray Two
- Armada 5.5mm Deformity Instruments, Tray One
- Armada 5.5mm Deformity Instruments, Tray Two
- Armada 5.5mm Titanium Degenerative Implants Tray
- Armada Vertebral Body Derotation Tray
- Armada Rod Cutter Tray
- C-Arm Fluoroscope
- Radiolucent Surgical Table
- NVM5*

**OPTIONAL:**
- Armada 5.5mm Titanium Cross Connector Tray
- Armada 5.5mm Titanium Reduction Screw Implants Tray
- Armada 5.5mm Titanium Uniplanar Implants Tray
- Armada 5.5mm Titanium Reduction Uniplanar Implants Tray
- Armada 5.5mm Titanium Fixed Screws & Hooks
- Armada 5.5mm Titanium Iliac Implants Tray
- Armada 5.5mm Titanium Deformity Implants Tray
- Armada 5.5mm Titanium Extended Polyaxial Implants Tray
- Armada 5.5mm Titanium Long Rod Implants Tray

**Exhibit 9**, at pp. 2 (left), 16 (right).

40.     NuVasive recommends several styles of implant screws for use in its Armada system, including "Fixed Screws," "Uniplanar Screws" and/or "Provisional Locking Screws." **Exhibit 9**, at p.  2.  The "Provisional Locking Screws" in particular are described as "providing the flexibility of a polyaxial screw with the corrective capability of a fixed screw," as depicted below:



*See* Id. at p. 2 (left); *see also* NuVasive's "Grandes Aplicacoes com Processo Sofisticado," at p. 6 (right), hereinafter **Exhibit 25**.  Upon information and belief, such polyaxial screws can be sold "modular" and "fully assembled."

41.     Further, the Armada system makes use of cylindrical rods that connect multiple bone anchors, as shown below:



**Exhibit 9**, at p. 4.

42. The rod-engaging inserts used in the bone anchors of the Armada system, upon information and belief, have a top surface with a pair of tool interface notches or slots so that they can be twisted or rotated in place within the receiver until outer surfaces of the insert become engaged with inner surfaces of the receiver to inhibit further movement of the insert relative to the receiver.

*The NuVasive Precept Product:*

43. Similarly, to the Armada product, discussed above, NuVasive describes the Precept spinal system as "consist[ing] of a variety of polyaxial screws, reduction screws, offset connectors, rods, locking nuts, and transverse connectors." *See* NuVasive "Special 510k Premarket Notification – NuVasive Precept Spinal System," attached hereto as **Exhibit 10**, p. 1. "Implant components can be rigidly locked into a variety of different configurations to suit the individual pathology and anatomical conditions of the patient." *See* Id.

44. Depicted below, the Precept product is in various stages and views of implantation:




Precept® - Practical, Elegant MAS® Fixation
• Market Differentiating Implant Design
• Advanced Guide Technology
• Refined Rod Passage
• Elegant Reduction Options
• Powerful Compression/Distraction
• Multifunctional Instruments to Reduce Steps

*Recommended if fewer than maximum number of screws accommodated by the Brigade implant are used.*




*See* NuVasive "Brigade Standalone ALIF Surgical Technique" attached hereto as **Exhibit 11**, at

12

p. 3 (top); *see also* Screenshot from "MAS Fixation Patient Education Animation" dated January 10, 2019 by "NuVasiveInc" channel, www.youtube.com/watch?v=LC2Y5jT9RQU (retrieved September 24, 2020) at 0:49 (bottom left), at 1:46 (bottom right).  Upon information and belief, Precept screws can be sold "modular" and "fully assembled."

45.    The rod-engaging inserts used in the bone anchors of the Precept system, upon information and belief, have a top surface with tool interface notches or slots so that they can be twisted or rotated in place within the receiver until outer surfaces of the insert become engaged with inner surfaces of the receiver to inhibit further movement of the insert relative to the receiver. The Precept screw shank is cannulated and the shank head is engaged by the insert.

### *The NuVasive Reline Product:*

46.    NuVasive states "[t]he Reline portfolio represents an evolution of posterior fixation technology designed to facilitate the preservation and restoration of patient alignment, while addressing a vast array of spinal pathologies from an open, MAS®, or hybrid approach." *See* https://www.nuvasive.com/procedures/featured-offerings/reline/ (retrieved October 12, 2020). The Reline suite of instrumentation is designed for procedural versatility with its implants accommodating multiple rod diameters and materials. *See* Id.  Upon information and belief, NuVasive has manufactured, offered for sale and sold at least two versions of the Reline product, Reline I and Reline II.  Collectively, these products will be referred to simply as the "Reline" product for the purposes of the allegations of this Complaint unless otherwise specified.

75062127.4

47.     As depicted below, with post-operative lateral and frontal radiographs, the NuVasive Reline product is shown installed in a patient:



*See* NuVasive's "Medialized Minimally Disruptive Procedure Newsletter" for March 29, 2018, attached hereto as **Exhibit 12**, at p. 1.

48.     Further, as depicted below, the NuVasive Reline system is shown in a separate or stand-alone configuration as would be installed in a patient (left) and also with some of the instruments used to install and adjust the Reline implants (right):



*See* Nuvasive's "An Introduction to Posterior Fixation for the Thoracolumbar Spin," copyright

14

2017, attached hereto as **Exhibit 13**, at p.7 (left); *see also* www.nuvasive.com/wp-content/uploads/2017/02/iga_obro_i_reline_rod_screws.png (retrieved September 24, 2020) (right).  The rod-engaging inserts used in the bone anchors of the Reline system, upon information and belief, have a top surface with tool interface notches or slots so that they can be twisted or rotated in place within the receiver until outer surfaces of the insert become engaged with inner surfaces of the receiver to inhibit further movement of the insert relative to the receiver.  Further, upon information and belief, the Reline screws can be sold "modular" and "fully assembled."

### *The NuVasive SpheRx Products:*

49.      NuVasive describes the SpheRx system as being "[d]esigned for and dedicated to open pedicle screw fixation." *See* NuVasive's "SpheRx II Unique Spherical Rod Design", copyright 2014, attached hereto as **Exhibit 14**, at p. 1. The system includes polyaxial screws that couple with both spherical end rods and conventional cylindrical rods. Utilizing the spherical end rods permits "[n]o rod overhang at the superior end of the construct[.]" *See* Id.  Such a design "[m]inimize[s] incidence of adjacent level disease and facet joint impingement." *See* Id.

50.      Upon information and belief, NuVasive has manufactured, offered for sale and sold three versions of the polyaxial screws for the SpheRx system, namely the SpheRx or SpheRx DBR, SpheRx II or SpheRx DBR II, and SpheRx III or SpheRx DBR III, with an apparent substantial design change being made between the SpheRx and SpheRx II/III polyaxial screws.  Respectively, these products will be referred to as the "SpheRx" and "SpheRx II/III" products for the purposes of the allegations of this Complaint to reflect this design change unless otherwise specified.

51.      At least one version of the SpheRx screw products have a cannulated polyaxial screw, a non-pivoting retainer, and an insert held in place by crimps with surfaces configured to accommodate both spherical and cylindrical end rods.

52.     Depicted below, a pair of SpheRx screws are shown partially assembled with a rod having spherical ends (*i.e.* a dual ball rod (DBR) connector) and shown in one of its various polyaxial configurations:



*See* NuVasive's SEC Filing entitled "Amendment No. 1 to Form S-3" dated January 23, 2006, ir.nuvasive.com/node/10691/html at p. 3 (retrieved September 24, 2020).

53.     The SpheRx II/III screw products, upon information and belief, have a compound articulation-type retainer and a twist-in-place insert with two upwardly facing surfaces to accommodate both spherical and cylindrical end rods.  Upon information and belief, the rod-engaging inserts used in the bone anchors of the SpheRx II/III systems have a top surface with tool interface notices or slots so that they can be twisted or rotated in place within the receiver until outer surfaces of the insert become engaged with inner surfaces of the receiver to inhibit further movement of the insert relative to the receiver.

54.     Depicted below, the SpheRx DBR II and SpheRx DBR III screw (as they share a receiver design) are shown assembled using a spherical end (ball) rod (left) and shown assembled in various polyaxial configurations (right):

 

See **Exhibit 14** at p. 2.  Upon information and belief, the SpheRx screws can be sold "modular" and "fully assembled."

### *The NuVasive VuePoint Product:*

55.     NuVasive describes its VuePoint (hereinafter "VuePoint") screw products comprise a system that provides: "[c]olor-coded, friction-fit, polyaxial screw heads [that] promote easy identification and handling." *See* NuVasive's "VuePoint II Technique Guide," copyright 2015 attached hereto as **Exhibit 26**, at p. 3.  Upon information and belief, NuVasive has manufactured, offered for sale and sold two versions of the VuePoint Product, the VuePoint I and VuePoint II.  Collectively, these products will be referred to as the "VuePoint" product for the purposes of the allegations of this Complaint unless otherwise specified.

56.     The NuVasive VuePoint screw products can include polyaxial screw configurations.  As depicted below, VuePoint's polyaxial screw products can be configured with a 40/40° degrees of angulation and an 80° conical sweep.  *See* Id. at p. 12.

57.     Further, as depicted below, NuVasive highlights the advantages of the VuePoint's friction-fit feature during installation.  According to NuVasive, friction fit "helps eliminate head flop, which is potentially troublesome when aligning a multi-level construct."   *See* Id. at p. 16; *see also:*



*See* Id. at pp. 10 (left), 14 (right).  Upon information and belief, VuePoint screws are sold "fully assembled" in which the rod-engaging insert, having a top surface with tool interface notches or slots, will have been twisted or rotated in place within the receiver until outer surfaces of the insert will have become engaged with inner surfaces of the receiver and a bottom surface of the insert engaged with the shank head to establish the pre-lock friction fit.

<u>COUNT ONE</u>

**Infringement of the `932 Patent**

58.     Plaintiff repeats and realleges as if fully set forth herein, the allegations contained in all the preceding paragraphs ¶¶ 1 through 57.

59.     As set forth below, NuVasive has infringed and continues to infringe one or more claims of the `932 patent under 35 U.S.C. § 271 by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority the Armada, Precept, Reline, SpheRx II/III as well as the VuePoint screw products:

60.     Specifically, the Armada screw products comprise a "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connection member" as set forth in claim 1 of the `932 patent when certain components of the Armada screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 15** details how these assembled components of the Armada screw product directly infringe *at least* claims 1, 22, 31 and 32 of the `932 patent by satisfying each and every limitation of those claims, either literally or under the doctrine of equivalents.

61.     Further, when certain components of the Armada screw products are implanted by a surgeon in order to treat one of several spine conditions the Armada screw products also directly infringe *at least* claims 1, 22, 31 and 32 of the `932 patent.

62.     Specifically, the Precept screw products comprise a "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member" as set forth in claim 1 of the `932 patent when certain components of the Precept screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 15** details how these assembled components of the Precept screw products directly infringes *at least* claims 1, 22, 31 and 32 of the `932 patent by satisfying each and every limitation those claims, either literally or under the doctrine of equivalents.

63.     Further, when the certain components of the Precept screw products are implanted by a surgeon in order to treat one of several spine conditions the Precept screw products also directly infringe *at least* claims 1, 22, 31 and 32 of the `932 patent.

64.     Specifically, the Reline screw products comprise a "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member" as set forth in claim 1 of the `932 patent when certain components of the Reline screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 15**, details how these assembled components of the Reline product directly infringes *at least* claims 1, 22, 31 and 32 of the `932 patent by satisfying each and every limitation of those claims, either literally or under the doctrine of equivalents.

65.     Further, when the certain components of the Reline screw products are implanted by a surgeon in order to treat one of several spine conditions the Reline screw products also directly infringe *at least* claims 1, 22, 31 and 32 of the `932 patent.

66.     Specifically, the SpheRx II/III screw product comprise a "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member" as set forth in claim 1 of the `932 patent when certain components of the  SpheRx II/III screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 15**, details how these assembled components of the SpheRx II/III screw products directly infringe *at least* claims 1, 22, 31 and 32 of the `932 patent by satisfying each and every limitation of those claims, either literally or under the doctrine of equivalents.

67.     Further, when certain components of the SpheRx II/III screw products are implanted by a surgeon in order to treat one of several spine conditions the SpheRx II/III screw products also directly infringe *at least* claims 1, 22, 31 and 32 of the `932patent.

68.     Specifically, the VuePoint  screw product comprise a "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member" as set forth in claim 1 of the `932 patent when certain components of the VuePoint  screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 16**, details how these assembled components of the VuePoint screw products directly infringe *at least* claim 1 of the `932 patent by satisfying each and every limitation of claim 1, either literally or under the doctrine of equivalents.

69.     Further, when certain components of the VuePoint screw products are implanted by a surgeon in order to treat one of several spine conditions the VuePoint screw products also directly infringe *at least* claim 1 of the `932 patent.

70.     NuVasive had actual knowledge of the `932 patent and NuVasive's unauthorized use thereof as Dr. Jackson offered a license to NuVasive under the `932 patent – including specifically claim 1 on or about March 7, 2019.  Further, NuVasive, upon information and belief, has the specific intent to encourage surgeons to directly infringe *at least* claims 1, 22, 31 and 32

75062127.4

of the `932 patent by using and/or assembling certain components of the Armada, Precept, Reline and SpheRx II/III, respectively, as discussed above.  Also, NuVasive, upon information and belief, has the specific intent to encourage surgeons to directly infringe *at least* claim 1 of the `932 patent by using and/or assembling certain components of the VuePoint screw products, as discussed above.  NuVasive provides the components used in the completed medical implant assembly for the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products along with instructions and tools to accomplish this assembly.  Consequently, NuVasive induces the infringement of the `932 patent through at least its unauthorized sales of the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products pursuant to 35 U.S.C. § 271(b).

71.     NuVasive's Armada, Precept, Reline, SpheRx II/III and VuePoint screw products and their systems can be sold partially disassembled in their constituent components as part of surgical trays.  These components, such as the "longitudinal connecting member," "shank," "compression insert," etc., as claimed, comprise material components of the "medical implant assembl[ies]" of *at least* claim 1, and are designed, configured and adapted to work with each other and have no substantial purpose other than as part of infringing devices and are accordingly not staple articles of commerce.  Consequently, NuVasive contributes to the infringement of the `932 patent through at least its unauthorized sales of the surgical trays incorporating the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products pursuant to 35 U.S.C. § 271(c).

72.     As outlined above, under the totality of the circumstances, NuVasive's infringement of the `932 patent is willful from at least the date of Dr. Jackson's letter of March 7, 2019 offering NuVasive a license to the `932 patent – an offer that NuVasive rejected.

## COUNT TWO

### Infringement of the `711 Patent

73.     Plaintiff repeats and realleges as if fully set forth herein, the allegations contained in all the preceding paragraphs ¶¶ 1 through 72.

74.     As set forth below, NuVasive has infringed and continues to infringe one or more claims of the `711 patent under 35 U.S.C. § 271 by manufacturing, providing, selling, offering to

sell, importing and/or distributing without authority the Armada, Precept, Reline, and VuePoint screw products:

75.     Specifically, the Armada screw products comprise a "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connection member" as set forth in claim 1 of the `711 patent when certain components of the Armada screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 17** details how these assembled components of the Armada screw products directly infringes *at least* claim 1 of the `711 patent by satisfying each and every limitation of claim 1, either literally or under the doctrine of equivalents.

76.     Further, when the components of the Armada screw products are implanted by a surgeon in order to treat one of several spine conditions the Armada screw products also directly infringe *at least* claim 1 of the `711 patent.

77.     Specifically, the Precept screw products comprise a "medial implant assembly having at least one polyaxial bone screw attached to a longitudinal connection member" as set forth in claim 1 of the `711 patent when certain components of the Precept screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 17** details how these assembled components of the Precept screw products directly infringe *at least* claim 1 of the `711 patent by satisfying each and every limitation of claim 1, either literally or under the doctrine of equivalents.

78.     Further, when the certain components of the Precept screw products are implanted by a surgeon in order to treat one of several spine conditions the Precept screw products also directly infringe *at least* claim 1 of the `711 patent.

79.     Specifically, the Reline screw products comprise a "medial implant assembly having at least one polyaxial bone screw attached to a longitudinal connection member" as set forth in claim 1 of the `711 patent when certain components of the Reline screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 17** details how these assembled components of the Reline screw products

22

directly infringe *at least* claim 1 of the `711 patent by satisfying each and every limitation of claim 1, either literally or under the doctrine of equivalents.

80.    Further, when the certain components of the Reline screw products are implanted by a surgeon in order to treat one of several spine conditions the Reline screw products also directly infringe *at least* claim 1 of the `711 patent.

81.    Specifically, the VuePoint screw products comprise a "medial implant assembly having at least one polyaxial bone screw attached to a longitudinal connection member" as set forth in claim 1 of the `711 patent when certain components of the VuePoint screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 17** details how these assembled components of the VuePoint screw products directly infringe *at least* claim 1 of the `711 patent by satisfying each and every limitation of claim 1, either literally or under the doctrine of equivalents.

82.    Further, when the certain components of the VuePoint screw products are implanted by a surgeon in order to treat one of several spine conditions the VuePoint screw products also directly infringe *at least* claim 1 of the `711 patent.

83.    NuVasive had or should have had actual knowledge of the `711 patent and NuVasive's unauthorized use thereof as Dr. Jackson offered a license to NuVasive under the family of patents that included the `711 on or about March 7, 2019.  Further, NuVasive, upon information and belief, has the specific intent to encourage surgeons to directly infringe *at least* claim 1 of the `711 patent by using and/or assembling components of the Armada, Precept, Reline and VuePoint screw products, respectively, as discussed above.  NuVasive provides the components used in the completed medical implant assembly for the Armada, Precept, Reline and VuePoint screw products along with instructions and tools to accomplish this assembly. Consequently, NuVasive induces the infringement of the `711 patent through at least its unauthorized sales of the Armada, Precept, Reline and VuePoint screw products pursuant to 35 U.S.C. § 271(b).

75062127.4

84.     Further, NuVasive's Armada, Precept, Reline and VuePoint screw products and their systems can be sold partially disassembled in their constituent components as part of surgical trays.  These components, such as the "longitudinal connecting member," "shank," "receiver," "compression insert," etc., as claimed, comprise material components of the "medical implant assembly" of *at least* claim 1, and are designed, configured and adapted to work with each other and have no substantial purpose other than as part of infringing devices and are accordingly not staple articles of commerce.  Consequently, NuVasive contributes to the infringement of the `711 patent through at least its unauthorized sales of the surgical trays incorporating the Armada, Precept, Reline and VuePoint screw products pursuant to 35 U.S.C. § 271(c).

85.     As outlined above, under the totality of the circumstances, NuVasive's infringement of the `711 patent is willful from at least the date of Dr. Jackson's letter of March 7, 2019 offering NuVasive a license to the `711 patent – an offer that NuVasive rejected.

## COUNT THREE

### Infringement of the `866 Patent

86.     Plaintiff repeats and realleges as if fully set forth herein, the allegations contained in all the preceding paragraphs ¶¶ 1 through 85.

87.     As set forth below, NuVasive has infringed and continues to infringe one or more claims of the `866 patent under 35 U.S.C. § 271 by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority the Armada, Precept, Reline and SpheRx II/III screw products:

88.     Specifically, the Armada screw products comprise a "bone anchor assembly for securing an elongate rod to a bone" as set forth in claim 1 of the `866 patent when certain components of the Armada product are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 18** details how these assembled components of the Armada screw products directly infringe *at least* claims 1 and 9 of the `866 patent by satisfying each and every limitation of those claims, either literally or under the doctrine of equivalents.

89.     Further, when the certain components of the Armada screw products are implanted by a surgeon in order to treat one of several spine conditions the Armada screw products also directly infringe *at least* claims 1 and 9 of the `866 patent.

90.     Specifically, the Precept screw products comprise a "bone anchor assembly for securing an elongate rod to a bone" as set forth in claim 1 of the `866 patent when certain components of the Precept screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 18** details how these assembled components of the Precept screw products directly infringe *at least* claims 1 and 9 of the `866 patent by satisfying each and every limitation of those claims, either literally or under the doctrine of equivalents.

91.     Further, when the certain components of the Precept screw products are implanted by a surgeon in order to treat one of several spine conditions the Precept screw products also directly infringe *at least* claims 1 and 9 of the `866 patent.

92.     Specifically, the Reline screw products comprise a "bone anchor assembly for securing an elongate rod to a bone" as set forth in claim 1 of the `866 patent when certain components of the Reline screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 18**, details how these assembled components of the Reline screw products directly infringe *at least* claims 1 and 9 of the `866 patent by satisfying each and every limitation of those claims, either literally or under the doctrine of equivalents.

93.     Further, when the certain components of the Reline screw products are implanted by a surgeon in order to treat one of several spine conditions the Reline screw products also directly infringe *at least* claims 1 and 9 of the `866 patent.

94.     Specifically, the SpheRx II/III screw products comprise a "bone anchor assembly for securing an elongate rod to a bone" as set forth in claim 1 of the `866 patent when certain components of the  SpheRx II/III screw products are implanted by a surgeon in order to treat one of several spine conditions.  The claim chart attached hereto as **Exhibit 18**, details how these

assembled components of the SpheRx II/III screw products directly infringe *at least* claims 1 and 9 of the `866 patent by satisfying each and every limitation of those claims, either literally or under the doctrine of equivalents.

95.     Further, when the certain components of the SpheRx II/III screw products are implanted by a surgeon in order to treat one of several spine conditions the SpheRx II/III screw products also directly infringe *at least* claims 1 and 9 of the `866 patent.

96.     NuVasive had actual knowledge of the `866 patent and NuVasive's unauthorized use thereof as Dr. Jackson offered a license to NuVasive under the `866 patent – including specifically claim 1 -- on or about March 7, 2019.  Further, NuVasive, upon information and belief, has the specific intent to encourage surgeons to directly infringe *at least* claims 1 and 9 of the `866 patent by using and/or assembling components of the Armada, Precept, Reline, SpheRx II/III screw products, respectively, as discussed above.  NuVasive provides the components used in the completed bone anchor assembly for the Armada, Precept, Reline, SpheRx II/III screw products along with instructions and tools to accomplish this assembly.  Consequently, NuVasive induces infringement of the `932 patent through at least its unauthorized sales of the Armada, Precept, Reline, SpheRx II/III screw products pursuant to 35 U.S.C. § 271(b).

97.     NuVasive's Armada, Precept, Reline SpheRx II/III screw products and their systems can be sold partially disassembled in their constituent components as part of surgical trays. These components, such as the "shank," "receiver," "retainer", etc., as claimed, comprise material components of the "bone anchor assembly for securing an elongate rod to a bone" of *at least* claims 1 and 9, and are designed, configured and adapted to work with each other and have no substantial purpose other than as part of infringing devices and are accordingly not staple articles of commerce.  Consequently, NuVasive contributes to the infringement of the `866 patent through at least its unauthorized sales of the surgical trays incorporating the Armada, Precept, Reline, SpheRx II/III screw products pursuant to 35 U.S.C. § 271(c).

98.     As outlined above, under the totality of the circumstances, NuVasive's infringement of the `866 patent is willful from at least the date of Dr. Jackson's letter of March 7, 2019 offering NuVasive a license to the `866 patent – an offer that NuVasive rejected.

## COUNT FOUR

### Infringement of the `200 Patent

99.     Plaintiff repeats and realleges as if fully set forth herein, the allegations contained in all the preceding paragraphs ¶¶ 1 through 98.

100.     As set forth below, NuVasive has infringed and continues to infringe one or more claims of the `200 patent under 35 U.S.C. § 271 by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products:

101.     Specifically, the Armada screw products comprise a "pivotal bone anchor assembly for securing an elongate rod to a bone via a closure top" as set forth in claim 1 of the `200 patent. The claim chart attached hereto as **Exhibit 19** details how the Armada screw products directly infringe *at least* claims 1 and 18 of the `200 patent by satisfying each and every limitation of those claims of the `200 patent either literally or under the doctrine of equivalents.

102.      Further, when certain components of the Armada screw products are implanted by a surgeon in order to treat one of several spine conditions the Armada screw products also directly infringe *at least* claims 1 and 18 of the `200 patent.

103.     Specifically, the Precept screw products comprise a "pivotal bone anchor assembly for securing an elongate rod to a bone via a closure top" as set forth in claim 18 of the `200 patent. The claim chart attached hereto as **Exhibit 19** details how the Precept screw products directly infringe *at least* claims 1 and 18 of the `200 patent by satisfying each and every limitation of those claims either literally or under the doctrine of equivalents.

104.     Further when certain components of the Precept screw products are implanted by a surgeon in order to treat one of several spine conditions the Precept screw products also directly infringe *at least* claims 1 and 18 of the `200 patent.

75062127.4

105.   Specifically, the Reline screw products comprise a "pivotal bone anchor assembly for securing an elongate rod to a bone via a closure top" as set forth in claim 1 of the `200 patent. The claim chart attached hereto as **Exhibit 19** details how the Reline screw products directly infringe *at least* claims 1 and 18 of the `200 patent by satisfying each and every limitation either literally or under the doctrine of equivalents.

106.   Further, when certain components of the Reline screw products are implanted by a surgeon in order to treat one of several spine conditions the Reline screw products also directly infringe *at least* claims 1 and 18 of the `200 patent.

107.   Specifically, the SpheRx II/III screw products comprise a "pivotal bone anchor assembly for securing an elongate rod to a bone via a closure top" as set forth in claim 1 of the `200 patent.  The claim chart attached hereto as **Exhibit 19** details how the SpheRx II/III screw products directly infringe *at least* claims 1 and 18 of the `200 patent by satisfying each and every limitation either literally or under the doctrine of equivalents.

108.   Further when certain components of the SpheRx II/III screw products are implanted by a surgeon in order to treat one of several spine conditions the SpheRx II/III screw products also directly *at least* infringe claims 1 and 18 of the `200 patent.

109.   Specifically, the VuePoint screw products comprise a "pivotal bone anchor assembly for securing an elongate rod to a bone via a closure top" as set forth in claim 18 of the `200 patent.  The claim chart attached hereto as **Exhibit 19** details how the VuePoint screw products directly infringe *at least* claims 1 and 18 of the `200 patent by satisfying each and every limitation either literally or under the doctrine of equivalents.

110.   Further when certain components of the VuePoint screw products are implanted by a surgeon in order to treat one of several spine conditions the VuePoint screw products also directly infringe *at least* claims 1 and 18 of the `200 patent.

111.   NuVasive had actual knowledge of the `200 patent and NuVasive's unauthorized use thereof as Dr. Jackson offered a license to NuVasive under the application that directly gave rise to the `200 patent on or about March 7, 2019.  Further, NuVasive, upon information and belief,

has the specific intent to encourage surgeons to directly infringe *at least* claims 1 and 18 of the `200 patent by using and/or assembling components of the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products, respectively, as discussed above.   NuVasive provides the components used in the completed pivotal bone anchor assembly for the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products along with instructions and tools to accomplish this assembly.   Consequently, NuVasive induces the infringement of the `200 patent through at least its unauthorized sales of the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products pursuant to 35 U.S.C. § 271(b).

112.   NuVasive's Armada, Precept, Reline, SpheRx II/III and VuePoint screw products and their systems can be sold partially disassembled in their constituent components as part of surgical trays.   These components, such as the "receiver," "shank", "pressure insert," etc., as claimed, comprise material components of the "pivotal bone anchor assembly for securing an elongate rod to a bone via a closure top" of *at least* claims 1 and 18 and are designed, configured and adapted to work with each other and have no substantial purpose other than as part of infringing devices and accordingly are not staple articles of commerce.   Consequently, NuVasive contributes to the infringement of the `200 patent through at least its unauthorized sales of the surgical trays incorporating the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products pursuant to 35 U.S.C. § 271(c).

113.   As outlined above, under the totality of the circumstances, NuVasive's infringement of the `200 patent is willful from at least the date of Dr. Jackson's letter of March 7, 2019 offering NuVasive a license to the `200 patent – an offer that NuVasive rejected.

## COUNT FIVE

### Infringement of the `444 Patent

114.   Plaintiff repeats and realleges as if fully set forth herein, the allegations contained in all the preceding paragraphs ¶¶ 1 through 113.

115.   As set forth below, NuVasive has infringed and continues to infringe one or more claims of the `444 patent under 35 U.S.C. § 271 by manufacturing, providing, selling, offering to

75062127.4

sell, importing and/or distributing without authority the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products:

116.    Specifically, the Armada screw products comprise a "pivotal bone anchor assembly for securing an elongate rod to a bone via a closure top" as set forth in claim 1 of the `444 patent. The claim chart attached hereto as **Exhibit 20** details how the Armada product satisfies each and every limitation of *at least* claim 1 of the `444 patent either literally or under the doctrine of equivalents.

117.    Further, when certain components of the Armada screw products are implanted by a surgeon in order to treat one of several spine conditions the Armada product also directly infringes *at least* claim 1 of the `444 patent.

118.    Specifically, the Precept screw products comprise a "pivotal bone anchor assembly for securing an elongate rod to a bone via a closure top" as set forth in claim 1 of the `444 patent. The claim chart attached hereto as **Exhibit 20** details how the Precept screw products satisfies each and every limitation of *at least* claim 1 of the `444 patent either literally or under the doctrine of equivalents.

119.    Further, when certain components of the Precept screw products are implanted by a surgeon in order to treat one of several spine conditions the Precept screw products also directly infringe *at least* claim 1 of the `444 patent.

120.    Specifically, the Reline screw products comprise a "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member" as set forth in claim 1 of the `444 patent.  The claim chart **Exhibit 20** details how the Reline screw products satisfies each and every limitation of *at least* claim 1 of the `444 patent either literally or under the doctrine of equivalents.

121.    Further, when certain components of the Reline screw products are implanted by a surgeon in order to treat one of several spine conditions the Reline screw products also directly infringe *at least* claim 1 of the `444 patent.

75062127.4

122.   Specifically, the SpheRx II/III screw products comprise a "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member" as set forth in claim 1 of the `444 patent.  The claim chart **Exhibit 20** details how the SpheRx II/III screw products satisfies each and every limitation of *at least* claim 1 of the `444 patent either literally or under the doctrine of equivalents.

123.   Further, when certain components of the SpheRx II/III screw products are implanted by a surgeon in order to treat one of several spine conditions the SpheRx II/III screw products also directly infringe *at least* claim 1 of the `444 patent.

124.   Specifically, the VuePoint screw products comprise a "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member" as set forth in claim 1 of the `444 patent.  The claim chart **Exhibit 20** details how the VuePoint screw products satisfies each and every limitation of *at least* claim 1 of the `444 patent either literally or under the doctrine of equivalents.

125.   Further, when certain components of the VuePoint screw products are implanted by a surgeon in order to treat one of several spine conditions the VuePoint screw products also directly infringe *at least* claim 1 of the `444 patent.

126.   NuVasive had or should have had actual knowledge of the `444 patent and NuVasive's unauthorized use thereof as Dr. Jackson offered a license to NuVasive under the family of patents that included the `444 patent on or about March 7, 2019.  Further, NuVasive, upon information and belief, has the specific intent to encourage surgeons to directly infringe *at least* claim 1 of the `444 patent by using and/or assembling components of the Armada, Precept, Reline screw products, respectively, as discussed above.  NuVasive provides the components used in the completed pivotal bone anchor assembly for the Armada, Precept, Reline, SpheRx II/III and VuePoint products along with instructions and tools to accomplish this assembly.  Consequently, NuVasive induces the infringement of the `444 patent through at least its unauthorized sales of the Armada, Precept,  Reline, SpheRx II/III and VuePoint products pursuant to 35 U.S.C. § 271(b).

75062127.4

127.    NuVasive's Armada, Precept, Reline, SpheRx II/III and VuePoint screw products and their systems can be sold partially disassembled in their constituent components as part of surgical trays.  These components, such as the "receiver," "shank," "pressure insert," etc., as claimed, comprise material components of at least the "pivotal bone anchor assembly for securing an elongate rod to a bone via a closure top" of *at least* claim 1 and the "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member" of claim 1 of the `444 patent, and are designed, configured and adapted to work with each other and have no substantial purpose other than as part of infringing devices and are accordingly not staple articles of commerce.  Consequently, NuVasive contributes to the infringement of the `444 patent through at least its unauthorized sales of the surgical trays incorporating the Armada, Precept, Reline, SpheRx II/III  and VuePoint screw products pursuant to 35 U.S.C. § 271(c).

128.    As outlined above, under the totality of the circumstances, NuVasive's infringement of the `444 patent is willful from at least the date of Dr. Jackson's letter of March 7, 2019 offering NuVasive a license to the `444 patent – an offer that NuVasive rejected.

## COUNT SIX

### Infringement of the `273 Patent

129.    Plaintiff repeats and realleges as if fully set forth herein, the allegations contained in all the preceding paragraphs ¶¶ 1 through 128.

130.    As set forth below, NuVasive has infringed and continues to infringe one or more claims of the `273 patent under 35 U.S.C. § 271 by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products:

131.    Specifically, the Armada screw products comprise a "bone anchor assembly for securing an elongate rod to a bone" as set forth in claim 1 of the `273 patent.  The claim chart attached hereto as **Exhibit 21** details how the Armada screw product satisfies each and every limitation of *at least* claims 1, 12 and 35 of the `273 patent either literally or under the doctrine of equivalents.

132.     Further, when certain components of the Armada screw products are implanted by a surgeon in order to treat one of several spine conditions the Armada screw products also directly infringes *at least* claims 1, 12 and 35 of the `273 patent.

133.     Specifically, the Precept screw products comprise a "bone anchor assembly for securing an elongate rod to a bone" as set forth in claim 1 of the `273 patent.  The claim chart attached hereto as **Exhibit 21** details how the Precept screw products satisfy each and every limitation of *at least* claims 1, 12 and 35 of the `273 patent either literally or under the doctrine of equivalents.

134.     Further, when certain components of the Precept screw products are implanted by a surgeon in order to treat one of several spine conditions also directly infringes *at least* claims 1, 12 and 35 of the `273 patent.

135.     Specifically, the Reline screw products comprise a "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member" as set forth in claim 1 of the `273 patent.  The claim chart attached hereto as **Exhibit 21**, details how the Reline product directly infringes *at least* claims 1, 12 and 35 of the `273 patent by satisfying each and every limitation of claim 1, either literally or under the doctrine of equivalents.

136.     Further, when certain components of the Reline screw product are implanted by a surgeon in order to treat one of several spine conditions also directly infringes *at least* claims 1, 12 and 35 of the `273 patent.

137.     Specifically, the SpheRx II/III screw products comprise a "medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member" as set forth in claim 1 of the `273 patent.  The claim chart attached hereto as **Exhibit 21**, details how the SpheRx II/III screw products directly infringe *at least* claims 1, 12 and 35 of the `273 patent by satisfying each and every limitation of those claims, either literally or under the doctrine of equivalents.

138.    Further, when certain components of the SpheRx II/III screw products are implanted by a surgeon in order to treat one of several spine conditions also directly infringes *at least* claims 1, 12 and 35 of the `273.

139.    Specifically, the VuePoint screw products comprise a "bone anchor assembly for securing an elongate rod to a bone" as set forth in claim 1 of the `273 patent.  The claim chart attached hereto as **Exhibit 22** details how the VuePoint screw product satisfies each and every limitation of *at least* claims 1 and 12 of the `273 patent either literally or under the doctrine of equivalents.

140.    Further, when certain components of the VuePoint screw products are implanted by a surgeon in order to treat one of several spine conditions the VuePoint screw products also directly infringes *at least* claims 1 and 12 of the `273 patent.

141.    NuVasive had or should have had actual knowledge of the `273 patent and NuVasive's unauthorized use thereof as Dr. Jackson offered a license to NuVasive under the family of patents that included the `273 patent on or about March 7, 2019. Further, NuVasive, upon information and belief, has the specific intent to encourage surgeons to directly infringe *at least* claims 1, 12 and 35 of the `273 patent by using and/or assembling components of the Armada, Precept, Reline and SpheRx II/III screw products, respectively, as discussed above.  For the same reasons, upon information and belief, NuVasive has the specific intent to encourage surgeons to directly infringe *at least* claims 1 and 12 of the `273 patent by using and/or assembling components of the VuePoint screw products as discussed above.  NuVasive provides the components used in the completed bone anchor assembly for the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products along with instructions and tools to accomplish this assembly.  Consequently, NuVasive induces the infringement of the `273 patent through at least its unauthorized sales of the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products pursuant to 35 U.S.C. § 271(b).

142.    NuVasive's Armada, Precept, Reline and SpheRx II/III screw products and their systems can be sold partially disassembled in their constituent components as part of surgical trays.

34

These components, such as the "shank," "receiver," "pressure insert," etc., as claimed, comprise material components of the "bone anchor assembly" of *at least* claims 1, 12 and 35 and are designed, configured and adapted to work with each other and have no substantial purpose other than as part of infringing devices and are accordingly not staple articles of commerce.  For similar reasons, NuVasive's VuePoint screw products and their systems can be sold partially disassembled in their constituent components as part of surgical trays.  These components, such as the "shank," "receiver," "pressure insert," etc., as claimed, comprise material components of the "bone anchor assembly" of *at least* claims 1 and 12 and are designed, configured and adapted to work with each other and have no substantial purpose other than as part of infringing devices and are accordingly not staple articles of commerce.  Consequently, NuVasive contributes to the infringement of the `273 patent through at least its unauthorized sales of the surgical trays incorporating the Armada, Precept, Reline, SpheRx II/III and VuePoint screw products pursuant to 35 U.S.C. § 271(c).

143.    As outlined above, under the totality of the circumstances, NuVasive's infringement of the `273 patent is willful from at least the date the `273 patent issued as Dr. Jackson's letter of March 7, 2019 offered NuVasive a license to the `273 patent – an offer that NuVasive rejected.

## COUNT SEVEN

### Infringement of the `292 Patent

144.    Plaintiff repeats and realleges as if fully set forth herein, the allegations contained in all the preceding paragraphs ¶¶ 1 through 143.

145.    As set forth below, NuVasive has infringed and continues to infringe one or more claims of the `292 patent under 35 U.S.C. § 271 by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority the SpheRx screw products:

146.    Specifically, the SpheRx screw products comprise a "cannulated polyaxial bone anchor assembly implantable in a bone and for mechanically coupling a stabilization member to the bone" as set forth in claim 1 of the `292 patent.  The claim chart attached hereto as **Exhibit 23**, details how the SpheRx screw products directly infringe *at least* claims 1 and 25 of the `292 patent

by satisfying each and every limitation of those claims, either literally or under the doctrine of equivalents.

147.    Further, when components of the SpheRx screw products are implanted by a surgeon in order to treat one of several spine conditions the assembled SpheRx screw products also directly infringes *at least* claims 1 and 25 of the `292 patent as detailed in **Exhibit 23**.

148.    NuVasive had actual knowledge of the `292 patent and NuVasive's unauthorized use thereof as Dr. Jackson offered a license to NuVasive under the `292 patent on or about March 7, 2019.  Further, NuVasive, upon information and belief, has the specific intent to encourage surgeons to directly infringe *at least* claims 1 and 25 of the `292 patent by assembling components of the SpheRx product, as discussed above.  NuVasive provides the components used in the completed cannulated polyaxial bone anchor assembly for the SpheRx products along with instructions and tools to accomplish this assembly.  Consequently, NuVasive induces the infringement of the `292 patent through at least its unauthorized sales of the SpheRx products pursuant to 35 U.S.C. § 271(b).

149.    NuVasive's SpheRx screw products and their systems can also be sold partially dissembled in its constituent components as part of surgical trays.  These components, such as the "anchor member" and "head member", etc. as claimed, comprise material components of the "cannulated polyaxial bone anchor assembly implantable in a bone and for mechanically coupling a stabilization member to the bone" of *at least* claims 1 and 25, and are designed, configured and adapted to work with each other and have no substantial purpose other than as part of infringing devices and are accordingly not staple articles of commerce.  Consequently, NuVasive contributes to the infringement of the `292 patent through at least its unauthorized sales of the surgical trays incorporating the SpheRx products pursuant to 35 U.S.C. § 271(c).

150.    As outlined above, under the totality of the circumstances, NuVasive's infringement of the `292 patent is willful from at least the date of Dr. Jackson's letter of March 7, 2019 offering NuVasive a license to the `292 patent – an offer that NuVasive rejected.

75062127.4

## COUNT EIGHT

### Infringement of the `319 Patent

151.     Plaintiff repeats and realleges as if fully set forth herein, the allegations contained in all the preceding paragraphs ¶¶ 1 through 150.

152.     As set forth below, NuVasive has infringed and continues to infringe one or more claims of the `319 patent under 35 U.S.C. § 271 by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority the Precept and Reline screw products:

153.     Specifically, the Precept screw products comprise a "pivotal bone anchor assembly for anchoring to patient bone and coupling with an elongated implant via a closure" as set forth in claim 1 of the `319 patent as satisfying each and every limitation of claim 1 of the `319 patent. The claim chart attached hereto as **Exhibit 24** details how the Precept screw products directly infringe *at least* claims 1, 5, 7-8, 10-11 and 22 of the `319 patent by satisfying each and every limitation of those claims of the `319 patent either literally or under the doctrine of equivalents.

154.     Further, when certain components of the Precept screw products are implanted by a surgeon in order to treat one of several spine conditions the Precept screw products also directly infringe *at least* claims 1, 5, 7-8, 10-11 and 22 of the `319 patent as detailed in **Exhibit 24**.

155.     Specifically, the Reline screw products comprise a "pivotal bone anchor assembly for anchoring to patient bone and coupling with an elongated implant via a closure" as set forth in claim 1 of the `319 patent.  The claim chart attached hereto as **Exhibit 24**  details how the Precept screws product directly infringe *at least* claims 1, 5, 7-8, 10-11 and 22  of the `319 patent by satisfying each and every limitation of those claims either literally or under the doctrine of equivalents.

156.     Further, when certain components of the Reline screw products are implanted by a surgeon in order to treat one of several spine conditions the Reline screw products also directly infringe *at least* claims 1, 5, 7-8, 10-11 and 22 of the `319 patent as detailed in **Exhibit 24**.

157.     NuVasive had actual knowledge of the `319 patent and NuVasive's unauthorized use thereof as Dr. Jackson offered a license to NuVasive under the application directly giving rise

to the `319 patent on or about March 7, 2019.  Further, NuVasive, upon information and belief, has the specific intent to encourage surgeons to directly infringe at least claim 1 of the `319 patent by using and/or assembling components of the Precept and Reline screw products, respectively, as discussed above.  NuVasive provides the components used in the completed pivotal bone anchor assembly for the Precept and Reline products along with instructions and tools to accomplish this assembly.  Consequently, NuVasive induces the infringement of the `319 patent through at least its unauthorized sales of the Precept and Reline products pursuant to 35 U.S.C. § 271(b).

158.    NuVasive's Precept and Reline products and their systems can be sold partially disassembled in their constituent components as part of surgical trays.  These components, such as the "shank," "receiver," "compression insert," etc., as claimed, comprise material components of the "pivotal bone anchor assembly for anchoring to patient bone and coupling with an elongated implant via a closure" of at least claim 1, and are designed, configured and adapted to work with each other and have no substantial purpose other than as part of infringing devices and are accordingly not staple articles of commerce.  Consequently, NuVasive contributes to the infringement of the `319 patent through at least its sales of the surgical trays incorporating the Precept and Reline screw products pursuant to 35 U.S.C. § 271(c).

159.    As outlined above, under the totality of the circumstances, NuVasive's infringement of the `319 patent is willful from at least the date of Dr. Jackson's letter of March 7, 2019 offering NuVasive a license to the `319 patent – an offer that NuVasive rejected.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.  Hold that Defendant NuVasive has infringed one or more claims of the Asserted Patents pursuant to 35 U.S.C. § 271.

B.  Preliminarily and permanently enjoin Defendant NuVasive as well as its respective agents, servants, officers, directors, employees and all other persons or entities acting in concert with them, directly or indirectly, from infringing, inducing others to infringe, or contributing to the infringement of the Asserted Patents pursuant to 35 U.S.C. § 283.

75062127.4

C.  Order Defendant NuVasive to account for and pay to Plaintiff damages as a consequence of Defendant's infringement of the Asserted Patents, as available to Plaintiff, under 35 U.S.C. § 284.

D.  Find that Defendant NuVasive's infringement is willful and accordingly award Plaintiff enhanced damages in accordance with 35 U.S.C. § 284.

E.  Declare this case exceptional pursuant to 35 U.S.C. § 285 and award Plaintiff reasonable attorneys' fees and costs in this action.

F.  Award to Plaintiff its costs, expenses, disbursements, and attorneys' fees incurred herein.

G.  Award to Plaintiff pre-judgment and post-judgment interest on the foregoing amounts at the maximum rate recoverable by law.

H.  Award to Plaintiff such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Roger P. Jackson, M.D. demand trial by jury of all issues triable by a jury.

POLSINELLI PC

*/s/ Stephen J. Kraftschik*
Stephen J. Kraftschik (#5623)
Christina B. Vavala (#6135)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
(302) 252-0920
skraftschik@polsinelli.com
cvavala@polsinelli.com

*Attorneys for Plaintiff Roger P. Jackson, M.D.*

OF COUNSEL:

Thomas L. Gemmell
Polsinelli PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606

Aaron M. Levine
Enes Ovcina
Polsinelli PC
1000 Louisiana St., 64th Floor
Houston, TX 77002

75062127.4

Todd M. Malynn
Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA  90067

January 19, 2021

75062127.4