IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROGER P. JACKSON, M.D.,

     Plaintiff,

     v.

NUVASIVE, INC.,

     Defendant.

Civil Action No. 21-53-RGA

## MEMORANDUM

Before me is Defendant's Motion to Dismiss the First Amended Complaint.   (D.I. 21).

Defendant moves to dismiss Counts One through Nine (patent infringement) under Rule 12(b)(1)

due to lack of standing and to dismiss Count Ten (fraudulent inducement) under Rule 12(b)(6)

for failure to state a claim.   (*Id.*).   I have considered the parties' briefing.   (D.I. 22, 25, 26, 34,

35).   For the reasons stated below, Defendant's motion is DENIED.

### I.   BACKGROUND

On January 19, 2021, Plaintiff Roger P. Jackson, M.D. filed this suit against Defendant

NuVasive, Inc., alleging infringement of eight patents.   (D.I. 1).   NuVasive filed a motion to

dismiss the complaint under Rule 12(b)(1) for lack of standing.   (D.I. 8).   Dr. Jackson then filed

the First Amended Complaint which added an additional count of patent infringement and a

claim of fraudulent inducement.   (D.I. 17).   Dr. Jackson now asserts that NuVasive infringes

U.S. Patent Nos. 8,353,932 ("the '932 patent"); 8,696,711 ("the '711 patent"); 9,788,866 ("the

'866 patent"); 10,335,200 ("the '200 patent"); 10,561,444 ("the '444 patent"); 10,722,273 ("the

'273 patent"); 9,808,292 ("the '292 patent"); 10,441,319 ("the '319 patent"); and 11,051,856 ("the '856 patent") (together, "Asserted Patents").   (*Id.*).   The Asserted Patents generally relate to spinal implant systems composed of separately inserted components used to fixate or align a patient's vertebrae.   (*Id.* at ¶ 8).

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(1)

Rule 12(b)(1) allows for dismissal where the court lacks subject matter jurisdiction over an action or the plaintiff lacks standing to bring its claim.   Motions brought under Rule 12(b)(1) may raise either a facial or factual challenge to the court's jurisdiction.   Here, NuVasive raises a facial challenge.   "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).   The party asserting subject matter jurisdiction bears "the burden of proof that jurisdiction does in fact exist." *Id.*

### B.   Rule 12(b)(6)

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief."   FED. R. CIV. P. 8(a)(2).   Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard.   A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

2

The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Id.* at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

## III.   DISCUSSION

### A.  Standing

NuVasive moves to dismiss Dr. Jackson's nine patent infringement claims due to lack of standing. In support, NuVasive argues, (1) Dr. Jackson assigned all substantial rights in the Asserted Patents to NuVasive; and (2) alternatively, Dr. Jackson granted NuVasive a covenant not to sue it for providing the Accused Products. I will address each argument in turn.

#### 1.  Assignment of Substantially All Patent Rights

In December 2014, Dr. Jackson and NuVasive entered into the Amended and Restated Development and License Agreement (the "2014 Agreement"), which replaced a previous license agreement between the parties. (D.I. 23-1, Ex. A). In the 2014 Agreement, Dr. Jackson assigned to NuVasive "the entire right, title and interest in and to the MIS IP, Polyaxial Screw IP

3

and Top Notch IP . . . ." (*Id.*, § 2.01). NuVasive argues that this assignment encompasses the Asserted Patents. (D.I. 22 at 10). Dr. Jackson disagrees. (D.I. 25 at 5).

As this dispute requires me to interpret the language of the 2014 Agreement, I must first decide which law to apply. The 2014 Agreement contains a choice of law provision that provides, "This Agreement shall be subject to, governed by, and construed according to the laws of the State of Missouri without regard to its conflict of laws provisions." (D.I. 23-1, Ex. A, art. XV). Thus, I will apply Missouri law in interpreting this agreement. "The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and give effect to that intention." *Lafarge N. Am., Inc. v. Discovery Grp. L.L.C.*, 574 F.3d 973, 979 (8th Cir. 2009) (citation omitted). Under Missouri law, a court must first determine whether a contract is ambiguous—i.e., it is reasonably susceptible to different constructions. *Id.* "If no ambiguity exists, the court must construe and enforce the contract according to its plain meaning." *Sligo, Inc. v. Nevois*, 84 F.3d 1014, 1019 (8th Cir. 1996).

The 2014 Agreement includes the following definitions for "Polyaxial Screw IP," "MIS IP," and "Top Notch IP," respectively:

> "Polyaxial Screw IP" shall mean the specific proprietary bottom loaded spherical capture polyaxial pedicle screw (including the head, shank and capture pieces) developed by the Jackson Group and claimed or disclosed in U.S. Patent Application No. 11/126,965 (with or without the use of the Helical Flange) and any continuations, patent applications, substitutions, amendments, extensions, reexaminations, continuations-in-part, divisions, reissues, additions and counterparts thereto.

(D.I. 23-1, Ex. A, § 1.14).

> "MIS IP" shall mean the minimally/less invasive surgery rod insertion/reduction tools ("Tools") and techniques claimed or disclosed in U.S. Patent No. 7,160,300, U.S. Patent No. 7,470,279, U.S. Patent No. 7,862,587, U.S. Patent No. 8,066,739, U.S. Patent No. 8,100,915, U.S. Patent No. 8,152,810, U.S. Patent No. 8,162,948, U.S. Patent No. 8,292,892, U.S. Patent No. 8,377,067, U.S. Patent Application No. 11/272,508, and U.S.

> Patent Application No. 13/373,735 and any continuations, patent applications, substitutions, amendments, extensions, reexaminations, continuations-in-part, divisions, reissues, additions and counterparts thereto.

(*Id.*, § 1.11).

> "Top Notch IP" shall mean the horizontal tool attachment feature claimed or disclosed in U.S. Patent No. 8,377,067, U.S. Patent No. 8,162,948, U.S. Patent Application No. 11/272,508, U.S. Patent Application No. 13/815,054 and any continuations, patent applications, substitutions, amendments, extensions, reexaminations, continuations-in-part, divisions, reissues, additions and counterparts thereto.

(*Id.*, § 1.18).

Dr. Jackson contends that this assignment does not cover all the technology claimed or disclosed in the enumerated patents or applications, and instead only extends to the recited technology (e.g., "the specific proprietary bottom loaded spherical capture polyaxial pedicle screw" or "the horizontal tool attachment feature").   (D.I. 25 at 6–7).   I agree.   This interpretation is consistent with the plain language of the contract.   In fact, the definitions for "MIS IP" and "Top Notch IP" both list U.S. Patent No. 8,377,067, U.S. Patent No. 8,162,948, and U.S. Patent Application No. 11/272,508.   If the definition of "MIS IP" was intended to cover all the technology claimed and disclosed in these patents, then there would be no reason to list the patents again in the definition of "Top Notch IP."

NuVasive argues that the Asserted Patents—none of which are listed in any of the above definitions—fall within the scope of the assigned IP.   For example, NuVasive argues that the asserted "Twist-In-Place" patents[1] fall within the scope of the assigned "Polyaxial Screw IP." (D.I. 26 at 2–3).   "Polyaxial Screw IP" is defined to include U.S. Patent Application No.

---

[1] The '932, '711, '200, '444, '273, '866, and '856 patents.

11/126,965, which issued as U.S. Patent No. 7,476,239 ("the '239 patent").   U.S. Patent No. 10,076,361 ("the '361 patent")—a continuation-in-part of the '239 patent—discloses a compression insert in addition to the screw, receiver head, and retaining member in the '239 patent.   '361 patent, 4:7.   NuVasive argues that this compression insert disclosed in the '361 patent falls within the scope of the assigned "Polyaxial Screw IP," and thus the "twist-in-place" compression inserts (and the seven "Twist-In-Place" patents) have been assigned to NuVasive. (D.I. 26 at 3).

NuVasive's argument, however, rests on an improper contract interpretation.   "Polyaxial Screw IP" is defined as "the *specific proprietary* bottom loaded spherical capture polyaxial pedicle screw . . . claimed or disclosed in U.S. Patent Application No. 11/126,965 . . . and any continuations, patent applications, [etc.] . . . *thereto.*"   (D.I. 23-1, Ex. A, § 1.14 (emphasis added)).   "Thereto" is a modifying clause which refers back to the enumerated patent application.   The use of "thereto" shows that the continuations, patent applications, etc. must be related to the enumerated patent application.   Further, the "Polyaxial Screw IP" definition refers to the "specific proprietary" pedicle screw of the enumerated patent application.   Give this language, I conclude that "Polyaxial Screw IP" only includes patents which are related to the enumerated patent application.   It does not include any unrelated patent which happens to disclose a similar polyaxial pedicle screw.[2]

---

[2] In fact, at least two of the "Twist-In-Place" patents had issued at the time the parties entered into the 2014 Agreement.   The '711 patent issued on April 15, 2014, and the '932 patent issued on January 15, 2013.   Yet the 2014 Agreement makes no mention of either patent.   If the parties intended to assign these issued patents, it would seem reasonable to expect that they would have expressly listed the patent numbers, rather than simply listing one unrelated patent application number.

The 2014 Agreement also licenses certain technology to NuVasive, including the "Helical Flange." (*Id.*, § 2.01). "Helical Flange" is defined as "the proprietary helically wound mating and interlocking structures owned by the Jackson Group and utilized as the means by which closure tops engage polyaxial screws and other spinal implants, instead of threads, with the proprietary elements claimed or disclosed in U.S. Patent No. 6,726,689, and any continuations, [etc.] . . . thereto and *to any other related intellectual property invented and owned by the Jackson Group.*" (*Id.*, § 1.07 (emphasis added); *see also id.*, §§ 1.03, 1.09, 1.10). The italicized clause extends the definition to cover other patents not related to the enumerated patent. This clause is not present in the definition of "Polyaxial Screw IP," which seems to further confirm that the parties did not intend to assign patents with no relation to the enumerated patent application.

Thus, even accepting NuVasive's argument that the compression insert disclosed in the '361 patent was assigned as part of the "Polyaxial Screw IP," this does not mean that the asserted "Twist-In-Place" patents have also been assigned. These patents do not claim priority to the '239 or '361 patents. Thus, they do not fall within the scope of "Polyaxial Screw IP" as it is defined in the 2014 Agreement.

None of the nine Asserted Patents claim priority to the '239 patent. Instead, the Asserted Patents are related to the enumerated patents in the definitions of "Top Notch IP" or "MIS IP." (D.I. 22 at 11). NuVasive makes no effort to describe how the Asserted Patents fit the definitions of "Top Notch IP" or "MIS IP," or how they relate to "the minimally/less invasive surgery rod insertion/reduction tools" and "the horizontal tool attachment feature." Thus, I find that the Asserted Patents do not fall within the scope of "Top Notch IP" or "MIS IP."

7

I therefore decline NuVasive's argument that Dr. Jackson assigned all substantial rights in the Asserted Patents to NuVasive.

### 2.   Covenant Not to Sue

NuVasive alternatively argues that Dr. Jackson is prohibited from taking any action against NuVasive under the 2014 Agreement's covenant not to sue.   (D.I. 22 at 12–14).   The 2014 Agreement provides that Dr. Jackson will not take any action against NuVasive for infringement of the "MIS IP, Top Notch IP, Helical Flange, BOT Implants, Instruments, Methodologies, Polyaxial Screw IP or Related System Components."   (D.I. 23-1, Ex. A, § 2.03).

"Related System Components" is defined as "the items sold by NuVasive for use with the Polyaxial Screw, such as closure tops and set screws, whether or not such items incorporate Jackson Group Intellectual Property Rights (as defined below)."   (*Id.*, § 1.16).   NuVasive contends that the Accused Products fall within the definition of "Related System Components" because "they are items sold by NuVasive for use with polyaxial screw fixation systems."   (D.I. 22 at 14).

For example, NuVasive argues that the "twist-in-place" compression inserts qualify as "Related System Components."   (D.I. 26 at 3).   As Dr. Jackson points out, however, "Related System Components" include only those items sold for use with the Polyaxial Screw, not the polyaxial screw systems themselves.   Here, Dr. Jackson does not simply accuse NuVasive's inserts of infringement, he accuses NuVasive's screw systems as a whole.   (*See, e.g.*, D.I. 17 at ¶¶ 73–85).   Thus, even assuming that the compression insert is a "Related System Component" under the 2014 Agreement, this would not insulate NuVasive's screw systems as a whole. Because the Accused Products are the screw fixation systems themselves, not items sold for use

8

with the screw fixation systems, they are not "Related System Components" covered by the covenant not to sue.

Dr. Jackson also covenanted not to sue for infringement of the "BOT Implants." The 2014 Agreement defines "BOT Implants" as "Products utilizing the above described break-off tabs and which utilize a Helical Flange. The break-off tabs elements of the BOT Implants are claimed or disclosed in U.S. Patent Application No. 11/268,200 . . . ." (D.I. 23-1, Ex. A, § 1.03). NuVasive argues that the '319 patent (entitled "Pivotal Bone Anchor with Tool Engagement Grooves and Break-Off Extensions") is a "BOT Implants" patent and is thus covered by the covenant not to sue. (D.I. 26 at 4). Besides pointing to the reference of "break-off extensions" in the patent's title, NuVasive does not demonstrate how the '319 patent meets the definition of "BOT Implants." For example, NuVasive does not point to anything in the '319 patent that relates to a Helical Flange. Thus, I decline to find on the present record that the '319 patent is a "BOT Implants" patent covered by the covenant not to sue.

NuVasive has failed to show that any of the Asserted Patents were assigned to NuVasive or are covered by the covenant not to sue.[3] Thus, I deny NuVasive's motion to dismiss under Rule 12(b)(1) for lack of standing.

### B. Fraudulent Inducement

NuVasive moves to dismiss Dr. Jackson's claim for fraudulent inducement (Count Ten) for failure to state a claim. The parties disagree regarding whether Delaware or Missouri law

---

[3] In its opening brief, NuVasive has a third argument that the Asserted Patents cover improvements owned by NuVasive. (D.I. 22 at 14–17). This argument fails. As discussed above, Dr. Jackson assigned the "Polyaxial Screw IP," "MIS IP," and "Top Notch IP" as those terms are defined in the 2014 Agreement. The Asserted Patents do not fall within the scope of any of those terms.

9

applies to this claim.   (D.I. 22 at 9–10; D.I. 25 at 14 n.15).   I do not find it appropriate to

undertake a choice-of-law analysis at the motion to dismiss stage.   *Arçelik A.Ş. v. E. I. du Pont*

*de Nemours & Co.*, 2018 WL 1401327, at \*9 (D. Del. Mar. 20, 2018) (deferring a choice of law

analysis where nearly "no discovery has taken place, and the Court would benefit from a more-

developed record"); *Graboff v. The Collern Firm*, 2010 WL 4456923, at \*8 (E.D. Pa. Nov. 8,

2010) ("[W]hen confronted with a choice of law issue at the motion to dismiss stage, courts

within the Third Circuit have concluded that it is more appropriate to address the issue at a later

stage in the proceedings.").   Regardless, I find that Dr. Jackson has stated a claim for fraudulent

inducement under both Delaware and Missouri law.

A plaintiff must plead fraud with particularity under Rule 9(b).   FED. R. CIV. P. 9(b).

"Particularity" has been interpreted to require that plaintiffs "place the defendant on notice of the

precise misconduct with which it is charged" by "alleg[ing] the date, time and place of the

alleged fraud or otherwise inject[ing] precision or some measure of substantiation into a fraud

allegation."   *Alpizar-Fallas v. Favero*, 908 F.3d 910, 918–19 (3d Cir. 2018) (cleaned up).

To state a claim for fraudulent inducement, Dr. Jackson "must plead facts supporting an

inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty

to disclose; (2) the defendant knew or believed that the representation was false or made the

representation with a reckless indifference to the truth; (3) the defendant intended to induce the

plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the

representation; and (5) the plaintiff was injured by its reliance."   *Sofregen Med. Inc. v. Allergan*

*Sales, LLC*, 2021 WL 1400071, at \*2 (Del. Super. Ct. Apr. 1, 2021); *see also Prime Aid*

*Pharmacy Corp. v. Express Scripts, Inc.*, 2017 WL 2021082, at \*3 (E.D. Mo. May 12, 2017).

10

Dr. Jackson alleges that during negotiations for the 2014 Agreement, NuVasive's Keith Valentine sent him two royalty buyout models that included sales data relating to NuVasive's products that use Dr. Jackson's compound articulation technology, but these models did not include any financial projections for NuVasive's new Reline product.   (D.I. 17 at ¶ 36). "NuVasive led him to believe that NuVasive's forthcoming flagship [Reline] product would not use his compound articulation technology, or would design around it."   (*Id.*).   During the negotiations, however, NuVasive filed a Section 510(k) premarket notification of intent to market its Reline product with the FDA which showed that the Reline product would include Dr. Jackson's compound articulation technology.   (*Id.* at ¶ 37).   "Had NuVasive accurately included (and not withheld) projections to include Reline, Dr. Jackson would have insisted on the running royalties he was entitled to under the 2008 Agreement, or bargained for a much larger one-time buy-out payment in connection with the 2014 Agreement."   (*Id.* at ¶ 38).

NuVasive first argues that Dr. Jackson failed to state a claim because NuVasive had no duty to disclose additional information about its Reline product.   (D.I. 22 at 18–19).   Under both Delaware and Missouri law, once a party chooses to speak, they must "make a full and fair disclosure as to the matters about which [they] assume[] to speak."   *Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *6 (Del. Ch. Apr. 10, 2008) (cleaned up) ("In other words, once a party chooses to speak, he can be held liable if he makes a representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter."); *see also Constance v. B.B.C. Dev. Co.*, 25 S.W.3d 571, 586 (Mo. Ct. App. 2000) ("[W]hen a party makes a partial disclosure, the party then has a duty to tell the whole truth." (citation omitted)).

11

Dr. Jackson alleges that NuVasive disclosed certain information about its new "flagship" Reline product, including that the Reline product would incorporate Dr. Jackson's Helical Flange technology.   (D.I. 17 at ¶¶ 33–34).   NuVasive also provided Dr. Jackson with financial data for two of NuVasive's products which used his compound articulation technology.   (*Id.* at ¶ 36). Given these disclosures, NuVasive had a duty to tell the whole truth about the Reline product and its incorporation of compound articulation technology.   Dr. Jackson's allegations are sufficient to support an inference that NuVasive omitted facts about its Reline product that it had a duty to disclose.

NuVasive also argues that Dr. Jackson fails to sufficiently plead justifiable reliance. (D.I. 22 at 19–20).   NuVasive contends that information about the Reline product was publicly available from the FDA and the USPTO at the time of contract negotiations, so Dr. Jackson could have reasonably discovered that the Reline product practiced his compound articulation technology.   (*Id.*).   I cannot resolve this issue on a motion to dismiss.   There are factual disputes regarding the type of information that was publicly available and whether Dr. Jackson could have determined that Reline was covered by his patents.[4]   (*See* D.I. 25 at 16–17).   Dr. Jackson's allegations of justifiable reliance are sufficient.   (D.I. 17 at ¶¶ 33–38, 189).

Because Dr. Jackson has sufficiently stated a claim for fraudulent inducement under both Delaware and Missouri law, I will deny NuVasive's motion to dismiss Count Ten.

---

[4] NuVasive also argues that Dr. Jackson's claim is barred by the statute of limitations (3 years in Delaware and 5 years in Missouri).   (D.I. 22 at 20; D.I. 26 at 10).   But, again, there are factual disputes as to when there was sufficient publicly available information that would have alerted Dr. Jackson that the Reline product incorporated his compound articulation technology.   (*See* D.I. 25 at 18–19).   Thus, I cannot dismiss Count Ten as time barred.

## IV.  CONCLUSION

An appropriate order will issue.

Entered this \_\_\_\_ day of February, 2022.

_____
United States District Judge

13