## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROGER P. JACKSON, M.D.,

Plaintiff,

v.

NUVASIVE, INC.,

Defendant.

C.A. No. 21-53-RGA

███████████████████████

PUBLIC VERSION FILED: March 13, 2024

### NUVASIVE, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE THE TESTIMONY OF BRIAN BECKER

Dated: February 20, 2024

OF COUNSEL:

Colin G. Cabral
James R. Anderson
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
(617) 526-9600
ccabral@proskauer.com
jaanderson@proskauer.com

Jessica M. Griffith
PROSKAUER ROSE LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 557-2900
jgriffith@proskauer.com

Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Counsel for Defendant NuVasive, Inc.*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

NATURE AND STAGE OF THE PROCEEDINGS .................................................... 2

SUMMARY OF ARGUMENT ..................................................................................... 2

STATEMENT OF UNDISPUTED FACTS ................................................................... 8

ARGUMENT .................................................................................................................... 16

I.    NuVasive Is Entitled to Judgment as a Matter of Law on Dr. Jackson's Fraudulent
      Inducement Claim .................................................................................................. 16

      A.    Dr. Jackson's Fraudulent Inducement Claim Is Time-Barred ............................. 16

      B.    Dr. Jackson Cannot Prove the Elements of Fraudulent Inducement by
            Clear and Convincing Evidence ........................................................................... 19

            1.    Overwhelming Evidence Refutes Dr. Jackson's Allegation that
                  NuVasive Withheld Information and Projections Related to Reline ........ 20

            2.    Dr. Jackson Cannot Establish Fraudulent Inducement Based on
                  "False and Manipulated Revenue Forecasts" ........................................... 21

                  a.    Forward-looking Projections Are Not Actionable Fraud .............. 22

                  b.    Dr. Jackson Did Not Rely on the Financial Projections in
                        the Global Royalty Buyout Models ............................................... 22

            3.    NuVasive Did Not Make Any False Representation About a
                  Potential Redesign of Future Product Generations ................................... 23

II.   NuVasive Is Entitled to Judgment as a Matter of Law on Dr. Jackson's Patent
      Infringement Claims .............................................................................................. 24

      A.    Section 3.03(a) of the 2014 Agreement Precludes Dr. Jackson's Recovery
            of Additional Royalty Payments from NuVasive ................................................ 24

      B.    NuVasive Has a Valid License to Manufacture and Sell the Accused
            Products ................................................................................................................. 26

      C.    The Asserted Patents Fall Within the Covenant Not to Sue ................................ 27

III.  The Court Should Grant Summary Judgment that Dr. Jackson Has Breached
      Section 2.03 of the 2014 Agreement ..................................................................... 29

i

IV.    The Damages Opinions of Brian Becker Should Be Excluded ........................................ 29

    A.    Dr. Becker's First "But-For" Fraud Scenario Does Not Satisfy Rule 702 ....... 3030

        1.    Dr. Becker's First But-For Scenario Is Nothing More than a "Simple Math Calculation"........................................................................ 30

        2.    Dr. Becker's First But-For Scenario Is Rank Speculation that Does Not Fit the Facts of the Case.................................................................... 31

        3.    Dr. Becker's Opinions Concerning Prejudgment Interest Cannot Be Presented to a Jury.................................................................................. 33

    B.    Dr. Becker's Opinions Regarding His Second "But For" Fraud Scenario Must Also Be Excluded Under Rule 702.............................................................. 33

        1.    Dr. Becker's Second But-For Scenario Disregards Key Facts, Rendering It Unreliable.............................................................................. 33

        2.    Dr. Becker's Second But-For Scenario Is Inadmissible Because It Integrates and Depends on His Calculation of Prejudgment Interest ....... 34

    C.    Dr. Becker's Patent Infringement Damages Opinions Must Be Excluded........... 34

        1.    Dr. Becker Did Not Consider the Only Third-Party License Pertaining to the Patents-In-Suit. ............................................................. 35

        2.    Dr. Becker Did Not Establish the Technical Comparability of the Licenses He Considered........................................................................... 37

        3.    Dr. Becker Opinions Did Not Establish the Economic Comparability of the Licenses He Considered ......................................... 38

    D.    Dr. Becker's Conclusory Opinions Concerning the Lower Value Patent Families Must Also Be Excluded. ....................................................................... 40

CONCLUSION..................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ActiveVideo Networks, Inc. v. Verizon Comms, Inc.*,
  694 F.3d 1312 (Fed Cir. 2012)........................................................................37

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014)........................................................................35

*Arnott v. Kruse*,
  730 S.W.2d 597 (Mo. Ct. App. 1987)..........................................................22, 23

*BeautyCon Media ABC Trust v. New General Market Partners, LLC*,
  2023 WL 5164146 (Del. Super. Ct. Aug. 11, 2023)....................................16, 17, 18

*CareDx, Inc. v. Natera Inc.*,
  2021 WL 1840646 (D. Del. May 7, 2021).....................................................30, 31

*Centerre Bank of Independence, N.A. v. Bliss*,
  765 S.W.2d 276 (Mo. Ct. App. 1988)...........................................................19, 20

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*,
  430 F. Supp. 2d 346 (D. Del. 2016).................................................................29

*CSIRO v. Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015)..................................................................34, 35

*Dancin Development, L.L.C. v. NRT Missouri, Inc.*,
  291 S.W.3d 739 (Mo. Ct. App. 2009).......................................................19, 22, 23

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).....................................................................................29

*Don King Equip. Co. v. Double D Tractor Parts, Inc.*,
  115 S.W.3d 363 (Mo. Ct. App. 2003)...............................................................25

*DuBose v. Wyndham Vacation Resorts, Inc.*,
  2021 WL 3145206 (D. Del. July 26, 2021) ........................................................17

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp, LLC*,
  879 F.3d 1332 (Fed. Cir. 2018)...............................................................35, 39, 40

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010)................................................................37, 40

*Gen. Video Corp. v. Kertesz*,
    2008 WL 509816 (Del. Ch. Feb. 25, 2008) ...........................................................18

*Georgia-Pacific v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970)........................................................................35

*Health Care Found. of Greater Kansas City v. HM Acquisition, LLC*,
    507 S.W.3d 646 (Mo. Ct. App. 2017)....................................................................25

*In re Physiotherapy Holdings, Inc.*,
    2019 WL 3916536 (D. Del. July 2, 2019) .......................................................33, 34

*In re Tyson Foods, Inc.*,
    919 A.2d 563 (Del. Ch. 2007)..........................................................................17, 18

*Intel Corp. v. Broadcom Corp.*,
    173 F. Supp. 2d 201 (D. Del. 2001).......................................................................26

*Jackson v. NuVasive, Inc.*,
    Case No. 20-cv-2010 (S.D. Cal.) .............................................................................2

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)..............................................................................35

*M2M Solutions LLC v. Enfora, Inc.*,
    167 F. Supp. 3d 665 (D. Del. 2016) .................................................................38, 39

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*,
    946 F.3d 1354 (Fed. Cir. 2020)................................................................................6

*MOSAID Techs. Inc. v. LSI Corp*
    2014 WL 807877 (D. Del. Feb. 28, 2014) .......................................................33, 34

*Muilenburg, Inc. v. Cherokee Rose Design and Build, L.L.C.*,
    250 S.W.3d 848 (Mo. Ct. App. 2008)....................................................................25

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)....................................................................................29

*Pivotal Payments Direct Corp. v. Planet Payment, Inc.*,
    2015 WL 11120934 (Del. Super. Ct. Dec. 29, 2015) ................................16, 17, 18

*Prime Aid Pharm. Corp. v. Express Scripts, Inc.*,
    2017 WL 2021082 (E.D. Mo. May 12, 2017) ........................................................19

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)................................................................................35

*Rickey v. New York Life Ins. Co.*,
 71 S.W.2d 88 (1934)............................................................................................25

*Schneider v. Fried*,
 320 F.3d 396 (3d Cir. 2003)..........................................................................29, 32

*Sonos, Inc. v. D&M Holdings Inc.*,
 297 F. Supp. 3d 501 (D. Del. 2017)...............................................................30, 32

*Trotter's Corp. v. Ringleader Restaurants, Inc.*,
 929 S.W.2d 935 (Mo. Ct. App. 1996)............................................................22, 23

*ViaTech Techs., Inc. v. Adobe, Inc.*,
 2023 WL 5975219 (D. Del. Sept. 14, 2023) ........................................................37

*VirnetX, Inc. v. Cisco Sys.*,
 767 F.3d 1308 (Fed. Cir. 2014).....................................................................35, 37

*VLSI Tech. LLC v. Intel Corp.*,
 87 F.4th 1332 (Fed. Cir. 2023) ...........................................................................36

*Walters v. Maloney*,
 758 S.W.2d 489 (Mo. Ct. App. 1988)............................................................20, 21

*Weinstein v. Luxeyard, Inc.*,
 2022 WL 130973 (Del. Super. Ct. Jan. 14, 2022) ...............................................16

*ZF Meritor LLC v. Eaton Corp.*,
 646 F. Supp. 2d 663 (D. Del. 2009)..............................................................31, 34

## OTHER AUTHORITIES

Federal Rule of Evidence 702.........................................................................................29

## **INTRODUCTION**

This is a contract case masquerading as a patent dispute.  In 2008, NuVasive, Inc. ("NuVasive") and Dr. Roger Jackson entered into a license agreement under which NuVasive paid royalties on the net sales of spinal implant products that included polyaxial screws.  Six years later, NuVasive and Dr. Jackson finalized a global buyout of all past, present, and future royalty obligations owed by NuVasive to Dr. Jackson.  ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████[1]

But Dr. Jackson and his lawyers at Polsinelli had other ideas.  After signing the 2014 Agreement (████████████████████████████████), they told NuVasive that Dr. Jackson had other "more valuable" patent families that covered the same products that were the subject of the global royalty buyout.  Through his counsel at Polsinelli—a law firm that serves as Dr. Jackson's patent prosecution counsel, deal counsel, and litigation counsel—Dr. Jackson demanded millions in additional royalties from NuVasive for the sale of products that had been licensed for over a decade.  When NuVasive refused to yield, Dr. Jackson filed this lawsuit, where he purports to seek over $100 million in compensatory damages.

NuVasive respectfully moves for summary judgment and to exclude the opinions of Dr. Jackson's damages expert, Dr. Brian Becker.  This case should not go to a jury.  But if it does, Dr. Jackson's damages theories must be excluded because they do not come close to meeting the standard for admissibility set by Federal Rule of Evidence 702.

---

[1] Ex. A, Amended and Restated Development and License Agreement (the "2014 Agreement"), § 3.03 (emphasis added).

## NATURE AND STAGE OF THE PROCEEDINGS

Dr. Jackson originally filed suit against NuVasive in the Southern District of California on October 13, 2020. *See Jackson v. NuVasive, Inc.*, Case No. 20-cv-2010 (S.D. Cal.). The original complaint asserted eight patents, including seven of the patents at issue in this case. Dr. Jackson did not assert a fraud claim in the original lawsuit. The docket reflects no activity until January 19, 2021, when Dr. Jackson filed a notice of voluntary dismissal pursuant to Rule 41(a)(1)(A)(i).

Dr. Jackson initiated this action on the same day he dismissed the case in California. He filed a First Amended Complaint on July 21, 2021 (D.I. 17), followed by a Second Amended Complaint on October 21, 2022 (D.I. 77), and a Third Amended Complaint ("TAC") on January 31, 2024 (D.I. 191).

Dr. Jackson alleges fraudulent inducement and infringement of eight patents: (i) U.S. Patent No. 8,353,932 ("the '932 patent"), (ii) U.S. Patent No. 8,696,711 ("the '711 patent"), (iii) U.S. Patent No. 9,788,866 ("the '866 patent"), (iv) U.S. Patent No. 9,808,292 ("the '292 patent"), (v) U.S. Patent No. 10,335,200 ("the '200 patent"), (vi) U.S. Patent No. 10,561,444 ("the '444 patent"), (vii) U.S. Patent No. 10,722,273 ("the '273 patent"), and (viii) U.S. Patent No. 11,051,856 ("the '856 patent") (collectively, the "Asserted Patents").

NuVasive has asserted multiple counterclaims against Dr. Jackson. D.I. 201. Among other things, NuVasive alleges that Dr. Jackson breached his covenant not to sue.

Fact and expert discovery are closed.

## SUMMARY OF ARGUMENT

**A.**   ***No Fraudulent Inducement***

1.   The Third Amended Complaint includes three separate theories of fraudulent inducement. First, Dr. Jackson alleges that the two royalty buyout models that NuVasive sent to Dr. Jackson on September 26, 2014 did not include financial projections for the Reline product.

This is the only theory of fraud that appeared in the original Complaint.  Second, Dr. Jackson alleges that revenue projections in the buyout models were "false and manipulated."  Third, Dr. Jackson alleges that NuVasive falsely represented that it could design around the licensed technology.  The latter two theories appeared for the first time in the Third Amended Complaint.

2.      The entirety of Dr. Jackson's fraud claim is time-barred.  The 2014 Agreement includes a choice-of-law provision stating that the agreement is governed by Missouri law.  But the choice-of-law provision is silent with respect to the statute of limitations.  Under these circumstances, Delaware law is clear that choice-of-law provisions do not apply to statute of limitations, and that the law of the forum applies because the statute of limitations is a procedural matter.  Delaware has a three-year statute of limitations for fraudulent inducement claims.  This is fatal to Dr. Jackson's claim.  Dr. Jackson waited over six years before he brought a claim for fraudulent inducement on January 19, 2021.

3.      Dr. Jackson cannot prove fraudulent inducement by clear and convincing evidence.  Dr. Jackson contends that NuVasive concealed the existence of NuVasive's flagship Reline product line and withheld sales projections for Reline during the negotiation of the 2014 Agreement.  This false allegation has been refuted by overwhelming evidence.  *First*, NuVasive produced documents showing that NuVasive spoke to Dr. Jackson about Reline by phone on September 17, 2014.  *Second*, Dr. Jackson admitted during his deposition that the royalty buyout models he received from NuVasive mentioned "Reline."  *Third*, multiple fact witnesses testified that the royalty buyout models received by Dr. Jackson included hundreds of millions in projected sales for the Reline products.  *Fourth*, Dr. Jackson's own damages expert does not agree with him.

He also told Dr. Jackson *and*

3

*his lawyers* that their allegations about Reline were wrong.  This is not a battle of the experts.  Dr. Jackson's expert agrees with NuVasive.

4.      Dr. Jackson did not rely on the projections in NuVasive's buyout models.  NuVasive sent two models to Dr. Jackson on September 26, 2014.  Two weeks later, Dr. Jackson's lawyer at Polsinelli responded and told NuVasive that he and Dr. Jackson had "carefully reviewed and considered [the] financial projections and **initial proposal** for a global buyout of the existing License Agreement."  Critically, Dr. Jackson's lawyer wrote: "**We think your projections are lower than we would anticipate and we think your present discount rate is too high.**" ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ In light of this evidence, Dr. Jackson cannot show the type of reliance needed to sustain a claim of fraudulent inducement.  No genuine dispute of material fact exists.

5.      Similarly, Dr. Jackson cannot prove fraud based on alleged misrepresentations about a redesign of future products.  There is nothing false or fraudulent about the *potential* to redesign products at some point in the future.   Also, internal communications show that NuVasive's head of product development, Pat Miles, "believe[d] he could design around [Dr. Jackson's] technology down the road."

   **B.**      ***No Damages***

6.      Dr. Jackson has no viable claim for damages.  ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████ Dr. Jackson is bound by this provision in the 2014 Agreement, which remains in effect so long as NuVasive continues to sell licensed "Products."  He has abandoned any claim seeking additional payments from NuVasive.

**C.    *Non-Infringement***

7.    NuVasive has a license to manufacture and sell the accused products and, therefore, does not infringe the Asserted Patents. ██████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

8.    There is no genuine dispute of material fact that each of the accused products falls within the definition of the licensed "Products" because they use "Helical Flange" technology.  Dr. Jackson's own technical expert concedes this critical point.

9.    ████████████████████████████████████
████████████████████████████

10.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

11.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

12.   ████████████████████████████████████████████

*See Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 946 F.3d 1354, 1360–61 (Fed. Cir. 2020) ("A covenant not to sue is equivalent to a nonexclusive or 'bare' license . . . which is a promise by the patent owner not to sue the licensee for practicing the patented invention, and under which the patent owner impliedly reserves the right to grant similar nonexclusive licenses to other entities.").

13.   Dr. Jackson's technical expert, a spinal surgeon named Dr. Thomas Errico, admitted during his deposition that the accused products exploit the same intellectual property that Dr. Jackson promised not to assert against NuVasive in the 2014 Agreement. *See*, *e.g.*, Ex. CC, Deposition Transcript of Thomas Errico ("Errico Tr.") at 128:13–21 ("Do you have an opinion on whether the Reline product family practices the intellectual property recited in the 2014 agreement? A. Yes, I do. **Helical flange**, breakoff technology, and the top notch."), 128:6–12 ("Q. Do you have an opinion on whether the VuePoint products practiced the intellectual property recited in the 2014 agreement?  A. Top notch technologies, **helical flange**, but not necessarily the breakoff tabs.") (emphases added); *see also id.* 115:5–12 (all products); 117:4–119:9 (Armada); 120:9–19 (Precept); 127:7–19 (SpheRx).

14.   NuVasive is entitled to judgment as a matter of law because it has a license to, and therefore does not infringe, each of the Asserted Patents.

6

### D.    *Breach of Contract*

15.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

### E.    *Daubert Motion*

16.    Dr. Jackson cannot demonstrate by a preponderance of the evidence that the opinions of his damages expert, Brian Becker, meet the requirements of Rule 702.

17.    Dr. Becker's opinions related to the fraudulent inducement claim consist of nothing more than simple math calculations that are not specialized knowledge and would not help the trier of fact to understand the evidence in this case.  Dr. Becker's opinions also do not fit the facts of the case.  His but-for scenarios ignore the parties' negotiation history and assume an alternate reality in which the parties did not enter into the 2014 Agreement.  The problems with Dr. Becker's opinions are compounded by the fact that his damages estimate is grossly inflated by 200–300% with prejudgment interest calculations that can never be shown to a jury.  The law is clear that prejudgment interest is an issue for the Court, not the jury.

18.    Dr. Becker's opinions on patent infringement damages are also untenable.  His analysis is based on a host of "comparable" agreements that involve different licensees and different patents.  At the same time, Dr. Becker chose not to consider the only third-party license agreement that involved the Asserted Patents.  In that third-party agreement, Dr. Jackson gave away the patented technology in the Asserted Patents *for free* in any products that incorporated "Helical Flange" technology.

19.     Further, Dr. Becker did nothing to account for the differences in the technologies and economic circumstances of the contracting parties in the agreements he considered.  His failure to consider the most relevant agreements to the damages analysis is indefensible.  Dr. Becker's inflated damages opinions are unreliable and must be excluded.

## STATEMENT OF UNDISPUTED FACTS

### *The 2008 Agreement*

1.     On March 5, 2008, NuVasive and Dr. Jackson entered into an agreement titled, "Development and License Agreement (Polyaxial Screw/MIS/LIS/Helical Flange/BOT)" (the "2008 Agreement").  Ex. F.



2.     Under the 2008 Agreement,

3.     The 2008 Agreement

4.     Pursuant to the 2008 Agreement,

5.     On May 11, 2015, Larry Swain from Polsinelli wrote to NuVasive:

Ex. G at NUV0004970.

6.     NuVasive sent Dr. Jackson royalty reports under the 2008 Agreement showing royalty payments for licensed sales of Armada, Precept, and SpheRx products.  *Id.* at NUV0004972–977.

7.      Dr. Jackson's damages expert, Brian Becker, testified that the accused Armada, Precept, Reline and SpheRx products lines were part of the 2008 Agreement.  Ex. DD, Deposition Transcript of Brian Becker ("Becker Tr.") at 134:3–8 ("Q Your report also indicates that four of the five accused product lines in this case were part of the 2008 agreement, including Armada, Precept, Reline and SpheRx.  Is that accurate?  A. That is accurate.").

<em>Negotiation of the Global Buyout</em>

8.      In or around August 2014, the parties began discussion about a global buyout of NuVasive's royalty obligations to Dr. Jackson.  On August 29, 2014, NuVasive's Chief Patent Counsel, Jonathan Spangler, wrote the following to Dr. Jackson and his lawyer, Larry Swain: █

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Ex. H, at NUV0003168. Mr. Spangler attached certain product literature to the August 29, 2014 email, which showed, among other things, that NuVasive's products use the Helical Flange.  *E.g.*, *id.* at NUV0003194 (Helical Flange on Precept); NUV0003205 (Helical Flange on Armada); NUV0003209 (Helical Flange on SpheRx).

9.      On September 17, 2014, NuVasive's President, Keith Valentine, spoke with Dr. Jackson by phone and summarized the call in an internal email to his colleagues.  Ex. I.  Mr. Valentine summarized four key points.  Among them, Mr. Valentine wrote that Dr. Jackson was "surprised to hear from Pat [Miles] in Alaska at SRS that Reline may not need access to the Jackson's MIS patents . . . as this will be potentially problematic with a number of companies and patent holders."  *Id.* at NUV0055585.  The fourth key point reads: "HE IS RECEPTIVE TO A GLOBAL BUYOUT."  *Id.* (all caps in original).  Mr. Valentine went on to say that the prospect of a global buyout was "a great direction" and recommended telling Dr. Jackson "for simple, but

reliable modeling purposes, Reline will be 2x Precept + Armada sales of today within 4 years of launch, and then it will decline over another 4 years . . . ." *Id.*

10.     On September 26, 2014, Keith Valentine sent Dr. Jackson two royalty buyout models for his review.  Exs C–E.  Mr. Valentine wrote: "One assumes licensing out to life of patent/contract while the other considers a redesign in future generation of products."  Ex. C at JAC-0094792.  Mr. Valentine also wrote: "Keep in mind, this is a first pass outlook with two assumptive scenarios.  We look forward to your input and views of how we modeled this."  *Id.*

11.     ███████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████

12.     Dr. Jackson and his damages expert admit that the royalty models sent by NuVasive explicitly mention "Reline."  Ex. EE, Deposition Transcript of Roger Jackson ("Jackson Tr.") at 60:14–17 ("Q. Here again, the royalty model provided by NuVasive to you in September 2014 mentions Reline, correct?  A. In these notes, yep.  Yes."); Ex. DD, Becker Tr. at 168:6–10 ("Q. Do you agree that the royalty buyout projections provided by NuVasive to Dr. Jackson expressly mention Reline?  A. This document does mention Reline.  If that's what you're asking, yes.").

13.     Dr. Jackson testified that he did not see the references to Reline in the buyout models shared by NuVasive when he reviewed them in 2014 because he "never went over there" to the Notes section of the spreadsheet.  Ex. EE, Jackson Tr. at 59:8–23, 60:14–22, 64:18–25.

14.     On October 10, 2014, Larry Swain responded and told Mr. Valentine that Dr.

Jackson had "████████████████████████████████████████████████████

██████████████████████████████████████" Ex. B at JAC-0094766.

15.     Mr. Swain confirmed that he and Dr. Jackson did not agree with or rely on

NuVasive's financial projections: ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

16.     The negotiations continued.  In November 2014, NuVasive began drafting a term

sheet for Dr. Jackson.  Ex. J.  Jonathan Spangler revised the draft term sheet to add a covenant not

to sue "for EACH of the various aspects of IP from our original agreement with Dr. Jackson."  *Id.*

at NUV0005047 (all caps in original).  He explained: "I just want to ensure we're as clear as

possible that we're FOREVER FREE FROM JACKSON (and any down-stream

licensees/assignees) based on the rights we originally obtained and are now obtaining."  *Id.* (all

caps in original).

17.     On November 24, 2014, Keith Valentine sent the revised term sheet to Dr. Jackson.

Ex. K.  The terms included ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████        *Id.* at JAC-0094820. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

11



18.   Larry Swain responded on behalf of Dr. Jackson on November 26, 2014.  Ex. L.

19.   The parties spoke again by phone on December 4, 2014.  Ex. M.  Larry Swain wrote the next day to summarize the "deal points" the parties had discussed.  *Id.* at JAC-0094774.  He wrote that t

20.   Jonathan Spangler sent Dr. Jackson a final copy of the agreement for execution on December 31, 2014.  Ex. N.

21.

22.   Jonathan Spangler confirmed during his deposition that NuVasive had "multiple conversations" with Dr. Jackson about the Reline product during the negotiation of the 2014 Agreement.  *E.g.*, Ex. FF, Spangler Tr. at 190:12–25 ("Q. Did NuVasive discuss the Reline product with Dr. Jackson during the negotiation of the 2014 agreement?  A. Yes.").

23.   Similarly, Keith Valentine testified that he talked to Dr. Jackson about Reline "many times."  Ex. BB, Deposition Transcript of Keith Valentine ("Valentine Tr.") at 153:23–154:2 ("Q. Did you talk to Dr. Jackson about Reline more than once?  A. Many times.").

*NuVasive's Internal Modeling and Projections*

24.     The first draft of a royalty buyout model circulated internally between members of NuVasive's finance team on September 22, 2014.  Ex. O. ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████

25.     This internal email correspondence confirms that NuVasive's financial projections included Reline from the beginning.  The first email about the buyout model says "if you look at Reline, for example, the international projections start to decline prior to the US projections . . . ." *Id.* at NUV0055697; *see also id.* ("I went ahead and changed the Armada and Precept projections so that they ramp down as Reline ramps up.  Please verify this makes sense.").

26.     Multiple individuals on the finance team weighed in with comments on the model. For example, one email from NuVasive's Head of Finance, Jereme Sylvain, instructed his team to "take the US Falcon revenues and flatline them from 2018 to 2019 and the downward trajectory starting in 2020."  *Id.* at NUV0055696.

27.     "Project Falcon" was the internal project name at NuVasive for what later became Reline.  Ex. FF, Spangler Tr. at 99:16–100:9.

28.     Dr. Jackson's damages expert admits that "Falcon Plate" and "Reline" were synonymous in the context of the royalty buyout models.  Ex. DD, Becker Tr. at 164:10–165:15; 170:2–14 ("Q. You told Dr. Jackson and his counsel that Falcon Plate and Reline were synonymous in the context of the royalty buyout models provided by NuVasive to Dr. Jackson.  Is that correct?  A. I think I said something to that effect, generally.  I don't recall the exact words, but that it was my opinion or based on the data that they were synonymous.").

29.     The finance team specifically requested that Pat Miles pay "particular attention to the relationship between Reline, Precept, and Armada," and that he "pressure test the revenue assumptions around reline and its timeline." Ex. P at NUV0055616.

30.     By September 23, 2014, Pat Miles had communicated to Quentin Blackford, NuVasive's Chief Financial Officer at the time, that "he believe[d] he could design around [Dr. Jackson's] technology down the road." *Id.* at NUV0055614.

31.     Keith Valentine testified that the exchange with Pat Miles, who was "the most knowledge person at the company on the product lines and . . . their revenue performance," showed "people trying to put together a good faith model" to share with Dr. Jackson. Ex. BB, Valentine Tr. at 65:18–66:7.

32.     Mr. Blackford circulated an updated model on September 24, 2014. Ex. Q. Mr. Blackford specifically cited "concern" that he and Pat Miles had "over how to project the future more than 5 years out from now." *Id.* at NUV0055662. The CFO also wrote: "I think [Dr. Jackson] needs to understand that the significant royalty stream that is in front of us due to the US List price provision will force us to . . . [e]xplore alternative design options in the second generation of Reline (Pat is saying this can be done)." *Id.*

33.     On September 25, 2014, Mr. Blackford circulated "a model that would get to ~$22M." *Id.* at NUV0055660. The Chief Financial Officer told Keith Valentine that he was "not comfortable going any higher at this point with all the different feedback I get from Pat around concerns with pricing, etc." *Id.* Mr. Blackford also referenced "a lot of questions in the investment community" given the size of the proposed global buyout. *Id.*

34.     Dr. Jackson received the two royalty buyout models from NuVasive the next day, on September 26, 2014. *See* Exs. C–E.

*The 2014 Agreement*

35.     The parties signed the 2014 Agreement, titled "Amended and Restated Development and License Agreement," on December 31, 2014.  Ex. A.

36.     The first page of the 2014 Agreement acknowledges ███████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

37.     The 2014 Agreement terminated and replaced the 2008 Agreement in its entirety. *Id.* at Art. XVII ("Effect on Prior Agreement").

38.     The 2014 Agreement ██████████████████████████████████████████

███████████████████████████████████████████████████████████████████

39.     Section 1.07 of the 2014 Agreement ████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████

40.     Section 3.01 states ████████████████████████████████████████████

██████████████

41.     ██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████

42.     In Section 3.03 of the 2014 Agreement, ████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████

43.     Jonathan Spangler testified that the global buyout was "the single biggest IP deal that [NuVasive] ever did," and that the company's "goal" was to be "FOREVER FREE FROM JACKSON."  Ex. FF, Spangler Tr. at 107:2–25.

## ARGUMENT

## I.     NuVasive Is Entitled to Judgment as a Matter of Law on Dr. Jackson's Fraudulent Inducement Claim

### A.     Dr. Jackson's Fraudulent Inducement Claim Is Time-Barred

The 2014 Agreement includes a choice-of-law provision stating that the Agreement is governed by Missouri law.  But the choice-of-law provision is silent with respect to the statute of limitations.  In situations like this, Delaware courts apply Delaware law to determine whether a claim is timely because the statute of limitations is a procedural issue governed by the law of the forum state.  *See Weinstein v. Luxeyard, Inc.*, 2022 WL 130973, at *3 (Del. Super. Ct. Jan. 14, 2022) ("Under Delaware law, however, choice of law provisions do not apply to statutes of limitations unless expressly included."); *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2015 WL 11120934, at *3 (Del. Super. Ct. Dec. 29, 2015) (applying Delaware statute of limitations where choice-of-law provision stated contract "shall be construed in accordance with the laws of the State of New York without regard to the conflicts of law provisions thereof").

For example, in *BeautyCon Media ABC Trust v. New General Market Partners, LLC*, the Delaware state court held the plaintiff's fraudulent inducement claim was subject to Delaware's statute of limitations, notwithstanding choice-of-law provisions in the operative agreements selecting California law.  2023 WL 5164146, at *17 (Del. Super. Ct. Aug. 11, 2023).  The choice-

of-law provisions in *BeautyCon* stated that California law would apply to "all actions arising out of or in connection with this Agreement . . . without regard to the conflicts of laws provisions of the State of California or of any other state." *Id.* But because "the choice of law provision d[id] not specify whether it include[d] California's statute of limitations," the court held Delaware's statute of limitations applied. *Id.* The same analysis applies here.

Delaware imposes a strict three-year statute of limitations for fraudulent inducement claims. *See DuBose v. Wyndham Vacation Resorts, Inc.*, 2021 WL 3145206, at *2 n.1 (D. Del. July 26, 2021) (citing 10 *Del. C.* § 8106(a)). "The statute of limitations begins to run at the time that the cause of action accrues, which is generally when there has been a harmful act by a defendant. This is true even if the plaintiff is unaware of the cause of action or the harm." *In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007).

Dr. Jackson alleges that he was fraudulently induced to enter into the 2014 Agreement. His cause of action accrued when he signed the agreement on December 31, 2014. Yet, Dr. Jackson did not bring his fraud claim until January 19, 2021—over six years after the execution date of the 2014 Agreement. As a result, the Court should enter judgment as a matter of law that Dr. Jackson's fraud claim is barred by the Delaware statute of limitations.

Delaware law recognizes three limited exceptions to the statute of limitations under which the time to file an action would be tolled: inherently unknowable injury (*i.e.*, the discovery rule), fraudulent concealment, and equitable tolling. *BeautyCon*, 2023 WL 5164148, at *17. None of them apply here.

Under all theories, the facts underlying the claim must be "so hidden that they could not have been discovered by a reasonable plaintiff." *Pivotal Payments*, 2015 WL 11120934, at *5. "[N]o theory will toll the statute beyond the point where the plaintiff was objectively aware, or

should have been aware, of facts giving rise to the wrong." *BeautyCon*, 2023 WL 5164148, at *17. The discovery rule arises only when the injury was "inherently unknowable," and the plaintiff was "blamelessly ignorant." *Id.* at *18. The discovery rule tolls the limitations period only until the plaintiff is on inquiry notice, meaning that the plaintiff "has discovered facts sufficient to put a person of ordinary intelligence on inquiry which, if pursued, would lead to discovery." *Id.* at *18 (cleaned up). Tolling by fraudulent concealment requires "an affirmative act of concealment by a defendant" and "will only toll a claim until the injured party, exercising reasonable diligence, should have discovered the alleged injury." *Gen. Video Corp. v. Kertesz*, 2008 WL 509816, *5–6 (Del. Ch. Feb. 25, 2008) (cleaned up). Equitable tolling applies only where the parties are in a fiduciary relationship and is therefore facially inapplicable here. *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007).

Dr. Jackson cannot credibly argue that the statute of limitations has been tolled in this case. *First*, Dr. Jackson admits that he did not read the "Notes" section of the buyout models that mention Reline. SOF ¶¶ 12–13. ██████████████████████████████████████

██████████████████████████████████████████████████ *Second*, Dr. Jackson was on inquiry notice no later than October 10, 2014, when he and his lawyer argued that NuVasive's financial projections were too low after a "careful review" of the buyout models: "████████████

██████████████████████████████" *Id.* at ¶ 15. There is no evidence that Dr. Jackson ever asked for different projections. Instead, Dr. Jackson negotiated for more money upfront. *Id.* at ¶¶ 15–19. *Third*, Dr. Jackson was also on inquiry notice about NuVasive's ability to implement a redesign in a future generation of products. NuVasive told Dr. Jackson that one of the buyout models considered a redesign in a future generation of products. There is no evidence in the record to suggest that Dr. Jackson ever expressed skepticism about a potential redesign, or that NuVasive

concealed a good-faith belief that such a redesign was impossible.  To the contrary, Pat Miles, the individual most knowledgeable about product development at NuVasive, told the company's CFO that he believed he could design around Dr. Jackson's technology, if necessary.  *Id.* ¶ 30.

### B.    Dr. Jackson Cannot Prove the Elements of Fraudulent Inducement by Clear and Convincing Evidence

Dr. Jackson has previously argued that Missouri law governs his fraudulent inducement claim on the merits.[2]  To prevail on a claim of fraudulent inducement under Missouri law, Dr. Jackson must show: (1) a false, material representation; (2) the speaker's knowledge of its falsity or ignorance of its truth; (3) the speaker's intent that the hearer act upon the representation in a manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the statement; (5) the hearer's reliance on its truth; (6) the hearer's right to rely on the statement; and (7) proximate injury.  *Prime Aid Pharm. Corp. v. Express Scripts, Inc.*, 2017 WL 2021082, at *1, 3 (E.D. Mo. May 12, 2017); *see also Dancin Development, L.L.C. v. NRT Missouri, Inc.*, 291 S.W.3d 739, 743–44 (Mo. Ct. App. 2009).  Each element must be established by clear and convincing evidence. *Dancin Development¸ L.L.C.¸* 291 S.W.3d at 744; *Centerre Bank of Independence, N.A. v. Bliss*, 765 S.W.2d 276, 284 (Mo. Ct. App. 1988) ("Fraud imputes venality and corruption to the person charged with it, and both reason and law require clear and convincing evidence of it.").

Dr. Jackson has alleged three different theories of fraudulent inducement.  First, Dr. Jackson alleges that the royalty buyout models that NuVasive sent to Dr. Jackson did not include financial projections for the Reline product family.   Second, Dr. Jackson alleges that the NuVasive's projections were "false and manipulated."  Third, Dr. Jackson alleges that NuVasive

---

[2] *See* D.I. 25 at 14 n.15 ("Missouri (not Delaware) law would appear to control Dr. Jackson's claim.").

made false representations about the potential for a redesign in future generations of products. Each of these theories is addressed in turn below.

> **1. Overwhelming Evidence Refutes Dr. Jackson's Allegation that NuVasive Withheld Information and Projections Related to Reline**

Dr. Jackson's first theory is one of fraud by omission, which cannot lie unless there is a "deliberate suppression of the truth and an intention to deceive." *Walters v. Maloney*, 758 S.W.2d 489, 500 (Mo. Ct. App. 1988). Misrepresentation of a material fact by silence can only constitute fraud where the silent party has a duty to speak; no such duty arises "when the other party has knowledge of the facts." *Centerre Bank*, 765 S.W.2d at 284 (citing *Taylor v. Western Casualty & Surety Co.*, 523 S.W.2d 582, 586 (Mo. Ct. App. 1975)).

There is no genuine factual dispute that NuVasive told Dr. Jackson about Reline. Nor can Dr. Jackson credibly dispute that the two royalty buyout models sent by NuVasive to Dr. Jackson on September 26, 2014 included financial projections for Reline. Dr. Jackson's claim is refuted by the following evidence:

- Dr. Jackson spoke with Keith Valentine about Reline by phone on September 17, 2014, approximately 10 days before NuVasive sent him the two royalty buyout models on September 26, 2014. SOF ¶ 9.

- Internal emails at NuVasive confirm that the early drafts of the buyout models included both domestic and international sales projections for Reline. SOF ¶¶ 24–29.

- Dr. Jackson's damages expert, Brian Becker, testified that, based on his review of the evidence, ██████████████████████████████████████████ ████████████████████████████████████████ SOF ¶ 11.

- Dr. Becker admitted the buyout models explicitly mention Reline. SOF ¶ 12.

- Dr. Jackson also admitted that the buyout models mention Reline, but he insists he did not see the information before his deposition. SOF ¶ 12.

- Dr. Becker testified that the terms "Reline" and "Falcon Plate" were synonymous for purposes of evaluating the projections in the buyout models, and that he told this to Dr. Jackson and his lawyers at the Polsinelli firm.  SOF ¶ 28.

- When asked at his deposition if the projections for Falcon Plate could be projections the Reline product, Dr. Jackson answered: "I have no idea."  Ex. EE, Jackson Tr. at 57:6–10.

- Jonathan Spangler, NuVasive's Chief Patent Counsel, testified that NuVasive had "multiple conversations" with Dr. Jackson about Reline during the negotiation of the 2014 Agreement.  SOF ¶ 22.

- Keith Valentine, NuVasive's President, testified that he told Dr. Jackson about Reline and spoke with Dr. Jackson about Reline "many times" during the negotiation of the 2014 Agreement.  SOF ¶ 23.

The undisputed facts set forth above are fundamentally inconsistent with a "deliberate suppression of the truth and intention to deceive."  *See Walters*, 758 S.W.2d at 500.

The evidence is overwhelming.  Dr. Jackson's own expert does not agree with his allegation that NuVasive's buyout models omitted projections for Reline.  Dr. Becker reviewed the evidence in this case and concluded that Dr. Jackson was wrong.  There is no genuine dispute of material fact.  Dr. Jackson cannot satisfy his burden of proving multiple elements of fraudulent inducement by clear and convincing evidence, including, at minimum, (1) a false, material representation; (2) NuVasive's knowledge of falsity; (4) Dr. Jackson's alleged ignorance of the falsity of the statement; (5) Dr. Jackson's reliance on the alleged omission; and (7) proximate injury.  Summary judgment is appropriate here.

### 2. Dr. Jackson Cannot Establish Fraudulent Inducement Based on "False and Manipulated Revenue Forecasts"

Dr. Jackson's second theory is that he was fraudulently induced into entering the 2014 Agreement based on "false and manipulated revenue forecasts."  *See* TAC ¶¶ 193–202.  This theory fails for two main reasons: (1) forward-looking projections are not actionable fraud, and (2) Dr. Jackson did not rely on the revenue projections that NuVasive sent him.

### a.      Forward-looking Projections Are Not Actionable Fraud

"To constitute fraud, the alleged misrepresentation must relate to a past or existing fact." *Trotter's Corp. v. Ringleader Restaurants, Inc.*, 929 S.W.2d 935, 940 (Mo. Ct. App. 1996). "Mere statements of opinion, expectations and predictions for the future are insufficient to authorize a recovery for fraudulent misrepresentation." *Arnott v. Kruse*, 730 S.W.2d 597, 600 (Mo. Ct. App. 1987).

The financial projections in the royalty buyout models were forward-looking predictions based on assumptions about future events.  This is as true for the earliest drafts of NuVasive's internal models, dated September 22–25, 2014, as it is for the buyout models that were ultimately shared with Dr. Jackson on September 26, 2014.  In fact, NuVasive described the buyout models to Dr. Jackson's lawyer as "a first pass outlook with two assumptive scenarios."  SOF ¶ 10.  This type of predictive "outlook" is a classic forward-looking statement that cannot form a basis for fraud as a matter of law.  *See Arnott*, 730 S.W.2d at 600 (affirming judgment of no fraudulent inducement based on a future "projection of income"); *Trotter's*, 929 S.W.2d at 940 (affirming summary judgment of no fraudulent inducement based on "predictions of future success and profitability"); *Dancin Development*, 291 S.W. 3d at 744 (affirming summary judgment of no fraudulent inducement based on an alleged misrepresentation concerning the value of an investment property).

### b.      Dr. Jackson Did Not Rely on the Financial Projections in the Global Royalty Buyout Models

No genuine factual dispute exists concerning the lack of reliance on the royalty buyout models that Dr. Jackson received from NuVasive.

On October 10, 2014, Dr. Jackson's lawyer wrote to NuVasive, saying ███████████████

███████████████████████████████████████████████████████

█████████   SOF ¶ 14 (emphasis added).  But what he wrote next dooms Dr. Jackson's

fraudulent inducement claim:



SOF ¶ 15 (emphasis added).  In other words, Dr. Jackson and his legal counsel told NuVasive that

they *disagreed* with the company's revenue forecast.  ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

Dr. Jackson cannot prove reliance on "false and manipulated" forecasts based on these

facts—let alone prove reliance by clear and convincing evidence.  Similarly, Dr. Jackson cannot

establish other elements of fraud based on a revenue forecast, including (1) a false, material

representation; (2) NuVasive's knowledge of falsity; (4) Dr. Jackson's ignorance of the falsity of

the forecasts; and (7) proximate injury.  The Court should grant summary judgment for NuVasive.

> **3.  NuVasive Did Not Make Any False Representation About a Potential
> Redesign of Future Product Generations**

In a last-ditch effort to save his fraudulent inducement claim, Dr. Jackson added yet another

theory of fraud in the Third Amended Complaint, alleging that "NuVasive also falsely represented

that it could design around aspects of the licensed technology."  *See* TAC ¶¶ 207-212.  As an initial

matter, any forward-statements reflecting the company's expectations about what *might* be

possible in the design of future products is not actionable fraud under Missouri law.  *See Trotter's*,

929 S.W.2d at 940; *Arnott*, 730 S.W.2d at 600.

Dr. Jackson's claim also fails because NuVasive did not make a false representation about a future redesign.  Internal email correspondence shows that Pat Miles—the head of product development at NuVasive—told the company's CFO that that "he believe[d] he could design around [Dr. Jackson's] technology down the road."   SOF ¶ 30.   In separate internal correspondence, NuVasive's Chief Financial Officer affirmed the company's intention to explore alternative design options and repeated the internal view that a redesign was possible: "I think [Dr. Jackson] needs to understand that the significant royalty stream that is in front of us due to the US List price provision will force us to . . . [e]xplore alternative design options in the second generation of Reline (Pat is saying this can be done)."  SOF ¶ 32.  Simply put, there is no evidence in the record to suggest that NuVasive genuinely believed that a redesign was impossible.  To the contrary, the individual most knowledgeable about product development thought it could be done.

The fact that NuVasive did not try to design around Dr. Jackson's technology is of no moment— ███████████████████████████████████████████████  Here again, Dr. Jackson cannot prove multiple elements of fraud by clear and convincing evidence, including at least (1) a false, material representation; (2) NuVasive's knowledge of falsity; (4) Dr. Jackson's ignorance of the falsity of the statement; (5) Dr. Jackson's reliance on its truth; and (7) proximate injury.

## II.     NuVasive Is Entitled to Judgment as a Matter of Law on Dr. Jackson's Patent Infringement Claims

### A.     Section 3.03(a) of the 2014 Agreement Precludes Dr. Jackson's Recovery of Additional Royalty Payments from NuVasive



Ex. A, 2014 Agreement, § 3.03 (emphasis

added).  This provision in the 2014 Agreement precludes any claim by Dr. Jackson that NuVasive

has additional financial obligations to him.

The choice-of-law provision in the 2014 Agreement states ███████████████████

████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████ Ex. A, 2014 Agreement, Art. XV.  Missouri applies "the

objective theory of contracts," in which "[i]t is presumed the parties' intent is expressed by the

natural and ordinary meaning of the language in the contract."  *Don King Equip. Co. v. Double D*

*Tractor Parts, Inc.*, 115 S.W.3d 363, 369 (Mo. Ct. App. 2003).  "When interpreting any contract,

a court must follow the terms of the contract as written if those terms are plain, unequivocal, and

clear."  *Muilenburg, Inc. v. Cherokee Rose Design and Build, L.L.C.*, 250 S.W.3d 848, 853–54

(Mo. Ct. App. 2008).  The Court must "read the terms of a contract as a whole to determine the

intention of the parties," "give the terms their plain, ordinary, and usual meaning," and construe

each term of the contract "to avoid rendering other terms meaningless."  *Health Care Found. of*

*Greater Kansas City v. HM Acquisition, LLC*, 507 S.W.3d 646, 656 (Mo. Ct. App. 2017) (cleaned

up).  "[I]t is not within the province of the court to alter a contract by construction, or to make a

new contract for the parties."  *Rickey v. New York Life Ins. Co.*, 71 S.W.2d 88, 93 (1934).

Subsection (a) of Section 3.03 is dispositive here.  Critically, ████████████████████

████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████ *See Rickey*, 71 S.W.2d at 93 ("[A] court's duty

is confined to the interpretation of the contract which the parties have made for themselves, without

regard to its wisdom or its folly, and . . . a court may not read into a contract words which the

contract does not contain.").  By contrast, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

Additional support can be found elsewhere in the 2014 Agreement.  In Section 7.01, ██

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████ Ex. A, 2014 Agreement, § 7.01.  In other words, the parties agreed ████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████ There is no genuine factual question that NuVasive

continues to sell the "Products" and "Instruments" referenced in the 2014 Agreement.

In sum, the 2014 Agreement reflects █████████████████████████████████████

████████████████████████████████████████████████ Full stop.  Judgment should

be entered in favor of NuVasive on this basis alone.

### B.    NuVasive Has a Valid License to Manufacture and Sell the Accused Products

It is well settled that "a valid license is a complete defense to infringement."  *Intel Corp. v.*

*Broadcom Corp.*, 173 F. Supp. 2d 201, 228 (D. Del. 2001).

The first page of the 2014 Agreement expressly acknowledges ███████████████

████████████████████████████████████████████████████████ Ex. A, 2014

Agreement, at 1 (second "WHEREAS" clause).  The licensed ██████████████████

████████████████████████████████████████████████████████ Ex. F, 2008

Agreement § 1.15.

The 2014 Agreement then ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████



By its own terms, ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

There is also no genuine factual dispute that the products accused of patent infringement in this case—including the Armada, Precept, SpheRx, Reline, and VuePoint product lines—are coextensive with the "Products" licensed under the 2014 Agreement. NuVasive's product literature shows that the products covered by the 2008 Agreement, which NuVasive continued to sell thereafter, use "Helical Flange" technology. SOF ¶ 8. Dr. Jackson's technical expert admitted that the accused products use "Helical Flange" technology. *See* Summary of the Argument at ¶ 13. Those key admissions bring the accused products within the definition of the licensed "Products."

### C.    The Asserted Patents Fall Within the Covenant Not to Sue

In Section 2.03 of the 2014 Agreement, ██████████████████████████████ ████████████████████████████████ Ex. A, 2014 Agreement, § 2.03. The 2014 Agreement ████████████████████████████████



*Id.* § 1.07 (emphases added).  This Court has already concluded that the clause "any other related intellectual property invented and owned by the Jackson Group" in the 2014 Agreement "extends the definition to cover other patents not related to the enumerated patent."  *See* D.I. 36 at 7.

Five of the eight Asserted Patents explicitly incorporate the '689 patent by reference into their written description.  For example, the asserted '932 patent, with reference to a "helically wound guide and advancement structure in the form of a flange form," states the following: "The flange form utilized in accordance with the present invention may take a variety of forms, including those described in Applicant's U.S. Pat. No. 6,726,689, which is incorporated herein by reference."  Ex. R, '932 patent, at 10:2–5.  Similar language regarding incorporation by reference of the '689 patent appears in the asserted '711 patent (Ex. S at 9:56–10:2), in the asserted '200 patent (Ex. T at 9:65–10:11), and in the asserted '444 patent (Ex. U at 10:4–18).

The other asserted patents describe the same "Helical Flange" technology disclosed in the '689 patent in multiple places in their written descriptions, including, for example:

> Each of the arms 52 [of receiver 10] has an interior surface 60 that defines the inner cylindrical profile and includes a partial helically wound guide and advancement structure 62. **In the illustrated embodiment, the guide and advancement structure 62 is a partial helically wound flangeform configured to mate under rotation with a similar structure on the nested fastener 18, as described more fully below.**

Ex. V, '273 patent at 7:21–27 (emphasis added).  Substantially similar language appears in the '292 patent (Ex. W at 7:20–25), in the '866 patent (Ex. X at 7:13–17), and in the '856 patent (Ex. Y at 18:4–14).

There is no genuine factual dispute that the Asserted Patents constitute "other related intellectual property invented and owned by the Jackson Group" with the scope of the definition of "Helical Flange" in Section 1.07 of the 2014 Agreement.

**III.     The Court Should Grant Summary Judgment that Dr. Jackson Has Breached Section 2.03 of the 2014 Agreement**

Dr. Jackson has accused NuVasive of infringing his rights "in and to . . . Helical Flange" by bringing this lawsuit.  For the same reasons set forth above in Section II.C, Dr. Jackson is in breach of his covenant not to sue NuVasive, as set forth in Section 2.03 of the 2014 Agreement. NuVasive is entitled to judgment as a matter of law on its breach of contract counterclaim.  D.I. 201, First Counterclaim.

**IV.     The Damages Opinions of Brian Becker Should Be Excluded**

The party proffering expert testimony bears the burden of proving admissibility.  FED. R. EVID. 702, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993).  Expert opinions are unreliable when the expert fails to adequately "explain how and why he or she has reached the conclusion being proffered," or it becomes apparent that their conclusions rest on little "more than a subjective belief or speculation."  *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 362 (D. Del. 2016).  Ultimately, "[a] court may conclude that there is simply too great a gap between the data and the opinion proffered," *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000), in which case it will properly "act[] as a gatekeeper" to prevent opinion testimony that does not meet Rule 702's requirements from reaching the jury, *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003).

For the reasons set forth below, Dr. Jackson can meet his burden of providing the admissibility of Dr. Becker's damages opinions beyond a preponderance of the evidence.  Sections IV.A and IV.B address Dr. Becker's two "but for" scenarios associated with his opinions on fraud. Sections IV.C. and IV.D address Dr. Becker's opinions on patent infringement damages.

### A.      Dr. Becker's First "But-For" Fraud Scenario Does Not Satisfy Rule 702

To calculate the damages that Dr. Jackson allegedly suffered in connection with his fraudulent inducement claim, Dr. Becker presents two "but-for scenarios."  Ex. Z, Supplemental Expert Report of Brian C. Becker, Ph.D. ("Becker Report"), at 28–30.  In the first scenario, Dr. Becker started with the first draft of NuVasive's buyout projections and assumed that Dr. Jackson ████████████████████████████████████ *Id.* at 28–29, Table 8.  ██████████

████████████████████████████████████████████████████████████████████

██████████████████████ *Id.* ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

### 1.      Dr. Becker's First But-For Scenario Is Nothing More than a "Simple Math Calculation"

Opinions that "do not contain specialized knowledge outside a juror's common understanding . . . fail to meet the 'qualification' and 'fit' requirements."  *CareDx, Inc. v. Natera Inc.*, 2021 WL 1840646, *3 (D. Del. May 7, 2021); *see also Sonos, Inc. v. D&M Holdings Inc.*, 297 F. Supp. 3d 501, 521 (D. Del. 2017) ("When a factual issue is equally within the competence of  the jurors to understand and decide, expert testimony is not helpful to the jury and, therefore, not admissible." (Internal quotation marks and citation omitted)).  "[S]imple math calculations" are "not a specialized form of knowledge that a jury lacks or a scientific technique that a jury is incapable of performing."  *CareDx*, 2021 WL 1840646, *3.  Expert opinions that do nothing more than perform such calculations are inadmissible.

To arrive at his first but-for damages opinion, Dr. Becker merely subtracts the total projection of royalties in one NuVasive spreadsheet from the total projected royalties in another spreadsheet. Ex. Z at 28–29, Table 8. Performing that calculation does not require any special expertise or scientific technique. As a result, Dr. Becker's testimony should be excluded. *See CareDx*, 2021 WL 1840646, \*3 (expert's damages testimony that "merely performed multiplication" deemed inadmissible).

### 2. Dr. Becker's First But-For Scenario Is Rank Speculation that Does Not Fit the Facts of the Case

Dr. Becker did not "engage in [any] reasonable, let alone scientific, effort" to value the patents covered in the 2008 Agreement, or any of the other assets that NuVasive acquired in connection with the 2014 Agreement. *CareDx*, 2021 WL 1840646, \*3. Without performing that calculation, ████████████████████████████████████████████████████████████████

████████████████████████ Nor did Dr. Becker independently evaluate or analyze any of the assumptions underlying NuVasive's projections and modeling, including the discount rate that should be applied to determine the present value of the projected royalty streams. Instead, Dr. Becker arbitrarily credits NuVasive's first internal draft of the buyout model, which happened to have the highest estimated royalties, and he simply assumes the amount reflected in that initial draft would have fully manifested itself in the parties' agreement. That is not an opinion based on any accepted scientific methodology or technique, but merely an unsupported assertion by someone who has not conducted any analysis at all. *ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663, 667 (D. Del. 2009) (excluding expert's damages testimony where the expert "relied on the [party's] estimates without knowing . . . the validity of the underlying data and assumptions on which the [party's] estimates were based.").

31

These shortcomings are compounded by Dr. Becker's failure to consider important documentary evidence related to the parties' negotiations, including, for example, t Ex. Z, App'x B (failing to list Ex. B); Ex. DD, Becker Tr. at 222:14–19 (admitting facts may not have been considered when forming his opinion). . *See* Exs. L, M; Ex. Z at App'x B (failing to list Exs. L, M); Ex. DD, Becker Tr. at 234:17–236:17, 241:18–242:1, 244:16–245:5 (admitting facts may not have been considered in forming his opinion).

Dr. Becker's opinion—that the difference between NuVasive's first internal projection and the projections shared with Dr. Jackson would have translated directly into a final agreement between the parties—is not supported by or tied to the facts of this case.  It is rank speculation. Plaintiff has a right to argue that theory to a jury, but not to falsely cloak it in the imprimatur of an expert witness.  *See Sonos*, 297 F. Supp. 3d at 522; *see also Schneider*, 320 F.3d at 404 (explaining that expert testimony "must be based on the methods and procedures of science rather than on subjective belief or supported speculation" and there must be "a valid scientific connection to the pertinent inquiry" (internal quotation marks and citations omitted)).

### 3. Dr. Becker's Opinions Concerning Prejudgment Interest Cannot Be Presented to a Jury

Dr. Becker's first but-for scenario should be excluded.  But in the event the Court disagrees, the portion of his opinion pertaining to prejudgment interest should be excluded because "interest-based calculation[s] [are] properly reserved for the Court, not the jury."  *MOSAID Techs. Inc. v. LSI Corp*, 2014 WL 807877, *2 n.3 (D. Del. Feb. 28, 2014); *see In re Physiotherapy Holdings, Inc.*, 2019 WL 3916536, at *3 (D. Del. July 2, 2019) (same).

### B. Dr. Becker's Opinions Regarding His Second "But For" Fraud Scenario Must Also Be Excluded Under Rule 702

Dr. Becker's second "but for" scenario rests on an unfounded assumption that the 2014 Agreement never existed.  He assumes that the parties would have continued their pre-existing relationship under the 2008 Agreement, even though it is beyond dispute that the 2008 Agreement was superseded and replaced by the 2014 Agreement.  These opinions fail to satisfy Rule 702's requirements for multiple reasons.

### 1. Dr. Becker's Second But-For Scenario Disregards Key Facts, Rendering It Unreliable

Dr. Becker's overarching assumptions in this scenario are that "(a) Dr. Jackson and NuVasive did not agree on a buy-out; [and] (b) NuVasive continued to use Dr. Jackson's patents in its products per the 2008 Agreement."  Ex. Z at 29. 

Ex. DD, Becker Tr. at 24:5–7.  It is beyond dispute, however,

Ex. Z at 29–30, Table 11B.

Dr. Becker

arbitrarily cherry-picked one of the royalty buyout models shared with Dr. Jackson, and he used it to back into the value of the other assets transferred under the 2014 Agreement.  That does not suffice.  *ZF Meritor*, 646 F. Supp. 2d at 667 (excluding expert's damages testimony where the expert "relied on the [party's] estimates without knowing . . . the validity of the underlying data and assumptions upon which the [party's] estimates were based.").

Dr. Becker also assumes, without any basis, that the parties' relationship would have continued under the 2008 Agreement, but NuVasive would not have made *any* payments to date, such that statutory interest or contractual interest would accrued.  These opinions have no basis in fact and must be excluded.

### 2. Dr. Becker's Second But-For Scenario Is Inadmissible Because It Integrates and Depends on His Calculation of Prejudgment Interest

Unlike his first but-for scenario—which at least presents a separate and distinct damages amount—Dr. Becker bakes prejudgment interest directly into his second but-for scenario damages calculation.  Because "interest-based calculation[s] [are] properly reserved for the Court, not the jury," the entirety of Dr. Becker's second damages scenario is inadmissible for this reason as well. *MOSAID Techs.*, 2014 WL 807877 at *2 n.3; *see In re Physiotherapy*, 2019 WL 3916536, at *3.

### C. Dr. Becker's Patent Infringement Damages Opinions Must Be Excluded

The Federal Circuit has cautioned that "given the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented—using whatever methodology—is sufficiently reliable to support a damages award."  *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).  To be reliable, the expert's opinion "must reflect the value attributable to the infringing features of the product, and no more."  *Id.*  In other words, "proof of damages must be carefully tied to the claimed invention itself."  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1324 (Fed. Cir. 2014).  As a result, "only

theories comporting with settled principles of apportionment [are] allowed to reach the jury." *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014).

"[S]uch apportionment can be done . . . through a *thorough* and *reliable* analysis to apportion the royalty rate." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp, LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (emphasis added).  One commonly used approach to apportion the royalty rate is the "hypothetical negotiation," which "tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).

That is the approach Dr. Becker purported to take when providing opinions on damages related to NuVasive's alleged infringement.  Ex. Z, Becker Report, at 4.  But Dr. Becker's analysis is fundamentally flawed and must be excluded.

### 1.     Dr. Becker Did Not Consider the Only Third-Party License Pertaining to the Patents-In-Suit.

The first *Georgia-Pacific* factor that a damages expert must consider when attempting to reconstruct a hypothetical negotiation is "the royalties received by the patentee for the licensing of *the patent in suit*, proving or tending to prove an established royalty."  *Georgia-Pacific v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (emphasis added).  "By its terms, this factor considers only past and present licenses to the *actual patent* and the *actual claims* in litigation."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (emphasis added).  Thus, where such a license exists, it is often deemed the "starting point" for any hypothetical-negotiation analysis.  *Id.*  Indeed, the "use of *other* licenses that involve (only or even partly) technology *other* than the patented technology at issue in the case at hand" is often precluded because those licenses—unlike those that *do* focus on the patented technology—provide "an inadequate basis for soundly extracting . . . information that is truly informative about the

value of the technology in the case at hand." *VLSI Tech. LLC v. Intel Corp.,* 87 F.4th 1332, 1346 (Fed. Cir. 2023) (emphasis added).

Despite these well-established principles, Dr. Becker relied only on licenses that do not involve the patents-in-suit, while excluding from his analysis the only license that did.  It is no mystery why he ignored it. ██████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████  Ex. AA, Second Addendum to Amended and Restated Alphatec Spine License Agreement, at 12–13, § 29(a)(v) ("Alphatec License"). ██████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████  *Id.* at § 29(a).  I█████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████  *Id.* ████████████████████████████████████████████████

████████████████████

At his deposition, Dr. Becker attempted to excuse the wholesale exclusion of the Alphatec license from his analysis.  He explained that because the Alphatec License post-dated the time at which the hypothetical negotiation would have taken place, neither NuVasive nor Plaintiff would have been aware of or considered its terms.  Ex. DD, Becker Tr. at 143:17–144:16.  That explanation does not withstand scrutiny.  NuVasive is not aware of any other case in which a party's expert relied solely on the date of the hypothetical negotiation to exclude licenses of comparable (let alone identical) technologies, as Dr. Becker did here.  Experts routinely rely on

comparable license agreements that post-date the hypothetical-negotiation date. *See*, *e.g.*, *VirnetX*, 767 F.3d at 1330–31 (rejecting challenge to expert's reliance on comparable licenses that post-dated hypothetical negotiation date by several years); *ActiveVideo Networks, Inc. v. Verizon Comms, Inc.*, 694 F.3d 1312, 1333 (Fed Cir. 2012) (same).

### 2.   Dr. Becker Did Not Establish the Technical Comparability of the Licenses He Considered

When relying on past licenses, an expert "must account for differences in the technologies and economic circumstances of the contracting parties." *Finjan*, *Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010).  To account for the relative differences in the technologies, Dr. Becker principally relies on Dr. Jackson's own subjective evaluation of the TIP family's value versus the technologies included "in *some* of the licenses" that Dr. Becker considered.  Ex. Z, Becker Report, at 19 (emphasis added). Dr. Becker does not explain why Plaintiff did not proffer his views as to *all* of the licenses Dr. Becker considered.

In any event, Dr. Becker relied primarily on private conversations with Dr. Jackson in which he said that the TIP patent family was of "Greater" or "Much Greater" value than all other technologies they discussed, although it is not at all clear what those technologies were.  Ex. Z, Becker Report, at 19, Table 3E (merely referring to purportedly comparative technologies as, *e.g.*, "Products," "Instruments," "Patents," and "Licensed Products").

Dr. Becker's reliance on Dr. Jackson's own biased evaluation does not adequately "account for differences in the technologies . . . of the contracting parties," and should be excluded for that reason alone.  *Secure Computing*, 626 F.3d at 1211; *see also ViaTech Techs., Inc. v. Adobe, Inc.*, 2023 WL 5975219, *9 (D. Del. Sept. 14, 2023) (party failed to establish comparability "because there is no evidence or analysis of the patents in the portfolio").

Dr. Becker's opinion should also be excluded for two additional reasons. *First*, Dr. Becker "provides little more than ambiguous conclusions of technological comparability between the [other] license agreements and the [TIP patents], without any rationale other than undisclosed conversations with [Plaintiff]." *M2M Solutions LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 677 (D. Del. 2016). It is not even clear which technologies Dr. Becker considered or compared, or what those technologies are. Such "hazy reasoning" is directly akin to the "loose, vague allegations of technological comparability, without any explanation" that this Court has previously found "do not even provide a basis to meaningfully assess technological comparability." *Id.* at 677–78.

*Second*, ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████ The evidence flatly contradicts Dr. Jackson's unsupported assertion that the TIP patent family is his "most valuable invention" and had "Greater" value than the licensed Helical Flange technology. Ex. Z, Becker Report, at 22, Table 3E. Dr. Becker's reliance on his discussions with Dr. Jackson are wholly unreliable.

### 3.   Dr. Becker Opinions Did Not Establish the Economic Comparability of the Licenses He Considered

Dr. Becker fails to sufficiently account for the "economic circumstances of the contracting parties," so his opinion must be excluded for this reason, as well. *Secure Computing*, 626 F.3d at 1211 (internal quotation marks and citation omitted).

When opining on the royalty rate that hypothetical negotiations related to the license of the cannulated poly-axial screw and circumferential tool engagement patent families would yield Dr. Becker expressly considered "Dr. Jackson's history of licensing and/or 'stacking' multiple patented technologies." Ex. Z, Becker Report, at 24. But he failed to take account of that important

"economic circumstance" when offering opinions regarding the likely result of a hypothetical negotiation involving the TIP patent family.

Dr. Becker's economic comparability analysis falls short for other reasons as well. Although he identifies "attributes" (*i.e.*, economic license terms) that would likely impact "the ultimate royalty rate determination" and noted their presence or absence in each of the licenses he considered, Dr. Becker did not analyze or explain how any attribute's presence or absence *actually* impacted the agreed-upon rate in any of those licenses. ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. Z, Becker Report, at 17–19; *compare* Table 3A, *with* 3D. But Dr. Becker makes no attempt to analyze what the royalty rate would have been in each of those agreements had they all possessed the same economic attributes to isolate the value associated with any of those attributes. Nor did Dr. Becker explain how the presence or absence of any of those economic attributes impacted his conclusion as to the royalty rate that the hypothetical negotiation for TIP patents would yield. Dr. Becker's testimony must therefore be excluded. *See Enfora*, 167 F. Supp. 3d at 678 (Andrews, J.) ("unsubstantiated conclusions about economic comparability, lacking in analysis . . . provide nothing more than *ipse dixit*").

Dr. Becker's attempt to summarily run through each of the *Georgia-Pacific* factors, the discussion of which are superficial and conclusory, or else incorporate the incomplete and faulty analyses described above (Ex Z at 31–38), cannot save his opinions, either. *Exmark*, 879 F.3d at 1350 ("[A] superficial recitation of the *Georgia-Pacific* factors, followed by conclusory remarks, cannot support the jury's verdict.") (cleaned up).

**D.     Dr. Becker's Conclusory Opinions Concerning the Lower Value Patent Families Must Also Be Excluded.**

 Dr. Becker did not analyze the incremental royalty rate that a second or third patent family generated in any of the other licensing agreements to which he refers; nor did he analyze the relative value of any second or third patent family to the first, and then tie that finding back to the relative value between the patents at issue here and the TIP family.  *Secure Computing*, 626 F.3d at 1211 (expert relying on other licenses to establish reasonable royalty rate must analyze "technologies and economic circumstances" and compare them to technologies and economic circumstances at issue in hypothetical negotiation).

Dr. Becker also fails to point to any evidence supporting the conclusion that the value added by the cannulated poly-axial screw patent is equivalent to the value added by the circumferential tool engagement patent, ███████████████████████████ ███████████████████████████████ Dr. Becker did not engage in a "thorough and reliable analysis;" in fact, he barely conducted any "analysis" at all.  *Exmark*, 879 F.3d at 1348.

<u>CONCLUSION</u>

For the reasons set forth above, NuVasive respectfully requests that the Court grant summary judgment on Dr. Jackson's claims of fraudulent inducement and patent infringement claims, as well as NuVasive's breach of contract claim (D.I. 201, First Counterclaim).  In the event the case is allowed to proceed to trial, the Court should exclude the opinions of Dr. Jackson's damages expert, Brian Becker.

Dated: February 20, 2024

**McCARTER & ENGLISH, LLP**

OF COUNSEL:

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)

Colin G. Cabral
Alexandra M. Joyce (#6423)
James R. Anderson
Renaissance Centre
PROSKAUER ROSE LLP
405 N. King Street, 8th Floor
One International Place
Wilmington, Delaware 19801
Boston, MA 02110
(302) 984-6300
(617) 526-9600
dsilver@mccarter.com
ccabral@proskauer.com
ajoyce@mccarter.com
jaanderson@proskauer.com

*Counsel for Defendant NuVasive, Inc.*

Jessica M. Griffith
PROSKAUER ROSE LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 557-2900
jgriffith@proskauer.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing document was caused to be served on February 20, 2024 on the following counsel in the manner indicated:

<u>VIA EMAIL:</u>

Stephen J. Kraftschik
POLSINELLI PC
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
skraftschik@polsinelli.com

Darren E. Donnelly
POLSINELLI LLP
Three Embarcadero Center, St. 2400
San Francisco, CA  94111
ddonnelly@polsinelli.com

Thomas L. Gemmell
POLSINELLI PC
150 N. Riverside Plaza, Ste. 3000
Chicago, IL  60606
tgemmell@polsinelli.com

Aaron Levine
POLSINELLI PC
1000 Louisiana Street, Ste. 6400
Houston, TX 77002
alevine@polsinelli.com

*Counsel for Plaintiff*

/s/ *Daniel M. Silver*
Daniel M. Silver (#4758)