IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROGER P. JACKSON, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 21-53 (RGA) |
| | ) | |
| v. | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| NUVASIVE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ROGER P. JACKSON, M.D.'S COMBINED OPENING BRIEF IN SUPPORT OF HIS
MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON INFRINGEMENT,
DEFENDANT'S COUNTERCLAIMS FOR BREACH OF CONTRACT, BREACH OF
IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, FRAUD, UNJUST
ENRICHMENT, PORTIONS OF ITS AFFIRMATIVE DEFENSE OF INVALIDITY AND
TO EXCLUDE DEFENDANT'S PATENT DAMAGES OPINIONS**

OF COUNSEL:

Thomas Gemmell
POLSINELLI PC
150 North Riverside Plaza, Suite 3000
Chicago, IL 60606
Phone: (312) 819-1900
Fax: (312) 819-1910
tgemmell@polsinelli.com

Darren E. Donnelly
POLSINELLI LLP
Three Embarcadero Center, Suite 2400
San Francisco, CA  94111
Phone: (650) 461-7700
Fax: (415) 248-2101
ddonnelly@polsinelli.com

Aaron M. Levine
POLSINELLI PC
1000 Louisiana St., 64th Floor
Houston, TX 77002
Phone: (713) 374-1600
Fax: (713) 374-1601
alevine@polsinelli.com

Original Filing Date: February 20, 2024
Redacted Filing Date: March 14, 2024

POLSINELLI PC
Stephen J. Kraftschik (#5623)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
(302) 252-0920
skraftschik@polsinelli.com
*Attorneys for Plaintiff Roger P. Jackson, M.D.*

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

NATURE AND STAGE OF PROCEEDING ......................................................................1

FACTS ................................................................................................................................2

    I.      NuVasive's Uncontested Use of Asserted Patents.................................................. 2

    II.     Background on Spinal Implant Systems ................................................................. 3

    III.    The Parties' 2008 Development and License Agreement....................................... 3

    IV.    The Parties' 2014 Amended and Restated Development and License
          Agreement ............................................................................................................ 4

    V.     No Asserted Patent is Connected to the 2008 Agreement Or 2014
          Agreement Patents and Applications ..................................................................... 6

SUMMARY OF THE ARGUMENT ...................................................................................6

LEGAL STANDARDS .......................................................................................................7

ARGUMENT .......................................................................................................................8

    I.      The Uncontested Technical Issues Leave Only NuVasive's Contractual
          Defenses for the Court ......................................................................................... 8

         A.     Nuvasive's Representative Products Utilize Twist-In-Place
              Technology ............................................................................................ 9

         B.     Dr. Jackson Has Shown Entitlement to Partial Summary Judgment
              Infringement for the Uncontested Technical Issues................................. 10

         C.     NuVasive Cannot Prevail on its License Defense Because the 2014
              Agreement Does Not Grant It Rights to the Asserted Patents or
              Immunize it From Suit ........................................................................... 11

             1.     No Asserted Patents are Connected to Patents or Applications
                   Listed in the 2014 Agreement ..................................................... 12

             2.     The License to Helical Flange Does Grant NuVasive Rights to
                   Practice the Claims in the Asserted Patents ................................. 12

             3.     The License to BOT Implants Does Not Grant NuVasive Rights to
                   Practice the Claims in the Asserted Patents ................................. 17

4.      The Assignment of Top Notch IP Does Not Grant NuVasive Rights to Use any of the Inventions of the Asserted Patents ........ 20

5.      The Covenant Not to Sue Does Not Insulate NuVasive .............. 20

II.     Summary Judgment is Appropriate On NuVasive's First, Second, Third, and Fourth Counterclaims ...................................................................... 22

A.      Summary Judgment on NuVasive's First Counterclaim for Breach of Contract .................................................................................. 22

B.      Summary Judgment on NuVasive's Second Counterclaim for Breach of Implied Covenant of Good Faith and Fair Dealing ...... 23

C.      Summary Judgment on NuVasive's Third Counterclaim for Fraud .................................................................................................... 23

D.      Summary Judgment on NuVasive's Fourth Counterclaim for Unjust Enrichment ...................................................................... 26

III.    Partial Summary Judgment on Two of NuVasive's Invalidity Theories Is Warranted ....................................................................................................... 27

A.      Purcell is Not Prior Art to the '292 Patent .................................... 27

B.      No Claim is Indefinite Under *IPXL* ................................................ 28

IV.     The Court Should Exclude Mr. Pampinella's Patent Damages Opinions Because they are Based Almost Entirely on Patent "Analytics" Providing Unreliable Information on Valuing the Asserted Patents ...................................... 30

A.      Pampinella's Reliance on IPLytics and Derwent "Patent Citation" Analyses Does Not Reliably Value the Asserted Patents ........................ 31

B.      The Court Should Prevent Pampinella From Presenting His Unreliable Patent Royalty Damages Opinions To the Jury ...................... 36

C.      Pampinella's IPLytics Analysis Is Unreliable .............................. 37

D.      Pampinella's Unreliable Derwent Analysis Is Not Tied to the Facts of the Case .................................................................................... 39

CONCLUSION .......................................................................................................... 40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*10x Genomics, Inc. v. NanoString Technologies, Inc.*,
   2023 WL 5805585 (D. Del. Sept. 7, 2023).............................................................29

*Acceleration Bay LLC v. Activision Blizzard Inc.*,
   No. 1:16-cv-00453-RGA, 2019 WL 4194060 (D. Del. Sept. 4, 2019)....................39

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................................7

*Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Trust Co.*,
   464 S.W.3d 177 (Mo. 2015) .....................................................................................23

*Ballard v. National Football League Players Ass'n*,
   123 F. Supp. 3d 1161 (E.D. Mo. 2015).....................................................................25

*Bath Junkie Branson, LLC v. Bath Junkie, Inc.*,
   528 F.3d 556 (8th Cir. 2008) ................................................................................7, 8

*Carborundum Co. v. Molten Metal Equip. Innovations*,
   72 F.3d 872 (Fed. Cir. 1995).....................................................................................10

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)....................................................................................................7

*CloudofChange, LLC v. NCR Corp.*,
   2021 WL 11549625 (W.D. Tex. Nov. 1, 2021) ........................................................37

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)........................................................................................8, 38, 40

*Exergen Corporation v. Kaz USA, Inc.*,
   2015 WL 4506472 (D. Mass. July 24, 2015) ...........................................................23

*Fail–Safe, L.L.C. v. A.O. Smith Corp.*,
   744 F.Supp.2d 870 (E.D.Wis.2010)..........................................................................40

*Furminator, Inc. v. Kim Laube & Co., Inc.*,
   2010 WL 5184899 (E.D. Mo. Dec. 15, 2010) ..........................................................22

*Goldsmith v. Lee Enters., Inc.*,
   2021 WL 5758434 (E.D. Mo. Dec. 3, 2021) ............................................................23

*GPNE Corp. v. Apple, Inc.*,
    No. 12-cv-02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ................................39

*Hilgraeve Corp. v. Symantec Corp.*,
    265 F.3d 1336 (Fed. Cir. 2001)..................................................................................22

*Howard v. Turnbull*,
    316 S.W.3d 431 (Mo. App. 2010) ..............................................................................27

*Integrated Global Concepts, Inc. v. j2 Global, Inc.*,
    2014 WL 1230910 (N.D. Cal. Mar. 21, 2014)............................................................22

*Invitrogen Corp. v. Clontech Laboratories, Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005)..................................................................................10

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005)............................................................................ *passim*

*Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*,
    60 F.4th 1373 (Fed. Cir. 2023) ..................................................................................29

*Koger v. Hartford Life Ins. Co.*,
    28 S.W.3d 405 (Mo. Ct. App. 2000)..........................................................................23

*Level One Techs., Inc. v. Penske Truck Leasing Co., L.P.*,
    2018 WL 2193520 (E.D. Mo. 2018)......................................................................26, 27

*Manufacturing Resources Int'l, Inc. v. Civiq Smartscapes, LLC*,
    2019 WL 4198194 (D. Del. Sept. 4, 2019)................................................................37

*MasterMine Software, Inc. v. Microsoft Corp.*,
    874 F.3d 1307 (Fed. Cir. 2017)..................................................................................30

*McGinley v. Franklin Sports, Inc.*,
    262 F.3d 1339 (Fed. Cir. 2001)..................................................................................10

*McGowan v. Am. Family Ins. Co.*,
    2017 WL 11680965 (W.D. Mo. Dec. 15, 2017) ....................................................23, 24

*Nichia Corp. v. Feit Electric Co., Inc.*,
    2022 WL 17222250 (C.D. Cal. Oct. 12, 2022)..........................................................8, 9

*Oracle Am., Inc. v. Google Inc.*,
    2012 WL 877125 (N.D. Cal. Mar. 15, 2012)..............................................................39

*Podobnik v. U.S. Postal Serv.*,
    409 F.3d 584 (3d Cir. 2005)..........................................................................................8

*Realtek Semiconductor Corp. v. LSI Corp.*,
   2014 WL 46997 (N.D. Cal. Jan. 6, 2014) ................................................................39

*Sellers v. Bayer Healthcare Pharms. Inc.*,
   2017 WL 2305006 (W.D. Mo. Feb. 9, 2017) ...........................................................24

*SightSound.Com Inc. v. N2K, Inc.*,
   185 F.Supp.2d 445 (W.D. Pa. 2002) ..................................................................25, 27

*Sligo, Inc. v. Nevois*,
   84 F.3d 1014 (8th Cir. 1996) ..................................................................................8

*State Contracting & Eng'g Corp. v. Florida*,
   258 F.3d 1329 (Fed. Cir. 2001) .............................................................................11

*State Indus., Inc. v. A.O. Smith Corp.*,
   751 F.2d 1226 (Fed. Cir. 1985) .............................................................................26

*Stockdall v. TG Investments, Inc.*,
   129 F.Supp.3d 871 (E.D. Mo. Dec. 30, 2015) .......................................................27

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
   2020 WL 9438750 (D. Del. Feb. 20, 2020) ...........................................................28

*Targus Int'l LLC v. Victorinox Swiss Army, Inc.*,
   2021 WL 1737531 (D. Del. May 3, 2021) (RGA)...................................................29

*UltimatePointer, L.L.C. v. Nintendo Co.*,
   816 F.3d 816 (Fed. Cir. 2016)..........................................................................29, 30

*United States v. Mitchell*,
   365 F.3d 215 (3d Cir. 2004)...................................................................................38

*ViaTech Techs., Inc. v. Adobe, Inc.*,
   2023 WL 5975219 (D. Del. Sept. 14, 2023) ..........................................................39

**Statutes**

35 U.S.C. § 119(e)(1).....................................................................................................28

## INTRODUCTION

Plaintiff Roger Jackson, M.D. ("Dr. Jackson") moves for partial summary judgment on the following grounds: (1) on infringement of certain Asserted Patents by certain of Defendant NuVasive, Inc.'s ("NuVasive") Accused Products where Defendant's technical expert has provided no non-infringement opinion; (2) on NuVasive's affirmative defenses of license (Third) and covenant not to sue (Fourth) on the Asserted Patents under the Parties' 2014 Amended and Restated Development and License Agreement ("2014 Agreement"); (3) on NuVasive's First, Second, Third, and Fourth Counterclaims which fall with its Third and Fourth defenses; and (4) two portions of NuVasive's invalidity (Second) defense.  Dr. Jackson also moves to exclude the reasonable royalty opinions of NuVasive's damages expert, Mr. James Pampinella ("Pampinella").

## NATURE AND STAGE OF PROCEEDING

Dr. Jackson filed his original Complaint on January 19, 2021.  D.I. 1.  NuVasive moved to dismiss it, arguing the 2014 Agreement granted NuVasive all substantial rights in the Asserted Patents or otherwise shielded NuVasive from an infringement suit.  The Court denied the Motion based on the plain language of the 2014 Agreement.  D.I. 35, 36.  Dr. Jackson filed a Second Amended Complaint and NuVasive filed an Answer and Counterclaims.  D.I. 77, 89. The Court granted Dr. Jackson's motion to dismiss certain NuVasive defenses and inequitable conduct counterclaims, without prejudice.  D.I. 147, 148.  Dr. Jackson filed a Third Amended Complaint ("TAC") amending Dr. Jackson's Fraudulent Inducement claim to aver facts learned during discovery regarding NuVasive's intentional misrepresentations to Dr. Jackson and NuVasive responded.  D.I. 191, 201.[1]  Fact and expert discovery are closed.

---

[1] The Court deemed Dr. Jackson's motion to dismiss the inequitable conduct counterclaims moot. D.I. 204.  While it does not impact the present motion, because the counterclaims remain unchanged, Dr. Jackson intends to pursue dismissal of them.

## FACTS

NuVasive is accused of infringing eight Asserted Patents[2] by commercializing its Reline, Armada, Precept, SpheRx, and VuePoint II systems (the "Accused Products"). D.I. 191, ¶¶ 71–188.  The '932, '711, '200, '444, '866, and '273 patents relate to "Twist in Place" insert and receiver technologies (the "TIP Patents"); the '292 patent relates to a cannulated polyaxial screw; and the '856 patent relates to a circumferential tool engaging groove polyaxial screw. *Id.*, ¶¶ 11–18; *see also* Exhibits 2–9 ("Ex.").[3]  The Parties stipulated that a (non)infringement finding of a Representative Product acts as a (non)infringement finding for corresponding products.  D.I. 170.

## I.   NUVASIVE'S UNCONTESTED USE OF ASSERTED PATENTS

Dr. Jackson alleges the Representative Products infringe the indicated TIP Patents where ***NuVasive's technical expert provided no non-infringement opinion for those products and claims*** (the "Uncontested Technical Issues").  *See* Ex. A, ¶ 20.

| Uncontested Technical Issues:  Representative Products and Claims | | | | | |
|---|---|---|---|---|---|
| Representative Products | '711 | '866 | '200 | '444 | '273 |
| Reline 1601XXXX[4] | 1 | 1–2, 9 | 1, 9–11, 15, 19 | 1, 12, 17 | 2, 35, 39, 41 |
| Reline 1451XXXX | 1 | 1–2, 9 | 1, 9–11, 19 | 1, 12 | 2, 35, 39, 41 |
| Reline 16171111 | 1 | 1–2, 9 | 1, 9–11, 15, 19 | 1, 12, 17 | 2, 35, 39, 41 |
| Armada 845XXXX | 1 | 1–2 | | | 2, 35, 39, 41 |
| Precept 822XXXX | 1 | 1–2 | | | 2, 35, 39, 41 |
| SpheRX DBR III 448XXXX | | 1–2 | | | 2, 35, 39, 41 |
| SpheRX DBR II 737X5XX | | | | | 2,  39, 41 |
| VuePoint II 897XXX | | | | | 2,  39, 41 |

---

[2]  U.S. patent nos. 8,353,932, 8,696,711, 9,788,866, 9,808,292, 10,353,200, 10,561,444, 10,722,273, and 11,051,856, all identified by their last three numbers, e.g., the "'932 patent".

[3]  Exhibit 1 is the Declaration of Aaron M. Levine in support of this Motion, attesting to the accuracy of the remaining exhibits 2–64.  Exhibit citations in this Motion are to those identified in the Appendix.

[4]  Product number "X"s are placeholders for shank dimension designations, *e.g.*, Reline 16014520 is a Reline 1601 with a 4.5x20mm shank. Shank dimensions are immaterial to infringement.

## II.    BACKGROUND ON SPINAL IMPLANT SYSTEMS

As part of its spinal implant systems, NuVasive's accused polyaxial pedicle screws include a "shank" and a "receiver" component (also called a "tulip," or "head") that receives a rod to connect multiple implants placed in different vertebrae.  Ex. 13.  Surgeons use these rods to fix the relative orientation of the vertebrate.  *Id.*  Rods are secured via a closure top.  *Id.* "Polyaxial" refers to the receiver being able to pivot relative to the shank in any angular direction.

Spinal implant systems *e.g.*, Reline, also ordinarily include: (1) monoaxial screws (shank fixed relative to the receiver); (2) uniplanar screws (shank may pivot in a single plane); and (3) non-screw implants, such as hooks and connectors.  Various implants from the Reline system are shown below:



Ex. 13 at 5, 7.  Even non-polyaxial screw implants use closure top mating features to seat connecting rods.  *Id.*; Ex. 24, 196:14–198:3.  Specialized tools and instruments are used to install the implants correctly and safely.  Ex. 13 at 14–26, 30–43, 49–78, 80–84, 88–94.

## III.    THE PARTIES' 2008 DEVELOPMENT AND LICENSE AGREEMENT

In 2008, the Parties entered a "Development and License Agreement" (the "2008 Agreement").  Ex. 10. ███████████████████████



██████ *Id.*, §§ 1.13, 6.01. ██████

██████ *Id.*, § 1.18.

## IV.   THE PARTIES' 2014 AMENDED AND RESTATED DEVELOPMENT AND LICENSE AGREEMENT

In May 2014, Dr. Jackson asked NuVasive about its royalty payments for international (or "outside the US" abbreviated "OUS") sales. Ex. 35. Eventually, NuVasive admitted it owed Dr. Jackson ~$1.8M in underpaid OUS royalties and then used that as a reason to propose "buying out" all its future running royalty obligations under the 2008 Agreement, ultimately resulting in the 2014 Agreement. Although begun in September 2014, NuVasive insisted that negotiations complete by the end of December 2014, purportedly for NuVasive tax reasons. Ex. 60. Unbeknownst to Dr. Jackson, NuVasive was simultaneously seeking (September 5, 2014) and then obtaining (November 19, 2014) FDA approval to market Reline, which became NuVasive's strongest selling system. Ex. 61.

To persuade Dr. Jackson to accept its proposal, NuVasive on September 26, 2014, sent a projection of the royalties he would receive if the Parties were to continue under the 2008

---

[5] The 2008 Agreement provided ████████████████████████ Ex. 10, §§ 1.13, 6.01 (██████).

[6] Many of the definitions of the 2008 Agreement are similar, if not the same, as those set forth in the later 2014 Agreement. *Compare* Ex. 10, § 1.15 ("Polyaxial Screw" definition in 2008 Agreement), *with* Ex. 11, § 1.15; *see also* § 1.14; "Products" in Ex. 10, § 1.16, and Ex. 11, § 1.15. Other definitions had their listing of enumerated patents and applications expanded. *See* "Helical Flange" Ex. 10, § 1.07, Ex. 11, § 1.07; "BOT Implants," Ex. 10, § 1.02, Ex. 11, § 1.03. Others appear for the first time in the 2014 Agreement, such as "Top Notch," in Ex. 11, § 1.18.

Agreement.  Specifically, NuVasive ███████████████████████████████████

███████████████████████████████████[7] which NuVasive purported to be based on

NuVasive's forecasts of sales of the royalty-bearing products. Exs. 36, 37. ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████

     NuVasive and Dr. Jackson ultimately agreed to NuVasive's "buy out" of its future royalty

obligations under the 2008 Agreement, to release of NuVasive's past underpayment of royalties

and royalties that would be due for Q4 2014, and for Dr. Jackson to assign outright to NuVasive

the Polyaxial Screw IP, Top Notch IP, and MIS IP.  Ex. 11, §§ 2.01, 2.02, 3.03.  In return, ███

███████████████████████████████. *Id.*, § 3.01.  Internally, ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████. Exs. 53, 62, 64. ████████████████████████████████████████████

██████████████████████████. Ex. 53.

---

[7] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ Although Dr. Jackson's
Fraudulent Inducement claim (Count Nine) is not the subject of this Motion, discovery revealed
that internally Mr. Valentine told NuVasive executives a design around was an unrealistic
prospect.  *See* D.I. 191, ¶ 209 and Ex. 40 to D.I. 191 (Ex. 63).

## V.    NO ASSERTED PATENT IS CONNECTED TO THE 2008 AGREEMENT OR 2014 AGREEMENT PATENTS AND APPLICATIONS

Years after NuVasive's launched Reline, Dr. Jackson learned Reline and other NuVasive products infringed patents on technologies *unconnected to those licensed in the 2008 Agreement or then "bought out" in the 2014 Agreement*.  In particular *(i) none of the Asserted Patents are listed in the 2014 Agreement (a superset of those listed in the 2008 Agreement); (ii) none of the later continuity chains of any of the patents or applications listed in the 2014 Agreement include any of the Asserted Patents; and, (iii) none of the Asserted Patents claim priority to any patent or application listed in the 2014 Agreement*.  Dr. Jackson's TIP Patents, Cannulated Polyaxial Screw ('292) patent, and Circumferential Tool Engagement Groove ('856) patent are all from *different patent families* from those recited in the 2008 Agreement or 2014 Agreement.  Ex. 59.

## <u>SUMMARY OF THE ARGUMENT</u>

- Partial Summary Judgment of Infringement on the Uncontested Infringement Issues is warranted as NuVasive's technical expert has no opinions rebutting Dr. Jackson's expert and other evidence.  The *Asserted Patents are not connected to* any patent family licensed or assigned to NuVasive and no right granted by license, assignment or covenant not-to-sue in *the 2014 Agreement* applies to the Asserted Patents.

- The Court should grant summary judgment on NuVasive's First (breach of contract) Second (breach of implied covenant of good faith and fair dealing), Third (fraud), and Fourth (unjust enrichment) Counterclaims because the record is devoid of any evidence supporting those claims and each fall with NuVasive's 2014 Agreement contract defenses.  Its fraud counterclaim also fails because there is no evidence Dr. Jackson made any false representations to NuVasive or had any duty to speak resulting in withheld material information.

- Summary Judgment that U.S. patent No. 7,377,923 ("Purcell '923") is not prior art to the '292 patent is warranted as Purcell's Figure 13 embodiment, necessary to NuVasive's invalidity theories, is not entitled to a priority date before the priority date of the '292 patent.

- Summary Judgment of no Indefiniteness under *IPXL* as to claims 1 and 31 of the '932 patent, claim 1 of the '200 patent, and claim 1 of the '444 patent, is appropriate because when read in context the claims do not recite method steps and there is no question when infringement occurs.

- The patent royalty rate opinion of Pampinella, NuVasive's proposed damages expert, is based nearly exclusively on patent citation analyses, one of which relies on concededly-unscientific metrics, and the other derived from incorrect data. His opinions do not reliably relate to the value of the asserted patents and should be prevented from going to the jury.

## LEGAL STANDARDS

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "no evidence" summary judgment is appropriate when the moving party shows an absence of evidence to support the case of the party with the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party need not "produce evidence showing the absence of a genuine issue of material fact" on issues for which it does not bear the burden of proof. *Id*. Once a demonstrated absence of evidence exists, the nonmovant must present evidence indicating that there is a genuine factual issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment. *Id*.

In interpreting contracts, "[t]he nature and extent of a contract's essential terms which form the basis of the parties' mutual assent must be certain or capable of being certain." *Bath Junkie*

*Branson, LLC v. Bath Junkie, Inc.*, 528 F.3d 556, 561 (8th Cir. 2008) (citations omitted).[8]  "Under the objective theory of contracts applied in Missouri since 1892, the stress is on the outward manifestation of assent made to the other party."  *Id.*  The "meeting of minds is to be determined by the expressed, and not by the secret, intention of the parties."  *Id.*  An expert may testify only if the testimony is based on sufficient facts or data, the product of reliable principles or methods, and the expert has reliably applied them. Fed. R. Evid. 702. The trial judge must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

## ARGUMENT

## I.   THE UNCONTESTED TECHNICAL ISSUES LEAVE ONLY NUVASIVE'S CONTRACTUAL DEFENSES FOR THE COURT

Dr. Jackson seeks partial summary judgment of infringement for the Uncontested Technical Issues, where NuVasive's technical expert offers no opinions rebutting the opinions of Dr. Jackson's infringement expert, Dr. Errico.  Ex. 30 (Fallin non-infringement Rebuttal report); Ex. 26, 21:5–8.  Dr. Jackson has shown infringement through Dr. Errico's Declaration and reports, which rely on NuVasive's technical documents and deposition testimony.  Ex. A (Declaration of Dr. Errico); *see also* Exs. A-1 and A-2 (Opening and Reply Reports of Dr. Errico on infringement). Given Mr. Fallin's lack of non-infringement opinions for the Uncontested Technical Issues, there is no genuine[9] issue of material fact and partial summary judgment for Dr. Jackson is appropriate.

---

[8] As discussed in the Court's prior Order, interpreting the 2014 Agreement requires applying Missouri law. D.I. 36 at 4 (quoting D.I. 23-1, Ex. A, art. XV).  Under Missouri law, a court must first determine whether a contract is ambiguous—*i.e.*, it is reasonably susceptible to different constructions.  *Id.*  "If no ambiguity exists, the court must construe and enforce the contract according to its plain meaning."  *Sligo, Inc. v. Nevois*, 84 F.3d 1014, 1019 (8th Cir. 1996).

[9] NuVasive's unverified response to Interrogatory No. 22 (seeking non-infringement contentions) does not identify any evidence and merely lists claim elements followed by a statement that "the Accused Products each lack features that meet one or more of the recited claim elements identified below." Ex. 54 at 5–14.  This cannot defeat summary judgment. *See Podobnik v. U.S. Postal Serv.*,

### A.     Nuvasive's Representative Products Utilize Twist-In-Place Technology

Twist-in-place polyaxial screw assemblies use an insert (12) in the receiver that transfers

forces of a connecting and distributes them on a shank head.  *See* Ex.

7, Fig. 1, Abstract (the '444 patent).  The insert (12) (annotated in red)

assembles from the top of the receiver ("top loaded"), not the bottom

("bottom loaded"), and rotates from a first orientation (sometimes

stated as the rod seating surface of the insert perpendicular to the

receiver channel) to a second orientation (so that the insert and receiver

channels align).  *Id.*; *compare* Ex. 16.  Rotating the insert causes part

of it to rotate beneath a shoulder or downward-facing protrusion in the

receiver bore.  *Id.*  This creates a high resistance to push-out, a type of

failure of the products.  Ex. A, ¶ 19 (*citing* Exs. A-1, ¶¶ 39–40 and A-

2, ¶¶ 41, 44, 46).  Each of NuVasive's Accused Products uses a TIP

design.  Ex. A, ¶ 18 (*citing* Ex. A-1, ¶ 44) (see below).



Fig. 1.



The Reline 1601XXXX Representative Product

illustrates the Uncontested Technical Issues.[10]     Each

NuVasive product has an "assembly diagram" that both

illustrates and instructs its assembly.  Ex. 12, 154:25–

156:15; Ex. 17, 164:2–165:24.   NuVasive intends its

---

409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations . . . to show the existence of a genuine issue"); *Nichia Corp. v. Feit Electric Co., Inc.*, 2022 WL 17222250, at *5 (C.D. Cal. Oct. 12, 2022) ("unverified discovery may not be considered by a court evaluating a motion for summary judgment").

[10] As stipulated to by the parties, the Reline 1601XXXX represents other families of NuVasive Reline products.  D.I. 170.  Infringement of the Reline 1601XXXX, per stipulation of the parties establishes the infringement of each product the Reline 1601XXXX represents.  *Id.*

manufacturers to rely on these assembly diagrams.  Ex. 12, 155:5–19; Ex. 17, 164:18–165:6.  The

Reline 1601XXXX assembly diagram shows the shank is first "bottom loaded" while the insert is

"top loaded," with the final assembly depicted in cross-section on the far right in the diagram

above.  Ex. 16.  The narrative instructions demonstrate that the insert ("load ring") is inserted into

the receiver ("tulip") from above then rotated 90 degrees to "lock into place":



*Id.*  NuVasive then ensures that the polyaxial motion of the shank has been maintained.  *Id.* Each

of the other Representative Products are associated with similar "assembly drawings" providing

similar instructions.  *See, e.g.,* Exs. 14–15, 18–22.

As set forth by Dr. Errico's declaration and Expert Report, the representative Reline

1601XXXX family of Accused Products literally satisfies each and every limitation of the asserted

claims of the '711 (Ex. A, ¶ 10 (*citing* Ex. A-1, ¶¶ 436–454)), '866 (*Id.* (*citing* Ex. A-1, ¶¶ 473–

540)), '273 (*Id.* (*citing* Ex. A-1, ¶¶ 808–884)), '200 (*Id.* (*citing* Ex. A-1, ¶¶ 436–454)), and '444

(*Id.* (*citing* Ex. A-1, ¶¶ 752–804) patents.  Dr. Errico's declaration and Expert Reports set forth his

uncontested analysis with respect to the other Representative Products.  Ex. A, ¶¶ 11–17.

### B.   Dr. Jackson Has Shown Entitlement to Partial Summary Judgment Infringement for the Uncontested Technical Issues

Where, as here, if there "is no factual dispute" that the accused products satisfy all elements

of a claim, summary judgment of infringement is appropriate.  *Invitrogen Corp. v. Clontech*

*Laboratories, Inc.*, 429 F.3d 1052, 1080 (Fed. Cir. 2005) (affirming summary judgment of

infringement and rejecting accused infringer's argument that the conclusory expert testimony it

presented raised a material issue of fact); *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349

(Fed. Cir. 2001) (affirming summary judgment of infringement where accused infringer "did not present any nonconclusory evidence in opposition to [patentee's] summary judgment of infringement"). NuVasive has the burden of establishing any defense of express license. *Carborundum Co. v. Molten Metal Equip. Innovations*, 72 F.3d 872, 878 (Fed. Cir. 1995). The determination of whether there is an express license is "governed by ordinary principles of state contract law." *State Contracting & Eng'g Corp. v. Florida*, 258 F.3d 1329, 1339 (Fed. Cir. 2001).

### C.    NuVasive Cannot Prevail on its License Defense Because the 2014 Agreement Does Not Grant It Rights to the Asserted Patents or Immunize it From Suit

In view of NuVasive's *de facto* concession on the technical merits, Dr. Jackson's entitlement to summary judgment of infringement turns on NuVasive's Third (license) and Fourth (covenant not to sue) affirmative defenses. D.I. 201 at 18. These are premised on its contention that the 2014 Agreement, which "bought out" NuVasive's running royalty obligations under the Parties' 2008 Agreement, extends far beyond the patents under the 2008 Agreement to include *any* of Dr. Jackson's patents in the field, including the Asserted Patents. The Court has already considered and rejected that basic premise in denying NuVasive's motion dismiss. D.I. 36 at 5–7. The Court determined the definitions of "Polyaxial Screw IP," "Top Notch IP," and "MIS IP" do not encompass the Asserted Patents, and the definition of "Related System Component" does not cover the Accused Products. D.I. 36.[11]

---

[11] The Court found that the assignment in the 2014 Agreement of the MIS IP, Polyaxial Screw IP, and Top Notch IP, "does not cover all the technology claimed or disclosed in the enumerated patents or application, and instead only extends to the recited technology." D.I. 36 at 5. The Court rejected NuVasive's argument, that "the Asserted Patents . . . fall within the scope of the assigned IP," because it "rests on an improper contract interpretation." *Id.* at 5-6. The Court concluded "that 'Polyaxial Screw IP' only includes patents which are related to the enumerated patent applications [and] does not include any unrelated patent which happens to disclose a similar polyaxial pedicle screw." *Id.* at 6. The Court concluded "that 'Polyaxial Screw IP' only includes patents which are related to the enumerated patent applications [and] does not include any unrelated patent which happens to disclose a similar polyaxial pedicle screw." *Id.*

Dr. Jackson anticipates NuVasive will argue the 2014 Agreement granted it rights that cover the Asserted Patents via the license grant to Helical Flange and BOT Implants, and/or the assignment of Top Notch IP. Ex. 55 at 10–11. Its position appears to be that, if any Accused Product includes a structural feature within the definitions of Helical Flange, BOT Implants, and/or Top Notch IP, the 2014 Agreement must also encompass the Asserted Patents. ***Dr. Jackson freely concedes some Accused Products include Helical Flange or other technologies covered by the rights granted to NuVasive in the 2014 Agreement; but Dr. Jackson does not claim patent infringement because of NuVasive use of Helical Flanges, BOT Implants or the Top Notch IP (or any other rights granted in the 2014 Agreement***. The plain and unambiguous language of the 2014 Agreement shows it does not extend to the Asserted Patents or the different technologies now accused in the Accused Products. NuVasive's position still "rests on an improper contract interpretation." D.I. 36 at 5-6.

**1.     No Asserted Patents are Connected to Patents or Applications Listed in the 2014 Agreement**

As stated above, the Asserted Patents and the technology they claim are unconnected to the enumerated patents within the 2014 Agreement. None of the Asserted Patents claim priority to any enumerated patent or application from the 2014 Agreement, which can be confirmed by simply inspecting the "Related U.S. Application Data" appearing on the front of each Asserted Patent. Exs. 2–9. A similar exercise starting with the enumerated patents and applications from the 2014 Agreement looking forward in time using the USPTO's "Continuity Data" reveals that no Asserted Patent descends from any 2014 Agreement patent document. Ex. 59.

**2.     The License to Helical Flange Does Grant NuVasive Rights to Practice the Claims in the Asserted Patents**

Neither the subject matter licensed under the "Helical Flange," nor the enumerated patent documents in the definition, cover the Asserted Patents. The 2014 Agreement grants NuVasive a

████████████████████████████████████████████████████████

██████████ [12] Ex. 11, § 2.02(a).  The 2014 Agreement defines Helical Flange as:



*Id.*, § 1.07 (emphasis added).  This definition has a subject matter restriction, ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  It also includes the clause, ██████████

███████████████████████████████████  Read with the subject

matter limitation, the definition has clear limits.

        **First**, the definition indicates that t███████████████████████████████████

███████████████████████████████████  It is further limited to

████████████████████████████████████████████████████████

████████████████████  To identify ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████  is  what  is  relevant  to  the

───────────────────

[12] Because the Court already rejected NuVasive's argument that the Accused Products fall within the definition of "Related System Components," Dr. Jackson focuses on the license to utilize the Helical Flange in conjunction with the "Products."  D.I. 36 at 8.

definition.  However, structures disclosed in the '689 patent that are, *e.g.*, prior art, or are structures that are not "helically wound mating and interlocking structures" are not structures within the definition of "Helical Flange' because ███████████████████████████████████████████ ████████████████████████████████ The same limit applies in the clause █████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ If, in one of those set of applications, proprietary elements of the "helically wound mating and interlocking structures owned by the Jackson Group" are disclosed or claimed, such elements are within the Helical Flange, but not anything disclosed or claimed therein.  If, say, a reissue referred to a prior-art patent or structure, that structure is not *ipso facto* brought within the definition of Helical Flange.

      As shown to the right, the '689 patent discloses in Figures 11-14 four helical flange forms (annotated in red).  If Dr. Jackson invented some other helical flange form, for example an octagonal flange, and it was claimed or disclosed in a continuation-in-part of the '689 patent, that new flange form would be within the Helical Flange, because it would be ████████████████████████████████████ ████████████████████████████████████████ If this same continuation-in-part also claimed or disclosed a new screwdriver for driving closure tops, the screwdriver would not be within the Helical Flange definition.



      The Helical Flange definition also contains the clause █████████ ████████████████████████████████████████████████████████ It is to be similarly understood.  If that ██████████████████████████████████████████

███████████████████████████████████████████████

█████████████████ *those elements* are within the Helical Flange, not anything and everything

disclosed or claimed in that intellectual property.  Again, a prior art structure referenced is not

brought within Helical Flange; nor are any inventions not a directed to ██████████████████

███████████████████████████████████ brought within the Helical Flange.  Thus,

in context, ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

Thus, if a new, *e.g.*, octagonal flange form, were disclosed or claimed in a patent that *does*

*not descend* from the '689 patent, that new flange form is brought within the definition of Helical

Flange.  However, if a new "fastener insertion" methodology, for example, is disclosed or claimed

in a patent that does not descend from the '689 patent, this subject matter it is not within the

definition of Helical Flange.  Such patents would have to be separately licensed, either through

some other portion of the 2014 Agreement or in a separate agreement.  This is exactly how the

2014 Agreement works.  *See e.g.* Ex. 11, § 1.11 (██████████████████████████████████

█████████████████████████).  The ██████████████████████████████████

████████████████████████████████████  However, it

refers to the '689 patent, without descending from it.  *See* Ex. 51 at 8:34–48 (patent issuing from

'377 application noting and incorporating prior art '689 patent).

NuVasive's interpretation of the 2014 Agreement is that when reference is made to the '689 patent ███████████████████████████████████████████████ *ipso facto* comes within the definition of Helical Flange.  NuVasive's view would have absurd results.  For example, if in 2025, Dr. Jackson filed a patent application on new subject matter that referred to the now-expired '689 patent as a useful item of prior art (███████████████), NuVasive would argue it became a "Helical Flange" of the definition and licensed.  That result flies in the face of the express reservation of rights of § 2.05 and the plain language of § 1.07 and in the face of common sense[13].  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████

**Second**, rights to Helical Flange are limited to ████████████████████

████████████████████████████████████████████████

████████████████████████████ Ex. 11, §§ 1.15, 2.02(a).  The Court determined the Asserted Patents "do not fall within the scope of 'Polyaxial Screw IP' as it is defined in the 2014 Agreement." D.I. 36 at 7.  Because the clause "██████████████████

████████████████████████ does not include polyaxial screws, NuVasive did not receive a license to the Asserted Patents through it.  This clause refers to and relates to *other* spinal

---

[13] NuVasive is obligated to ████████████████████████████████████████
████████████████████████████████████████████████ in the 2014 Agreement. Ex. 11, § 5.02.  NuVasive has a patent marking page and none of the Asserted Patents appear on it.  Ex. 23.  NuVasive's conduct is telling on its belief of the merits claim to a license to the Asserted Patents.

implants included within a system, such as monoaxial screws, uniplanar screws, plates, connectors, hooks, *etc*.  Ex. 13.  These other spinal implants also receive connecting rods and also can be secured with helical flange-style closure tops.  *Id*.; ex. 24 at 196:14–198:3. The ability to put helical flange closure tops on non-"Polyaxial Screw" implants gave NuVasive the ability to simplify its systems by using the same "Polyaxial Screw" closure top technology.[14]

Despite the limitations in the 2014 Agreement, NuVasive's position appears to be that any polyaxial screw that includes a helical flange (or a BOT extension or a top notch groove, as discussed below) as a structural feature is licensed under ***all other patented technology of Dr. Jackson***, including the Asserted Patents.  Mr. Fallin opinions about the 2014 Agreement, apparently are to support the argument that the Accused Products include such structural features.  Ex. 30, ¶¶ 39–40.  That misses the mark for at least two reasons.  First, NuVasive is not being accused of infringing due to use of helical flanges.  Second, as described above, NuVasive did not receive the rights to the Asserted Patent claims and it was not given universal immunity for all aspects of whatever device might also use a helical flange.

### 3.    The License to BOT Implants Does Not Grant NuVasive Rights to Practice the Claims in the Asserted Patents

The BOT Implants definition



" Ex. 11,

---

[14] The language of the 2008 Agreement, which                                          supports Dr. Jackson's interpretation.  Ex. 10, § 6.01(a), (b).

§ 1.03.  Thus, the 2014 Agreement's license to BOT Implants ███████████████

████████████████████████████████████████████████████████████████

███████████████    Again, NuVasive is not being sued for patent infringement due to the

presence of break-off extension on any product.  Indeed, no Asserted Claim includes a limitation

directed to this feature.  Ex. A, ¶ 21 (citing reply report ¶65–66).

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████    Ex. 11, §1.03.  As with the definition of "Helical Flange," this definition has a

technical or functional definition regarding what BOT Implants represent.  Also, like the "Helical

Flange" the next part of the definition ("████████████████████████████████

████████████████████████████████████████████") provides a structural

limitation corresponding to the functional limitation.  Those (structural) elements "████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████.  Subject matter

"████████████████████████████████████████████████████████

████████████████████████" is not within the definition of BOT Implants.

    After "████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████" The analysis of this clause is the same as above.  If

---

[15] In general terms, BOT extension tabs are extensions that grant additional height to the rod channel of an implant so that very mal-aligned vertebrae can be properly aligned using a technique referred to as "reduction."  Once the vertebrae have been aligned, by mechanically forcing the rod into place and securing it with a closure top, the extension tabs are broken off and removed to lower the profile of the implants.

there are elements "█████████████████████████████████████████████████ ████████████████████████████████████████████████ Subject matter ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████.

The BOT Implant definition limits NuVasive's use of that related intellectual property only in connection with "███████████████████████████████████████████████████████ ███████████████" Ex. 11, § 1.03. Thus, the license only extends to uses of that break-off extension with the Products, regardless of the where the "███████████████████████████████ ██████████████". The 2014 Agreement granted NuVasive rights to use break-off extensions in specific ways, not in every conceivable way. Ex. A, ¶ 21 (citing reply report ¶ 65–66).

Again, NuVasive appears to contend that because certain of the Accused Products include break-off extension tab structures that it is universally licensed. It appears to contend that the clause "██████████████████████████████████████████████████" means the Asserted Patents become "BOT Implants" if products that infringe them also have the functional features in the BOT Implant definition. As discussed above in connection with the Helical Flange, the definition (and thus the license) extends only to the "break off tab elements" with the functional features of the definition that are "█████████████████" in the stated patent or other related intellectual property. The definition (and thus the license) does not extend to *everything* "████████████████" in the stated patents or other related intellectual property. Assuming *arguendo* a NuVasive Accused Product is a BOT Implant, the license extends only to what makes it a BOT Implant and does not include the claims of the Accused Patents which recite none of those functional features or elements.

### 4.     The Assignment of Top Notch IP Does Not Grant NuVasive Rights to Use any of the Inventions of the Asserted Patents

Like Polyaxial Screw IP, Top Notch IP is confined to specific patents and applications. None of the Asserted Patents claim priority to them or are within their "continuity data." The 2014 Agreement defines Top Notch IP as:



Ex.11, § 1.18.  According to § 2.01 these patents were assigned to NuVasive.  As the Court previously found, "'thereto' is a modifying clause which refers back to the enumerated patent[s]." D.I. 36 at 6.  "The use of 'thereto' shows that the continuations, patent applications, etc. must be related to the enumerated patent[s]." *Id.* The Court should affirm its reasoning and "conclude that ['Top Notch IP'] only includes patents which are related to the enumerated patent[s]" (*i.e.*, patents that claim priority to any of the enumerated patents).  As noted above, no Asserted Patents claims priority to any of the enumerated patents or applications in § 1.18 of the 2014 Agreement and no enumerated patent or application includes an Asserted Patent among its descendants.  Exs. 2–9, 59.  Like Polyaxial Screw IP, the Top Notch IP "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮" a horizonal tool attachment feature.  No Asserted Patents qualify.

### 5.     The Covenant Not to Sue Does Not Insulate NuVasive

The Court previously determined that the covenant in the 2014 Agreement does not encompass any of the Asserted Patents.  D.I. 36 at 9 ("NuVasive has failed to show that any of the Asserted Patents . . . are covered by the covenant not to sue.").  For the same reasons discussed above and for the reasons in the Court's Order, the covenant not to sue does not insulate NuVasive from infringing the Asserted Patents.  The covenant not to sue in § 2.03 of the 2014 Agreement

("CNTS") is not universal, but tracks the limited grants of rights licensed or assigned to NuVasive.

Ex. 11, § 2.03 ("███████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████").[16]  Thus, the CNTS is only potentially applicable to Dr. Jackson's claims in

this suit if the Asserted Patents are within the rights to "████████████████████████

████████████████████████████████████████████████████████████"

    For all the reasons above, none of the claims of the Asserted Patents fall within Top Notch

IP, Helical Flange, BOT Implants.  Further, the Court has previously determined that the Asserted

Patents "do not fall within the scope of "Polyaxial Screw IP" as it is defined in the 2014

Agreement." D.I. 36 at 7.  The Court also determined that "[b]ecause the Accused Products are the

screw fixation systems themselves, not items sold for use with the screw fixation systems, such as

rods or closure tops, they are not "Related System Components" covered by the covenant not to

sue." *Id*. at 8–9.  Finally, the Accused Products are not "Instruments" or "Methodologies" as

defined in § 1.09 and 1.10 of the 2014 Agreement and NuVasive has no evidence or argument for

such a contention.  *See, e.g.,* Ex. 30, ¶¶ 36–52 (position on other terms with no opinions on

"Instruments" or "Methodologies").  The CNTS does not apply.

    The fact that a specific NuVasive product incorporates a structural feature, such as a helical

flange, break-off extension or top-notch groove, does not immunize it from infringing other

families of patents that cover other technological features, as the Asserted Patents do here.  The

---

[16] Notably, § 2.05, ████████████████████████████████████, undermines NuVasive's
universal immunity theory. Ex. 11, § 2.05.  Were NuVasive's theory of the 2014 Agreement
correct, a single page would have sufficed for the 2014 Agreement, with a single license under all
Dr. Jackson's patents past, present and future.  Instead, the Parties specifically delineated a dozen
separate technology categories in §§ 1.02–1.03, 1.07–1.12, 1.14–1.16 and 1.18, none of which
recite any of the Asserted Patents or their claimed technologies. Were the 2014 Agreement
intended to cover all aspects of NuVasive's products it would have simply identified the products.

permitted use of one patent does not grant protection from others independently patented technologies.  Partial summary judgment for Dr. Jackson on the CNTS is appropriate here.

## II.   SUMMARY JUDGMENT IS APPROPRIATE ON NUVASIVE'S FIRST, SECOND, THIRD, AND FOURTH COUNTERCLAIMS

The record is devoid of evidence supporting NuVasive's first, second, third, and fourth counterclaims, which largely fall with its contract-based defenses.

### A.   Summary Judgment on NuVasive's First Counterclaim for Breach of Contract

Filing this lawsuit is the only conduct identified by NuVasive purportedly constituting breach of the 2014 Agreement.  D.I. 201, ¶¶ 81; Ex. 55 at 10–11 (Interrogatory response with similar allegations).  Because NuVasive lacks rights to practice the claims of the Asserted Patents, as addressed above, it was not a breach for Dr. Jackson to sue for infringement and summary judgment is warranted. *Furminator, Inc. v. Kim Laube & Co., Inc*., 2010 WL 5184899, *17 (E.D. Mo. Dec. 15, 2010) (rejecting accused infringer's argument that a covenant not to sue patentee gave for the two other patents not at issue in the suit applied to the asserted patent, which issued from a continuation application of the two patents; further granting summary judgment of infringement); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1345-46 (Fed. Cir. 2001) (affirming summary judgment that accused infringer was not licensed to use patented technology because, in construing alleged technology transfer agreement under Ontario law, the agreement did not transfer any rights to the asserted patents); *Exergen Corporation v. Kaz USA, Inc.*, 2015 WL 4506472, at *3-5 (D. Mass. July 24, 2015) (granting patentee summary judgment that the accused infringer did not have an express license to the asserted patents, because it could not show that the accused products fell within the "licensed field" of the license agreement).

**B.      Summary Judgment on NuVasive's Second Counterclaim for Breach of Implied Covenant of Good Faith and Fair Dealing**

"Missouri law implies a covenant of good faith and fair dealing in every contract." *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 412 (Mo. Ct. App. 2000).  To establish this claim, NuVasive must prove that Dr. Jackson used "express contract terms in such a way as to evade the spirit of the transaction or to deny a party an expected benefit." *Id.*  It "bears the burden of providing *substantial* evidence to show bad faith" by Dr. Jackson.  *Goldsmith v. Lee Enters., Inc.*, 2021 WL 5758434, at *5 (E.D. Mo. Dec. 3, 2021) .  "There can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." *Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Trust Co.*, 464 S.W.3d 177, 185 (Mo. 2015).  The limited rights granted to NuVasive under the 2014 Agreement do not include rights to the Asserted Patents and ███████████████████████ Ex. 11, § 2.05.  Dr. Jackson has not sued NuVasive under any of the limited rights granted by the 2014 Agreement.  Summary judgment is appropriate.  *See Goldsmith*, 2021 WL 5758434, at *5.

**C.      Summary Judgment on NuVasive's Third Counterclaim for Fraud**

"In order to establish a submissible case of fraud, [NuVasive must] show … a false, material representation." *McGowan v. Am. Family Ins. Co.*, 2017 WL 11680965, at *3 (W.D. Mo. Dec. 15, 2017).  An omission may only "be considered a misrepresentation if the silent party has a duty to speak" which circumstances rarely permit to be actionable.  *Id.*  Such a duty "may arise from a relationship of trust or confidence, an inequality of condition, or superior knowledge that is not reasonably available to the other party." *Id.*

**No Evidence of Affirmative Misrepresentations.**  *First*, NuVasive relies on portions of an email (and attachment) ***NuVasive authored and sent*** to Dr. Jackson related to the 2014

23

Agreement negotiations as evidence of a misrepresentation **by Dr. Jackson**.   D.I. 201, ¶ 96 (quoting portions of Exs. 38 and 39).  Putting aside that the documents are NuVasive's statements, reading them in full shows the Parties were addressing limited rights during the negotiation.  For example, the attachment states that the parties intended to amend the 2008 Agreement for "clarification of **certain** intellectual property rights granted from Dr. Jackson to NuVasive," and then spent two pages clarifying those limited intellectual property rights. Ex. 39 (emphasis added).

*Second*, NuVasive alleges that "Dr. Jackson also falsely represented that he would not sue NuVasive for practicing [Dr. Jackson's intellectual property]," but the bracketed phrase in the actual document **sent by NuVasive** reads, "***the Top Notch IP, Helical Flange IP, BOT Implant IP, Instrument IP, Methodology IP, Polyaxial Screw IP or Related System Components IP***." *Compare* D.I. 201, ¶ 97, *with* Ex. 39 at 2.[17]  Lacking evidence that Dr. Jackson made an affirmative representation, summary judgment on that portion of the claim is appropriate.  *See Sellers v. Bayer Healthcare Pharms. Inc.*, 2017 WL 2305006, at *6 (W.D. Mo. Feb. 9, 2017) (granting summary judgment as to fraud claims for lack of evidence).

**No Evidence of An Actionable Omission.**  There is no evidence that Dr. Jackson owed NuVasive a duty to disclose what it alleges.  "The duty to disclose arises either where there is a relation of trust and confidence between the parties or where one party has superior knowledge or information not within the fair and reasonable reach of the other party."  *Ballard v. National Football League Players Ass'n*, 123 F. Supp. 3d 1161, 1170 (E.D. Mo. 2015).  Article XX of the

---

[17] In response to Dr. Jackson's Interrogatory asking NuVasive to identify any documents or testimony supporting its fraud claim, NuVasive did not identify a single document, witness, or testimony. Ex. 55 (Response to Interrogatory No. 24).  Instead, NuVasive stated that, "[d]uring the course of negotiations over the 2014 Agreement, Dr. Jackson, his attorneys, and NuVasive repeatedly referred to ███████████ as a 'buyout.'" *Id.*  Yet, that is exactly what the 2014 Agreement is—a lump sum buyout of NuVasive's royalty obligations under the 2008 Agreement for the limited technology granted.

2008 Agreement (in place during negotiations) makes clear that the parties " ████████

████████████████████████████████████████████

████████████████████████" Ex. 10.  NuVasive must therefore show a duty arising

from Dr. Jackson having some superior knowledge or information not within the fair and

reasonable reach of NuVasive.  NuVasive lacks any such evidence.

NuVasive only alleges Dr. Jackson "has superior knowledge" and "had a duty to disclose

to NuVasive" the "content of his own patent portfolio," but, rather than doing so, Dr. Jackson

"withheld and concealed the existence of patents and unpublished applications that he now asserts

against NuVasive."  D.I. 201, ¶¶ 95, 98.  By NuVasive's own admissions, two Asserted Patents

issued before the parties even entered the 2014 Agreement.  Ex. 55 at 12-13 ('711 and '932

patents).  They therefore do not give rise to a duty to disclose.  *Ballard*, 123 F. Supp. 3d at 1170

(no duty to disclose when purportedly withheld information is publicly available).[18]  Other than

the '711 and '932 patents, which had issued, ***none of the applications resulting in the Asserted***

***Patents had even been filed*** as of December 31, 2014, when the 2014 Agreement was executed.

*See* field 22 on the face of Exs. 4–9.  And, in any event, Dr. Jackson could not know what, if any,

claims would be allowed, nor the form or scope of any allowed claims.  *State Indus., Inc. v. A.O.*

*Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("Filing an application is no guarantee any

patent will issue and a very substantial percentage of applications never result in patents.  What

the scope of claims in patents that do issue will be is something totally unforeseeable.").

As the Court found, the Parties' intent not to grant rights to the Asserted Patents in the 2014

---

[18] Similarly, earlier patents and applications in the priority chains of the Asserted Patents were also public information that is intended to serve the public notice functions of the patent system.  *See, e.g.*, *SightSound.Com Inc. v. N2K, Inc.*, 185 F.Supp.2d 445, 454-55 (W.D. Pa. 2002) ("The public is entitled to rely upon the 'public record' of a patented invention, *i.e.*, the claims, specification, and file history.").

Agreement was demonstrated by the fact that "at least two of the 'Twist-In-Place' patents had issued at the time the parties entered into the 2014 Agreement" and despite this "the 2014 Agreement makes no mention of either patent."   D.I. 36 at 6 n.2.   Discovery confirmed that NuVasive scrupulously undertook freedom to operate patent searches with its products and that Dr. Jackson's patents were among the "top 5" patentees it would search for any technologies.   *See* Ex. 52 (excerpts of deposition of Mr. Spangler, NuVasive's in-house patent counsel who negotiated the 2014 Agreement) at 16:12–17:13 122:15–23:15 (conducted searches); 26:19–22; 27:2-28:4; 30:21-31:13 (searches done in connection with Accused Products); 178:25–177:9 and 180:23-181:4 (Jackson among top 5 patentees whose patents would have been located for Reline). That the 2014 Agreement does not reference the then-issued '711 and '932 patents confirms the Parties did not intend to grant rights to those patents or their claimed TIP Technology.

### D.     Summary Judgment on NuVasive's Fourth Counterclaim for Unjust Enrichment

An action for unjust enrichment cannot lie in the face of an express contract.   *Level One Techs., Inc. v. Penske Truck Leasing Co., L.P.*, 2018 WL 2193520, at *2 (E.D. Mo. 2018) ("If [a] plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply.").   While a party may plead inconsistent and alternative theories of relief, including for both breach of an express contract and unjust enrichment, at summary judgment, "the issue is whether the unjust enrichment claim covers the same subject matter as the contract." *Id.*  "If an express contract covers the same subject matter, the unjust enrichment claim cannot survive summary judgment." *Id.*  The unjust enrichment claim here covers the same subject matter as the breach of contract claim.  *See* D.I. 201, ¶¶ 103–113. Because Dr. Jackson did not breach the Agreement and NuVasive received what it paid for, there can be no unjust enrichment. *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. App. 2010) (defining

elements of an unjust enrichment claim).  "Even if a benefit is 'conferred' and 'appreciated,' if no injustice results from the defendant's retention of the benefit, then no cause of action for unjust enrichment will lie."  *Id.*

## III.   PARTIAL SUMMARY JUDGMENT ON TWO OF NUVASIVE'S INVALIDITY THEORIES IS WARRANTED

The Court should grant summary judgment that, first, U.S. Patent No. 7,377,923 to Purcell is not prior art to the asserted '292 patent because Purcell's Figure 13 embodiment, necessary to NuVasive's invalidity theories, is not entitled to a priority date before the filing of the '292 patent, and, second, the '932, '200, and '444 patents are not indefinite as a matter of law under the *IPXL Holdings, LLC v. Amazon. com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005) line of cases for allegedly claiming an apparatus and method step.

### A.  Purcell is Not Prior Art to the '292 Patent

There is no genuine dispute of material fact that Purcell is ***not*** prior art to the '292 patent. On its face, the '292 patent claims priority to June 18, 2003.  Ex. 5 ('292 patent, code (65)); *see also* Ex. 5 at 1:28–31 ("identical disclosure").  The application that ultimately issued as Purcell was filed on May 19, 2004, and qualifies as prior art under pre-AIA § 102(e), if, and only if, the relevant disclosures are supported by the earlier of the two provisional applications it references. Ex. 32, code (22).  The earlier Provisional Application No. 60/472,578 was filed on May 22, 2003; the later Provisional Application No. 60/527,060 was filed on December 4, 2003, six months after the '292 patent priority date.  *Id.*  Crucially, this later provisional added new subject matter, specifically what became Figures 10–13 of Purcell.  *Compare* Ex. 33, Ex. 34.  Consequently, that new subject matter of Figures 10–13 cannot receive the earlier May 22, 2003 filing date, but only the later December 4, 2003 filing date due to lack of § 112 support.  *See* 35 U.S.C. § 119(e)(1).

Mr. Fallin, NuVasive's proposed technical expert, includes two theories of invalidity

relating to the '292 patent.  *See* Exs. 28, 29.  Both theories rely on Purcell and specifically Figure 13's new subject matter to demonstrate the "radiused upper surface" feature of the asserted '292 patent claims.  Ex. 27, ¶¶ 187, 191–192; Ex. 28 at 5, 12; Ex. 29 at 5, 13; Ex. 26, 198:2–18, 201:23–202:7.  Figure 13 does not appear in and is not supported by the May 22, 2003 provisional application as Mr. Fallin conceded during his deposition.  Ex. 26, 73:24–74:7.  Accordingly, Purcell as applied by Mr. Fallin for his theories, specifically those opinions presented in Exhibit 9 and 10 of his Report, cannot represent prior art and Dr. Jackson is entitled to summary judgment as a matter of law.  *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, 2020 WL 9438750, at *1 (D. Del. Feb. 20, 2020) (granting Summary Judgment in part based on certain asserted references not qualifying as prior art under 35 U.S.C. § 102).

### B. No Claim is Indefinite Under *IPXL*

NuVasive argues through Mr. Fallin that claims 1 and 31 of the '932 patent, claim 1 of the '200 patent, and claim 1 of the '444 patent represent indefinite hybrid apparatus-method claims pursuant to *IPXL*.  Ex. 27, ¶¶ 153, 173, 186.  "The scope of the *IPXL* doctrine is narrow."  *Targus Int'l LLC v. Victorinox Swiss Army, Inc.*, 2021 WL 1737531, at *9 (D. Del. May 3, 2021) (RGA).  Further, indefiniteness under *IPXL* is a matter of law for the Court.  *10x Genomics, Inc. v. NanoString Technologies, Inc.*, 2023 WL 5805585, at *3 (D. Del. Sept. 7, 2023) (quoting *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1313 (Fed. Cir. 2017)).  Consequently, these issues are ripe for summary judgment.

Specifically, for example, NuVasive's proposed expert argues that both claims 1 and 31 of the '932 patent recites a compression insert that is "then rotated to a second orientation" from a first orientation.  Ex. 27, ¶ 153.  Mr. Fallin contends the use of "then" to describe how the claimed components fit together introduces "temporal" aspect into an apparatus claim, rendering it an indefinite method step and making the determination of infringement unclear.  *Id*.  Mr. Fallin

creates this illusion of apparatus claims including steps by selectively eliding the claim language, rather than considering the limitations as a whole.  *See* Ex. 27, ¶ 153; *see also* Ex. B, ¶ 15 (*citing* Ex. B-1, ¶¶ 793–795).  Mr. Fallin's position is essentially the same with respect to the claim 1 of the '200 and '444 patents.  *See* Ex. 27, ¶¶ 173, 186; *see also* Ex. B, ¶ 16 (*citing* Ex. B-1, ¶¶ 796–800), ¶ 17 (*citing* Ex. B-1, ¶¶ 801–804).

Considering the claim as a whole shows the claim is not indefinite.  *See* Ex. B, ¶¶ 15–18 (*citing* Ex. B-1, ¶¶ 793–804).  "[W]hen a claim is 'simply describing a system as well as the capabilities of the claimed system,' the rule does not apply."  *Targus*, 2021 WL 1737531, at *9 (quoting *Bayer Pharma AG v. Watson Labs., Inc.*, 2014 WL 4954617, at *6 (D. Del. Sept. 30, 2014).  Indeed, a claim is not an indefinite hybrid if it "is clearly limited to an apparatus possessing the recited structure and capable of performing the recited functions."  *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826 (Fed. Cir. 2016); *see also Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, 60 F.4th 1373, 1379 (Fed. Cir. 2023) ("[T]he inclusion of active verbs and other functional language describing the capabilities of a claimed system does not transform a system claim into a method claim.").  This is the case here.  Ex. B, ¶¶ 14–18; Ex. B-1, ¶¶ 791–804.[19]

Moreover, even assuming *arguendo*, that the claims did in fact mix steps into an apparatus claim, such claims are not invalid unless a determination of infringement is unclear.  The Federal Circuit "ha[s] held that a single claim covering both an apparatus and a method of use of that apparatus fails to meet the requirements of § 112 because it is unclear whether infringement occurs when one creates an infringing system, or whether infringement occurs when the user actually uses

---

[19] Additionally, the claims at issue here, unlike those few found indefinite pursuant to *IPXL*. do not identify or specify users (*e.g.*, surgeons) performing the purported steps.  "[T]he claims in *IPXL Holdings* ('the user uses the input means') and *Katz* ('said individual callers digitally enter data') focus[ed] on specific actions performed by the user."  *MasterMine*, 874 F.3d at 1316.

the system in an infringing manner." *UltimatePointer*, 816 F.3d at 826 (quoting *IPXL Holdings*, 430 F.3d at 1384. Here, with respect to claim 1 of the '200 patent and claim 1 of the '444 patent, Mr. Fallin does not question that infringement occurred in the Reline representative products as they are among the Uncontested Technical Issues. *See supra*, §§ I, VI.A. Further, Mr. Fallin's objections to infringement with respect to the '932 patent claims focus on other issues not when the insert is assembled into the receiver and by whom. Ex. 31, ¶¶ 46–53. Consequently, the narrow doctrine of *IXPL* does not apply and the Court should grant Dr. Jackson summary judgment.

## IV.   THE COURT SHOULD EXCLUDE MR. PAMPINELLA'S PATENT DAMAGES OPINIONS BECAUSE THEY ARE BASED ALMOST ENTIRELY ON PATENT "ANALYTICS" PROVIDING UNRELIABLE INFORMATION ON VALUING THE ASSERTED PATENTS

NuVasive's proposed damages expert, Mr. James Pampinella derives over 90% of his patent royalty rate from downwardly adjusting a license "baseline" based on two patent citation analyses: Derwent (his "primary basis") and IPLytics (used in his calculations). Derwent's metrics are based on incorrect data about the Asserted Patents and his IPLytics-based metrics have no connection to any scientifically-recognized, reliable metric for patent valuation. Because of these and other flaws, Pampinella's patent damages opinion cannot satisfy FRE 702 and should not go to the jury.

Pampinella beings by deriving a baseline range of royalty rates, settling on "3.0% as the baseline starting point for the determination of a reasonable royalty resulting from a hypothetical negotiation for a license to the Asserted Patents". Ex. 41 ¶ 111; Ex. 40, 28:9–23. He makes "a downward adjustment of this 3.0% starting point in order to account for" three considerations. However, the first two considerations resulted in no actual adjustments. Ex. 40, 39:10–40:8 (NuVasive's pleading on 2014 Agreement); 40:10–42:3, 44:5–44:13; 45:22–46:11 (conversation with Mr. Fallin). Only the third consideration, "Patent citation analysis," resulted in an adjustment:

a 90% adjustment of his 3% baseline down to an effective rate of 0.3 %.  Ex. 41, ¶ 132; Ex. 40, 46:21-49:7.  In substance, thus, his royalty rate opinions result from the "Patent citation analysis," and not from the "baseline" of his comparable licenses.  Next, he allocates a royalty rate to each "Patent Family" of Asserted Patents:  TIP (0.24%), and Cannulated Polyaxial Screw ('292 patent) (0.05%), and Circumferential Tool Engagement Groove ('856 patent) (0.01%).  Ex. 41, ¶ 133.

> ### A.    Pampinella's Reliance on IPLytics and Derwent "Patent Citation" Analyses Does Not Reliably Value the Asserted Patents

Pampinella obtains inputs from two sources, Derwent and IPLytics, through a process described below.  Ex. 41, ¶¶ 57–67.  Although his report (in ¶ 133) says he used Derwent, his testimony is that he used IPLytics to determine his Patent Family royalty rates.  Ex. 40, 49:2–49:7.

**Derwent:**  Derwent, "a solutions and intelligence platform owned by Clarivate," calculates a 'Combined Patent Impact' score which represents the importance of a patent relative to others." Ex. 41, ¶ 57.  ***Combined Patent Impact*** is based on two factors: ***Domain Influence*** and ***Strategic Importance***.  "Both factors are predictive citation metrics that use Derwent's proprietary analytics model ***to predict the number of forward citations a patent will receive in the next ten years***, as a patent's importance to the wider technology domain or its owner can be inferred by this prediction."[20]  Ex. 41, ¶ 58 (emphasis added).

Derwent anticipates problems identifying the "real" patent owner and attempts to address this uncertainty by using "machine learning" to create an output it calls the "Optimized Assignee." The "process to determine [the] Optimized Assignee" is to (1) "[d]etermine the current owner for a patent;" (2) if Derwent "cannot determine the current owner, ***predict*** the likely owner;" and (3) "[d]etermine a single, standardized name for the current or likely owner," which "is the **Optimized**

---

[20] A "forward citation" is when a later patent cites to the patent under review as prior art.

**Assignee**." Ex. 49 at 4–5; Ex. 50) (emphasis added).

Importantly, this "Optimized Assignee" serves as a foundation to the components of both the "Strategic Importance" and "Domain Influence" components of its "Combined Patent Impact" determination. Ex. 50. Specifically, "**Strategic Importance** . . . . This metric *is based on how many self-citations* in 10 years. [¶] *Self-citations are used* because this metric is focused on how the patent influences other patents in the company's portfolio. [¶] *Self-citation is defined as where at least one optimized assignee is the same* between the cited and citing patent." Ex. 48 at 4. "**Domain Influence** . . . This metric is based on how many forward citations <u>excluding self-citations</u> will this patent obtain in 10 years." *Id*. (emphasis in original). Thus, Derwent *predicts* two mutually exclusive forward citation counts: Self-citations over the next ten years where the Optimized Assignee is the same in the citing and cited patent, and citations over the next ten years where the Optimized Assignee of the citing patent is different from the cited patent. The former contributes to "Strategic Importance;" the latter "Domain Influence." Ex. 40, 122:11–123:10. The Combined Patent Impact is based on a combination of those two.

With respect to the Asserted Patents, Derwent's machine learning algorithm mis-perceived (hallucinated[21]) the Optimized Assignee of *7 out of 8 Asserted Patents*. Specifically, Derwent considered Dr. Jackson the Optimized Assignee of only the '292 patent. Derwent incorrectly treated Medtronic as the Optimized Assignee for the '273 patent, and Warsaw Orthopedics, Inc. as the Optimized Assignee of all other Asserted Patents. Ex. 47 ("Optimized Assignee" (rightmost) column).[22] Dr. Jackson, the sole inventor on the Asserted Patents, owns them all and

---

[21] "Hallucinate" is a technical term used when "a generative AI … create[es] outputs that are nonsensical or altogether inaccurate." *See e.g.*, https://www.ibm.com/topics/ai-hallucinations (last retrieved 2/18/2024).

[22] Dr. Jackson's damages expert, Dr. Becker had Mr. Pampinella's searches replicated, getting the same quantitative results as Mr. Pampinella for the metrics (with some slight changes from the

they have not been reassigned — to Warsaw Orthopedics, Medtronic, or anyone else.  Thus, for its Strategic Importance metric for the '273 patent, for example, Derwent computed the '273 patent's strategic importance **to Medtronic** by predicting how many times **Medtronic** would cite the '273 patent as prior art to a Medtronic patent over the next 10 years. For its Domain Influence metric, Derwent predicted how many times **companies other than Medtronic** would cite the '273 patent as prior art to those other companies' patents.  That same error occurs for the 6 Asserted Patents wrongly deemed assigned to Warsaw Orthopedics.  Derwent's hallucinated data results in metrics that have no logical connection to the Asserted Patents or the facts of this case.  Its Combined Patent Impact compounds the errors of its constituent Strategic Importance and Domain Influence parts.

Derwent's data problems are not limited to the Asserted Patents.  For the patents Mr. Pampinella uses as the 2008 Agreement patents, Derwent lists 3 as Optimized Assigned to Warsaw Orthopedics, Inc.; 7 to Medtronic, Inc.; 1 to "Zimvie, Inc (spinoff of Dental & Spine business)"; and 2 to NuVasive, Inc.  Ex. 45, ("Optimized Assignee Column").  For the 2014 Agreement Patents, Derwent lists 3 patents as Optimized Assigned to Medtronic, Inc; 3 to Warsaw Orthopedics, Inc.; and 15 (correctly) to NuVasive, Inc.  Ex. 46, ("Optimized Assignee Column").

Pampinella obtained the Derwent Combined Patent Impact for (a) patents listed in the 2008 Agreement; (b) the Asserted Patents; and (c) patents listed in the 2014 Agreement.  Ex. 42.  Using these, he performed aggregations and other computations to ultimately determine an "Adjustment Factor." *Id.*   As discussed below, he opined informed his downward adjustments.

Pampinella is clear that his opinions that the relative and absolute value of the Asserted

---

passage of time and new forward citation data).  Dr. Becker included the Optimized Assignee field in the output which Mr. Pampinella omitted.  These searches appear in Exs. 47 and 45–46.

Patents were based on the tainted Derwent data.  In ¶ 59–60 he opines based on Derwent's output

of how valuable the Asserted Patents are relative to the 2008 Agreement and 2014 Agreement

Patents.  Ex. 41, ¶ 59–60. In deposition, he testified "I rely on Derwent as the primary metric for

analyzing the relative value of the asserted patents compared to prior patents that were licensed."

Ex. 40, 56:21–56:24.  In ¶ 60 he offers the absolute valuation opinion "[t]he Derwent analysis

support that the Asserted Patents are of little incremental value and that Dr. Becker's range of

reasonable royalty rates of 3.0% to 4.0% is overstated."  Ex. 40, 67:23–67:24 ("Derwent, which is

my primary source for the derivation of the 0.3 percent.").  All of Derwent computations and

resulting royalty opinions are corrupted by the incorrect "Optimized Assignees."

　　　　**IPLYtics.**  Pampinella claimed his "results from the Derwent analysis can be corroborated

by a patent citation analysis using IPLytics.  IPlytics is a market intelligence tool that enables uses

to analyze technology and market landscapes."  Ex. 41, ¶ 61. IPLytics provides seven[23] "indicators

that analyze different aspects of a patent." Ex. 41, ¶ 62.  A summary of them is below (from ¶ 62)**:**

| Indicator | Calculated By Counting The Number Of: |
|---|---|
| Technical Relevance | Prior art citation a patent receives |
| Market Coverage | Countries in which the patent has been filed |
| Radicalness | A patent's citations to prior art (backward citations) |
| Legal Breadth | Words used in the shortest independent claim |
| Patent Scope | Distinct main IPC/CPC classes to which a patent has been classified |
| Cooperation | Legally independent patent co-assignees, excluding subsidiaries |
| Team Size | Inventors that are listed on the patent |

　　　　The only reliable metric as a measure of patent value that Mr. Pampinella's report cites is

based on forward citations.  Ex. 41,¶ 59.  He is unaware of any scientific study that correlates the

value of a patent to any metric other than forward citations.  Ex. 40, 56:15–56:24.  For the majority

---

[23] Before listing the seven indicators he used, Pampinella's report states "I consider the two indicators below."  Ex. 41, ¶ 26.  As described in more below, Mr. Pampinella actually used and equally weighed all seven indicators.  Ex. 40, 57:17–58:13.

of IPLYtics' 7 indicators, he conceded either he was unaware of any scientific study showing that indicator was a reliable measure to value a patent, or that he thought forward citations were more probative.   Ex. 40, 66:3-67:4 (Radicalness); 67:6-24 (Legal Breadth); 68:2-12 (Patent Scope); 68:14-20 (Cooperation); 68:23-69:3 (Team Size).   Mr. Pampinella created a new metric he named "Cumulative Multiple" in the Schedules to his report and "Competitive Impact" in the narrative portion of his report.  Both represent "the mathematical product of the [7 IPLytics] indicators listed above."  Ex. 41, ¶ 63, Schedule 4-4 R ("Cumulative Multiple [¶] F[sic]=A*B*C*D*E*F*G).  He is unaware of (1) any IPLytics direction stating to compute one metric from the product of its 7 indicators; (2) any of his peers computing one metric from the product of IPLytics' 7 indicators; or, (3) any statistical or scientific analysis endorsing the Cumulative Multiple he computed.  Ex. 40, 69:5–71:22 ("I wasn't concerned about ensuring that there was peer-reviewed information on team size and that kind of thing, and also that you could multiply these factors together.").   He gave each indicator equal weight. Ex. 40, 61:11–61:17.

Pampinella obtained values for each of the 7 IPLytics indicators for (A) patents listed in the 2014 Agreement[24] and (B) the Asserted Patents.   Ex. 43.   Even though they have no relationship, he computed the product of those indicators' values, creating a "Cumulative Multiple" for each patent.  *Id.*  He summed the Cumulative Multiple metric for each set of patents. *Id.* "Total (2014 Agreement) C=SUM(A) [¶] Total (Asserted Patents) D=SUM(B)."  He computed an "Adjustment Factor" as the ratio of the Asserted Patents Sum to the 2104 Agreement Patents Sum.  *See, e.g., id.* at 1 ("Adjustment Factor  E=D/C").  His "Adjustment Factor" using the 2014 Agreement is 0.11.  *Id.* at 1–2 ("E=D/C").  Thus, Pampinella's Adjustment Factor is computed

---

[24] "As IPLYtics does not provide data on expired patents, and a large majority of the patents in the 2008 Agreement are now expired" Pampinella did not analyze patents from the 2008 Agreement with IPLytics.  Ex. 41, ¶ 63.

from mathematical product of all 7 IPLytics indicators, the majority of which have no scientific or statistical basis for being reliably related to the value of a patent.  It is the literal and figurative product of data for which there no accepted scientific basis to conclude the data reliably predicts patent value which is how Pampinella used it, as described below.  Ex. 40, 57:14–61:23.

For each of the Patent Families, he computes subtotals of the Cumulative Metric for the patents in that Patent Family, *i.e.,* TIP (1.36), '292 patent (0.27), and '856 patent (0.05).  Ex. 43, (Schedule 4-4-R).  In the narrative portion of his report, he refers to these as "Group Values."  Ex. 41, ¶ 133, Table 13[25].  Further arithmetic operations ensue, eventually arriving at applied royalty rates of 0.24%, 0.05%, and 0.01%, respectively.  *Id.*; ¶ 133, Table 13.  He applies these Allocated Royalty Rates to his royalty base to compute the damages he opines compensate Dr. Jackson for NuVasive's infringement.  Ex. 41, ¶ 139–140, Table 15, Schedules 3-2-R–3-9-R (applying rates to sales of Representative Products), Schedule 3-0-R (totaling damages).

**B.    The Court Should Prevent Pampinella From Presenting His Unreliable Patent Royalty Damages Opinions To the Jury**

"Forward citation analysis is a method of estimating the value of a particular patent based on the number of times the patent is cited by later patents."  *Manufacturing Resources Int'l, Inc. v. Civiq Smartscapes, LLC*, 2019 WL 4198194, at *2 (D. Del. Sept. 4, 2019).  While a properly conducted forward citation analysis may be a reliable method for estimating a reasonable royalty, an "expert's forward citation analysis [is] unreliable [if] the expert ha[s] not tied the forward citation analysis to the facts of the case."  *Id.* (citing *Finjan, Inc. v. Blue Coat Sys., Inc.*, 2015 WL 4272870, at *7-8 (N.D. Cal. July 14, 2015)).  A forward citation analysis may also lack reliability when, as here, it considers metrics that have no scientific or technological basis in showing the

---

[25] Paragraph 133 of his report incorrectly states he used Derwent when his table is from IPLytics. Ex. 40, 49:1–7.

value of a particular patent (*e.g.,* "Team Size").  *See CloudofChange, LLC v. NCR Corp.*, 2021 WL 11549625, at *3 (W.D. Tex. Nov. 1, 2021) (excluding damages expert's forward citation analysis that relied on factors like the CPC classifications, whether the patents include a specific phrase in their titles or abstract, the number of claims in each patent, and how many times the patents had been cited by others).

### C.   Pampinella's IPLytics Analysis Is Unreliable

Pampinella's IPLytics analysis is not a forward citation analysis and there are no indicators of reliability for the analysis he conducted.  He used at least four IPLytics indicators that he concedes have no recognized scientific bases for reliably predicting patent value.  He gave each of those indicators **equal weight** as other metrics, *e.g.*, Technical Relevance, that potentially involve citations in some way.  Because of this equal weighting, it is as accurate to characterize his analysis as a "Team Size" analysis or "Cooperation" analysis as it is a "forward citation" analysis. Moreover, he can neither vouch for, nor apparently even cared, if Team Size and his other metrics had any peer-reviewed *bona fides*.  Ex. 40,71:16–21 ("I wasn't concerned about ensuring that there was peer-reviewed information on team size and that kind of thing.").

Moreover, Pampinella's IPLytics analysis is also flawed for his derivation and use of his "Cumulative Multiple."  This is not a value suggested by IPLytics; it is not used by his peers nor has it "attracted widespread acceptance within a relevant scientific community." *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 580 (1993). He is neither aware of any scientific study nor any "publication and peer review." *Id*. at 593 ("[A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be **whether it can be (and has been) tested**.") (emphasis added).

Likewise, since Mr. Pampinella is the sole user, no publicly "known or potential error rate" exists. *United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (providing "whether the method

has been subject to peer review" and "the known or potential rate of error" as factors to consider when evaluating the reliability of an expert's methodology under *Daubert*).  Pampinella's use of IPLytics is also flawed as the values are "normalized." Ex. 41, ¶ 62 ("An indicator of 1 indicates that a patent is in line with the technology/country/year average.  An indicator value of 2 indicates the patent is twice as valuable as the average comparable patent.").  Because the value of the IPLytics indicators do not have any unit values, simply summing them over the number of patents (the Asserted Patents or the 2014 Agreement patents) does not mean the sums are comparable.  Consider a "weight indicator." A child in a kindergarten class and an NFL player could both have "weight indicators" of 1 if their respective weights were "in line with" other members of the class and the NFL, respectively.  Adding the weight indicators of 21 (the number of 2014 Agreement patents Pampinella used) and 8 NFL players (the number of Asserted Patents) will almost inevitably produce the result that the sum of the weight indicators of the kindergarteners is greater than NFL players:  There are just more of them.  But that does not mean that the sum of the 21 kindergarteners' actual weights exceeds the sum of 8 NFL players' weights.  The normalization to 1 and summation removes information on the reality of the aggregate.  Although enmeshed in the product of his Cumulative Metric, Pampinella sums across the count of Asserted Patents and 2014 Agreement patents.  There are more in the latter than in the former.  Because of IPLytics' normalization and Pampinella's summation it is unknown and unknowable if the relevant aggregations are in fact larger or smaller.   Although enmeshed in the product of his Cumulative Metric, Pampinella sums across the count of Asserted Patents and 2014 Agreement patents.  There are more in the latter than in the former.  The more items in a sum, the higher it will be, but because of IPLytics' normalization it is unknown and unknowable if the aggregations are in fact larger or smaller.  *Acceleration Bay LLC v. Activision Blizzard Inc.*, No.

1:16-cv-00453-RGA, 2019 WL 4194060, at *4 (D. Del. Sept. 4, 2019) (excluding damages expert's opinion based on cost savings as "inherently untestable" and "entirely speculative. . . and divorced from the facts of this case".)

### D.     Pampinella's Unreliable Derwent Analysis Is Not Tied to the Facts of the Case

Pampinella's Derwent analysis starts from incorrect and unreliable data believing Dr. Jackson is not the "Optimized Assignee" of the Asserted Patents.  The hallucinated data corrupt the Strategic Importance, Domain Influence, and Combined Impact metrics and Pampinella makes no effort to even attempt corrections.  Any connection the facts of this case is unknowable and Pampinella's Derwent analysis should be excluded.  *See ViaTech Techs., Inc. v. Adobe, Inc.*, 2023 WL 5975219, at *10 (D. Del. Sept. 14, 2023); *Oracle Am., Inc. v. Google Inc.*, 2012 WL 877125, at *2 (N.D. Cal. Mar. 15, 2012) (striking portion of forward citation analysis for failure to tie analysis to facts of the case); *Realtek Semiconductor Corp. v. LSI Corp.*, 2014 WL 46997, at *3-4 (N.D. Cal. Jan. 6, 2014) (excluding damages expert's patent citation analysis as unreliable).

Moreover, Derwent does not report on actual "forward citations," but rather its black-box *predictions* of forward citations.  Ex. 41, ¶ 58.  These black-box predictions are articles of faith as Pampinella does not present any details or understanding of the AI's predictive methods.  Ex. 40, 112:8–12; 112:23–113:8.   Additionally, courts have held that "[e]xperts must follow some discernable methodology, and may not be 'a black box into which data is fed at one end and from which an answer emerges at the other.'" *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) (quoting *Lawrence v. Raymond Corp.*, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011)); *see also Fail–Safe, L.L.C. v. A.O. Smith Corp.*, 744 F.Supp.2d 870, 888 (E.D. Wis. 2010) (rejecting expert analysis that was "in a black box out of the view of the court ... the court cannot simply take an expert's word for a specific proposition").  This issue alone should

result in exclusion under *Daubert* as the "prediction" methodology is unknowable, not peer reviewed, and impervious to being cross-examined nor is there any evidence how *predictions* can be compared to *actual* forward citations.  *See, e.g.*, *Daubert*, 509 U.S. at 592-93.

Pampinella was clear that Derwent's analysis was the primary basis for analyzing the relative value of the asserted patents and for the derivation of the 0.3 percent royalty rate.  Ex. 40, 56:21–56:24; 67:23–67:24.  The tainted Derwent data infects the "primary basis" for Pampinella's patent damages analysis and it should not be presented to the jury.

<u>**CONCLUSION**</u>

For those reasons addressed, Plaintiff respectfully requests that this Court grant its motions for partial summary judgment and pursuant to *Daubert*.

POLSINELLI PC

OF COUNSEL:

Thomas Gemmell
POLSINELLI PC
150 North Riverside Plaza, Suite 3000
Chicago, IL 60606
Phone: (312) 819-1900
Fax: (312) 819-1910
tgemmell@polsinelli.com

Darren E. Donnelly
POLSINELLI LLP
Three Embarcadero Center, Suite 2400
San Francisco, CA 94111
Phone: (650) 461-7700
Fax: (415) 248-2101
ddonnelly@polsinelli.com

Aaron M. Levine
POLSINELLI PC
1000 Louisiana St., 64th Floor
Houston, TX 77002
Phone: (713) 374-1600
Fax: (713) 374-1601
alevine@polsinelli.com

February 20, 2024

*/s/ Stephen J. Kraftschik*
Stephen J. Kraftschik (#5623)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
(302) 252-0920
skraftschik@polsinelli.com
*Attorneys for Plaintiff Roger P. Jackson, M.D.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 14, 2024, upon the following in the manner indicated:

| | |
|---|---|
| Daniel M. Silver | *BY ELECTRONIC MAIL* |
| Alexandra M. Joyce | |
| MCCARTER & ENGLISH, LLP | |
| Renaissance Centre | |
| 405 N. King Street, 8th Floor | |
| Wilmington, Delaware 19801 | |
| (302) 984-6300 | |
| dsilver@mccarter.com | |
| ajoyce@mccarter.com | |
| *Attorneys for Defendant NuVasive, Inc.* | |

| | |
|---|---|
| Colin G. Cabral | *BY ELECTRONIC MAIL* |
| James R. Anderson | |
| PROSKAUER ROSE LLP | |
| One International Place | |
| Boston, MA  02110-2600 | |
| (617) 526-9600 | |
| ccabral@proskauer.com | |
| jaanderson@proskauer.com | |
| *Attorneys for Defendant NuVasive, Inc.* | |

| | |
|---|---|
| Jessica M. Griffith | *BY ELECTRONIC MAIL* |
| Seth H. Victor | |
| PROSKAUER ROSE LLP | |
| 2029 Century Park East, Suite 2400 | |
| Los Angeles, CA  90067-3010 | |
| (310) 284-4563 | |
| jgriffith@proskauer.com | |
| svictor@proskauer.com | |
| *Attorneys for Defendant NuVasive, Inc.* | |

*/s/ Stephen J. Kraftschik*

Stephen J. Kraftschik (#5623)