# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ROGER P. JACKSON, M.D., <br><br> Plaintiff, <br><br> v. <br><br> NUVASIVE, INC., <br><br> Defendant. | C.A. No. 21-53 (RGA) <br><br>  |

**NUVASIVE, INC.'S ANSWERING BRIEF IN OPPOSITION TO ROGER P. JACKSON, M.D.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND <u>MOTION TO EXCLUDE PATENT DAMAGES OPINIONS</u>**

Dated: March 20, 2024

OF COUNSEL:

Colin G. Cabral
James R. Anderson
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
(617) 526-9600
ccabral@proskauer.com
jaanderson@proskauer.com


Jessica M. Griffith
PROSKAUER ROSE LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 557-2900
jgriffith@proskauer.com

Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Counsel for Defendant NuVasive, Inc.*

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

SUMMARY OF THE ARGUMENT ...................................................................... 2

ARGUMENT ......................................................................................................... 4

I.  DR. JACKSON IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT ............................................................. 4

    A.  NuVasive Has a License to Make, Use, and Sell the Accused Products. ............... 4

        1.  The Accused Products are "Products" Under the 2014 Agreement. .......... 7

        2.  NuVasive's Helical Flange License ........................................................... 8

        3.  NuVasive's BOT Implant License .............................................................. 9

    B.  Dr. Jackson Covenanted Not to Sue NuVasive on the Asserted Patents. ............. 10

    C.  Other Genuine Issues of Material Fact Preclude Summary Judgment. ................ 13

II.  THE COURT SHOULD DENY DR. JACKSON'S MOTION AND GRANT SUMMARY JUDGMENT FOR NUVASIVE ON ITS BREACH OF CONTRACT COUNTERCLAIM ................................................................... 17

III.  SUMMARY JUDGMENT ON NUVASIVE'S SECOND, THIRD, AND FOURTH COUNTERCLAIMS IS NOT APPROPRIATE .............................. 18

    A.  The Motion Fails to Show an Absence of Disputed Material Facts on Dr. Jackson's Breach of the Implied Covenant of Good Faith and Fair Dealing (Second Counterclaim). ...................................................................... 18

    B.  The Motion Fails to Show an Absence of Disputed Material Facts on NuVasive's Fraud Claim (Third Counterclaim). .................................................. 20

        1.  Dr. Jackson Made Affirmative Misrepresentations to NuVasive. ............ 20

        2.  Dr. Jackson Violated a Duty to Disclose Information About His Patents to NuVasive. ................................................................................. 21

    C.  The Motion Fails to Show an Absence of Disputed Material Facts on NuVasive's Unjust Enrichment Claim (Fourth Counterclaim). .......................... 23

IV.  NUVASIVE'S INVALIDITY THEORIES ARE VIABLE AND THE '932, '200, AND '444 PATENTS ARE INDEFINITE ......................................... 25

    A.  Dr. Jackson Admits the Purcell Reference is Prior Art to the '292 Patent. .......... 25

    B.  The Asserted Claims of the '932, '200, and '444 Patents are Indefinite. ............. 27

i

V.    MR. PAMPINELLA'S PATENT DAMAGES OPINIONS ARE ADMISSIBLE........... 31

    A.    Mr. Pampinella's Patent Infringement Damages Opinion Is Based on a Well-Established Approach. .................................................................................. 31

    B.    Mr. Pampinella's Utilization of Independent, Third-Party Data Collection and Analysis Tools Was Tied to the Facts of the Case and Is Admissible........... 34

    C.    At Most, Dr. Jackson's Remaining Arguments Go to Credibility and Weight, Rather than Admissibility. ...................................................................... 36

CONCLUSION........................................................................................................................ 39

ME1 47940769v.1

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Acceleration Bay LLC v. Activision Blizzard Inc.*,
  2019 WL 4194060 (D. Del. Sept. 4, 2019).............................................................38

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................................4

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014), *overruled on other grounds by*
  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ..................33, 38

*Bai v. L & L Wings, Inc.*,
  160 F.3d 1350 (Fed. Cir. 1998)..................................................................................4

*Ballard v. Nat'l Football League Players Ass'n*,
  123 F. Supp. 3d 1161 (E.D. Mo. 2015)....................................................................21

*Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*,
  528 F.3d 556 (8th Cir. 2008) .....................................................................................5

*Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*,
  72 F.3d 872 (Fed. Cir. 1995)......................................................................................4

*City of St. Joseph v. Lake Contrary Sewer Dist.*,
  251 S.W.3d 362 (Mo. Ct. App. 2008)......................................................................19

*CloudofChange, LLC v. NCR Corp.*,
  2021 WL 11549625 (W.D. Tex. Nov. 1, 2021).........................................................34

*Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015).................................................................................33

*Courtesy Prods., L.L.C. v. Hamilton Beach Brands, Inc.*,
  2015 WL 7295436 (D. Del. Nov. 18, 2015) ........................................................27, 28

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
  424 F.3d 1293 (Fed. Cir. 2005)............................................................................15, 16

*Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*,
  2023 WL 8534968 (E.D. Tex. Nov. 28, 2023), *rep. & recommendation*
  *adopted*, 2023 WL 8534465 (E.D. Tex. Dec. 8, 2023)..............................................5

*Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*,
  149 F.3d 1309 (Fed. Cir. 1998)..................................................................................4

iii

*Exergen Corp. v. Kaz USA, Inc.*,
    2015 WL 4506472 (D. Mass. July 24, 2015)........................................................................17

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
    879 F.3d 1332 (Fed. Cir. 2018)........................................................................................33

*Fail-Safe L.L.C. v. A.O. Smith Corp.*,
    744 F. Supp. 2d 870 (E.D. Wis. 2010)..............................................................................35

*FURminator, Inc. v. Kim Laube & Co., Inc.*,
    758 F. Supp. 2d 797 (E.D. Mo. 2010)..............................................................................17

*GPNE Corp. v. Apple, Inc.*,
    2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ..................................................................35

*Hardy v. United States*,
    141 Fed. Cl. 1 (2018) ......................................................................................................36

*Health Care Found. of Greater Kansas City v. HM Acquisition, LLC*,
    507 S.W.3d 646 (Mo. Ct. App. 2017)...............................................................................5

*Hilgraeve Corp. v. Symantec Corp.*,
    265 F.3d 1336 (Fed. Cir. 2001).......................................................................................17

*Howard v. Turnbull*,
    316 S.W.3d 431 (Mo. Ct. App. 2010)..............................................................................23

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    441 F. Supp. 2d 1066 (N.D. Cal. 2006)...........................................................................23

*Intel Corp. v. Broadcom Corp.*,
    173 F. Supp. 2d 201 (D. Del. 2001)...............................................................................4, 6

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005)................................................................................. passim

*Kyocera Wireless Co. v. President Elecs., Ltd.*,
    179 F. App'x 53 (Fed. Cir. 2006) ....................................................................................14

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
    572 U.S. 915 (2014)........................................................................................................16

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009).......................................................................................33

*M2M Sols. LLC v. Enfora, Inc.*,
    167 F. Supp. 3d 665 (D. Del. 2016) (Andrews, J.) ..........................................................33

iv

*Martin v. Prier Brass Mfg. Co.*,
  710 S.W.2d 466 (Mo. App. 1986) ................................................................18, 19

*MasterMine Software, Inc. v. Microsoft Corp.*,
  874 F.3d 1307 (Fed. Cir. 2017) ..................................................................27, 30

*McKnight v. Midwest Eye Inst. of Kansas City, Inc.*,
  799 S.W.2d 909 (Mo. Ct. App. 1990) ...............................................................18

*Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*,
  2019 WL 4198194 (D. Del. Sept. 4, 2019) ............................................33, 34, 37

*Mo. Consol. Health Care Plan v. Cmty. Health Plan*,
  81 S.W.3d. 34 (Mo. Ct. App. 2002) ..................................................................18

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*,
  946 F.3d 1354 (Fed. Cir. 2020) ........................................................................10

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) ..........................................................................................27

*Oracle Am. Inc. v. Google Inc.*,
  2012 WL 877125 (N.D. Cal. Mar. 15, 2012) ....................................................35

*PersonalWeb Techs. LLC v. Int'l Bus. Machs. Corp.*,
  2017 WL 3476082 (N.D. Cal. Aug. 14, 2017) ..................................................38

*Promptu Sys. Corp. v. Comcast Cable Comm'ns, LLC*,
  92 F.4th 1384 (Fed. Cir. 2024) .........................................................................14

*Realtek Semiconductor Corp. v. LSI Corp.*,
  2014 WL 46997 (N.D. Cal. Jan. 6, 2014) .........................................................35

*Rembrandt Data Techs., LP v. AOL, LLC*,
  641 F.3d 1331 (Fed. Cir. 2011) ...............................................................6, 28, 30

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ..........................................................................33

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
  215 F.3d 1246 (Fed. Cir. 2000) ........................................................................14

*SightSound.Com Inc. v. N2K, Inc.*,
  185 F. Supp. 2d 445 (W.D. Pa. 2002) ..............................................................23

*St. Claire Intellectual Prop. Consultants, Inc. v. Sony Corp.*,
  2003 WL 25299214 (D. Del. Feb. 21, 2003) ....................................................26

v

*St. Lawrence Commc'ns LLC v. Motorola Mobility LLC*,
   2018 WL 915125 (E.D. Tex. Feb. 15, 2018) ...........................................................................5

*State Indus., Inc. v. A.O. Smith Corp.*,
   751 F.2d 1226 (Fed. Cir. 1985).............................................................................................23

*Tex. Instruments, Inc. v. Hyundai Elecs. Indus., Co.*,
   49 F. Supp. 2d 893 (E.D. Tex. 1999)...................................................................................5, 9

*U.S. Philips Corp. v. Int'l Trade Comm'n*,
   424 F.3d 1179 (Fed. Cir. 2005)...............................................................................................5

*UltimatePointer, L.L.C. v. Nintendo Co.*,
   816 F.3d 816 (Fed. Cir. 2016)...............................................................................................29

*Union Carbide Corp. v. Am. Can Co.*,
   724 F.2d 1567 (Fed. Cir. 1984)..............................................................................................14

*United States v. Applied Pharmacy Consultants, Inc.*,
   182 F.3d 603 (8th Cir. 1999) ................................................................................................23

*ViaTech Techs., Inc. v. Adobe, Inc.*,
   2023 WL 5975219 (D. Del. Sept. 14, 2023) (Andrews, J.) ....................................................34

*Virnetx, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014)..............................................................................................33

*Warner-Lambert Co. v. Purepac Pharm. Co. (In re Gabapentin Patent Litig.)*,
   503 F.3d 1254 (Fed. Cir. 2007)..............................................................................................13

*White Stone Partners, LP v. Piper Jaffray Cos., Inc.*,
   978 F. Supp. 878 (D. Minn. 1997)...................................................................................18, 19

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010)..............................................................................................33

**STATUTES AND RULES**

35 U.S.C. § 102 (2002) .............................................................................................................26

35 U.S.C. § 112.........................................................................................................................27

35 U.S.C. § 271.........................................................................................................................14

FED. R. CIV. P. 12 .....................................................................................................................11

FED. R. CIV. P. 56 .....................................................................................................................31

vi

**OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) ................................................................19

## **INTRODUCTION**

Dr. Jackson moves for summary judgment on virtually every issue in the case, including patent infringement. But Dr. Jackson gave up his right to accuse NuVasive's polyaxial screw products of infringement or to seek additional royalty payments from NuVasive. In 2008, Dr. Jackson granted NuVasive a license "to manufacture and sell" the accused products in exchange for millions in running royalties over the course of six years. Six years later, the parties amended and restated their license agreement, whereby NuVasive made a ███████ upfront payment to buy out all past, present, and future royalty obligations under the 2008 Agreement. The parties expressly agreed that ███████████████████████████████████████████████ ████████████████████████████████████████████████████ Only Dr. Jackson did not honor his end of the deal. Instead, he filed this lawsuit seeking tens of millions in additional royalties for sales of the licensed products.

According to Dr. Jackson's version of events, NuVasive paid him ████████ in 2014 but lost the ability to make and sell the licensed products when the parties amended and restated their license agreement. To reach this conclusion, Dr. Jackson argues that NuVasive only received a license to specific features in the accused products, as opposed to a license to make and sell the products themselves. This interpretation is deeply flawed. Among other things, the first page of the Amended and Restated Agreement expressly acknowledges that ████████████████████ ███████████████████████████████████████████████████ ██████████████████████████ Moreover, the Amended and Restated Agreement defines ████████████████████████████████████████████████████ ███████████████ There is no dispute here that the accused products use "Helical Flange" technology. Indeed, Dr. Jackson's opening brief concedes the point:

1

> **Dr. Jackson freely concedes some Accused Products include Helical Flange** or other technologies covered by the rights granted to NuVasive in the 2014 Agreement; but Dr. Jackson does not claim patent infringement because of NuVasive use of Helical Flanges, BOT Implants or the Top Notch IP [] or any other rights granted in the 2014 Agreement.

D.I. 207 ("Op. Br.") at 12 (emphasis added). It does not matter *why* Dr. Jackson has alleged patent infringement. What matters for purposes of the Court's analysis is that NuVasive has a valid license to make and sell every one of the accused products.

The Court should grant summary judgment in favor of NuVasive for the reasons set forth in the memorandum of law submitted in support of NuVasive's motion for summary judgment. At minimum, however, genuine factual disputes compel the denial of Dr. Jackson's motion for the reasons set forth below.

Furthermore, as set forth in further detail below, the Court should deny Dr. Jackson's motion to exclude the damages opinions of NuVasive's expert, James Pampinella, because Dr. Pampinella's opinions are reliable and admissible, and Dr. Jackson's arguments go to credibility and weight of the evidence, which is an issue for the factfinder.

## SUMMARY OF THE ARGUMENT

1.     Dr. Jackson's flawed interpretation of the 2014 Agreement precludes summary judgment on NuVasive's licensing and covenant not to sue defenses. To the contrary, the Court should grant summary judgment against Dr. Jackson because NuVasive's interpretation of the 2014 Agreement is correct. Separate and apart from NuVasive's licensing and covenant not to sue defenses, NuVasive has raised genuine issues of material fact with respect to whether Dr. Jackson can carry his burden on infringement.

2.     Dr. Jackson's challenge to NuVasive's counterclaims also fails. Dr. Jackson breached the 2014 Agreement by filing this lawsuit and breaching his covenant not to sue. NuVasive affirmatively seeks damages from Dr. Jackson resulting from his failure to honor his

2

obligations under the 2014 Agreement. Dr. Jackson devotes only a single paragraph to NuVasive's counterclaims for breach of the implied covenant of good faith and fair dealing and unjust enrichment, respectively. Dr. Jackson's cursory analysis—which reduces to two or three short, conclusory sentences on each issue—is woefully inadequate and falls far short of demonstrating that summary judgment is appropriate. Further, NuVasive's fraud counterclaim involves numerous factual disputes, including whether Dr. Jackson violated his duty to disclose the existence of the patents-in-suit—two of which issued before the parties executed the 2014 Agreement and before Dr. Jackson accepted ███████ global buyout payment—if he really believed they were not part of the Agreement.

3.      Dr. Jackson's motion related to NuVasive's '292 patent invalidity defenses should be denied for two reasons: (1) Dr. Jackson admits that U.S. Patent No. 7,377,923 ("Purcell") is prior art; and (2) Dr. Jackson's argument that "Purcell's Figure 13 embodiment [is] necessary to NuVasive's invalidity theory" is wrong.

4.      The Asserted Claims of the '932, '200, and '444 patents are invalid as indefinite because they impermissibly recite method steps in apparatus claims, in violation of the principles set forth in *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005). Dr. Jackson's experts cannot even agree on when infringement occurs, which provides further support for the conclusion that these asserted claims are indefinite. The Court should grant summary judgment for NuVasive because these patents are invalid as a matter of law.

5.      The opinions of NuVasive's damages expert, James Pampinella, are admissible because they are the product of reliable and reproducible methods that have been deemed admissible by this Court and in numerous other cases. Dr. Jackson's disagreements with Mr.

Pampinella's conclusions go to the weight of the evidence, not its admissibility, and can be explored during cross-examination at trial.

## ARGUMENT

"Summary judgment is improper 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there is a genuine issue of material fact, "the evidence must be viewed in a light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent." *Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998).

## I.     DR. JACKSON IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT

### A.     NuVasive Has a License to Make, Use, and Sell the Accused Products.

The Court must deny Dr. Jackson's motion for partial summary judgment of infringement because NuVasive holds a "valid license[, which] is a complete defense to infringement." *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 228 (D. Del. 2001); *see also id.* ("A patent license is essentially a waiver of the patent owner's right to sue; the parties agree that the patent owner will allow the licensee either to make, to use, to sell (or some combination of, or derivative of, these three rights) without subjecting the licensee to an infringement suit."); *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995) ("[A]ll or part of the right to exclude may be waived by granting a license, which may be express or implied.").

The parties agree that the 2014 Agreement is governed by Missouri law. *See* Op. Br. at 8 n.8 ("interpreting the 2014 Agreement requires applying Missouri law"). Accordingly, the Court must "read the terms of a contract as a whole to determine the intention of the parties," "give the terms their plain, ordinary, and usual meaning," and construe each term of the contract "to avoid

rendering other terms meaningless." *Health Care Found. of Greater Kansas City v. HM Acquisition, LLC*, 507 S.W.3d 646, 656 (Mo. Ct. App. 2017) (cleaned up).[1]

Dr. Jackson errs by interpreting the license provisions of the 2014 Agreement as a narrow patent-by-patent license instead of reading the terms as written,[2] which grant a package license for NuVasive to make and sell "Products" that practice certain technologies. The Federal Circuit has recognized the many benefits that flow from package licenses like this one:

> Package licensing can also obviate any potential patent disputes between a licensor and a licensee and thus reduce the likelihood that a licensee will find itself involved in costly litigation over unlicensed patents with potentially adverse consequences for both parties, such as a finding that the licensee infringed the unlicensed patents or that the unlicensed patents were invalid. **Thus, package licensing provides the parties a way of ensuring that a single licensing fee will cover all the patents needed to practice a particular technology and protecting against the unpleasant surprise for a licensee who learns, after making a substantial investment, that he needed a license to more patents than he originally obtained.**

*U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1192–93 (Fed. Cir. 2005) (cleaned up) (emphasis added). Indeed, worldwide licenses defined by the licensed technology (as opposed to individual patents) arose precisely to account for patent holders, like Dr. Jackson, with large patent portfolios. *Tex. Instruments, Inc. v. Hyundai Elecs. Indus., Co*., 49 F. Supp. 2d 893, 901 (E.D. Tex. 1999); *see also St. Lawrence Commc'ns LLC v. Motorola Mobility LLC*, 2018 WL 915125,

---

[1] Dr. Jackson cites a case in which there was no written contract to ascertain the mutual intent of the parties. *See* Op. Br. at 7–8 (citing *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 528 F.3d 556, 558 (8th Cir. 2008)). Here, there are no "secret" intentions because the parties' intentions are reflected in the executed agreement.

[2] Before filing this lawsuit, Dr. Jackson and his attorneys demanded additional royalties from NuVasive arguing that the license should be evaluated claim by claim. NuVasive Ex. GG, attached to the Declaration of James R. Anderson, submitted contemporaneously herewith. This is wrong as a matter of law. *Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, 2023 WL 8534968, at *3 (E.D. Tex. Nov. 28, 2023) (claim-by-claim analysis of license not appropriate where "Licensed Technology" was defined as "patents, all issued patents, pending applications, and subsequently filed applications"), *rep. & recommendation adopted*, 2023 WL 8534465, at *1 (E.D. Tex. Dec. 8, 2023).

ME1 47940769v.1

at *9 (E.D. Tex. Feb. 15, 2018) (citing cases recognizing common nature, and "procompetitive effect" of "grouping patents together in package licenses"); *cf. Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1338 (Fed. Cir. 2011) (interpreting license grant which "specif[ied] product types using general, functional terms").

Article I of the 2014 Agreement sets forth definitions for a host of different technologies with reference to ██████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████ *E.g.*, D.I. 215, Jackson Ex. 11 § 1.07 (defining "Helical Flange"). The license grant then gives NuVasive and its customers a license to ██████████████████████████████████████████████████████████████ █████████████████████████████████████████ *See id.* at § 2.02; *see also id.* at § 1.03 ████████████████████████████████████████████ ████████████████████████████████████████████

Dr. Jackson argues that the asserted patents are not "connected" to the patents or applications listed in the 2014 Agreement. *See* Op. Br. at 12 ("None of the Asserted Patents claim priority to any enumerated patent or application from the 2014 Agreement . . . ."). But this argument misses the point. The relevant question is not whether the asserted patents are "connected" or "unconnected" to patents and applications identified in the 2014 Agreement, but rather whether the accused products are licensed under Section 2.02. Dr. Jackson cannot now negate the license he granted and for which he received valuable consideration. *See Intel*, 173 F. Supp. 2d at 230 ("[O]nce the patentee has received consideration for releasing the article from the monopoly, by virtue of the license agreement, he can no longer limit or charge for its use.").

### 1.    The Accused Products are "Products" Under the 2014 Agreement.

The parties defined the term ████████ to mean ████████████████████ ████████████████████████████████ D.I. 215, Jackson Ex. 11 § 1.15.  This definition references two other capitalized terms.

*First*, the definition of ██████████████████████████ This term is not defined in the 2014 Agreement.  It was defined in 2008 Agreement, however, to mean ██████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████ D.I. 215, Jackson Ex. 11 § 1.14.  There is no dispute that ████████████ ████████████████████████████████████████████ ████████[3] Dr. Jackson's expert admitted that the accused Armada, Precept, SpheRX, and Reline products fall within the definition of Polyaxial Screw IP.  *See* D.I. 216, Jackson Ex. 24; Errico Tr. at 133:20–142:20.[4]  There is no contrary evidence on this point.

*Second*, the definition of ██████████████████████████████ ██████████████████████ D.I. 215, Jackson Ex. 11 § 1.15.  Here again, there is no genuine dispute that the accused products utilize the Helical Flange.[5]  Dr. Jackson "freely concedes" in his opening brief that at least "some" of the accused spinal implant products include Helical Flange.

---

[3] The definition of ██████████████████ in the 2008 Agreement is coextensive with the definition of ████████████████ in the 2014 Agreement, but the scope of ██████████████ is broader because ██████████

[4] The accused VuePoint products are "top-loaded" screws, meaning they are not ████████████ ██████████████████████ *See* D.I. 215, Jackson Ex. 11, 2014 Agreement, § 1.14.

[5] Both Dr. Jackson and his technical expert have admitted that the accused products use "Helical Flange" technology.  Ex. KK, submitted herewith, Jackson Tr. at 114:10–114:23 (Armada, Precept, SpherEx), 114:24–115:9 (Reline); D.I. 216, Jackson Ex. 24, Errico Tr. at 117:4–12 (Armada), 120:9–17 (Precept), 127:13–19 (SpheRX), 128:6–15 (VuePoint), 128:16–21 (Reline).

*See* Op. Br. at 12 ("Dr. Jackson freely concedes some Accused Products include Helical Flange or other technologies covered by the rights granted to NuVasive in the 2014 Agreement . . . ."). In any event, all of the accused products qualify as "Products" under at least one part of that term's two-part definition.

Dr. Jackson's interpretation of "Products" is unfounded and nonsensical. Op. Br. at 16–17. Without any support or analysis, Dr. Jackson argues that the words █████████████████ ███████████████████ does not include polyaxial screws," but instead refers only to "monoaxial screws, uniplanar screws, plates, connectors, hooks, etc." *Id.* This strained reading tries to exclude from the definition of ███████ any polyaxial screw that does not meet the definition of ██████████████████ *even if* that polyaxial screw is a █████████████████████ D.I. 215, Jackson Ex. 11 § 1.15. There is nothing in the definition (or any anywhere else in the agreement) that supports Dr. Jackson's position. To the contrary, the words ████████████████████████████ ████████████████████████████

### 2. NuVasive's Helical Flange License

Section 2.02(a) of the 2014 Agreement grants NuVasive the necessary rights to ████████████████████████████ ███████ D.I. 215, Jackson Ex. 11 § 2.02(a) ███████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ██████████████

Dr. Jackson expounds at length about the definition of ███████████ arguing that NuVasive does not have rights to "practice the claims in the asserted patents." *See* Op. Br. at 12–

8

16.  As explained in NuVasive's opening brief, however, the definition of 

expressly includes not only

*See* D.I. 210 at 27–28.  Most of the asserted

patents incorporate the '689 patent by reference, and the remaining patents describe the same

technology claimed and disclosed in the '689 patent.  *Id.*  Each one

of the asserted patents is

Dr. Jackson admits that the "rights to Helical Flange are limited to NuVasive's use of that

related intellectual property only in conjunction with the Products . . . ."  Op. Br. at 16 (internal

quotes omitted).  NuVasive agrees.  Use of the Helical Flange in conjunction with the Products is

part of the license that Dr. Jackson granted to NuVasive.  D.I. 215, Jackson Ex. 11 § 2.02(a).

Last, Dr. Jackson makes the naked assertion that NuVasive "was not given universal

immunity for all aspects of whatever device might also use a helical flange."  Op. Br.  at 17.  But

that is exactly what happened.  NuVasive can make and sell Products that utilize the Helical Flange

with immunity from infringement claims by Dr. Jackson.   Just like the defendant in *Texas*

*Instruments*, NuVasive "enjoyed a worldwide license—worldwide freedom to manufacture

without fear of infringement suits during the entire term of the License Agreement."  49 F. Supp.

2d at 907.

### 3.    *NuVasive's BOT Implant License*

Section 2.02(b) of the 2014 Agreement granted NuVasive 

D.I. 215,

Jackson Ex. 11 §§ 1.03, 2.02(b).

9



It is undisputed that at least some of the accused Reline, Armada, and Precept products fall within the definition of ████████████[6]  The parties' experts agree that these accused products are ████████████████████  *See* D.I. 216, Jackson Ex. 24, Errico Tr. at 117:4–12, 120:9–17, 128:16–21.

Dr. Jackson's position on ████████████ highlights the fundamental problem with his approach to the interpretation of the 2014 Agreement.  Dr. Jackson argues that, to the extent a NuVasive product has been licensed, the license ████████████████████ Op. Br. at 19.  That argument has it exactly backwards.  The contract language is clear that ████ ████████████████████████ ████████████████  D.I. 215, Jackson Ex. 11 § 1.03 (emphasis added).  The license is to the accused products and not limited to only the break-off tab feature in the accused products, as Dr. Jackson argues.

**B.    Dr. Jackson Covenanted Not to Sue NuVasive on the Asserted Patents.**

 "A covenant not to sue is equivalent to a nonexclusive or 'bare' license . . . which is a promise by the patent owner not to sue the licensee for practicing the patented invention, and under which the patent owner impliedly reserves the right to grant similar nonexclusive licenses to other entities."  *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 946 F.3d 1354, 1360–61 (Fed. Cir. 2020) (citation omitted).

---

[6] Like the definition ████████████████ also broadly defined to encompass patents beyond family members of the listed patents.  D.I. 215, Jackson Ex. 11 § 1.03 ██████████████ ████████.

Here, Dr. Jackson agreed to a covenant not to sue ("CNS") NuVasive for infringement of the asserted patents. As explained in NuVasive's opening brief, Dr. Jackson agreed not to bring a claim against NuVasive for infringement of ███████████ which, by definition, includes all of the asserted patents as ████████████████████████████ *See* D.I. 210 at 27–28.

Dr. Jackson does not analyze the CNS provision in his opening brief. Instead, Dr. Jackson relies on the Court's prior ruling at the Rule 12 stage: "The Court previously determined that the covenant in the 2014 Agreement does not encompass any of the Asserted Patents." Op. Br. at 20. That is simply not true. The Court focused primarily on an argument made by NuVasive's prior counsel—namely, that all of the patents-in-suit were covered by the separately-defined term ██████████████████████ in the CNS. D.I. 36 at 8–9. The Court also addressed an argument specific to a patent that is no longer part of this case—U.S. Patent No. 10,441,319—but "decline[d] to find *on the present record* that the '319 patent is . . . covered by covenant not to sue." *Id.* at 9 (emphasis added). Dr. Jackson has mischaracterized the Court's prior ruling.

Dr. Jackson also argues that "[t]he fact that a specific NuVasive product incorporates a structural feature, such as a helical flange, break-off extension or top-notch groove does not immunize it from infringing other families of patent that cover other technological features, as the Asserted Patents do here." Op. Br. at 21. Again, Dr. Jackson's approach to this issue is misguided. To determine whether the asserted patents are covered by the CNS, the Court must determine whether they fall within the scope of any of the defined terms in the CNS. As explained above, each one of the asserted patents is ██████████████████████████████████ ████████████████████████████████ because they expressly incorporate the '689

11

patent by reference or else describe the same ███████████████ technology claimed and disclosed in the '689 patent.

Dr. Jackson's argument fails for a separate reason: he has also sued NuVasive on his rights in and to ███████████ in violation of the CNS.  For example, Dr. Jackson and his experts refer to the asserted '856 patent as the "Circumferential Tool Engagement Groove" patent.  *See*, *e.g.*, Op. Br. at 31.  Specifically, Dr. Jackson and his experts allege that NuVasive practices the "[h]orizontally and non-threaded circumferentially-extending tool engagement grooves are formed into the upper side outer surfaces of the receiver" in the '856 patent, "as shown in Figures 22 and 35."  D.I. 214, Jackson Ex. B-1, Oxland Rebuttal Report ¶ 214; D.I. 212, Jackson Ex. A-1, Errico Report ¶ 58.  The problem for Dr. Jackson is that the ***exact same*** circumferential tool engagement groove is depicted in U.S. Patent No. 8,900,272, which issued from U.S. Application No. 13/815,054—████████████████████████████████ ███████



'856 patent, Figure 22          '272 patent, Figure 22

There can be no genuine dispute that, in an effort to prove infringement of the '856 patent, Dr. Jackson has relied on elements ████████████████████████████████████  This

12

is a clear violation of his covenant not to assert a claim against NuVasive for infringement ███████

███████ [7]

Finally, Dr. Jackson argues in a footnote that "[w]ere NuVasive's theory of the 2014 Agreement correct, a single page would have sufficed for the 2014 Agreement, with a single license under all Dr. Jackson's patents past, present and future." Op. Br. at 21 n.16. That is not so. The 2014 Agreement was not just a simple patent license agreement: Dr. Jackson ████



(§ 2.04). In addition, the parties were also attempting to resolve issues related to ███████████████████████ (Art. III). This was a multifaceted agreement. Dr. Jackson's argument is reductive and wrong.

### C. Other Genuine Issues of Material Fact Preclude Summary Judgment.

Dr. Jackson's motion rests on the flawed premise that there are "uncontested technical issues" solely because NuVasive's technical expert did not offer an opinion on every issue raised by Dr. Jackson's technical expert. Dr. Jackson has the burden to show infringement, which "requires a determination that every claim limitation or its equivalent be found in the accused device. Those determinations are questions of fact, and on summary judgment, the issue is whether there is no genuine issue of material fact regarding infringement." *Warner-Lambert Co. v. Purepac Pharm. Co. (In re Gabapentin Patent Litig.)*, 503 F.3d 1254, 1259 (Fed. Cir. 2007) (citation omitted). NuVasive does not have the burden to show non-infringement, and the absence

---

[7] Both parties' experts agree that the accused products include ███████████ D.I. 216, Jackson Ex. 24, Errico Tr. at 117:4–12 (Armada), 120:9–17 (Precept), 127:13–19 (SpheRX), 128:6–15 (VuePoint), 128:16–21 (Reline); D.I. 216, Jackson Ex. 30, Fallin Rebuttal Report ¶¶ 49–52.

of expert opinion on specific claim elements is not equivalent to the absence of genuine factual disputes. *See Kyocera Wireless Co. v. President Elecs., Ltd.*, 179 F. App'x 53, 54 (Fed. Cir. 2006) ("[E]xpert evidence is not always necessary to resolve questions of patent infringement." (citing *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1573 (Fed. Cir. 1984))). There are several grounds upon which there are genuine disputes of material fact sufficient to defeat summary judgment.

*First*, Dr. Jackson's motion does not articulate the grounds on which he is seeking summary judgment and should be denied on that basis. The Complaint advances multiple infringement theories (under §§ 271(a), (b), (c), (f)) for each of the Asserted Patents. Dr. Jackson's opening brief does not identify the grounds on which the motion is based. The only guidance is a statement that "the representative Reline 1601XXXX family of Accused Products literally satisfies each and every limitation of the asserted claims of" certain Asserted Patents. Op. Br. at 10. There is no discussion of *any* of the other asserted patents or accused products, apart from the statement that "Dr. Errico's declaration and Expert Reports set forth his uncontested analysis with respect to the other Representative Products," which is nothing more than a conclusory effort to evade briefing limits. *See, e.g.*, *Promptu Sys. Corp. v. Comcast Cable Comm'ns, LLC*, 92 F.4th 1384, 1385 (Fed. Cir. 2024) ("We have repeatedly held that incorporating argument by reference 'cannot be used to exceed word count.'" (citation omitted)). This deficiency is significant for several reasons. For example, Dr. Jackson has put forth no evidence related to infringement under § 271(f). Also, as addressed further below, Dr. Jackson appears to concede that NuVasive does not make the complete invention claimed by certain of the asserted patents, and therefore cannot "be held liable under § 271(a) for 'making' or 'selling' less than a complete invention." *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 n.2 (Fed. Cir. 2000). And Dr. Jackson does not address

14

whether he is asking that NuVasive be held liable for direct or indirect infringement, or specify the actual act of alleged infringement.

*Second*, Dr. Jackson's claim that the technical issues are uncontested is simply incorrect. For example, the independent asserted claims of the '866, '200, '444, and '273 patents all require a "U-shaped" or "rod receiving" channel configured to receive an elongate connecting rod. However, Dr. Errico testified that he did not know whether the receiver channels in the accused products were configured to receive the elongate rod.  D.I. 216, Jackson Ex. 24, Errico Tr. at 155:23–156:14 (A:  "[I]n this particular drawing it looks like there's a little gap between the U-body and – and the rod. . . . I don't know if it's just an artistic rendering or whether it's not, if we had a physical part here and locked it down, whether we'd see that.").[8]  The question of whether the medical implant assembly in fact infringes is similar to the one presented in *Cross Medical*, where the Federal Circuit "conclude[d] that there is a genuine issue of material fact as to whether surgeons infringe by making the claimed apparatus."  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312–14 (Fed. Cir. 2005).  Indeed, "a reasonable juror could conclude that the apparatus is not made because . . . there is no contact between the receiver member and the bone," as required by the claim language.  *Id.* at 1313.  The same is true here.  Dr. Errico's uncertainty about whether the components of the accused products are configured to (or do) fit together, as required by the asserted claims, creates a genuine dispute of material fact on infringement that should be put to the jury.

As Dr. Jackson notes, NuVasive identified several missing claim elements in its response to Dr. Jackson's Interrogatory No. 22.  D.I. 217, Jackson Ex. 54 at 5–14.  Dr. Jackson faults the

---

[8] Dr. Errico was asked these questions in the context of a Surgical Technique Guide for the VuePoint product, but when asked whether the other Accused Products would function the same way, testified "I don't know."  D.I. 216, Jackson Ex. 24, Errico Tr. at 158:3–22.

ME1 47940769v.1

interrogatory responses because they "do not identify any evidence," Op. Br. at 8 n.9, but the evidence of non-infringement is simply that the accused products lack the identified features—no more is necessary at this stage. The parties disagree that the claim elements are present in the accused products. This precludes summary judgment because "the device must meet all of the structural limitations" in order to infringe. *Cross Med.*, 424 F.3d at 1312–14. NuVasive should be permitted to present its infringement defenses to the jury, both through the affirmative testimony of its fact witnesses and cross-examination of Dr. Jackson's witnesses.

*Third*, certain of Dr. Jackson's infringement theories fail because he has not alleged that a single actor directly infringed the claims by making or using the whole bone screw assembly. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) ("[O]ur case law leaves no doubt that inducement liability may arise 'if, but only if, there is direct infringement.'" (cleaned up). For example, Dr. Jackson has alleged that NuVasive infringes the '711 patent indirectly because the asserted claims are not infringed until a surgeon "inserts the longitudinal connecting member into the receiver channel during a procedure." *E.g.*, D.I. 212, Jackson Ex. A-1, Errico Report ¶ 457. But there is no single direct infringer because the surgeon does not practice each claim element during the surgery. In fact, Dr. Jackson's technical expert testified that in the claimed "medical implant assembly," one element is performed by the surgeon (the "polyaxial bone screw [is attached] to a longitudinal connecting member"), while a separate element ("and then rotated to a second orientation") is performed by the manufacturer. D.I. 216, Jackson Ex. 24, Errico Tr. at 78:4–79:20. Dr. Errico also testified that he did not even know who the manufacturer is. *Id.* at 79:21–25. The same issue infects the asserted claims of the '866, '200, '444, and '273 patents (and potentially others) because each of them claim bone anchor assemblies secured to a longitudinal rod (by a surgeon) where the pressure insert is rotated from a first orientation to a

16

second orientation (by the manufacturer). *Id.* at 186:17–189:10 ("Q. The surgeon doesn't rotate the pressure insert within the receiver bore. Right? A. That is correct. Q. That's true for all of the accused products. Right? [Objection] A. Yes. Yes.").[9]

## II.   THE COURT SHOULD DENY DR. JACKSON'S MOTION AND GRANT SUMMARY JUDGMENT FOR NUVASIVE ON ITS BREACH OF CONTRACT COUNTERCLAIM

The Court should deny Dr. Jackson's motion and grant summary judgment for NuVasive on its breach of contract counterclaim because, for the reasons set forth above and in NuVasive's opening brief, Dr. Jackson has breached the license (§ 2.02) and covenant not to sue (§ 2.03), as well as his agreement that ███████████████ would be ████████████████ ████████████████████████ (Art. III). *See* D.I. 210 at 27–29. The three cases identified by Dr. Jackson in a string cite are easily distinguishable. *See* Op. Br. at 22 (citing *FURminator, Inc. v. Kim Laube & Co., Inc.*, 758 F. Supp. 2d 797, 816 (E.D. Mo. 2010) (the covenant not to sue "was specifically issued with respect to [two enumerated patents] only"); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1345–46 (Fed. Cir. 2001) (finding no license where the contract provided for the transfer of copyrights in software "but failed to mention the transfer of patent rights"); *Exergen Corp. v. Kaz USA, Inc.*, 2015 WL 4506472, at *4–5 (D. Mass. July 24, 2015) (finding the accused products did not fall with the "Licensed Field" because the contract required "material[] changes from circumstances existent at the time of execution of th[e] Agreement such that it [wa]s no longer practicable" to market the accused product) (cleaned up).

---

[9] This divided infringement issue is further compounded by the fact that it is not even clear when infringement of certain of these claims occurs, for the reasons discussed in Section III.B with respect to *IPXL*.

### III.    SUMMARY JUDGMENT ON NUVASIVE'S SECOND, THIRD, AND FOURTH COUNTERCLAIMS IS NOT APPROPRIATE

Dr. Jackson argues that NuVasive's other counterclaims "largely fall with its contract-based defenses." Op. Br. at 22. This inaccurate and uninspired framing exposes a serious flaw with Dr. Jackson's challenge to NuVasive's counterclaims, each of which is based on different facts and different legal theories than NuVasive's contract-based defenses. Dr. Jackson's motion should be denied in its entirety.

### A.    The Motion Fails to Show an Absence of Disputed Material Facts on Dr. Jackson's Breach of the Implied Covenant of Good Faith and Fair Dealing (Second Counterclaim).

Dr. Jackson's motion for summary judgment on NuVasive's second counterclaim fails because he does not even engage with the implied covenant of good faith and fair dealing under Missouri law. In a single paragraph, Dr. Jackson argues only that "Dr. Jackson has not sued NuVasive under any of the limited rights granted by the 2014 Agreement." Op. Br. at 23. Even if that were true, it is wholly irrelevant to whether Dr. Jackson breached his implied covenant of good faith and fair dealing.

In Missouri, the implied covenant of good faith and fair dealing exists in every contract. *Martin v. Prier Brass Mfg. Co.,* 710 S.W.2d 466, 473 (Mo. App. 1986). This covenant imposes a duty on contracting parties to enable performance and allow for the achievement of expected benefits. *Id.*; *McKnight v. Midwest Eye Inst. of Kansas City, Inc.,* 799 S.W.2d 909, 914–15 (Mo. Ct. App. 1990*)*. A breach occurs when one party acts to deny the other the expected benefit of the contract. *Mo. Consol. Health Care Plan v. Cmty. Health Plan*, 81 S.W.3d 34, 46 (Mo. Ct. App. 2002). To prove a breach of the covenant, a plaintiff must "allege[] sufficient facts which, if proven, would support an inference of bad faith." *White Stone Partners, LP v. Piper Jaffray Cos., Inc.*, 978 F. Supp. 878, 885 (D. Minn. 1997). Subterfuges or evasions also violate the obligation

of good faith, regardless of whether the actors believe their conduct to be justified.  Restatement (Second) of Contracts § 205 (1981).[10]  If a party's conduct does not breach the express terms of a contract, it may still violate the covenant if the conduct is an "eva[sion] of the spirit of the bargain." *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 370 (Mo. Ct. App. 2008).

NuVasive has alleged that, even if Dr. Jackson did not breach an express provision in the 2014 Agreement, he evaded the spirit of the bargain in bad faith.  D.I. 201 ¶¶ 9, 90.  NuVasive has come forward with overwhelming evidence sufficient to defeat summary judgment.  Both parties understood that, ███████████████████, NuVasive would be free to make and sell its polyaxial screw products free from further royalty obligations to Dr. Jackson.  *E.g.*, D.I. 211, NuVasive Ex. B (Dr. Jackson's lawyer referring to "global buyout of the existing License Agreement"); D.I. 211, NuVasive Ex. J (NuVasive's intention to be "FOREVER FREE FROM JACKSON (and any down-stream licensees/assignees)").  The 2014 Agreement is clear and unambiguous that Dr. Jackson accepted the large upfront payment in lieu of ████████████████████████ ██████████ D.I. 215, Jackson Ex. 11 § 3.03.

Dr. Jackson breached his duty of good faith by depriving NuVasive of its expected benefit under the 2014 Agreement.  Dr. Jackson's bad-faith effort to undermine the spirit of the 2014 Agreement began soon after the execution of the 2014 Agreement, when he and his counsel sought to renegotiate the agreement to NuVasive's detriment.  *See* Ex. HH, submitted herewith, at JAC-0080509 (2015 correspondence describing "claim by claim" process to "carve out and exclude those claims" that Dr. Jackson had already assigned to NuVasive in the 2014 Agreement).  Those efforts continued into 2019 when Dr. Jackson's counsel demanded additional licenses to Dr.

---

[10] Both Minnesota and Missouri have adopted the implied covenant of good faith and fair dealing from the Restatement (Second) of Contracts § 205.  *See Martin*, 710 S.W.2d at 473; *see also White Stone Partners*, 978 F. Supp. at 880–81.

Jackson's patents, notwithstanding the parties' mutual intent to execute a global royalty buyout. D.I. 211, NuVasive Ex. GG, Mar. 7, 2019 Letter to NuVasive (listing multiple patent families already addressed in the 2014 Agreement to which Dr. Jackson contended NuVasive "needs a license for freedom to operate"). To the extent Dr. Jackson did not breach an express provision in the 2014 Agreement, he has breached his covenant of good faith and fair dealing.

**B.    The Motion Fails to Show an Absence of Disputed Material Facts on NuVasive's Fraud Claim (Third Counterclaim).**

Dr. Jackson challenges whether he made (i) any material misrepresentations to NuVasive, and (ii) any actionable omissions during the negotiation of the 2014 Agreement. *See* D.I. 210 at 23–25. But the record contains ample evidence from which a jury could reasonably conclude that Dr. Jackson made misrepresentations and omissions. For this reason, Dr. Jackson's motion for summary judgment should be denied.

### *1.    Dr. Jackson Made Affirmative Misrepresentations to NuVasive.*

Dr. Jackson told NuVasive's head of product development that he was "receptive to a global buyout." D.I. 211, NuVasive Ex. I, at NUV0055585 (original in all caps). Dr. Jackson's lawyer, Mr. Swain, conveyed his understanding that the parties were negotiating "a global buyout of the existing [2008] License Agreement." D.I. 211, NuVasive Ex. B, at JAC-0094766. The 2008 License Agreement was "a license from the Jackson Group to manufacture and sell [] Products and Instruments," which included the "Polyaxial Screw, and any other NuVasive spinal implant on which uses the Helical Flange," *i.e.*, the Accused Products. D.I. 211, NuVasive Ex. F, at NUV0004514.[11] And, of course, the parties agreed in the 2014 Agreement that NuVasive would

---

[11] *See also* NuVasive Ex. DD, Becker Tr.at 134:3–8 ("Q Your report also indicates that four of the five accused product lines in this case were part of the 2008 agreement, including Armada, Precept, Reline and SpheRx. Is that accurate? A. That is accurate.").

ME1 47940769v.1

not have any more financial obligations to Dr. Jackson in exchange for the $30 million lump-sum buyout payment.  D.I. 215, Jackson Ex. 11, 2014 Agreement, Art. III.  A jury could reasonably conclude from these facts that Dr. Jackson made misrepresentations to NuVasive, and that NuVasive was in fact misled by such misrepresentations.  *See also* D.I. 211, NuVasive Ex. J at NUV0005047 ("I just want to ensure we're as clear as possible that we're FOREVER FREE FROM JACKSON (and any down-stream licensees/assignees) based on the rights we originally obtained and are now obtaining.").

At most, Dr. Jackson's summary judgment brief offers a disputed interpretation of how NuVasive understood the representations that Dr. Jackson and his lawyers made about the global buyout and NuVasive's freedom to operate.  *See* Op. Br. at 23–24.  That is not enough to carry his burden to show the absence of genuine disputes of material fact.

### 2.    *Dr. Jackson Violated a Duty to Disclose Information About His Patents to NuVasive.*

Dr. Jackson agrees that a duty to disclose "arises . . . where one party has superior knowledge or information not within the fair and reasonable reach of the other party," but then argues incorrectly that there was no duty of disclosure here.  *See* Op. Br. at 24 (citing *Ballard v. Nat'l Football League Players Ass'n*, 123 F. Supp. 3d 1161, 1170 (E.D. Mo. 2015)).

During the parties' negotiations for the 2014 Agreement, Dr. Jackson failed to disclose all of the patents and patent applications that he believed could be asserted against the accused products, even though he knew that NuVasive expected to obtain freedom to operate.  It is beyond dispute that Dr. Jackson, the sole inventor of the Asserted Patents, and the lawyers at the law firm that serve as his patent, licensing, and litigation counsel, had superior knowledge of Dr. Jackson's patent portfolio as compared to NuVasive.  Yet Dr. Jackson advances the baseless assertion that he "could not know what, if any claims would be allowed, nor the form or scope of any allowed

claims." Op. Br. at 25. To the contrary, two of the asserted patents—the '711 and '932 patents—issued before the execution of the 2014 Agreement and Dr. Jackson failed to disclose them. Given his newfound assertion in this proceeding that those patents cover the accused products, a jury could find that he violated his duty to disclose their existence to NuVasive when the parties negotiated the 2014 Agreement.

Next, Dr. Jackson argues that because "the 2014 Agreement does not reference the then-issued '711 and '932 patents [it] confirms the Parties did not intend to grant rights to those patents or their claimed TIP Technology." Op. Br. at 26. This is circular reasoning. It is axiomatic that a contract procured by fraud through omission will not reference the omitted facts. It is therefore unsurprising the 2014 Agreement did not mention those patents—NuVasive did not know about them. Dr. Jackson failed to disclose the existence of the '711 and '932 patents, or his belief that NuVasive infringed them, before accepting ████████████ despite having superior knowledge of his own portfolio. *See, e.g.*, NuVasive Ex. II, submitted herewith, Becker Tr. at 185:3–16.

The rest of the asserted patents claim priority to chains of applications that pre-date the execution of the 2014 Agreement by many years.[12] In fact, Dr. Jackson has asserted in this litigation that *all* of the Asserted Patents are entitled to a priority date no later than October 30, 2007.[13] So, according to Dr. Jackson, the asserted claims merely cover the same subject matter as

---

[12] The '200 and '444 patents claim priority to, *inter alia*, Application No. 12/228,207 (*i.e.*, the '932 patent), filed Aug. 20, 2008; the '292 patent claims priority to, *inter alia*, Application No. 10/464,633, filed June 18, 2003; the '866 and '273 patents claim priority to, *inter alia*, Application No. 11/140,343; and the '856 patent claims priority to, *inter alia*, Application No. 12/290,244, filed October 29, 2008.

[13] *See* D.I. 214, Jackson Ex. B-1, Oxland Rebuttal Report, ¶¶ 111, 123, 148, 156 (Sept. 17, 2007 priority date for '932, '711, '200, '444 patents); 136, 169 (May 27, 2005 priority date for '866, '273 patent); 190 (June 18, 2003 priority date for '292 patent); 215 (Oct. 30, 2007 priority date for '856 patent).

applications that he filed over *seven years* before he signed the 2014 Agreement and accepted ▉ ▉ from NuVasive.

There is a genuine dispute of material fact as to whether Dr. Jackson owed a duty of disclosure to NuVasive based on the parties' business and licensing relationship. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F. Supp. 2d 1066, 1077 (N.D. Cal. 2006) (denying summary judgment on fraud claim where licensor failed to disclose the existence of certain patents during license negotiations that licensor later claimed were infringed).[14]  Dr. Jackson failed to disclose material information about his own patent portfolio, which precludes summary judgment on NuVasive's third counterclaim for fraud.

### C.    The Motion Fails to Show an Absence of Disputed Material Facts on NuVasive's Unjust Enrichment Claim (Fourth Counterclaim).

There are disputed questions of material fact on each element of NuVasive's unjust enrichment claim.  The elements of unjust enrichment are that: (1) a benefit was conferred on the defendant, (2) the defendant appreciated the benefit, and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances.  *Howard v. Turnbull,* 316 S.W.3d 431, 436 (Mo. Ct. App. 2010).  The mere fact that there is an express contract between parties does not bar an unjust enrichment claim.  Even where this is no breach of contract, a defendant can still have been unjustly enriched if the payment they received was inequitable or unjust.  *United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 607–09 (8th Cir. 1999).

---

[14] Several of the cases cited by Dr. Jackson have nothing to do with fraud or whether an inventor had a duty of disclosure based on superior knowledge of his own patent portfolio. *See State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) (finding no willful infringement because "[a] 'patent pending' notice gives one no knowledge whatsoever.  It is not even a guarantee that an application has been filed"); *SightSound.Com Inc. v. N2K, Inc.*, 185 F. Supp. 2d 445, 454–55 (W.D. Pa. 2002) (declining to consider extrinsic evidence for claim construction because it would modify the "public record" established by the intrinsic evidence).

Dr. Jackson argues that "[t]he unjust enrichment claim here covers the same subject matter as the breach of contract claim." Op. Br. at 26. He is wrong. NuVasive has alleged, and the record evidence demonstrates, that NuVasive paid Dr. Jackson ███████ with the understanding that "Dr. Jackson would stop making demands that NuVasive take additional licenses to his patents," and that "NuVasive could sell its products free from Dr. Jackson's threats of infringement." D.I. 201 ¶¶ 104–05. NuVasive has also alleged that Dr. Jackson failed to disclose specific patents, including at least two of the asserted patents, "that he believed would be necessary for NuVasive to obtain freedom to operate," which led to "his own enrichment, as well as the impoverishment of NuVasive." D.I. 201 ¶¶ 106, 109.

NuVasive's allegations are supported by admissible evidence. For example, both parties were on the same page that they negotiated a global royalty buyout back in 2014. *See, e.g.*, D.I. 211, NuVasive Ex. B (Dr. Jackson's lawyer referring to "global buyout of the existing License Agreement"). During the negotiation, NuVasive wanted to be "as clear as possible that we're FOREVER FREE FROM JACKSON (and any down-stream licensees/assignees) based on the rights we originally obtained and are now obtaining." D.I. 211, NuVasive Ex. J. (all caps in original). And there is no evidence to suggest that Dr. Jackson ever disclosed the existence of the '711 and '932 patents prior to accepting ███████ from NuVasive. On this point, the testimony of Dr. Jackson's damages expert is revealing:

> Q.    Isn't it correct that Dr. Jackson told you that the "twist in place" patent family was his most valuable invention?
>
> A.    Yes, it is true.
>
> Q.    And Dr. Jackson told you that. Is that right?
>
> A.    Yes, he did.

24

> Q.    And did Dr. Jackson tell you why he did not inform NuVasive about what he believed to be his most valuable invention between January of 2013 and December of 2014 before the execution of the 2014 agreement?
>
> A.    I don't recall him mentioning that.

NuVasive Ex. II, submitted herewith, Becker Tr. at 185:3–16 (objection omitted).

Dr. Jackson does not attempt to address any of this evidence in his opening brief.  Instead, he argues that "[b]ecause Dr. Jackson did not breach the Agreement and NuVasive received what it paid for, there can be no unjust enrichment."  Op. Br. at 26.  But that conclusory argument is incorrect because NuVasive did not get what it paid for—namely, freedom to operate worldwide forever free from harassment and additional royalty demands by Dr. Jackson.  That is why NuVasive's unjust enrichment claim does not cover the same subject matter as the 2014 Agreement.  That is also why Dr. Jackson's motion for summary judgment must be denied.

## IV.    NUVASIVE'S INVALIDITY THEORIES ARE VIABLE AND THE '932, '200, AND '444 PATENTS ARE INDEFINITE

### A.    Dr. Jackson Admits the Purcell Reference is Prior Art to the '292 Patent.

Dr. Jackson argues that the Purcell reference "is not prior art to the asserted '292 patent because Purcell's Figure 13 embodiment, necessary to NuVasive's invalidity theories, is not entitled to a priority date before the filing of the '292 patent."  Op. Br. at 27.  This argument fails for two reasons.

*First*, Dr. Jackson admits that the Purcell reference is prior art as to the subject matter disclosed in Purcell's first-filed provisional, which includes Figures 1–9 and their accompanying disclosure.  In fact, Dr. Jackson admits that the '292 patent is prior art entitled to a priority date no earlier than June 18, 2003.  Op. Br. at 27.  He also admits that the Purcell reference claims priority from a provisional application that was filed on May 22, 2003.  *Id.*  Nor is there any genuine dispute that the May 22, 2003 Purcell provisional application provides written description and

enablement support for Figures 1–9 and the accompanying disclosure of the Purcell patent—those sections are virtually mirror images of one another. *Compare* D.I. 216, Jackson Ex. 33, *with* D.I. 216, Jackson Ex. 32; D.I. 216, Jackson Ex. 26, Fallin Tr. at 92:4–93:16. There is also no dispute that, as to those teachings (which make up the bulk of the reference), Purcell qualifies as prior art under pre-AIA § 102(e) as of May 22, 2003 and therefore pre-dates the filing of the '292 patent.

*Second*, contrary to Dr. Jackson's assertion, Figure 13 of Purcell is not "necessary" to NuVasive's invalidity theories as to the '292 patent. Mr. Fallin's expert report identifies an the element in two different embodiments shown in two different figures of the Purcell reference, as well as in the Schlapfer '090 reference, for which the priority date is not challenged. D.I. 216, Jackson Ex. 28, Purcell Invalidity Chart, at 5, 12; D.I. 216, Jackson Ex. 29, Schlapfer '090 Invalidity Chart, at 5. Mr. Fallin confirmed at his deposition that the "radiused upper surface" he identified in Schlapfer and the un-challenged embodiment of Purcell align with Dr. Errico's understanding of the meaning of that claim term. D.I. 216, Jackson Ex. 26, Fallin Tr. at 90:5–92:3.

Dr. Jackson does not address any of NuVasive's arguments or evidence concerning the obviousness of the '292 patent over the prior art. *See*, *e.g.*, D.I. 216, Jackson Ex. 27, Fallin Report § XV; Jackson Exs. 28, 29. Those arguments raise numerous disputed issues of material fact about what the references show and whether those disclosures render the asserted claims of the '292 patent obvious. Accordingly, Dr. Jackson is not entitled to judgment that NuVasive's theories of invalidity with respect to the '292 patent fail as a matter of law.[15] *See St. Claire Intellectual Prop.*

---

[15] Insofar as Dr. Jackson's requested relief is limited to judgment that Purcell "is not prior art to U.S. Patent No. 9,808,292 *for the subject matter disclosed in connection with Purcell's Figure 13 embodiment*," D.I. 205, Proposed Order ¶ 7 (emphasis added), it would have no impact on NuVasive's claims or defenses.

*Consultants, Inc. v. Sony Corp.*, 2003 WL 25299214, at *1 (D. Del. Feb. 21, 2003) (denying summary judgment on validity where "conflicting expert testimony" raised "genuine issues of material fact regarding . . . obviousness").

### B.    The Asserted Claims of the '932, '200, and '444 Patents are Indefinite.

Dr. Jackson argues that the asserted claims of the '932, '200, and '444 patents are not indefinite under *IPXL* and its progeny because the asserted claims are limited to language "describing the capabilities" of the claimed system and because, according to Dr. Jackson, "such claims are not invalid unless a determination of infringement is unclear." Op. Br. at 29 (citing *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005)). He is wrong on both counts. These asserted claims are indefinite because they "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

When a claim recites "a system and the method for using that system, it does not apprise a person of ordinary skill in the art of its scope" and is indefinite under 35 U.S.C. § 112. *IPXL Holdings, L.L.C.*, 430 F.3d at 1384. Dr. Jackson ignores the distinction between "the impermissible practice of combining apparatus and method limitations," on the one hand, and "'functional limitations,' in which the drafter properly defines something by what it does rather than what it is," on the other hand. *Courtesy Prods., L.L.C. v. Hamilton Beach Brands, Inc.*, 2015 WL 7295436, at *4 (D. Del. Nov. 18, 2015) (citation omitted).

The asserted claims of the '932, '200, and '444 patents impermissibly combine the functional language of "capability" with a method step. *See* D.I. 216, Jackson Ex. 27, Fallin Invalidity Report, §§ XI.C, XIII.C, XIV.C; D.I. 216, Jackson Ex. 31, Fallin Reply Invalidity Report, ¶¶ 91–94. These are not "apparatus claims with proper functional language." *Cf. MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1313 (Fed. Cir. 2017).

ME1 47940769v.1

Asserted claims 1 and 31 of the '923 patent, for example, recite that the insert is *capable* of being top-loaded: "the [compression] insert is top-load*able* in the receiver in a first orientation" (emphasis added). That is permissible. But they also impermissibly recite that the insert is "*then rotated* to a second orientation." D.I. 215, Jackson Ex. 2 (emphasis added). The issue is even more stark with respect to asserted claims 1 and 18 of the '200 patent, where the claim then requires the steps of installing and then rotating the pressure insert: "the pressure insert *being installed* into a first position . . . *wherein upon rotation of the pressure insert* . . . the insert upwardly-facing surface *is rotated* under the receiver downwardly-facing surface." D.I. 215, Jackson Ex. 6, '200 patent, Claim 1 (emphasis added); *see also id.*, Claim 18 and D.I. 215, Jackson Ex. 7, '444 patent, Claim 1 (similar).

This District has rejected nearly identical language as indefinite under *IPXL*. In *Courtesy Products*, a claim for a "beverage brewing system" recited a number of components as claim limitations, including "a beverage brewing machine" and "a plurality of . . . brew baskets." 2015 WL 7295436, at *5. The claim then recited "the brew baskets *being inserted* into the location in the beverage brewing machine." *Id.* (emphasis added). The court found the claim indefinite because, "[l]ike the system claim in *IPXL*," the "*system*" claim also recited the method step of "*inserting* a brew basket." *Id.* (emphasis added); *see also Rembrandt Data*, 641 F.3d at 1339 (claim indefinite for reciting four apparatus elements ("buffer means, fractional encoding means, second buffer means, and trellis encoding means") and one method element ("transmitting the trellis encoded frames")).

The "being installed" and "rotation" method steps in the asserted claims of the '923, '200, and '444 patents give rise to the same indefiniteness issue as the "insertion" language that invalidated the claims at issue in *Courtesy Products*. 2015 WL 7295436, at *5 ("The court

concludes that a person of ordinary skill in the art would not understand whether the claims at bar are infringed by an apparatus capable of heating water and having brew baskets inserted or when a person actually uses the beverage brewing system to heat water and inserts a brew basket.").

Dr. Jackson's expert witnesses admit that it is "unclear" from the language of these asserted claims "whether infringement occurs when one creates an infringing system, or whether infringement occurs when the user actually uses the system in an infringing manner." *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826 (Fed. Cir. 2016) (cleaned up). Dr. Jackson's invalidity expert, Dr. Oxland, claims that "one of ordinary skill in the art would not be confused as to when infringement occurs, as it plainly occurs when the claimed components of the assembly are combined." D.I. 214, Jackson Ex. B-1, Oxland Rebuttal Report, ¶ 795 ('932 patent), ¶ 798 ('200 patent), ¶ 803 ('444 patent). But this assertion is by itself confusing. Are the components of the assembly combined in an infringing manner when the insert is merely placed in the receiver? Or are they combined only after the insert is rotated from the first position to the second position?

Dr. Jackson's experts disagree on the answers to these questions. At his deposition, Dr. Oxland testified that "when [the pressure insert] is in that locked position, that's when there would be infringement of that claim," *i.e.*, *after* the pressure insert has been rotated to the second position. D.I. 216, Jackson Ex. 25, Oxland Tr. at 178:4–8. Yet, Dr. Jackson's infringement expert, Dr. Errico, came to a different conclusion, testifying that direct infringement occurs when the insert is installed in the first position *but not yet rotated* into the second position. *See* D.I. 216, Jackson Ex. 24, Errico Tr. at 190:23–192:18 ("[Q.] We've taken the insert and installed it in the first position but have not yet rotated it into the second position. Has Claim 1 [of the '444 patent] been directly infringed? A. Yeah, I think then that – then you've instructed the surgeon how to do the

29

rest. I think that's direct and indirect."); *see also id.* at 191:25–192:7 (response would be the same for the other Asserted Patents).

The doctrine articulated in *IPXL* was intended to address the problem that has arisen here. *See IPXL*, 430 F.3d at 1384 (finding claim indefinite where it was unclear whether infringement occurred "when one creates a system that allows" a user to perform certain functionality or "when the user actually uses the input means" and performs the functionality).

Contrary to Dr. Jackson's suggestion, the case law does not require that the claims "identify or specify users (*e.g.*, surgeons) performing the purported steps." Op. Br. at 29 n.19; *see MasterMine Software, Inc.*, 874 F.3d at 1314 (Federal Circuit "also applied [the *IPXL*] doctrine in [*Rembrandt Data*] where, unlike the claims in *IPXL Holdings* and *Katz*, the claims at issue did not claim user action"). That said, Dr. Errico admitted that the challenged claims include not just elements of a polyaxial screw, but also at least one method step that must be performed by the manufacturer manipulating the previously recited components of the screw.[16]

The inclusion of method steps in the independent claims of the '923, '200, and '444 patents renders them indefinite, and infects the dependent claims as well.[17] *See* D.I. 216, Jackson Ex. 27, Fallin Invalidity Report, §§ XI.C, XIII.C, XIV.C ("claim language that renders the claims indefinite because it recites both an apparatus and also an action performed by a component of the apparatus"); D.I. 216, Jackson Ex. 31, Fallin Reply Invalidity Report, ¶¶ 91–94 ("the statements in the Oxland Rebuttal Report about whether the claim language recites capabilities of various

---

[16] D.I. 216, Jackson Ex. 24, Errico Tr. at 172:13–19 (Claim 31 of the '932 patent "refers to the insertion and rotation of the pressure insert within the receiver. Correct? A. That is correct. Q. And that step is performed by the manufacturer. Correct? A. Yes."); *see also id.* at 169:4–11, 171:12–19 ('932 patent); 186:17–187:18; 188:17–189:2 ('200 patent); 189:4–10 ('444 patent).

[17] *See Rembrandt Data*, 641 F.3d at 1339 (finding method element in independent apparatus claim renders independent claim and its dependent claims invalid for indefiniteness).

features or steps that are taken with respect to particular features at particular times highlights the issues that a person of ordinary skill in the art would have in understanding whether infringement has occurred and, if so, when").

Under the circumstances, the Court should exercise its authority to grant summary judgment for NuVasive finding the asserted claims of the '932, '200, and '444 patents invalid as indefinite.  FED. R. CIV. P. 56(f)(1).

## V.     MR. PAMPINELLA'S PATENT DAMAGES OPINIONS ARE ADMISSIBLE

In an attempt to disqualify the patent damages opinions of NuVasive's expert, James, Pampinella, Dr. Jackson mischaracterizes Mr. Pampinella's citation analysis as the exclusive basis for his opinion as to the royalty rate that a hypothetical negotiation over the asserted patents would have yielded in 2013.  Op. Br. at 30, 40.  In reality, Mr. Pampinella's damages opinions are based on far more.  They utilize case-specific qualitative assessments and quantitative data, both of which are considered well-regarded and reliable by applicable case law.  That alone is grounds for denying Dr. Jackson's motion.  Additionally, Dr. Jackson's arguments targeting any purported shortcomings associated with Mr. Pampinella's citation analysis are undermined by the very authority he relies upon, and at most go to weight and credibility.  For these reasons, Dr. Jackson's motion to exclude Mr. Pampinella's testimony should be denied.

### A.     Mr. Pampinella's Patent Infringement Damages Opinion Is Based on a Well-Established Approach.

Mr. Pampinella utilized the "market approach" to render his opinion as to the reasonable royalty rate to which the parties would have agreed in a hypothetical negotiation.  The "market approach uses two categories of analytical procedures to indicate value": (1) the "collection and analysis of market-derived empirical transactional data . . . regarding the sale or licensing of the subject intangible asset itself and of comparative intangible assets," and (2) "[a]n assessment of

the current market conditions . . . and of the changes in market conditions between the dates of the empirical transactional data and the date of the analysis." D.I. 217, Jackson Ex. 41, Rebuttal Expert Report of James E. Pampinella, dated Jan. 12, 2024, ("Pampinella Rebuttal") at ¶ 88 (citation omitted).)

With regard to the first category of procedures outlined by the market approach, Mr. Pampinella analyzed thirteen of Dr Jackson's license agreements pertaining to the same or similar technologies as those covered by the Asserted Patents, concluding that a cumulative royalty rate of 3.0% of net sales of products making use of all three Asserted Patent families provided a starting point for ascertaining the royalty rate to which the parties to this case would have agreed in a hypothetical negotiation. *Id.* ¶¶ 90–108.

Moving then to the second category of valuation procedures, Mr. Pampinella considered each of the remaining *Georgia-Pacific* factors to determine how market conditions pertaining to a hypothetical negotiation would differ from the conditions surrounding the comparable licenses, especially the 2008 Agreement. When applying those factors, Mr. Pampinella determined that a downward adjustment to the royalty rate starting point was appropriate based on: (1) the fact that the Asserted Patents relate only to convenience, while the 2008 Agreement patents relate to safety (*id.* ¶¶ 56, 123, 125–26, 131); (2) the accused products represent a minor share of NuVasive's product revenue and net revenue (*id.* ¶ 119); (3) it was unlikely that NuVasive would agree to "stack" a full royalty rate on top of the royalty rate it was already committed to paying on net sales pursuant to the 2008 Agreement (*id.* ¶¶ 28, 66–70); and (4) NuVasive agreed to pay Dr. Jackson a ███████████████, representing a 2.7% royalty rate, based on the understanding that NuVasive would not have any further payment obligations to Dr. Jackson with respect to the products in which the Asserted Patents are used (*id.* ¶¶ 12, 49, 66, 131).

To help quantify the downward adjustment warranted by those case-specific facts, Mr. Pampinella performed what are known as "forward citation analyses," which are used to compare the relative importance of the Asserted Patents to those covered by the 2008 and 2014 Agreements. *Id.* ¶¶ 57–65, 132–33. To perform that analysis, Mr. Pampinella utilized two independent, third-party data collection and analysis tools to compare the relative importance of the asserted patents to those covered by the 2008 and 2014 Agreements. *Id.*

The reliability of Mr. Pampinella's approach, and his use of qualitative assessments and quantitative data tied to the facts and circumstances of this case, is well-established. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) (holding "hypothetical negotiation" is a well-accepted method to apportion the royalty rate); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (endorsing utilization of *Georgia-Pacific* factors to apportion royalty rate); *Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, 2019 WL 4198194, at *2–3 (D. Del. Sept. 4, 2019) (Andrews, J.) (finding "[f]orward citation analysis has an academic pedigree that supports it as a reliable methodology").[18]   Dr. Jackson's motion to exclude Mr. Pampinella's patent

---

[18] *See also Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1318 (Fed. Cir. 2014) (allowing expert testimony where "application was straightforward and adequately supported by . . . technical experts and [damages expert's] own experience and expertise), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015); *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1319–20 (Fed. Cir. 2010) (opinions are admissible when they "account for differences in the technologies and economic circumstances of the contracting parties"); *accord Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1331–33 (Fed. Cir. 2014) (excluding expert who relied on "conclusory assertions" akin to a "rule of thumb" that was not case-specific); *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1351 (Fed. Cir. 2018) (excluding expert's proposed royalty rate when "plucked . . . out of nowhere"); *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015) (holding that "abstract recitations . . . and qualitative testimony that an invention is valuable—without being anchored to a quantitative market valuation—are insufficiently reliable"); *M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 677 (D. Del. 2016) (Andrews, J.) (excluding analysis that relied solely on "ambiguous conclusions of technological comparability between the [other] license agreements and the [patents at issue], without any rationale other than

infringement damages opinions in their entirety ignores all of the qualitative and quantitative facts and circumstances that Mr. Pampinella considered and relied upon in forming his opinions aside from the patent citation analyses.

**B.    Mr. Pampinella's Utilization of Independent, Third-Party Data Collection and Analysis Tools Was Tied to the Facts of the Case and Is Admissible.**

"Multiple courts have found forward citation analyses to be reliable." *Manufacturing Resources*, 2019 WL 4198194, at *2. As this Court has recognized, forward-citation analyses are generally admissible unless they "fail[] to take into consideration the specific facts of th[e] case." *Id.* When an expert "ties his forward citation analysis to a specific comparable license," he has cleared that low bar and his opinion should be admitted because "[a]t base, the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Id.* at *3 (internal quotation marks and citation omitted).

Here, Mr. Pampinella tied his forward citation analysis to specific comparable licenses; namely, the patents covered by the 2008 and 2014 Agreements between Dr. Jackson and NuVasive. Dr. Jackson does not argue otherwise, nor does he even dispute that the 2008 or 2014 Agreements are potentially comparable licenses. This case stands in stark contrast to those relied on in Dr. Jackson's motion, where the expert "d[id] no analysis to a specific comparable license and does not tie the forward citations to the facts of this case." *ViaTech Techs., Inc. v. Adobe, Inc.*, 2023 WL 5975219, at *10 (D. Del. Sept. 14, 2023) (Andrews, J.) (cited Op. Br. at 39).[19]

---

undisclosed conversations with [Plaintiff]," as opposed to independent third-party data collection and analysis tool).

[19] For similar reasons, *CloudofChange, LLC v. NCR Corp.*, is also distinguishable. 2021 WL 11549625, at *3 (W.D. Tex. Nov. 1, 2021) (excluding expert who sought to identify substantially similar patents to the patents-in-suit by using factors that were not probative of determining similarity). Here, Dr. Jackson does not dispute that the 2008 and 2014 Agreements are sufficiently similar to the Asserted Patents or question Mr. Pampinella's reliance on them to perform his citation analyses.

ME1 47940769v.1

The other cases cited by Dr. Jackson provide no basis for excluding Mr. Pampinella's opinions, either.  In each of those cases, the expert's forward-citation analyses contained flaws that are simply not present here.  For example, in *Realtek Semiconductor Corp. v. LSI Corp.*, the court excluded the expert's forward-citation analysis because she attributed forward citations for non-relevant patents to the patents-in-suit.  2014 WL 46997, at *3–4 (N.D. Cal. Jan. 6, 2014) ("As [plaintiff] points out . . . a vast majority (93%) of the citations attributed to [the defendant's portfolio] come from another patent, which is not one of the patents-in-suit.").  Likewise, in *Oracle America Inc. v. Google Inc.*, the court found the forward-citation analysis unreliable because it "fail[ed] to account for the fact the [patent-in-suit] was re-issued twice, and thus fail[ed] to include citation counts to its predecessor patents."  2012 WL 877125, at *2 (N.D. Cal. Mar. 15, 2012).  In contrast to the expert's excluded in *Realtek* and *Oracle*, Mr. Pampinella did not misattribute any forward citations, nor were any of the patents that he analyzed re-issued.

None of the other out-of-circuit case law that Dr. Jackson cites even addresses the admissibility of a forward-citation analysis (despite his incorrect suggestion to the contrary).  Op. Br. at 39.  For example, in *GPNE Corp. v. Apple, Inc.*, the court excluded an expert's testimony because it was based on nothing more "than his 30 years of experience."  2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014) (opinion excluded as "classic *ipse dixit* reasoning" based on "an impermissible black box without sound economic and factual predicates") (cleaned up); *see also Fail-Safe L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010) (excluding opinion based on a single, undated, party-produced PowerPoint slide, where the expert failed to conduct any "'independent' research" to verify the information presented).

Mr. Pampinella's opinion is not a "black box" or *ipse dixit*.  He analyzed thirteen different comparable licenses and the unique circumstances surrounding a hypothetical negotiation over the

Asserted Patents, and then utilized an independent, third-party data collection and analysis patent platform to arrive at his opinion. Dr. Jackson's own expert was able to replicate Mr. Pampinella's results, Op. Br. at 32 n.22, further reinforcing the reliability of Mr. Pampinella's approach. *Hardy v. United States*, 141 Fed. Cl. 1, 61 (2018) ("It is well understood that replication is an indicia of reliability.").

In short, all of Dr. Jackson's authority supports admitting, rather than excluding, Mr. Pampinella's patent infringement opinions. Dr. Jackson's motion should be denied.

### C.    At Most, Dr. Jackson's Remaining Arguments Go to Credibility and Weight, Rather than Admissibility.

All of Dr. Jackson's other supposed issues with Mr. Pampinella's forward citation analyses are not grounds for exclusion; at most, they go to credibility and weight, which must be evaluated by the factfinder.

Dr. Jackson's primary argument is that Mr. Pampinella's Derwent-based patent citation analysis is unreliable because Derwent misidentified the "real" patent owner as licensees of Dr. Jackson's patents, rather than as Dr. Jackson himself. Op. Br. at 31–34, 39. That's simply not true. As the table from *Dr. Jackson's* damages expert shows, the Derwent output reflects Dr. Jackson as Assignee/Applicant and Inventor for each of the Asserted Patents. D.I. 217, Jackson Ex. 47.[20]    In addition, neither Dr. Jackson nor his damages expert explain how or why this

---

[20] Dr. Jackson contends that the "Optimized Assignees" that Derwent identified were "hallucinations," meaning they were "nonsensical or altogether inaccurate." Op. Br. at 32 n.21. In reality and contrary to Dr. Jackson's assertion, the "Optimized Assignees" field functioned as intended because the "patent[s] do[] not have reassignment information." D.I. 217, Jackson Ex. 50 at 3. In addition, Dr. Jackson cannot dispute that he has extensive license and assignment arrangements with Medtronic. *See* D.I. 215, 2008 Agreement at Schedule 1.10 (1999 Agreement with Medtronic); NuVasive Ex. JJ, submitted herewith, 2013 Agreement with Medtronic (including extensive assignments and cross-licenses with Medtronic). Medtronic and Warsaw Orthopedic have been corporate affiliates of one another. *See, e.g.*, *Sasso v. Warsaw Orthopedic, Inc.*, 45 N.E.3d 835, 837 (Ind. Ct. App. 2015).

"misidentification" has any significance at all.  Indeed, any purported misidentification impacts only the number of forward citations attributed to the purported owner ("Strategic Importance") versus all other persons and entities ("Domain Entities"), not the *total number of forward citations* represented by the "Combined Patent Impact" score, which is the metric that Mr. Pampinella relied upon to conduct his analysis.  D.I. 217, Jackson Ex. 41, Pampinella Rebuttal Report ¶ 59.  For example, if 4 forward citations are attributed to Entity A, 6 forward citations to Entity B, and 10 citations to all other persons or entities, the "Strategic Importance" metric will yield 4 or 6 forward citations and the "Domain Influence" metric will yield 16 or 14 forward citations depending upon whether Entity A or B is deemed the "Optimized Assignee."   In every case, however, the "Combined Patent Impact" score will yield 20 forward citations because the "Combined Patent Impact" score is comprised of "two mutually exclusive forward citation counts," as Dr. Jackson himself concedes.  Op. Br. at 32.

At most, Dr. Jackson has different views on how the data should be interpreted or used. To the extent Dr. Jackson contends that "[a]ll of [the] Derwent computations and resulting royalty opinions are corrupted by the incorrect 'Optimized Assignees,'" Op. Br. at 34, notwithstanding his failure to explain why the entity citing the patent-at-issue is its owner or another entity has any relevance to the analysis, he can cross-examine Mr. Pampinella on that point at trial.  *Mfg. Res.*, 2019 WL 4198194, at *3 ("[A]t base, the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court.") (cleaned up).

Next, Dr. Jackson takes issue with the fact that Mr. Pampinella relied equally on several "indicators that analyze different aspects of a patent" when utilizing the IPlytics platform, rather than solely on the "technical relevance" factor.  Op. Br. at 34–37 (admitting that forward citations, which is what "technical relevance" tracks, is a "reliable metric [of] patent value").  But as Mr.

Pampinella confirmed at his deposition, IPlytics has "seven different cases of relative value that they track," and although he "could have just gone with technical relevance . . . [he] felt for completeness [that he] would include all seven . . . ." D.I. 217, Jackson Ex. 40, Pampinella Tr. at 57:20–25; *see also id.* at 67:14–18. That was a "conservative" choice because had Mr. Pampinella relied only on "technical relevance"—the one factor that Dr. Jackson concedes is reliable—he would have concluded the Asserted Patents had even *less* value. *Id.* at 58:3–7. The weight to be accorded to Mr. Pampinella's decision not to "cherry-pick" the indicator most favorable to NuVasive (*id.* at 58:8) is a credibility determination to be made by the jury at trial, which Dr. Jackson is free to explore through cross-examination. *PersonalWeb Techs. LLC v. Int'l Bus. Machs. Corp.*, 2017 WL 3476082, at *2 (N.D. Cal. Aug. 14, 2017) (refusing to exclude expert who used a "'conservative' figure" even though he "could have chosen his final number in a more rigorous way" because party would be able to "cross-examine [him] on this choice and the jury will be able to assess the credibility of his opinion").

Lastly, Dr. Jackson contends that "Pampinella's use of IPLytics is also flawed as the values are 'normalized,'" so his decision to sum those values across patents was purportedly improper. Op. Br. at 37–38. Dr. Jackson's own damages expert, however, never questioned the propriety of this methodology in his reply report.[21] This leaves Dr. Jackson's complaints about IPLytics as naked attorney argument, which Mr. Pampinella should have an opportunity to address at trial. Indeed, as the Federal Circuit has cautioned, it is not for the judge to "evaluate the correctness of conclusions, [or] impose its own preferred methodology." *Apple Inc.*, 757 F.3d at 1314 (Fed. Cir. 2014).[22]

---

[21] *See generally* D.I. 217, Jackson Ex. 44, Reply Report of Brian C. Becker, dated Jan. 24, 2024.

[22] Dr. Jackson cites *Acceleration Bay LLC v. Activision Blizzard Inc.*, 2019 WL 4194060, at *4 (D. Del. Sept. 4, 2019), for the proposition that an expert's analysis should be excluded when it is

For these reasons, Dr. Jackson's motion to exclude Mr. Pampinella's patent infringement damages opinions should be denied.

## **CONCLUSION**

For the reasons set forth above, NuVasive respectfully requests that the Court deny (i) Dr. Jackson's motion for partial summary judgment on infringement, NuVasive's counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, unjust enrichment, and portions of its affirmative defense of invalidity; and (ii) Dr. Jackson's motion to exclude certain opinions of NuVasive's damages expert, James Pampinella, related to patent damages.

---

"inherently untestable" and "entirely speculative . . . and divorced from the facts of this case." Jackson Br. 38–39.  Dr. Jackson's reliance on *Activision* is inapposite, as he does not contend that Mr. Pampinella's analysis is "untestable," "speculative" or "divorced from the facts of the case," but merely that summing normalized values is a methodological flaw.

39

Dated: March 20, 2024

OF COUNSEL:

Colin G. Cabral
James R. Anderson
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
(617) 526-9600
ccabral@proskauer.com
jaanderson@proskauer.com

Jessica M. Griffith
PROSKAUER ROSE LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 557-2900
jgriffith@proskauer.com

McCARTER & ENGLISH, LLP

*/s/* Daniel M. Silver
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Counsel for Defendant NuVasive, Inc.*

40

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing document was caused to be served on March 20, 2024 on the following counsel in the manner indicated:

### VIA EMAIL:

Stephen J. Kraftschik
POLSINELLI PC
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
skraftschik@polsinelli.com

Darren E. Donnelly
POLSINELLI LLP
Three Embarcadero Center, St. 2400
San Francisco, CA 94111
ddonnelly@polsinelli.com

Thomas L. Gemmell
POLSINELLI PC
150 N. Riverside Plaza, Ste. 3000
Chicago, IL 60606
tgemmell@polsinelli.com

Aaron Levine
POLSINELLI PC
1000 Louisiana Street, Ste. 6400
Houston, TX 77002
alevine@polsinelli.com

*Counsel for Plaintiff*

/s/ *Daniel M. Silver*
Daniel M. Silver (#4758)

ME1 47939710v.1