IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROGER P. JACKSON, M.D.,

    Plaintiff,

v.

NUVASIVE, INC.,

    Defendant.

Civil Action No. 21-53-RGA

## MEMORANDUM OPINION

Stephen J. Kraftschik, POLSINELLI PC, Wilmington, DE; Thomas Gemmell, POLSINELLI PC, Chicago, IL; Darren E. Donnelly, POLSINELLI PC, San Francisco, CA; Aaron M. Levine (argued), POLSINELLI PC, Houston, TX,

    Attorneys for Plaintiff.

Daniel M. Silver, Alexandra M. Joyce, MCCARTER & ENGLISH LLP, Wilmington, DE; Colin G. Cabral (argued), James R. Anderson, PROSKAUER ROSE LLP, Boston, MA; Jessica M. Griffith, PROSKAUER ROSE LLP, Los Angeles, CA,

    Attorneys for Defendant.

May 31, 2024

*[Signature: Richard G. Andrews]*

ANDREWS, UNITED STATES DISTRICT JUDGE:

Before me are Plaintiff's motion for partial summary judgment on infringement, Defendant's counterclaims for breach of contract, breach of implied covenant of good faith and fair dealing, fraud, unjust enrichment, and portions of Defendant's invalidity defenses (D.I. 205), Plaintiff's motion to exclude Defendant's patent damages opinions (D.I. 206), and Defendant's motion for summary judgment and to exclude the testimony of Brian Becker (D.I. 209). The motions have been fully briefed. (D.I. 207, 210, 237, 239, 246, 248).[1] I heard oral argument on May 22, 2024.[2]

For the reasons set forth below, Plaintiff's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART. Defendant's motion for summary judgment is DENIED IN PART.

Plaintiff's motion is GRANTED with respect to Defendant's license defense for the Helical Flange grant in § 2.02(a) of the 2014 Agreement. Plaintiff's motion is DENIED with respect to Defendant's license defense for the BOT Implants grant in § 2.02(b) of the 2014 Agreement.

Defendant's motion is DENIED with respect to its license defense for the Helical Flange grant in § 2.02(a) of the 2014 Agreement. Defendant's motion is also DENIED with respect to its covenant not to sue argument and with respect to the argument that § 3.03 of the 2014 Agreement precludes Plaintiff from recovering additional royalty payments.

---

[1] Plaintiff filed a motion for leave to file a sur-reply in opposition to Defendant's motion for summary judgment. (D.I. 256). Defendant filed an opposition. (D.I. 257). Plaintiff filed a reply. (D.I. 260).

[2] Citations to the transcript of the argument, which is not yet docketed, are in the format "Hearing Tr. at ___."

2

I will address the other pending motions separately.

## I. BACKGROUND

On January 19, 2021, Plaintiff Dr. Jackson filed his Complaint against Defendant, alleging infringement of U.S. Patent Nos. 8,353,932 ("the '932 patent"), 8,696,711 ("the '711 patent"), 9,788,866 ("the '866 patent"), 10,335,200 ("the '200 patent"), 10,561,444 ("the '444 patent"), 10,722,273 ("the '273 patent"), 9,808,292 ("the '292 patent"), and 10,441,319 ("the '319 patent"). (D.I. 1 ¶ 6). On July 21, 2021, Plaintiff filed his First Amended Complaint, additionally alleging infringement of U.S. Patent No. 11,051,856 ("the '856 patent"). (D.I. 17 ¶ 7). On October 21, 2022, Plaintiff filed his Second Amended Complaint, which no longer asserted the '319 patent. (D.I. 77 ¶ 7). Plaintiff thus asserts eight patents against Defendant.[3] These patents "generally relate to spinal implant systems composed of separately inserted components used to fixate or align" a patient's vertebrae. (D.I. 191 ¶ 8). Plaintiff characterizes the patents as asserting three specific technologies. "The '932, '711, '200, '444, '866, and '273 patents relate to 'Twist in Place' insert and receiver technologies (the 'TIP Patents'); the '292 patent relates to a cannulated polyaxial screw; and the '856 patent relates to a circumferential tool engaging groove polyaxial screw." (D.I. 207 at 2).

In December 2014, Plaintiff and Defendant entered into the Amended and Restated Development and License Agreement (the "2014 Agreement"), which replaced a previous license agreement (the "2008 Agreement") between the parties. (D.I. 211-1 at 2–16 of 335).

---

[3] On January 31, 2024, Plaintiff filed his Third Amended Complaint, which asserted the same eight patents as the Second Amended Complaint. (D.I. 191 ¶ 7).

3

Defendant contends that the 2014 Agreement grants it a license to make, use, and sell the accused products. (*See, e.g.*, D.I. 239 at 4).[4] Plaintiff disagrees. (*See, e.g.*, D.I. 207 at 11–22).

For the purpose of this opinion, the most relevant parts of the 2014 Agreement[5] state:

> **BOT Implants**. In order to facilitate capturing a spinal fixation rod which is initially spaced a considerable distance from the seat of a channel of Products which are intended to receive the rod, the arms of the Products can be provided with break-off extensions or tabs. The increased length of the arms enables the rod to be captured within the channel with less resistance of the rod than would be possible closer to the rod seat within the Product's channel. A closure top utilizing a Helical Flange is then advanced into the channel between the arms and used to urge the rod toward the seat. Once the rod is fully seated and clamped into place, the arm extensions can be separated from the more proximate portions of the arms by breaking them at weakened areas or notches formed at break points along the arms to lower the profile of the Products. The anti-splay features of the Helical Flange are particularly useful in combination with the increased lengths of the arms since such elongated arms tend to be more flexible than the proximate portions of the arms. For the purposes of this Agreement, "BOT Implants" shall mean Products utilizing the above described break-off tabs and which utilize a Helical Flange. The break-off tabs elements of the BOT Implants are claimed or disclosed in U.S. Patent Application No. 11/268,200, entitled Helical Guide and Advancement Flange with Breakoff Extensions, filed by the Jackson Group, and any continuations, patent applications, substitutions, amendments, extensions, reexaminations, continuations-in-part, divisions, reissues, additions and counterparts thereto and to any other related intellectual property invented and owned by the Jackson Group.

(D.I. 211-1 at 3 of 335 (§ 1.03)).

> **Helical Flange**. "Helical Flange" shall mean the proprietary helically wound mating and interlocking structures owned by the Jackson Group and utilized as the means by which closure tops engage polyaxial screws and other spinal implants, instead of threads, with the proprietary elements claimed or disclosed in U.S. Patent No. 6,726,689, and any continuations, patent applications, substitutions, amendments, extensions, reexaminations, continuations-in-part, divisions, reissues, additions and counterparts thereto and to any other related intellectual property invented and owned by the Jackson Group.

---

[4] Defendant "is accused of infringing eight [a]sserted [p]atents by commercializing its Reline, Armada, Precept, SpheRx, and VuePoint II systems." (D.I. 207 at 2 (footnote omitted)).

[5] I include "titles and subtitles" though they appear only for "convenience" and are irrelevant to "construing or interpreting" the 2014 Agreement. (D.I. 211-1 at 14 of 335 (Art. XVI)).

4

(*Id.* at 4 of 335 (§ 1.07)).

> **Polyaxial Screw IP**. "Polyaxial Screw IP" shall mean the specific proprietary bottom loaded spherical capture polyaxial pedicle screw (including the head, shank and capture pieces) developed by the Jackson Group and claimed or disclosed in U.S. Patent Application No. 11/126,965 (with or without the use of the Helical Flange) and any continuations, patent applications, substitutions, amendments, extensions, reexaminations, continuations-in-part, divisions, reissues, additions and counterparts thereto.

(*Id.* at 5 of 335 (§ 1.14)).

> **Products**. "Products" shall mean the Polyaxial Screw, and any other NuVasive spinal implant on which uses the Helical Flange.

(*Id.* (§ 1.15)).[6]

> Helical Flange. The Jackson group hereby grants to NuVasive and its Affiliates a perpetual, non-exclusive, non-transferable, non-assignable, non-sublicensable (except such license shall be sublicensable to all third parties necessary for NuVasive in its sole discretion to manufacture, have manufactured, use, sell, offer for sale, import and otherwise distribute the Products and Related System Components) and fully paid-up license to utilize the Helical Flange in conjunction with the Products and Related Systems Components in the Territories.

(*Id.* at 6 of 335 (§ 2.02(a))).

> BOT Implants. The Jackson Group hereby grants to NuVasive and its Affiliates a perpetual, non-exclusive, non-transferable, non-assignable, non-sublicensable (except such license shall be sublicensable to all third parties necessary for NuVasive in its sole discretion to manufacture, have manufactured, use, sell, offer for sale, import and otherwise distribute the BOT Implants) and fully paid-up license to manufacture, have manufactured, use, sell, offer for sale, import and otherwise distribute BOT Implants in the Territories.

(*Id.* (§ 2.02(b))).

> **Covenant Not to Sue**. The Jackson Group hereby unconditionally covenants and agrees that it will not take any action or assert against NuVasive or its Affiliates or their respective distributors or indirect or direct customers any claim that the development, manufacture, having manufactured, use, marketing, offer for sale, sale, import, export commercialization or exploitation of any NuVasive product or procedure, whether before or after the Effective Date, infringes any the Jackson

---

[6] At oral argument, the parties agreed that the word "on" in the definition of "Products" could be ignored. (Hearing Tr. at 11:13–12:15, 53:23–54:3).

5

Group's rights in and to the MIS IP, Top Notch IP, Helical Flange, BOT Implants, Instruments, Methodologies, Polyaxial Screw IP or Related System Components. The Jackson Group shall impose the covenant set forth in this Section 2.03 on any third party to whom the Jackson Group may license or assign the BOT Implant, Helical Flange, Instruments, Methodologies or Related System Components.

(*Id.* (§ 2.03)).

**Acknowledgment; Release**. The parties hereby acknowledge and agree that: (a) the Upfront Payment is in lieu of all other financial obligations, whether past, present or future, that may be due and payable by NuVasive to the Jackson Group, including any royalty payments that may be due and payable by NuVasive to the Jackson Group under the Prior Agreement for the fourth quarter of calendar year 2014 (October 1, 2014 to December 31, 2014); (b) no further payments are or shall be due and payable under the Prior Agreement; and (c) all payments due and payable by NuVasive under the Prior Agreement have been fully and appropriately paid as of the Effective Date. Each party hereby expressly releases the other party from all claims and demands, known and unknown, claiming the underpayment or overpayment of royalties due under the Prior Agreement.

(*Id.* at 7–8 of 335 (§ 3.03)).

## II.  LEGAL STANDARD

### A.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

6

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### B. Contract Interpretation[7]

"The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and give effect to that intention." *Lafarge N. Am., Inc. v. Discovery Grp. L.L.C.*, 574 F.3d 973, 979 (8th Cir. 2009) (citation omitted). Under Missouri law, a court must first

---

[7] The 2014 Agreement contains a choice of law provision. It states, "This Agreement shall be subject to, governed by, and construed according to the laws of the State of Missouri without regard to its conflict of laws provisions." (D.I. 211-1 at 13 of 335 (Art. XV)). I will therefore apply Missouri law in interpreting the 2014 Agreement. The parties do not dispute that Missouri law applies. (*See* D.I. 207 at 8 n.8; *see also* D.I. 239 at 4).

7

determine whether a contract is ambiguous—i.e., whether it is reasonably susceptible to different constructions. *Id.* "If no ambiguity exists, the court must construe and enforce the contract according to its plain meaning." *Sligo, Inc. v. Nevois*, 84 F.3d 1014, 1019 (8th Cir. 1996).

## III. DISCUSSION

At oral argument, the parties agreed that, in relation to the issues addressed in this opinion, the 2014 Agreement is unambiguous, there are no disputed factual issues, and summary judgment for one side or the other is appropriate. (Hearing Tr. at 9:11–10:18, 48:4–10, 50:16–21). Of course, just because the parties so agree does not necessarily mean that I must grant summary judgment to one side or the other. The 2014 Agreement, like most complex agreements, is not perfectly drafted. The 2014 Agreement repeats many of the provisions of the 2008 Agreement either verbatim or with modest wording changes. Nevertheless, I conclude that it is unambiguous.

I note two drafting oddities. One of the key issues is the 2014 Agreement's grant of a license "to utilize the Helical Flange in conjunction with the Products and Related Systems Components." (D.I. 211-1 at 6 of 335 (§ 2.02(a)). "Products" includes "any other NuVasive spinal implant on which uses the Helical Flange." (*Id.* at 5 of 335 (§ 1.15)). Thus, the grant licenses Defendant in part "to utilize the Helical Flange in conjunction with [any other NuVasive spinal implant on which uses the Helical Flange]." I do not think "other" or "on" in the preceding sentence have any significance. Thus, the grant licenses Defendant "to utilize the Helical Flange in conjunction with any NuVasive spinal implant which uses the Helical Flange]." The other oddity is the mixing of patents and products in the license grant relating to the Helical Flange. As just noted, the 2014 Agreement grants a license "to utilize the Helical Flange in conjunction with the Products and Related Systems Components." (*Id.* at 6 of 335 (§

8

2.02(a))). "Related Systems Components" plainly refers to "items sold by NuVasive." (*Id.* at 5 of 335 (§ 1.16)). "Products" refers to two things—"the Polyaxial Screw, and any other NuVasive spinal implant . . . ." (*Id.* (§ 1.15)). While the NuVasive spinal implant is a NuVasive product, the Polyaxial Screw is Plaintiff's intellectual property. (*Id.* (§ 1.14)). Thus, the license grant is in part defined in relation to Defendant's products and in part in relation to one portion of Plaintiff's intellectual property.

As context for the following discussion, it is worth discussing the 2014 Agreement as a whole. Plaintiff sold three sets of related patents and patent applications (including anything resembling a descendant), called MIS IP, Polyaxial Screw IP, and Top Notch IP, to Defendant, albeit with some generally time-limited restrictions on what Defendant could do with them. (*See id.* at 5–7 of 335 (§§ 2.01, 2.04)). Plaintiff granted fully paid-up non-exclusive licenses to Defendant in connection with the "Helical Flange," "BOT Implants," and "Instruments and Methodologies."[8] The license grants relating to "Helical Flange" and "BOT Implants" use different wordings to describe the grants: "Helical Flange" is a "license to utilize the Helical Flange in conjunction with the Products and Related Systems Components;" BOT Implants is a license to manufacture, sell, or distribute BOT Implants. (*Id.* at 6 of 335 (§ 2.02)).

### A. License

Defendant argues it has "a package license . . . to make and sell 'Products' that practice certain technologies." (D.I. 239 at 5).[9] Specifically, Defendant contends that § 2.02(a) of the 2014 Agreement grants it "the necessary rights to manufacture, use, sell, offer for sale, import,

---

[8] The "Instruments and Methodologies" grant does not seem to be relevant to any issue in the case.

[9] Plaintiff argues, "[T]here is no contemporaneous evidence that Dr. Jackson (or NuVasive) desired to enter into a 'package,' 'portfolio' or 'universal' license." (D.I. 246 at 2).

9

and distribute 'Products' that utilize 'Helical Flange' Technology." (D.I. 210 at 27; *see also* D.I. 239 at 8). Defendant argues that the accused products fall within the scope of "Products" as defined in the 2014 Agreement. (D.I. 210 at 27; *see also* D.I. 239 at 7–8).

Plaintiff "freely concedes some [a]ccused [p]roducts include Helical Flange or other technologies covered by the rights granted to [Defendant] in the 2014 Agreement." (D.I. 207 at 12). Plaintiff contends, however, that the 2014 Agreement did not provide Defendant with rights to the asserted patents. (D.I. 237 at 11).[10] Plaintiff argues that the asserted patents do not "claim priority to any enumerated patent or application from the 2014 Agreement." (*Id.* at 12).[11]

Plaintiff argues that § 2.02(a) of the 2014 Agreement merely grants a license to "utilize the Helical Flange in conjunction with the Products and Related System Components," but that the asserted patents do not fall within the definition of "Products." (D.I. 237 at 11–12 (citations omitted); *see also* D.I. 207 at 16–17 (arguing that polyaxial screws are outside the scope of "any other NuVasive spinal implant on which uses the Helical Flange")). Plaintiff also disputes Defendant's interpretation of the "Helical Flange" definition, arguing that Defendant focuses on the last clause—"to any other related intellectual property invented and owned by the Jackson Group"—to the exclusion of the surrounding language. (D.I. 237 at 12 (citation omitted); *see also* D.I. 207 at 13–16). Plaintiff argues that the subject matter licensed under the "Helical Flange" grant does not cover the asserted patents. (D.I. 207 at 12). Plaintiff contends,

> If [Defendant's] interpretation of the Helical Flange grant were correct, the express grant of rights delineated in § 1.11 would serve no purpose as it would be

---

[10] Plaintiff argues, "The '711 and '932 [] patents had issued by the time the 2014 Agreement was negotiated and the absence of these patents (or their descendants) in the 2014 Agreement strongly suggests the [p]arties did not intend to include them." (D.I. 237 at 11).

[11] Defendant responds that it is irrelevant whether the asserted patents are "connected" to patents listed in the 2014 Agreement. (D.I. 239 at 6). Defendant contends, "The relevant question is . . . whether the accused products are licensed under Section 2.02." (*Id.*).

10

completely subsumed by the Helical Flange license. Moreover, the specifically-limited grant to only the "fastener insertion methodologies" within the '377 application would be made a nullity as the Helical Flange license would include anything disclosed or claimed in the '377 application already.

(D.I. 237 at 13).[12]

Plaintiff contends that the BOT Implants license does not provide any rights to practice the asserted patents. (D.I. 207 at 17). Plaintiff argues, "[T]he 2014 Agreement's license to BOT Implants is also tied to Products and does not grant [Defendant] universal rights to use BOT Implants (i.e., break-off tabs or extensions) on any conceivable product." (*Id.* at 18 (footnote omitted)). Plaintiff contends, even if an accused product were a BOT Implant, "the license extends only to what makes it a BOT Implant and does not include the claims of the [a]ccused [p]atents which recite none of those functional features or elements." (*Id.* at 19).[13]

Defendant responds that all the asserted patents are "related intellectual property invented and owned by the Jackson Group," which brings them within the scope of the "Helical Flange" definition. (D.I. 239 at 11). Defendant contends that the asserted patents meet this definition "because they expressly incorporate the '689 patent by reference or else describe the same 'helically wound flangeform' technology claimed and disclosed in the '689 patent." (*Id.* at 11–12).

---

[12] Defendant responds that § 1.11 of the 2014 Agreement does not reference the '377 application or include a grant of rights. (D.I. 248 at 5). That is correct. I think Plaintiff is referring to § 1.10, which does reference "fastener insertion methodologies," although it does not include any grant of rights.

[13] Defendant contends, "It is undisputed that at least some of the accused Reline, Armada, and Precept products fall within the definition of 'BOT Implants.'" (D.I. 239 at 10).

11

Before I determine the meaning of the 2014 Agreement under Missouri law, I note that the question I am addressing is whether Defendant's accused products are licensed under the 2014 Agreement, not whether Defendant may practice any individual asserted patent.[14]

I disagree with Defendant that the 2014 Agreement grants a broad package license. The plain language of the 2014 Agreement unambiguously indicates that Plaintiff provided specific grants to Defendant rather than a grant to all Products without limitations. Section 2.02, the license grant provision, describes license grants to the Helical Flange, to BOT Implants, and to Instruments and Methodologies. (D.I. 211-1 at 6 of 335). None of the license grants identify any of Defendant's products by name or other specific description. The license grant provision does not state that Defendant may without restriction or limitation use all Products. I do not think the 2014 Agreement indicates that the parties intended to enter into a universal, package, or portfolio license.

Rather than provide a limitless license to all Products, the 2014 Agreement imposes some limits on what Defendant may do. Section 2.02(a), contrary to Defendant's contention, imposes some of those limits. Section 2.02(a), which discusses the Helical Flange, does not license Defendant to use any Products that use Helical Flange technology. The language instead states that Defendant may "utilize the Helical Flange in conjunction with the Products and Related Systems Components in the Territories." (D.I. 211-1 at 6 of 335). The focus of § 2.02(a) is thus on the Helical Flange, not on the Products.

---

[14] The fact that the '711 and '932 patents issued before the 2014 Agreement was finalized but are not mentioned in the 2014 Agreement is some evidence that products practicing those patents are not within the scope of any license granted to Defendant, but I do not think it is dispositive of the matter.

12

I disagree with Defendant that the Helical Flange definition covers any patent that incorporates the '689 patent by reference. The plain language of "related intellectual property invented and owned by the Jackson Group" indicates that "related" technology is technology that is related to the subject matter at issue, which is "the proprietary helically wound mating and interlocking structures . . . utilized as the means by which closure tops engage polyaxial screws and other spinal implants, instead of threads." (*Id.* at 4 of 335). Mere incorporation by reference of the '689 patent is insufficient to bring an otherwise non-Helical-Flange patent within the scope of the Helical Flange definition.

I disagree with Plaintiff, however, that parts of the '689 patent may fall outside the scope of the Helical Flange definition in § 1.07. The plain language of the 2014 Agreement suggests that any technology claimed or disclosed in the '689 patent falls within the scope of the Helical Flange definition. Section 1.07 states that the Helical Flange includes "the proprietary elements claimed or disclosed in U.S. Patent No. 6,726,689, and any continuations, patent applications, substitutions, amendments, extensions, reexaminations, continuations-in-part, divisions, reissues, additional and counterparts thereto . . . ." (*Id.*). The disclosures in the '689 patent are thus within the scope of a Helical Flange. The 2014 Agreement does not indicate that any parts of the '689 patent are excluded from the Helical Flange definition. Plaintiff's contrary arguments are unpersuasive.[15]

The language in § 2.02(a) suggests that in order to use Products in their entirety, additional license grants are needed beyond § 2.02(a) alone, as § 2.02(a) only grants a license to the Helical Flange technology. I therefore conclude that § 2.02(a) does not grant Defendant a

---

[15] I am also unpersuaded by Plaintiff's argument that Defendant's interpretation would nullify language in § 1.11 (or, as I believe Plaintiff meant, § 1.10), as those sections set forth definitions instead of granting any rights.

13

license to use the accused products if those products feature both the Helical Flange technology and other technology that Plaintiff has patented but has not separately licensed to Defendant. Thus, if an accused product uses Helical Flange technology but also uses other technology that Plaintiff has patented, Defendant needs a license to that other technology to use the entire product. Defendant cannot rely on § 2.02(a) to avoid liability if its products feature patented technology other than the Helical Flange.

On the other hand, I disagree with Plaintiff that polyaxial screws that do not meet the definition of "Polyaxial Screw" fall outside the scope of "Products" in the 2014 Agreement. The definition of "Products" states, "'Products' shall mean the Polyaxial Screw, and any other NuVasive spinal implant on which uses the Helical Flange." (*Id.* at 5 of 335). The plain language of this section does not suggest that "any other NuVasive spinal implant on which uses the Helical Flange" cannot include polyaxial screws. The language merely suggests that the defined term "Polyaxial Screw" is different than "any other NuVasive spinal implant on which uses the Helical Flange." If a polyaxial screw that uses the Helical Flange does not meet the definition of "Polyaxial Screw,"[16] it may still qualify as "any other NuVasive spinal implant on which uses the Helical Flange." I do not think the 2014 Agreement supports Plaintiff's position.

---

[16] "Polyaxial Screw" in § 1.15 corresponds to "Polyaxial Screw IP" as defined in § 1.14. In the 2008 Agreement, what is now "Polyaxial Screw IP" was then simply "Polyaxial Screw." (*See generally* D.I. 215-1 at 238–70 of 347). Evidently, not all the references to "Polyaxial Screw" were changed to conform with the change to the defined term. The parties agreed at oral argument that the two terms meant the same thing. (Hearing Tr. at 53:2–14). The definition states,

> "Polyaxial Screw IP" shall mean the specific proprietary bottom loaded spherical capture polyaxial pedicle screw (including the head, shank and capture pieces) developed by the Jackson Group and claimed or disclosed in U.S. Patent Application No. 11/126,965 (with or without the use of the Helical Flange) and any continuations, patent applications, substitutions, amendments, extensions,

14

I further disagree with Plaintiff that the license to use BOT Implants cannot provide any rights to Defendant. The BOT Implants license grant and the BOT Implants definition are structured differently than the grant and definition for the Helical Flange. The BOT Implants grant provides a license "to manufacture, have manufactured, use, sell, offer for sale, import and otherwise distribute BOT Implants." (*Id.* at 6 of 335). This grant, unlike the Helical Flange grant, does not mention Products. The BOT Implants definition in § 1.03, however, states, "For the purposes of this Agreement, 'BOT Implants' shall mean Products utilizing the above described break-off tabs and which utilize a Helical Flange." (*Id.* at 3 of 335). Read together, §§ 1.03 and 2.02(b) plainly indicate that Plaintiff granted Defendant a license to use Products that utilize a Helical Flange and otherwise meet the definition of a BOT Implant. Contrary to Plaintiff's contention, the BOT Implants grant extends beyond the "functional features or elements" that make a product a BOT Implant. The BOT Implants grant is thus broader than the Helical Flange grant.

On the present record, I cannot determine which of Defendant's accused products meet the definition of BOT Implants as set forth in § 1.03. I conclude, however, that the 2014 Agreement grants Defendant a license to manufacture, sell, use, offer for sale, import, and otherwise distribute any products that both satisfy the BOT Implants definition in § 1.03 and the Products definition in § 1.15. Thus, if a product is a Polyaxial Screw which uses the Helical Flange and utilizes the relevant break-off tabs, or is a spinal implant which uses the Helical

---

> reexaminations, continuations-in-part, divisions, reissues, additions and counterparts thereto.

(D.I. 211-1 at 5 of 335). At oral argument, the parties advised that "bottom loaded" had some significance because a screw can also be "top loaded." (Hearing Tr. at 28:3–31:6, 92:17–93:17). I believe there are both kinds of screws at issue in this case.

Flange and utilizes the relevant break-off tabs, it is licensed pursuant to § 2.02(b). If any accused products do not meet these definitions, Defendant cannot rely on § 2.02(b) to avoid liability.

### B. Covenant Not to Sue

Defendant contends that Plaintiff, through § 2.03 of the 2014 Agreement, covenanted not to sue on the asserted patents. (D.I. 210 at 27–28). Defendant separately contends that Plaintiff has violated his covenant not to assert claims against Defendant for infringement of "Top Notch IP." (D.I. 239 at 12–13).

Plaintiff, on the other hand, argues the covenant not to sue does not immunize Defendant from the present suit. (D.I. 237 at 13–14; *see also* D.I. 207 at 20). Plaintiff contends the covenant only potentially applies if the asserted patents are within the scope of § 2.03. (D.I. 237 at 13–14; *see also* D.I. 207 at 21). Plaintiff argues, however, that the covenant does not apply because Defendant is not licensed to practice any of the asserted patents through the Helical Flange grant, and the Helical Flange grant is the only one on which Defendant relies. (D.I. 237 at 14).[17]

I am unpersuaded by Defendant's argument about Top Notch IP. I previously concluded that the asserted patents "do not fall within the scope of 'Top Notch IP.'" (D.I. 36 at 7). I see no reason to revisit that conclusion. Plaintiff's infringement allegations are thus unrelated to whether the accused products contain Top Notch IP. If Defendant does not otherwise have a license to practice the entirety of an accused product, Plaintiff is not prohibited by § 2.03 from

---

[17] Defendant argues that under Plaintiff's interpretation of the covenant not to sue, § 2.03 of the 2014 Agreement "would be completely unnecessary." (D.I. 248 at 5). I do not think this is right. Section 2.03 covers "indirect or direct customers," which is not a category that is expressly mentioned elsewhere in the agreement.

suing Defendant for infringing a non-Top-Notch-IP patent even if Defendant had a license to the Top Notch IP portion of the accused product.

I think the covenant not to sue only applies if the entirety of an accused product falls within the scope of "BOT Implants." Section 2.03 states, "The Jackson Group hereby unconditionally covenants and agrees that it will not take any action or assert against NuVasive . . . that the . . . use . . . of any NuVasive product . . . infringes any the Jackson Group's rights in and to the . . . BOT Implants . . . ." (D.I. 211-1 at 6 of 335). This language shows that Plaintiff cannot sue Defendant for infringement if Defendant is merely practicing its license for BOT Implants.

Because I cannot determine which of Defendant's accused products meet the definition of BOT Implants, I similarly cannot determine whether Plaintiff has violated the covenant not to sue.

### C. Section 3.03

Defendant argues that § 3.03(a) of the 2014 Agreement precludes Plaintiff from recovering any additional royalty payments. (D.I. 210 at 24). Defendant contends, "[T]he 2014 Agreement reflects the parties' clear intent that the $30 million buyout payment was to be the last payment from NuVasive to Dr. Jackson." (*Id.* at 26). Defendant relies on § 7.01 of the 2014 Agreement as additional support, arguing, "[T]he parties agreed that NuVasive would have no 'other financial obligations' to Dr. Jackson for so long as NuVasive continues to sell 'the Polyaxial Screw, and any other NuVasive spinal implant on which uses the Helical Flange.'" (*Id.* (quoting D.I. 211-1 at 5 of 335 (§ 1.15))).

Plaintiff argues that § 3.03 of the 2014 Agreement does not release Defendant from liability. (D.I. 237 at 9). Plaintiff contends that Defendant cannot even advance a release

defense at this stage, as Rule 8 of the Federal Rules of Civil Procedure required Defendant to plead that defense in its responsive pleading. (*Id.*). Plaintiff argues that Defendant did not raise a release defense until its summary judgment motion. (*Id.*). Plaintiff also contends that only the second sentence of § 3.03 provides for a release, but that Defendant seeks a release on the basis of the acknowledgment portion of § 3.03 (the first sentence). (*Id.* at 9–10).

Plaintiff argues that Defendant's position is incorrect because: (1) § 3.03(a) "lacks the 'clear, concise and unequivocal' language covering . . . [Defendant's] patent infringement"; (2) § 6.05, which defines "Damages," better reflects the parties' intent than § 7.01, which Defendant relies on, and the parties would have used the term "Damages" in § 3.03(a) if Defendant were correct; and (3) § 3.03(a), like subsections (b) and (c), is limited to the 2008 Agreement. (*Id.* at 10–11 (citations omitted)).[18]

Defendant agrees with Plaintiff that only the second sentence of § 3.03 provides for a release but argues that it has not relied on that language or even used the word "release." (D.I. 248 at 2–3). Defendant contends that the acknowledgment portion of § 3.03 "is entirely consistent with [Defendant's] position that the global royal[ty] buyout was intended to provide complete freedom to operate with respect to the licensed spinal implant products such that NuVasive would be 'FOREVER FREE FROM JACKSON' after making one final upfront payment of $30 million." (D.I. 248 at 2). Defendant argues that Plaintiff's reliance on § 6.05 is flawed because the indemnification language "relates to third-party claims that may be brought against [Plaintiff]." (*Id.* at 3).

I disagree with Defendant that § 3.03(a) precludes Plaintiff from recovering any additional payments. Because the license grants in the 2014 Agreement are not as broad as

---

[18] Defendant contends that § 3.03(a) is broader in scope than the rest of § 3.03. (D.I. 248 at 4).

18

Defendant contends, I do not think that the language in § 3.03(a) shows the parties intended for Defendant to be "forever free" from Plaintiff. I think the plain language of § 3.03 suggests that the parties intended Defendant to be free from "all other financial obligations" that are coextensive with the license grants in § 2.02. I thus conclude that § 3.03 does not preclude Plaintiff from recovering damages in the event that Defendant does not have a license and has infringed the asserted patents.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART. Defendant's motion for summary judgment is DENIED IN PART.

Plaintiff's motion is GRANTED with respect to Defendant's license defense for the Helical Flange grant in § 2.02(a) of the 2014 Agreement. Plaintiff's motion is DENIED with respect to Defendant's license defense for the BOT Implants grant in § 2.02(b) of the 2014 Agreement.

Defendant's motion is DENIED with respect to its license defense for the Helical Flange grant in § 2.02(a) of the 2014 Agreement. Defendant's motion is also DENIED with respect to its covenant not to sue argument and with respect to the argument that § 3.03 of the 2014 Agreement precludes Plaintiff from recovering additional royalty payments.

An appropriate order will issue.