**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ROGER P. JACKSON, M.D., | |
| Plaintiff, | |
| v. | Civil Action No. 21-53-RGA |
| NUVASIVE, INC., | |
| Defendant. | |

<u>MEMORANDUM OPINION</u>

Stephen J. Kraftschik, POLSINELLI PC, Wilmington, DE; Thomas Gemmell, POLSINELLI PC, Chicago, IL; Darren E. Donnelly, POLSINELLI PC, San Francisco, CA; Aaron M. Levine (argued), POLSINELLI PC, Houston, TX,

    Attorneys for Plaintiff.

Daniel M. Silver, Alexandra M. Joyce, MCCARTER & ENGLISH LLP, Wilmington, DE; Colin G. Cabral (argued), James R. Anderson, PROSKAUER ROSE LLP, Boston, MA; Jessica M. Griffith, PROSKAUER ROSE LLP, Los Angeles, CA,

    Attorneys for Defendant.

July _____, 2024

ANDREWS, U.S. DISTRICT JUDGE:

Before me are the parties' motions for summary judgment and Defendant's *Daubert* motion. (D.I. 205, 209). The motions have been fully briefed. (D.I. 207, 210, 237, 239, 246, 248).[1] I heard oral argument on May 22, 2024.[2] On May 31, 2024, I issued a Memorandum Opinion addressing Defendant's license and covenant not to sue defenses. (D.I. 261). The parties subsequently filed motions for clarification or reconsideration. (D.I. 264, 265). I addressed those motions in a separate order. (D.I. 283).

The parties have stipulated that the trial scheduled for August 12, 2024, will not include Plaintiff's patent claims. (*See* D.I. 274). I will therefore separately address the following issues: (1) infringement, (2) invalidity, and (3) *Daubert* arguments about expert testimony relating to patent damages.

For the reasons set forth below, Plaintiff's motion for summary judgment on Defendant's breach of contract counterclaim is DENIED. Defendant's motion for summary judgment on the breach of contract counterclaim is GRANTED IN PART and DENIED IN PART.

Plaintiff's motion for summary judgment is DENIED with respect to the unjust enrichment and breach of implied covenant of good faith and fair dealing counterclaims. Plaintiff's motion is GRANTED with respect to the fraud counterclaim. Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART with respect to Plaintiff's

---

[1] Plaintiff filed a motion for leave to file a sur-reply in opposition to Defendant's motion for summary judgment. (D.I. 256). Defendant filed an opposition. (D.I. 257). Plaintiff filed a reply. (D.I. 260).

[2] Citations to the transcript of the argument, which is not yet docketed, are in the format "Hearing Tr. at ___."

fraudulent inducement claim. Defendant's *Daubert* motion regarding Dr. Becker's fraudulent inducement opinions is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

Plaintiff's Third Amended Complaint includes a fraudulent inducement claim and asserts eight patents[3] against Defendant. (D.I. 191 ¶¶ 7, 189–217).[4] The patents "generally relate to spinal implant systems composed of separately inserted components used to fixate or align" a patient's vertebrae. (*Id.* ¶ 8). Plaintiff characterizes the patents as covering three specific technologies: "'Twist in Place' insert and receiver technologies," "a cannulated polyaxial screw," and "a circumferential tool engaging groove polyaxial screw." (D.I. 207 at 2).

In December 2014, the parties entered into the Amended and Restated Development and License Agreement (the "2014 Agreement"), which replaced a previous license agreement (the "2008 Agreement") between the parties. (D.I. 211-1 at 2–16 of 335). Plaintiff assigned various rights to Defendant through the 2014 Agreement. (*Id.*). Plaintiff's fraudulent inducement claim is related to negotiations leading up to the execution of the 2014 Agreement. (D.I. 191 ¶¶ 189–217). Defendant's counterclaims are related to the 2014 Agreement as well. (*See* D.I. 201 ¶¶ 77–113).

## II.   LEGAL STANDARD

### A.  Summary Judgment

---

[3] Plaintiff filed the original Complaint against Defendant in January 2021, alleging infringement of U.S. Patent Nos. 8,353,932, 8,696,711, 9,788,866, 10,335,200, 10,561,444, 10,722,273, 9,808,292, and 10,441,319. (D.I. 1 ¶ 6). Plaintiff filed the First Amended Complaint in July 2021, additionally alleging infringement of U.S. Patent No. 11,051,856. (D.I. 17 ¶ 7). In October 2022, Plaintiff filed the Second Amended Complaint, which no longer asserted U.S. Patent No. 10,441,319. (D.I. 77 ¶ 7).

[4] Plaintiff accuses Defendant "of infringing eight [a]sserted [p]atents by commercializing its Reline, Armada, Precept, SpheRx, and VuePoint II systems." (D.I. 207 at 2 (footnote omitted)).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*,

4

476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### B. *Daubert*

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (amended Dec. 1, 2023). The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."
>
> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnotes and citations omitted).[5]

## III.  DISCUSSION

### A. Defendant's Counterclaims

#### 1.  Breach of Contract

The parties both move for summary judgment on Defendant's breach of contract counterclaim.

Plaintiff contends that the filing of the present suit is the only conduct that Defendant identified as "purportedly constituting breach of the 2014 Agreement." (D.I. 207 at 22). Plaintiff argues, "Because NuVasive lacks rights to practice the claims of the [a]sserted [p]atents, . . . it was not a breach for Dr. Jackson to sue for infringement and summary judgment is warranted." (*Id.*). Defendant argues that Plaintiff breached the covenant not to sue in § 2.03 of the 2014 Agreement, as Plaintiff accused Defendant of infringing his rights "in and to . . . Helical Flange." (D.I. 210 at 29).

I have already found that Plaintiff breached the covenant not to sue with respect to four accused products—Precept 882XXXX, Reline 1602XXX, Reline 1312XXX, and Armada 827XXXX. (D.I. 283 at 7). I thus conclude that Plaintiff has breached the 2014 Agreement with respect to those products.

There is a factual question, however, as to whether Plaintiff breached the contract in additional ways. I think the parties' summary judgment briefing presents a genuine dispute of material fact as to which asserted patents, if any, meet the definition of a Helical Flange. (*See id.*

---

[5] The Court of Appeals wrote under an earlier version of Rule 702. Subsequent amendments affect the substance of the rule, but I do not think they alter the applicability of the quoted discussion so far as it goes.

at 7–9). A jury may compare each asserted patent to the Helical Flange language in the 2014

Agreement to determine, as a factual matter, whether Plaintiff breached the covenant not to sue

by asserting any of the eight patents against any of Defendant's other accused products.

Because I cannot find as a matter of law that Plaintiff has breached the covenant not to

sue with respect to the Helical Flange, I cannot grant summary judgment on Defendant's breach

of contract counterclaim beyond the Precept 882XXXX, Reline 1602XXX, reline 1312XXX, and

Armada 827XXXX products. Defendant's motion is accordingly GRANTED IN PART and

DENIED IN PART. Plaintiff's motion on the breach of contract counterclaim is DENIED.

### 2.  Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff argues, "There can be no breach of the implied promise or covenant of good

faith and fair dealing where the contract expressly permits the actions being challenged, and the

defendant acts in accordance with the express terms of the contract." (D.I. 207 at 23 (quoting

*Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Trust Co.*, 464 S.W.3d 177, 185

(Mo. 2015))). Plaintiff contends he did not sue Defendant under any of the rights granted by the

2014 Agreement, as the 2014 Agreement does not grant rights to the asserted patents and

reserves "[a]ll rights not expressly granted." (*Id.* (quoting D.I. 211-1 at 7 of 335 (§ 2.05))).[6]

Defendant argues that for the purpose of this counterclaim, it is irrelevant whether

Plaintiff sued under rights granted by the 2014 Agreement. (D.I. 239 at 18). Defendant

contends, "If a party's conduct does not breach the express terms of a contract, it may still

violate the covenant if the conduct is an 'eva[sion] [of] the spirit of the bargain.'" (*Id.* at 19

(quoting *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 370 (Mo. Ct. App.

---

[6] Plaintiff's argument for granting him summary judgment on the covenant of good faith and fair dealing counterclaim (D.I. 207 at 23) is so summary that I would consider it a forfeiture of the argument.

2008))).[7] Defendant contends that summary judgment is improper because the evidence shows that Plaintiff evaded the spirit of the bargain. (*Id.*). Defendant contends, "Both parties understood that, in exchange for $30 million, NuVasive would be free to make and sell its polyaxial screw products free from further royalty obligations to Dr. Jackson." (*Id.*). Defendant argues that Plaintiff, however, "sought to renegotiate the agreement to NuVasive's detriment" shortly after the parties executed the 2014 Agreement. (*Id.*). Defendant further argues that Plaintiff "demanded additional licenses" to his patents, "notwithstanding the parties' mutual intent to execute a global royalty buyout." (*Id.* at 19–20).

Plaintiff replies that he "could not violate the supposed 'spirit' of the 2014 Agreement" "unless the [p]arties understood that NuVasive was to receive a universal license." (D.I. 246 at 8). Plaintiff argues that any references to "global" buyouts refer to worldwide payments, contrary to Defendant's position. (*Id.* at 10–11). Plaintiff contends, "The entirety of the exchanges between the parties up through litigation, and even NuVasive's internal discussions, reflect only a worldwide meaning." (*Id.* at 11).

Plaintiff's argument focuses on the proposition that the rights granted through the 2014 Agreement do not include rights to the asserted patents. I have already concluded, however, that there is a factual question as to whether the asserted patents meet the Helical Flange definition. (D.I. 283 at 9). Because the 2014 Agreement includes a Helical Flange license grant, a reasonable jury could find that the contract does not expressly permit "the actions being challenged." Plaintiff's opening brief does not raise any other bases for granting his motion. Plaintiff has not shown that he is entitled to summary judgment on Defendant's counterclaim for

---

[7] I note that Missouri law, compared to Delaware law, appears to give a much broader and amorphous understanding to the meaning of the "covenant of good faith and fair dealing."

breach of the implied covenant of good faith and fair dealing. Plaintiff's motion on the counterclaim is therefore DENIED.

### 3. Fraud

First, Plaintiff argues there is no evidence of an affirmative misrepresentation to support Defendant's fraud counterclaim. (D.I. 207 at 23). Plaintiff contends that Defendant improperly relies on communications from Defendant to Plaintiff as evidence of Plaintiff's misrepresentations. (*Id.* at 23–24). Second, Plaintiff argues there is no evidence of an actionable omission. (*Id.* at 24). Plaintiff contends Defendant has not shown that Plaintiff owed a duty to disclose "arising from Dr. Jackson having some superior knowledge or information not within the fair and reasonable reach of NuVasive." (*Id.* at 25). Plaintiff contends two asserted patents that issued before execution of the 2014 Agreement do not give rise to such a duty. (*Id.*). As for the remaining six asserted patents, Plaintiff argues that none of the applications had even been filed prior to execution of the agreement. (*Id.*).

Defendant argues that "the record contains ample evidence from which a jury could reasonably conclude that Dr. Jackson made misrepresentations and omissions." (D.I. 239 at 20).

Regarding affirmative representations, Defendant's "ample evidence" consists of two emails. One of them is an email on September 17, 2014, from NuVasive's then-president, Keith Valentine, to two other NuVasive employees, recounting that Plaintiff had told Mr. Valentine that "he [wa]s receptive to a global buyout." (D.I. 211-1 at 214 of 335). The second of them, an email from Plaintiff's counsel,[8] dated October 10, 2014, addressed to Mr. Valentine, and copied to Plaintiff, states, "We have carefully reviewed and considered your financial projections and initial proposal for a global buyout of the existing License Agreement. . . . In our view the

---

[8] The lawyer was a partner of Plaintiff's litigation counsel.

9

present value discount for the global buyout would be in excess of $30 million; however, we

would be willing to accept a $30 million buyout payment payable January 1, 2015 for all

royalties based on US and foreign sales on or after January 1, 2015. . . ." (*Id.* at 18 of 335).  That

was not the end of the negotiations, as Mr. Valentine responded by email, "This will give us a

clear topic for discussion on Tuesday [October 14].  I'd also like to understand your views on the

IP acquisition and value as well as how we address the OUS [outside of United States] royalty

model calculations moving forward, with or without this global buyout." (*Id.*).  Defendant

contends that Plaintiff's attorney "conveyed his understanding that the parties were negotiating

'a global buyout of the existing [2008] License Agreement.'" (D.I. 239 at 20 (citation omitted)).

Defendant further contends that "the parties agreed in the 2014 Agreement that NuVasive would

not have any more financial obligations to Dr. Jackson in exchange for the $30 million lump-sum

buyout payment." (*Id.* at 20–21).  Defendant thus argues that Plaintiff, at most, "offers a

disputed interpretation of how NuVasive understood the representations that Dr. Jackson and his

lawyers made about the global buyout and NuVasive's freedom to operate." (*Id.* at 21).

Regarding omissions, Defendant argues there is a factual dispute as to whether Plaintiff

owed a duty of disclosure "based on the parties' business and licensing relationship." (*Id.* at 23).

Defendant contends a jury could find, for instance, that Plaintiff violated his duty to disclose the

existence of two issued patents during negotiations for the 2014 Agreement. (*Id.* at 22).

Defendant argues that Plaintiff had "superior knowledge" of his patent portfolio compared to

Defendant. (*Id.* at 21).  Regarding Plaintiff's contention that the absence of references in the

2014 Agreement to the two issued patents shows that the parties did not intend to include those

patents in the agreement, Defendant argues that "a contract procured by fraud through omission

will not reference the omitted facts." (*Id.* at 22).  Defendant further contends that the remaining

asserted patents all date back to subject matter in applications that Plaintiff filed years before execution of the 2014 Agreement. (*Id.* at 22–23).[9]

I do not think that Defendant has submitted evidence of affirmative misrepresentations by Plaintiff. There is nothing from which a jury could conclude that whatever Plaintiff meant by "global buyout" was a false, material representation at the time. Defendant cannot show fraud simply by arguing that Plaintiff now has a different definition of "global" than Defendant. Defendant has not submitted any evidence to suggest that Plaintiff or his attorney made misrepresentations in emails or otherwise.

I also do not agree with Defendant that there is a genuine dispute of material fact as to whether Plaintiff violated a duty to disclose. An omission can "be considered a misrepresentation if the silent party has a duty to speak," with the duty arising from "superior knowledge that is not reasonably available to the other party." *McGowan v. Am. Fam. Ins. Co.*, 2017 WL 11680965, at *3 (W.D. Mo. Dec. 15, 2017) (citations omitted). Neither party cites to cases that help resolve whether Plaintiff had a duty to disclose additional information during negotiations. (*See* D.I. 207 at 24–26; D.I. 239 at 21–23). Plaintiff argues that Defendant "scrupulously undertook freedom to operate patent searches with its products" and could have discovered the two publicly available patents (the '711 and '932 patents)[10] that issued prior to execution of the 2014 Agreement. (D.I. 207 at 25–26 (citing deposition testimony of Defendant's in-house counsel)). Defendant had just as much opportunity as Plaintiff to study

---

[9] In his reply, Plaintiff argues that "unless the [p]arties understood that NuVasive was to receive a universal license, then Dr. Jackson's supposed omissions of patents outside of the 2008 Agreement's scope cannot be actionable . . . ." (D.I. 246 at 8).

[10] The '711 patent issued April 15, 2014. The '932 patent issued January 15, 2013.

Plaintiff's issued patents and draw conclusions about whether Defendant needed a license to them in order to have freedom to operate.

Plaintiff has asserted six other patents against Defendant. (*See, e.g.*, *id.* at 2). These six patents issued after the execution of the 2014 Agreement but are all entitled to various priority dates long before the agreement's execution date. (*See* D.I. 239 at 22–23). It is hard to believe that Defendant was not aware of the disclosures in them, since most, if not all, of the disclosures are continuations of patents that issued before 2014. The earliest of the six patent applications was filed on September 28, 2015, nearly nine months after the parties executed the 2014 Agreement. (*See* D.I. 191 ¶ 17). Defendant's omissions theory is: "Dr. Jackson failed to disclose all of the patents and patent applications that he believed could be asserted against the accused products, even though he knew that NuVasive expected to obtain freedom to operate." (D.I. 239 at 21). There is no evidence that Plaintiff knew in 2014 that nine months later he would file a patent application that would become an issued patent that he could then assert against Defendant. A reasonable jury could not find that Plaintiff had a duty to disclose information about future patent applications that, so far as the record cited to me shows, were not even contemplated at the time of the 2014 Agreement. I therefore GRANT Plaintiff's motion for summary judgment on Defendant's fraud counterclaim.

### 4. Unjust Enrichment

To establish its unjust enrichment counterclaim, Defendant must prove "(1) [it] conferred a benefit on [Plaintiff]; (2) [Plaintiff] appreciated the benefit; and (3) [Plaintiff] accepted and retained the benefit under inequitable and/or unjust circumstances." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010). "Even if a benefit is 'conferred' and 'appreciated,' if no injustice results from [Plaintiff's] retention of the benefit, then no cause of action for unjust

enrichment will lie." (*Id.* (citation omitted)). "Unjust retention of benefits only occurs when the benefits were 'conferred (a) in misreliance on a right or duty; or (b) through dutiful intervention in another's affairs; or (c) under constraint." (*Id.* (citation and footnote omitted)).[11]

Plaintiff argues in one paragraph that Defendant's unjust enrichment claim fails as a matter of law because it covers the same subject matter as Defendant's breach of contract counterclaim. (D.I. 207 at 26). Plaintiff argues there is no unjust enrichment because Defendant "received what it paid for" and Plaintiff did not breach the 2014 Agreement. (*Id.* at 26–27).

Defendant argues there are disputed factual questions on each element of its unjust enrichment counterclaim. (D.I. 239 at 23). Defendant contends that its claim is not barred merely because the parties executed an express contract. (*Id.*). Defendant further argues that the unjust enrichment and breach of contract counterclaims do not cover the same subject matter. (*Id.* at 24). Defendant argues, "Even where this is no breach of contract, a defendant can still have been unjustly enriched if the payment they received was inequitable or unjust." (*Id.* at 23). Defendant contends that it "did not get what it paid for—namely, freedom to operate worldwide forever free from harassment and additional royalty demands by Dr. Jackson." (*Id.* at 25).[12]

I think that the unjust enrichment counterclaim does to some extent cover the same subject matter as the breach of contract counterclaim. Defendant alleges,

> Despite this, Dr. Jackson has repeatedly threatened NuVasive with patent infringement allegations and has sought royalties for patents that NuVasive reasonably expected would have been (or should have been) included as part of the 2014 Agreement. Dr. Jackson's threats culminated in the filing of this lawsuit.

---

[11] The parties should advise me by joint letter at least twenty-four hours before the pretrial conference whether unjust enrichment, under Missouri law, is an equitable or legal claim, i.e., should it be tried to the Court or to the jury.

[12] In his reply, Plaintiff argues there was no unjust enrichment because Defendant "received more than it bargained for (considering NuVasive's own fraudulent conduct)." (D.I. 246 at 8–9).

> Absent justification, Dr. Jackson failed to disclose to NuVasive the specific
> patents in his portfolio that he believed would be necessary for NuVasive to
> obtain freedom to operate. Dr. Jackson's failure to disclose this information to
> NuVasive was materially misleading and led to his own enrichment, as well as the
> impoverishment of NuVasive.

(D.I. 201 ¶¶ 108–09). The allegations in the first paragraph are the same as Defendant's breach

of contract counterclaim and/or the breach of the covenant of good faith and fair dealing

counterclaim—-Plaintiff wrongfully threatened to sue and did sue Defendant. (*See id.* ¶¶ 77–82).

The allegations in the second paragraph might cover different subject matter than is covered by

the contract. Defendant has submitted evidence from which a reasonable factfinder could

conclude that Defendant "did not get what it [thought it] paid for." (*See* D.I. 239 at 24–25 (citing

D.I. 211-1 at 18–19 of 335 (Ex. B), D.I. 211-1 at 218–22 of 335 (Ex. J), D.I. 240-1 at 29 of 165

(Ex. II))). Thus, it is possible that this could be the basis for an unjust enrichment claim.

 I therefore DENY Plaintiff's motion for summary judgment on the unjust enrichment

counterclaim.

### B. Plaintiff's Fraudulent Inducement Claim

#### 1. Statute of Limitations

 Defendant argues that Plaintiff's fraudulent inducement claim is time-barred. (D.I. 210 at

16). Because the choice-of-law provision in the 2014 Agreement is silent as to the statute of

limitations, Defendant contends that Delaware's statute of limitations applies. (*Id.*). Defendant

argues that Delaware law, which imposes a three-year statute of limitations on fraudulent

inducement claims, bars Plaintiff's claim because his cause of action accrued on December 31,

2014 (the effective date of the 2014 Agreement). (*Id.* at 17).

 Defendant contends that none of the exceptions that could toll the statute of limitations—

fraudulent concealment, equitable tolling, and the discovery rule—apply. (*Id.*). Defendant

argues, "[N]o theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong." (*Id.* at 17–18 (quoting *BeautyCon Media ABC Tr. v. New Gen. Mkt. Partners, LLC*, 2023 WL 5164148, at *17 (Del. Super. Ct. Aug. 11, 2023))). Here, Defendant argues that: (1) Plaintiff admitted he did not read the buyout models' "Notes" section, which mentions the Reline product; (2) Plaintiff was on inquiry notice by October 2014, when he and his attorney completed a "careful review" of the buyout models and concluded that Defendant's financial projections were too low; and (3) Plaintiff was on inquiry notice about Defendant's ability to redesign future products. (*Id.* at 18–19).

Plaintiff responds that Defendant has waived the statute of limitations as a defense. (D.I. 237 at 14). Plaintiff contends that Defendant "unsuccessfully raised the statute of limitations in its original motion to dismiss." (*Id.* at 15). Plaintiff contends Defendant later "abandoned the defense" and "did not plead 'statute of limitations' as an affirmative defense in any of its Answers or otherwise raise it in discovery responses." (*Id.*).

Plaintiff further argues that the discovery rule and doctrine of fraudulent concealment toll the statute of limitations for his claim. (*Id.* at 15–20). For the discovery rule, Plaintiff rejects Defendant's arguments about inquiry notice. (*Id.* at 16). When telling Defendant that its projections were too low, Plaintiff contends that he "could not know that NuVasive ha[d] 'internally' withheld another model with a value $12M higher." (*Id.*). Plaintiff also contends he "could not know that NuVasive believed, as Mr. Valentine wrote to his team, that a design around was 'not realistic.'" (*Id.* at 17). For the doctrine of fraudulent concealment, Plaintiff argues, "Despite having been ordered by the Court on September 5, 2023, to produce internal projections within thirty days[,] NuVasive continued concealing those very financial projections

on its privilege log until November 14, 2023—after NuVasive's 30(b)(6) deposition and just

prior to the close of fact discovery." (*Id.* (citation omitted)). Plaintiff contends that Defendant's

spreadsheet of financial projections is a "crucial document" because "it represents the shielded

'internal' version of manipulated models." (*Id.* at 19). Plaintiff contends that Defendant also

waited until the end of fact discovery to produce documents regarding its ability to design around

Plaintiff's patents. (*Id.* at 19–20).[13]

   In its reply, Defendant argues that it did not waive its statute of limitations defense, as it

timely raised the defense in its motion to dismiss. (D.I. 248 at 11). Defendant contends that

Plaintiff will not be prejudiced if I consider the defense now. (*Id.* at 11–12). Regarding tolling,

Defendant argues that the discovery rule does not apply. Defendant contends,

> Dr. Jackson could have, but did not, ask NuVasive about the assumptions
> underlying the projections or inquire about whether other iterations of the models
> existed, despite NuVasive's specific invitation to do so. . . . Dr. Jackson cannot
> now credibly maintain that it was "inherently unknowable" that NuVasive
> discussed the models internally before sharing them with Dr. Jackson, or that his
> failure to discover the existence of the initial drafts were due to his "blameless
> ignorance."

(*Id.* at 12 (citations omitted)). Defendant similarly contends "there is no 'inherently

unknowable' evidence in the record to suggest that redesigning around Dr. Jackson's patents was

impracticable, let alone impossible." (*Id.* at 13). Defendant argues that Plaintiff cannot rely on

the fraudulent concealment doctrine either, as he "has not alleged or shown that NuVasive had an

affirmative duty to disclose every draft of the financial models shared with him . . . ." (*Id.*).

   I agree with Defendant that it has not waived the statute of limitations as a defense.

Defendant raised this issue in its motion to dismiss. Defendant was permitted to do so instead of

---

[13] Plaintiff does not dispute Defendant's contention that he did not read the buyout models'
"Notes" section. (*See* D.I. 237 at 15–20).

asserting it in an answer. *See Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978). Plaintiff relies on inapposite cases to argue otherwise. In *Taylor v. Garrett*, 1992 WL 245933, at *2 (E.D. Pa. Sept. 11, 1992), the defendants moved for dismissal only after failing to timely raise the statute of limitations as an affirmative defense in an answer. In *Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1160 (3d Cir. 1989), the defendant "did not file a motion or present argument before the district court on the statute of limitations issue at any time before or at the trial." In both scenarios, the defendant did not raise the statute of limitations as a defense in any fashion at the beginning of the case.[14]

I agree with Plaintiff, however, that the statute of limitations is tolled. Defendant's contention that Plaintiff was on inquiry notice of the financial projections by October 2014 is unpersuasive. Defendant points to correspondence from Plaintiff's attorney, which states, "We think your projections are lower than we would anticipate and we think your present value discount rate is too high." (D.I. 210 at 11 (quoting D.I. 211-1 at 18 of 335)). This language does not suggest that Plaintiff was aware that Defendant "had 'internally' withheld another model with a value $12M higher." (D.I. 237 at 16). Although Defendant contends that Plaintiff did not ask for different projections, Defendant does not suggest that Plaintiff had a reason at the time to think the projections were false. Plaintiff argues that he did not obtain a "crucial" spreadsheet showing "the shielded 'internal' version of manipulated models" until late 2023. (*Id.* at 18–19). I think Plaintiff has introduced enough evidence to support tolling the statute of limitations under the discovery rule. I do not need to consider the parties' remaining arguments about tolling.

---

[14] It is true that Rule 8(c) states, "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . statute of limitations." In most cases, the document with the "responding" will be an answer. A motion to dismiss is literally "responding to a pleading," so I don't think the failure to have the statute of limitations in the answer is fatal in this case.

### 2. Choice of Law

Before addressing the merits of Plaintiff's fraudulent inducement claim, I consider the parties' choice-of-law dispute.

"The 2014 Agreement includes a choice-of-law provision stating that the Agreement is governed by Missouri law." (D.I. 210 at 16). Defendant contends, "Dr. Jackson has previously argued that Missouri law governs his fraudulent inducement claim on the merits." (*Id.* at 19).

Plaintiff responds that California law, not Missouri law or Kansas law, governs his fraudulent inducement claim. (D.I. 237 at 20). Plaintiff contends that the 2014 Agreement's "narrow choice-of-law provision" does not apply to a tort claim like fraudulent inducement. (*Id.* at 20 n.10). Plaintiff argues that application of the "most significant relationship" test under the Restatement (Second) of Conflict of Laws shows that California law applies. (*Id.* at 20–21).[15]

Defendant replies, "The Delaware Court of Chancery has analyzed almost identical contract language and concluded that fraudulent inducement claims were governed by the parties' choice of law." (D.I. 248 at 7). Defendant argues that judicial estoppel is appropriate here because Plaintiff "previously argued that 'Missouri (not Delaware) law would appear to control Dr. Jackson's [fraudulent inducement] claim' because his claim is 'entangled at a granular level with the operative contract.'" (*Id.* at 9 (quoting D.I. 25 at 14 n.15)).

Plaintiff filed a motion for leave to file a sur-reply. (D.I. 256). Defendant opposed the motion (D.I. 257), and Plaintiff filed a reply brief (D.I. 260). Local Rule 7.1.2 states that parties require the Court's approval to submit additional papers after briefing is complete. I may grant leave to file a sur-reply if the sur-reply responds to new facts, evidence, or arguments raised for

---

[15] Plaintiff contends that "differences between California and Kansas law on the substantive issues raised by NuVasive's motion do not impact the proper result." (D.I. 237 at 21).

the first time in a reply brief. *See EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 103 (D. Del. 2016). Here, Plaintiff's sur-reply responds to newly-cited cases and to Defendant's argument about the application of Missouri law. I think Plaintiff's sur-reply will allow me to fully evaluate Defendant's summary judgment motion on Plaintiff's fraudulent inducement claim. *Cf. St. Clair Intell. Prop. Consultants, Inc. v. Samsung Elecs. Co.*, 291 F.R.D. 75, 80 (D. Del. 2013). I therefore GRANT Plaintiff's motion for leave to file a sur-reply.

Before resolving the choice-of-law issue, I note that Defendant's judicial estoppel argument is unpersuasive. Both parties' current positions differ from arguments they made at the motion to dismiss stage. At the time, Defendant argued that Delaware law applies, and Plaintiff argued that Missouri law "would appear" to apply. (*Compare* D.I. 22 at 9–10 ("Here, because Dr. Jackson failed to plead where the alleged fraud occurred, Delaware law should apply to his fraudulent inducement claim."), *with* D.I. 25 at 14 n.15 ("Missouri (not Delaware) law would appear to control Dr. Jackson's claim. The 2014 Agreement states that it 'shall be subject to, governed by, and construed according to the laws of the State of Missouri.'" (citation omitted))). Now, Plaintiff argues that California law applies, and Defendant argues that Missouri law applies. I do not think these circumstances warrant a finding of estoppel, *see Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 781 (3d Cir. 2001) ("[J]udicial estoppel may not be employed unless a litigant's culpable conduct has assaulted the dignity or authority of the court."), particularly because I have not previously ruled on this issue (*see* D.I. 36 at 10 ("I do not find it appropriate to undertake a choice-of-law analysis at the motion to dismiss stage.")).

Having reviewed the cases on which the parties rely (*see, e.g.*, D.I. 237 at 20–21; D.I. 248 at 7–9; D.I. 256-1 at 1–3), I am persuaded by the logic in *ABRY Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032 (Del. Ch. 2006). The choice-of-law provision in the *ABRY*

agreement stated, "This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware, regardless of the Laws that might otherwise govern under applicable principles of conflicts of law." 891 A.2d at 1046. The *ABRY* plaintiff brought two fraudulent inducement claims and a negligent misrepresentation claim against the defendant. *Id.* at 1040. The Court of Chancery concluded it was "not sensible" to apply the choice-of-law provision to contract claims but not to "claims in tort seeking rescission of the [agreement] on grounds that false contractual representations were made." *Id.* at 1047.

The 2014 Agreement's choice-of-law provision states, "This Agreement shall be subject to, governed by, and construed according to the laws of the State of Missouri without regard to its conflict of laws provisions." (D.I. 211-1 at 13 of 335). I think the provision is similar to the provision in *ABRY*. Although Plaintiff is not seeking rescission of the contract, both Plaintiff and the *ABRY* plaintiff asserted fraudulent inducement claims, and one of the *ABRY* plaintiff's fraudulent inducement claims sought damages in the event that rescission was not granted. 891 A.2d at 1040. I conclude that the choice-of-law provision in the 2014 Agreement is broad enough to govern Plaintiff's fraudulent inducement claim. Missouri substantive law therefore applies to Plaintiff's claim.

### 3. Merits

Defendant argues that all three of Plaintiff's fraudulent inducement theories fail as a matter of law. (*See* D.I. 210 at 19–24). Because Plaintiff's answering brief does not address the first theory, that Defendant withheld information related to the Reline product, *see* Hearing Tr. at 97, it is waived. I will therefore focus on the remaining two theories: whether Plaintiff can establish fraudulent inducement based on "false and manipulated revenue forecasts," and whether Plaintiff made false representations about a potential redesign of future products.

### a.   "False and Manipulated Revenue Forecasts"

Defendant argues that forward-looking projections are not actionable.  (D.I. 210 at 21).

Defendant contends, "The financial projections in the royalty buyout models were forward-

looking predictions based on assumptions about future events."  (*Id.* at 22).  Defendant argues

that such forward-looking statements cannot form the basis of a fraud claim.  (*Id.*).

Defendant further argues that Plaintiff and his attorneys disagreed with Defendant's

revenue projections, so Plaintiff did not rely on those projections.  (*Id.* at 22–23).  In a

conclusory manner, Defendant contends that Plaintiff fails to establish other elements of his

fraudulent inducement claim.  (*Id.* at 23).

Plaintiff responds that his allegations "do not involve the type of representations or

puffery and sales propaganda that typically are classified as 'opinions' under the relevant law."

(D.I. 237 at 21).  Plaintiff contends that Defendant "made 'haircut' models for Dr. Jackson and

exploited its unique and superior knowledge with the intent to anchor negotiations with him."

(*Id.*; *see also id.* at 23 ("Dr. Jackson is suing because NuVasive hid its actual existing projections

from Dr. Jackson and then created doctored versions of those projections to present a number

that would anchor the negotiations at an acceptably low number for NuVasive while being

sufficiently plausible as to deceive Dr. Jackson.")).  Plaintiff argues that such communications

are actionable.  (*Id.* at 21).

Plaintiff further argues that he did rely on Defendant's purported misrepresentations.  (*Id.*

at 24).  Plaintiff contends "no jury would believe that Dr. Jackson would have sold the assigned

patents, reconciled past underpayments and agreed to the buyout proposal for $30M if NuVasive

had provided him with their 'internal' projections that valued the projected royalty portion alone

in excess of $32.1M."  (*Id.* at 25).  I think Plaintiff's allegations about financial projections are

actionable under Missouri law. *See Trotter's Corp. v. Ringleader Rests., Inc.*, 929 S.W.2d 935, 940 (Mo. Ct. App. 1996) ("To constitute fraud, the alleged misrepresentation must relate to a past or existing fact."). Although the financial projections involve predictions to the extent that they incorporate calculations of future royalties, the core of Plaintiff's theory is that Defendant represented certain financial projections as being Defendant's actual projections when they were not. (D.I. 237 at 23 ("Dr. Jackson is suing because NuVasive hid its actual existing projections from Dr. Jackson and then created doctored versions of those projections to present a number that would anchor the negotiations at an acceptably low number for NuVasive while being sufficiently plausible as to deceive Dr. Jackson.")). In other words, Plaintiff's theory is that Defendant misrepresented that the projections were its best estimates when they were not. I also think there is a genuine dispute of material fact as to whether Plaintiff relied on Defendant's purportedly false financial projections.

I therefore DENY Defendant's summary judgment motion on Plaintiff's financial projections theory.

### b. Redesign of Future Products

Defendant argues that "any forward-statements reflecting the company's expectations about what *might* be possible in the design of future products is not actionable fraud under Missouri law." (D.I. 210 at 23). Defendant further argues that Plaintiff's theory fails because Defendant "did not make a false representation about a future redesign." (*Id.* at 24). In a conclusory manner, Defendant contends that Plaintiff cannot meet other elements of his claim. (*Id.*).

Plaintiff argues that his redesign allegations are actionable. (D.I. 237 at 21). Plaintiff contends he did not sue "because the misrepresentations that [Defendant] could redesign were

22

simply wrong, but because NuVasive believed them to be untrue *at the time*." (*Id.* at 23).

Plaintiff argues a jury could conclude that Defendant did not believe its statements about the

redesign, as it knew that a redesign was not realistic. (*Id.* at 24 (citing D.I. 216-1 at 758 of 812

(Ex. 36); D.I. 217-1 at 674–77 of 835 (Ex. 63); D.I. 238-1 at 46–47 of 470 (Ex. 66); D.I. 238-1 at

101–03 of 470 (Ex. 67))).

In its reply brief, Defendant argues that Plaintiff's "entire claim is based on the

observation that one individual, Keith Valentine, an individual who was not in charge of product

development, thought a design-around might be 'potentially problematic' and expressed doubts

about whether a design-around was 'realistic.'" (D.I. 248 at 10). Defendant contends, "At most,

Dr. Jackson has cited evidence of a debate between colleagues; it is not clear and convincing

evidence of intent to defraud." (*Id.*).

I do not think that Plaintiff has submitted evidence of an "alleged misrepresentation . . .

relat[ing] to a past or existing fact" for his redesign theory. *Trotter's*, 929 S.W.2d at 940.

Plaintiff cites to the following statements from Defendant:

> Just had a brief discussion with Dr. J . . . . he is surprised to hear from Pat in
> Alaska at SRS that Reline may not need access to the Jackson MIS patents (80%
> we will but not 100% sure (?????)) as this will be potentially problematic with a
> number of companies and patent holders.

(D.I. 238-1 at 101 of 470 (Ex. 67) (email from Mr. Valentine to colleagues)).

> A design around is not realistic or nearly possible in this landscape. We are better
> off buying this out and using the hell out of the technology. This design around
> concept is a bad direction . . . .

(D.I. 217-1 at 674 of 835 (Ex. 63) (email from Mr. Valentine to a colleague)).

> One assumes licensing out to life of patent/contract while the other considers a
> redesign in future generations of products. . . . This forces us to consider what we
> do in future years from a design and royalty perspective.

23

(D.I. 216-1 at 758 of 812 (Ex. 36) (email from Mr. Valentine to Plaintiff)). These statements constitute "[m]ere statements of opinion, expectations, and predictions for the future." *Trotter's*, 929 S.W.2d at 940. The statements are therefore not actionable under Missouri law. I will GRANT Defendant's summary judgment motion with respect to Plaintiff's redesign theory.

### 4. Dr. Becker's Opinions

Dr. Becker, Plaintiff's expert, presents two "but-for scenarios" to calculate damages for Plaintiff's fraudulent inducement claim. (*See* D.I. 211-2 at 194–96 of 516 (Ex. Z)). The first scenario considers Defendant's "internal projections" of $32.1 million. (*Id.* at 194 of 516). The second scenario assumes a world where the parties did not agree on a buyout, Defendant continued to use Plaintiff's patents in products under the 2008 Agreement, and Defendant's "sales of products using these patents can be derived from its actual product sales from June 2014 to September 2023." (*Id.* at 195 of 516). Defendant argues that both "but-for" scenarios must be excluded under Federal Rule of Evidence 702. (*See* D.I. 210 at 30, 33).

#### a. First But-For Scenario

Defendant argues that Dr. Becker's first but-for scenario is inadmissible because he performs nothing more than "simple math calculations." (*Id.* at 30). Defendant contends that Dr. Becker "merely subtracts the total projection of royalties in one NuVasive spreadsheet from the total projected royalties in another spreadsheet" to arrive at a conclusion. (*Id.* at 31; *see also* D.I. 248 at 14 ("Dr. Becker did not analyze 'NuVasive's spreadsheet models,' but instead credited their net results full stop . . . .")). Defendant also calls Dr. Becker's opinion "rank speculation" and contends that he cannot present an opinion on prejudgment interest. (D.I. 210 at 31–33).

24

Plaintiff argues that Dr. Becker's opinion is more than simple math. Plaintiff contends, "Dr. Becker's opinions require comprehending and analyzing the voluminous quantitative data contained within NuVasive's spreadsheet models." (D.I. 237 at 27). Plaintiff further contends, "Dr. Becker's first but-for scenario reasonably considers NuVasive's 'internal view' of the projected royalties, a 'best estimate' for 'fair value.'" (*Id.* at 28).

First, I agree with Defendant that Dr. Becker cannot testify about prejudgment interest at trial. Prejudgment interest is not a proper topic for expert testimony. *See MOSAID Techs. Inc. v. LSI Corp.*, 2014 WL 807877, at *2 n.3 (D. Del. Feb. 28, 2014) ("As the Court understands it, the cost of capital is essentially a special pre-judgment interest rate to be applied to the damages figure. That interest-based calculation is properly reserved for the Court, not for the jury.").

Second, I think Dr. Becker's testimony must be excluded if it is limited to explaining that he subtracted the royalties that Plaintiff received from Defendant's internal royalty projections. "Multiplication is not a specialized form of knowledge that a jury lacks or a scientific technique that a jury is incapable of performing." *CareDx, Inc. v. Natera, Inc.*, 2021 WL 1840646, at *3 (D. Del. May 7, 2021). Subtraction even less so! Plaintiff argues that Dr. Becker's opinions require extensive analysis, yet the briefing does not provide any detail to explain what such an analysis entailed. The portion of his report entitled "fraudulent inducement damages . . . first but-for scenario" (D.I. 211-2 at 194–95 of 516) has no analysis, just the calculation of (the now-excluded) prejudgment interest calculations and the subtraction of 22.2 from 32.1. The jury can do the math itself. Plaintiff has the burden to show that Dr. Becker's proposed testimony complies with *Daubert*. Plaintiff has not come close to showing that. Dr. Becker's proposed testimony about the first but-for scenario as set forth in the "fraudulent inducement damages . . . first but-for scenario" portion of his report is excluded.

25

### b. Second But-For Scenario

Defendant argues that Dr. Becker's second but-for scenario is unreliable. Defendant contends that Plaintiff assumes without analysis that the non-royalty assets in the 2014 Agreement were worth $7.8 million and that the parties would have continued to follow the 2008 Agreement without Defendant making "*any* payments to date, such that statutory interest or contractual interest would accrue[]." (D.I. 210 at 33–34). Defendant further argues that Dr. Becker improperly "bakes prejudgment interest directly into his second but-for scenario damages calculation." (*Id.* at 34).

Plaintiff responds that "the difference between what Dr. Jackson was wrongly induced to give up and the value received" is a proper measure of damages. (D.I. 237 at 29). Plaintiff concedes that he would not have received a $30 million payment under this scenario but argues that Dr. Becker's analysis shows "he would have received a greater amount in royalties in the 2008 Agreement." (*Id.* at 30). The 2008 Agreement stated that royalties would be paid as long as Defendant sold "Products" or "Instruments." (*Id.* (citation omitted)). Plaintiff also contends that under California law, a jury may consider prejudgment interest. (*Id.*).

As explained above, I agree with Defendant that Dr. Becker cannot testify about prejudgment interest at trial. Plaintiff's citations to California law are unpersuasive; I have already decided that Missouri substantive law applies to the fraudulent inducement claim. Thus, to the extent that any calculations include prejudgment interest, they are inadmissible.

I agree with Plaintiff, however, that Dr. Becker's second but-for scenario is a proper measure of damages. Dr. Becker relies on one of the buyout projections that Defendant provided to Plaintiff. (*See* D.I. 211-2 at 231 of 516). Dr. Becker is going to have to redo his calculations without prejudgment interest. To be clear, this is what I expect his recalculation to be. He will

calculate the income stream from 2015 to the ending point, reduce that to its present value at about December 31, 2014, subtract whatever portion of the $30 million he attributes to the buyout of the 2008 Agreement, and that is the damages amount.  (If Plaintiff wins, I will later include prejudgment interest on the amount of damages.).  Defendant may cross-examine Dr. Becker and present testimony if Defendant thinks other evidence better reflects the portion of the $30 million payment that corresponds to royalty assets.

Defendant's *Daubert* motion on Dr. Becker's fraudulent inducement opinions is therefore GRANTED IN PART and DENIED IN PART.  Dr. Becker needs to redo his calculations for the second but-for scenario by the COB two business days from the issuance of this opinion.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment on the breach of contract counterclaim is DENIED.  Defendant's motion for summary judgment on the breach of contract counterclaim is GRANTED IN PART and DENIED IN PART.

Plaintiff's motion is DENIED with respect to the unjust enrichment and breach of implied covenant of good faith and fair dealing counterclaims.  The motion is GRANTED with respect to the fraud counterclaim.  Defendant's motion is GRANTED IN PART and DENIED IN PART with respect to the fraudulent inducement claim.  Defendant's *Daubert* motion regarding Dr. Becker's fraudulent inducement opinions is GRANTED IN PART and DENIED IN PART.

Plaintiff's motion for leave to file a sur-reply is GRANTED.

An appropriate order will issue.