IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROGER P. JACKSON, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>NUVASIVE, INC.,<br><br>Defendant. | Civil Action No. 21-53-RGA |

MEMORANDUM OPINION

Stephen J. Kraftschik, POLSINELLI PC, Wilmington, DE; Aaron M. Levine, Bobbie J. Horocofsky, POLSINELLI PC, Houston, TX; Darren E. Donnelly, POLSINELLI PC, San Francisco, CA; Kevin R. Davis, POLSINELLI PC, Los Angeles, CA; Lauren E. Peterson, POLSINELLI PC, Washington, D.C.; Thomas L. Gemmell, POLSINELLI PC, Chicago, IL,

    Attorneys for Plaintiffs.

Daniel M. Silver, Alexandra M. Joyce, MCCARTER & ENGLISH, LLP, Wilmington, DE; Colin G. Cabral, James R. Anderson, PROSKAUER ROSE LLP, Boston, MA; Jessica M. Griffith, Seth H. Victor, PROSKAUER ROSE LLP, Los Angeles, CA; Joseph Drayton, PROSKAUER ROSE LLP, New York, NY;

    Attorneys for Defendants.

March 14, 2025

1

*[signature]*
ANDREWS, UNITED STATES DISTRICT JUDGE:

Before me is Jackson's Renewed Motion for Partial Summary Judgment (D.I. 397) and Renewed Motion to Exclude Defendant NuVasive's Patent Damages Opinions. (D.I. 398). I have considered the parties' briefing. (D.I. 207, 246, 412 (Jackson); D.I. 239, 405 (NuVasive)). For the reasons set forth below, Jackson's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART and his Motion to Exclude Defendant NuVasive's Patent Damages Opinions is GRANTED.

I. BACKGROUND

Jackson asserts a total of thirty claims in eight patents against NuVasive. (D.I. 421 at 1). The patents "generally relate to spinal implant systems composed of separately inserted components used to fixate or align" a patient's vertebrae. (D.I. 191 ¶ 8). On October 10th, 2024, following a jury trial, I entered a final judgment over the parties' contractual disputes, which related to a license agreement entered into between the parties in 2014 ("2014 Agreement"). (D.I. 385). A trial is set for April to resolve the parties' remaining disputes. (D.I. 396).

Jackson now renews motions pertaining to three issues: summary judgment that certain accused products infringe the asserted patents, summary judgment on portions of NuVasive's invalidity defenses, and a *Daubert* motion to exclude NuVasive's damages expert's testimony. (D.I. 397, 398).

II. LEGAL STANDARDS

A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely

2

disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

### B. *Daubert*

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (amended Dec. 1, 2023). The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."
>
> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[1]

### III. DISCUSSION

#### A. Jackson's Brief in Support of Partial Summary Judgment of Infringement Violates Local Rules.

Jackson argues that of the thirty outstanding claims, there are seventeen[2] for which Jackson's infringement expert, Dr. Errico, offered infringement analyses and for which NuVasive's infringement expert, Mr. Fallin, offered no rebuttal. (D.I. 207 at 8). The seventeen claims and the accused products are outlined below.

| Uncontested Technical Issues: Representative Products and Claims | | | | | |
|---|---|---|---|---|---|
| Representative Products | '711 | '866 | '200 | '444 | '273 |
| Reline 1601XXXX[4] | 1 | 1–2, 9 | 1, 9–11, 15, 19 | 1, 12, 17 | 2, 35, 39, 41 |
| Reline 1451XXXX | 1 | 1–2, 9 | 1, 9–11, 19 | 1, 12 | 2, 35, 39, 41 |
| Reline 16171111 | 1 | 1–2, 9 | 1, 9–11, 15, 19 | 1, 12, 17 | 2, 35, 39, 41 |
| Armada 845XXXX | 1 | 1–2 | | | 2, 35, 39, 41 |
| Precept 822XXXX | 1 | 1–2 | | | 2, 35, 39, 41 |
| SpheRX DBR III 448XXXX | | 1–2 | | | 2, 35, 39, 41 |
| SpheRX DBR II 737X5XX | | | | | 2, 39, 41 |
| VuePoint II 897XXX | | | | | 2, 39, 41 |

(*Id.* at 2). Jackson moves for summary judgment of infringement with respect to these claims. NuVasive responds by arguing that Jackson's motion seeks to evade briefing limits, incorporating hundreds of pages of expert testimony by reference in violation of Local Rules. (D.I. 405 at 3). I agree with NuVasive.

---

[1] The Court of Appeals wrote under an earlier version of Rule 702. Subsequent amendments affect the substance of the rule, but I do not think they alter the applicability of the quoted discussion.
[2] At times, Plaintiff said there were nineteen claims. The table in Plaintiff's brief, though, contains seventeen claims, not nineteen. (D.I. 421 at 1 n.1).

D. Del. LR 7.1.3(c)(1)(D) requires that parties' briefs provide "[a] summary of argument, setting forth in separately numbered paragraphs the legal propositions upon which the party relies." Jackson states, under the heading "Summary of the Argument,"

> Partial Summary Judgment of Infringement on the Uncontested Infringement Issues is warranted as NuVasive's technical expert has no opinions rebutting Dr. Jackson's expert and other evidence. The Asserted Patents are not connected to any patent family licensed or assigned to NuVasive and no right granted by license, assignment or covenant not-to-sue in the 2014 Agreement applies to the Asserted Patents.

(D.I. 207 at 6).

D. Del. LR 7.1.3(a)(4) sets out briefing page limits. D. Del. LR 7.1.3(c)(1)(F) requires an argument. Jackson's briefs disregard both of these Local Rules. There is a brief section on "Twist-in-Place technology, but most of "argument" in support consists solely of incorporating hundreds of pages of expert report by reference and providing no argument except "read our expert's report." Nowhere do Jackson's briefs outline or summarize Dr. Errico's report with an eye toward the elements of the seventeen claims; instead, Jackson simply explains, "Dr. Jackson has shown infringement through Dr. Errico's Declaration and reports[.]" (D.I. 207 at 8). Or separately, "Dr. Errico's declaration and Expert Reports set forth his uncontested analysis with respect to the [Reline 1601XXXX family of Accused Products and the] other Representative Products." (*Id.* at 10). Jackson then cites about 1600 pages of expert reports. (*Id.*). I have struck briefs for far less. *See, e.g., TQ Delta, LLC, v. 2Wire, Inc.*, 2016 WL 5402180, at *1 n.2 (D. Del. Sept. 26, 2016) (striking a five-page appendix that exceeded the pages allotted to a party's reply brief).

Because Jackson's briefing violates Local Rules, I deny his motion for partial summary judgment of infringement.

### B. Jackson Is Entitled to Summary Judgment on Two of NuVasive's Invalidity Defenses.

Jackson moves for partial summary judgment on two of NuVasive's invalidity defenses. (D.I. 207 at 27–30). First, Jackson argues that one piece of NuVasive's proffered prior art, U.S. Patent No. 7,377,923 ("Purcell"),[3] is not entitled to a priority date before the filing date of one of the asserted patents, U.S. Patent No. 9,808,292 ("the '292 patent").[4] Second, Jackson argues that none of his asserted claims are indefinite under *IPXL Holdings, LLC v. Amazon. com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005). (*Id.*). Jackson's motion is granted with respect to both invalidity defenses.

#### 1. Purcell Is Not Prior Art to the '292 Patent for the Subject Matter Disclosed in Purcell's Figure 13 Embodiment.

Defendant has two obviousness combinations that rely upon U.S. Patent No. 7,377,923 to Purcell. (D.I. 216-1, Ex. 28, at 439–461 of 812; D.I. 216-1, Ex. 29, at 462–483 of 812). The first is described as "obviousness over Purcell '923." (D.I. 216-1, Ex. 28, at 441 of 812). The second is described as "obviousness over Schlapfer '090 alone or in view of Purcell '923." (D.I. 216-1, Ex. 29, at 464 of 812).

Jackson argues, "U.S. Patent No. 7,377,923 to Purcell is not prior art to the asserted '292 patent because Purcell's Figure 13 embodiment, necessary to NuVasive's invalidity theories, is not entitled to a priority date before the filing of the '292 patent[.]" (D.I. 207 at 27). I agree.

The '292 patent claims priority to June 18, 2003. '292 patent, at (63). The application that ultimately issued as Purcell was filed on May 19, 2004. Purcell, at (22). Purcell references two provisional applications—one filed on May 22, 2003, before the priority date of the '292 patent,

---

[3] Purcell is docketed at D.I. 215-1, Ex. 28.

[4] The '292 patent is docketed at D.I. 191-1, Ex. 7.

7

and another filed on December 4, 2003, after the priority date of the '292 patent. *Id.* at (60). Under 35 U.S.C. § 102(e) (pre-AIA), Purcell qualifies as prior art if the relevant disclosure is supported by the earlier provisional application. The relevant disclosure, according to Jackson, is Figure 13 in Purcell, which embodies the "radiused upper surface" feature of the asserted '292 patent claims. (D.I. 207 at 28). Figure 13 comes from the later provisional application, so, Jackson argues, Purcell cannot serve as prior art to the '292 patent. (*Id.* at 27–28).

NuVasive does not contest that Figure 13 comes from the later of the two provisional applications. (D.I. 239 at 26). Instead, NuVasive argues that Figure 13 is not necessary to NuVasive's invalidity theories regarding the '292 patent. (*Id.*). According to NuVasive, "Mr. Fallin's expert report identifies [the radiused upper surface] element in two different embodiments shown in two different figures of the Purcell reference[.]" (*Id.*). NuVasive cites to Fallin's expert report, which includes an invalidity chart based on Purcell.

| Claim Language | Description | Reference Citations |
|---|---|---|
| the first proximal end comprising a radiused upper surface; and an implant portion extending from the first proximal end towards the first distal end, the implant portion comprising an external helically wound thread for implantation into the bone; | Purcell '923 teaches a first proximal end comprising a radiused upper surface; and an implant portion extending from the first proximal end towards the first distal end, the implant portion comprising an external helically wound thread for implantation into the bone. | [Purcell '923 figures 2 and 13, with labels: first proximal end, Implant portion, first distal end, radiused upper surface] |

(D.I. 216-1 at 444 of 812).

8



(*Id.* at 451 of 812). I am not convinced. Mr. Fallin's invalidity chart clearly contemplates Figures 13 and 2 together—Figure 13 supplies the "radiused upper surface" element of the relevant claims while Figure 2 supplies other elements; otherwise, Figure 13 would not have been necessary to the invalidity chart at all. Mr. Fallin confirmed this understanding himself during deposition: "Q: On page 5 of [the invalidity chart], are you relying on Purcell figure 13 to show a radius to upper surface shank? A: Correct. Let me restate that. I use it to show a radius upper surface of a first proximal end of a shank."[5] (D.I. 216, Ex. 26, at 198:13–18). Mr. Fallin's invalidity chart also does not indicate a "radiused upper surface" on the first proximal end portion of the anchor member in Figure 2, a strange omission if he understood Figure 2 to disclose a radiused upper surface. A

---

[5] NuVasive cites to another section of Mr. Fallin's deposition in which he "confirmed . . . that the 'radiused upper surface' he identified in Schlapfer and the un-challenged embodiment of Purcell align with Dr. Errico's understanding of the meaning of that claim term." (D.I. 239 at 26 (citing D.I. 216 at Ex. 26, at 90:5–92:3)). The portion of Mr. Fallin's deposition that NuVasive cites, however, does not seem to relate to the "radiused upper surface" element at all.

separate invalidity chart, which combines Purcell with another reference, Schlapfer '090, underscores this point: in that invalidity chart, Mr. Fallin marked "radiused upper surface" twice, once for each figure where he believed the "radiused upper surface" appeared.



(D.I. 216-1 at 467 of 812). Based on the foregoing, I conclude that Mr. Fallin's use of Purcell clearly relies upon Figure 13. Therefore, for the purposes of Mr. Fallin's Purcell invalidity theories, Purcell cannot serve as prior art. I therefore grant Plaintiff's motion for partial summary judgment that Purcell is not prior art to the '292 patent. It follows that Defendant's obviousness theory solely reliant upon Purcell cannot go forward. The obviousness theory that relies upon Schlapfer can go forward, but without Purcell as a part of it.

2.   **None of Jackson's Asserted Patents Are Indefinite Under *IPXL*.**

Jackson next argues that he is entitled to summary judgment on the issue of whether certain claims in U.S. Patent No. 8,353,932 ("the '932 patent"), U.S. Patent No. 10,335,200 ("the '200

patent"), and U.S. Patent No. 10,561,444 ("the '444 patent") are indefinite under *IPXL*, 430 F.3d at 1377.[6] I agree with Jackson that the claims are not indefinite.

In *IPXL*, the Federal Circuit held that when a claim "recites both a system and the method for using that system, it does not apprise a person of ordinary skill in the art of its scope, and[ ] is [therefore indefinite] under section 112, paragraph 2." *Id.* at 1384. Subsequent decisions by the Federal Circuit upheld this rule where, as in *IPXL*, the claim language expressly required both an apparatus and that a user actually use the apparatus. *See H–W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1336 (Fed. Cir. 2014) (applying this principle to claim language stating "'wherein said user completes. . .' and 'wherein said user selects.'" (alterations in original)); *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) (applying this principle to claim language stating "'wherein . . . callers digitally enter data' and 'wherein . . . callers provide . . . data'" (alterations in original)). Numerous district courts have described this rule of law, however, as a narrow one, with the general understanding that "the rule does not apply to claims containing language simply describing a system as well as the capabilities of the claimed system; rather, the rule applies to claims describing a system that also require the user of the recited system to take specific action." *Bayer Pharma AG v. Watson Labs, Inc.*, 2014 WL 4954617, at *6 (D. Del. Sept. 30, 2014) (citing various district court opinions in accord with this position). *IPXL* may also apply when "functional language [appears] in isolation [in an apparatus claim.]" *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1316 (Fed. Cir. 2017) (distinguishing *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331 (Fed. Cir. 2011)).

---

[6] The '932 patent is docketed at D.I. 191-1, Ex. 1. The '200 patent is docketed at D.I. 191-1, Ex. 4. The '444 patent is docketed at D.I. 191-1, Ex. 5.

Mr. Fallin's expert report argues that claims 1 and 31 of the '932 patent, claim 1 of the '200 patent, and claim 1 of the '444 patent are indefinite under *IPXL*. (D.I. 216-1, Ex. 27, ¶¶ 153, 173, 186). Claim 1 of the '932 patent and Claim 1 of the '200 patent are representative of the claims in dispute. Claim 1 of the '932 patent claims:

> 1. In a medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member, the bone screw having a receiver with a channel, the improvement wherein:
>
> > a) at least a portion of the longitudinal connecting member is sized and shaped to be received in the receiver channel; and further comprising:
> >
> > b) a compression insert directly engaging both the longitudinal connecting member and a shank of the polyaxial bone screw, the insert having a base, a pair of opposed arms with outer receiver engaging portions, and the opposed arms defining a through channel with a lower connecting member seating surface; wherein
> >
> > c) the compression insert is top-loadable in the receiver in a first orientation, wherein, when in the first orientation, the compression insert through channel is substantially perpendicular to the receiver channel, ***and then rotated to a second orientation***, such that the compression insert through channel is substantially parallel to the receiver channel and cooperating receiver portions snap into the receiver engaging portions.

'932 patent, claim 1 (emphasis added). Claim 1 of the '200 patent claims:

> 1. A pivotal bone anchor assembly for securing an elongate rod to a bone via a closure top, the pivotal bone anchor assembly comprising:
>
> > . . .
> >
> > a pressure insert having an upwardly-facing curvate seating surface configured to receive at least an underside portion of the elongate rod, a central opening for a tool to pass through, at least one notch formed in an outer side surface thereof, a lower surface configured to engage the shank capture portion spherical outer surface to directly apply downward pressure to the shank capture portion, and an upwardly-facing surface positioned radially outward from the curvate seating surface, the ***pressure insert being installed into a first position*** within the receiver bore with the curvate seating surface in a non-alignment orientation with respect to the receiver rod-receiving channel,
> >
> > wherein ***upon rotation of the pressure insert*** about the longitudinal axis into a second position within the receiver, with the insert curvate seating surface in aco-linear alignment with the receiver rod-receiving channel the at least one receiver

>  inwardly-protruding integral structure is positioned in the at least one insert outer side surface notch so as to prevent further rotation of the pressure insert within the receiver bore, and *the insert upwardly-facing surface is rotated* under the receiver downwardly-facing surface so as to inhibit upward movement of the pressure insert within the receiver bore along the longitudinal axis.

'200 patent, claim 1. Mr. Fallin's report suggests that these claims run afoul of *IPXL* because, by requiring that the insert be rotated, they "add[] a temporal element to the claims that makes it unclear when infringement would actually occur." (D.I. 216-1, Ex. 27, ¶ 153).[7]

I disagree with Mr. Fallin's legal analysis. The Federal Circuit has repeatedly maintained that the *IPXL* indefiniteness doctrine applies when "it is unclear whether infringement . . . occurs when one creates a[n infringing] system, or whether infringement occurs when the user actually uses [the system in an infringing manner]." *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826 (Fed. Cir. 2016) (citing *IPXL*, 430 F.3d at 1384); *MasterMine*, 874 F.3d at 1316 (same). "The claims at issue here do not pose this problem." *MasterMine*, 874 F.3d at 1316. That is because the end user of the asserted patents, that is, the surgeon performing spinal surgery, plays no role in rotating the compression/pressure insert. (D.I. 246 at 15). It is the manufacturer, in the course of assembling the product, that rotates the insert. (D.I. 216-1, Ex. 24, at 79:3–20). NuVasive does not contest this. (D.I. 239 at 16, 30). Further, the principal case on which NuVasive relies, *Courtesy Prods., L.L.C. v. Hamilton Beach Brands, Inc.*, 2015 WL 7295436 (D. Del. Nov. 18, 2015), itself concerned claim language that "suggested the need for user action[.]" *Edgewell Pers. Care Brands, LLC v. Albaad Massuot Yitzhak, Ltd.*, 2017 WL 1900736, at *5 (D. Del. May 9, 2017) (distinguishing *Courtesy Prods.*, 2015 WL 7295436 in another *IPXL* case on that basis). This is not the kind of case with which *IPXL* or its progeny were concerned.

---

[7] The relevant sections of Mr. Fallin's report do not explicitly mention *IPXL*, but it is clear from the briefing that both parties understand *IPXL* to provide the basis for the current dispute. (D.I. 207, 239).

13

NuVasive's argument to the contrary depends on a contrived hypothetical: when would infringement occur if the manufacturer, rather than manufacturing the product, handed the surgeon its individual components and asked the surgeon to assemble it themselves? Once the insert has been installed in the first position, or only after the insert has been rotated into the second position? (D.I. 239 at 29–30). According to NuVasive, Jackson's experts provide different answers to this question, which must indicate that the disputed claims do not apprise a person of ordinary skill in the art of their scope. (*Id.*). I do not see how this inquiry is relevant, because, as discussed above, the parties agree that the manufacturer, not the surgeon, assembles the product. But even if it were relevant, Jackson's experts seem to agree that infringement occurs only once the insert has been rotated into the second position. Dr. Oxland's deposition provides, "Q: So there's not infringement of the claim until the pressure insert is in the locked position? A: When it's in the second position, yes." (D.I. 216-1, Ex. 25, at 178:10–14). Dr. Errico's deposition provides that there is only "partial" infringement in the first position, and that assembling "the rest of it" results in full infringement: "Q: So it's your testimony that the Claim 1 is directly infringed when the insert is installed in the first position? A: Yeah. Because I think the . . . company [has] partially violated Claim 1 and the rest of it is done by the surgeon, under their instructions." (D.I. 216-1, Ex. 24, at 192:8–17). To the extent that Dr. Errico's testimony wavers, I am not surprised. NuVasive's thought experiment is steeped in "a hypothetical world that does not and has never existed." (D.I. 246 at 17). "[T]hese last questions would be better understood after a scotch[.]" (D.I. 216-1, Ex. 24, at 192:20–21).

To summarize, I find that claims 1 and 31 of the '932 patent, claim 1 of the '200 patent, and claim 1 of the '444 patent would apprise a person of ordinary skill in the art of their scope.

*See Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1217 (Fed. Cir. 1991). They are not indefinite under *IXPL*.

### C. Mr. Pampinella's Reasonable Royalty Opinion Is Unreliable.

Jackson moves to exclude the damages opinion of Mr. Pampinella, NuVasive's damages expert, on the grounds that it is unreliable under FRE 702. (D.I. 207 at 30). I agree with Jackson.

Mr. Pampinella's damages opinion begins with a hypothetical reasonable royalty negotiation starting point of 3.0%. (D.I. 217-1, Ex. 41, ¶ 111). It then determines that a downward adjustment to the royalty rate is appropriate based on a variety of factors. (D.I. 238 at 32 (citing D.I. 217-1)). "To help quantify the downward adjustment warranted by those case-specific facts" (*id.* at 33), Mr. Pampinella "utilized two independent, third-party data collection and analysis tools to compare the relative importance of the asserted patents" in order to conduct a "forward citation analys[is.]" (*Id.*) "Forward citation analysis is a method of estimating the value of a particular patent based on the number of times the patent is cited by later patents." *Manufacturing Resources Int'l, Inc. v. Civiq Smartscapes, LLC*, 2019 WL 4198194, at *2 (D. Del. Sept. 4, 2019).

Jackson's argument is aimed at Mr. Pampinella's use of these third-party analysis tools. The first tool, "Derwent," "calculates a 'Combined Patent Impact' score which represents the importance of a patent relative to others." (D.I. 217-1, Ex. 41, ¶ 57). The second, "IPLytics," "is a market intelligence tool that enables use[r]s to analyze technology and market landscapes." (*Id.* ¶ 61). These tools are critical to Mr. Pampinella's analysis. Mr. Pampinella's report states, "I use the lower end of the range of the adjustment factors resulting from patent citation metrics of 0.11 to make a downward adjustment to the starting point of 3.0%, resulting in a reasonable royalty of 0.3%." (*Id.* ¶ 132). In his deposition, he stated, "The primary empirical adjustments are made with the citation analysis[.]" (D.I. 217-1, Ex. 40, 39:16–19).

Pampinella's use of Derwent and IPLytics are both unreliable. His use of Derwent is unreliable because he does not appear to have any understanding of how Derwent's "Combined Patent Impact" score is calculated. Pampinella's deposition testimony is revealing: "Q. Do you know one way or another how Derwent computes its combined patent metric? A. I don't know the proprietary algorithm in formulas that they use[.]" (D.I. 217-1, Ex. 40, 112:8–12). Mr. Pampinella responded to a question about Derwent's consideration of Medtronic as the "optimized assignee" of one of Jackson's patents by explaining, "I trust [Derwent did so] because they think it gives better results which is why people subscribe." (*Id.*, 128:6–8). It is impossible to test Derwent's conclusion as to the value of the asserted patents if Pampinella himself has no understanding of how Derwent works. *See Schneider*, 320 F.3d at 405. Though disqualifying on its own, Pampinella's ignorance of Derwent's algorithm is especially concerning given that Derwent's "machine learning processes" have seemingly generated an incorrect assignee for the asserted patents via its "Optimized Assignee" output. (D.I. 217-1 at 342, 390–91 of 835). NuVasive barely argues this point, noting in a footnote, "Dr. Jackson cannot dispute that he has extensive license and assignment arrangements with [other organizations]." (D.I. 239 at 36). Dr. Jackson has not reassigned the patents. (D.I. 207 at 32–33).

Pampinella's use of IPLytics is equally unreliable. IPLytics provides seven "indicators that analyze different aspects of a patent." (D.I. 217-1, Ex. 41, ¶ 62). The table below summarizes the seven factors.

| Indicator | Calculated By Counting The Number Of: |
| --- | --- |
| Technical Relevance | Prior art citation a patent receives |
| Market Coverage | Countries in which the patent has been filed |
| Radicalness | A patent's citations to prior art (backward citations) |
| Legal Breadth | Words used in the shortest independent claim |
| Patent Scope | Distinct main IPC/CPC classes to which a patent has been classified |
| Cooperation | Legally independent patent co-assignees, excluding subsidiaries |
| Team Size | Inventors that are listed on the patent |

(D.I. 207 at 34). Pampinella assigned each factor an equal weight (*id.* at 61:11–17), obtained values for each of the factors for the patents in the 2014 Agreement and the asserted patents, and computed the product of those factors' values to create a "Competitive Impact" for each patent. (D.I. 217-1, Ex. 41, ¶¶ 61–65, Ex. 43). He then summed the Competitive Impact for each set of patents, and computed an "Adjustment Factor" as the ratio of the asserted patents sum to the 2014 Agreement patents sum. (*Id.* at Ex. 43). He then applied this "Adjustment Factor" to the starting point of 3.0% to arrive at a reasonable royalty of 0.3%. (*Id.*, Ex. 41, ¶ 132).

Jackson correctly identifies multiple problems with this approach. First, the correlation between some of these factors and the value of a patent is dubious—it is unclear, for example, why the number of inventors listed on a patent ("Team Size") is an indicator of a patent's value. Second, Pampinella was not aware of any scientific study that correlates the value of a patent to any metric other than forward citations (captured by "Technical Relevance") (D.I. 217-1, Ex. 40, at 56:15–58:13). Because the factors are, by Pampinella's admission, of differing importance (*id.* at 57:17–58:13), the decision to include each of them, and weight them equally, bears on the reliability of Pampinella's analysis. Third, there is no evidence in the record that combining the factors into a single "Competitive Impact" is a method that enjoys "a particular degree of acceptance within [the] community[,]" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) (citation omitted), nor does IPLytics itself suggest such an approach. (D.I. 217-1, Ex. 40, 69:5–16). To the contrary, Pampinella stated in his deposition that he was unaware of any peers' efforts to combine all seven of the IPLytics factors, though he "ha[d] seen other experts take various factors and try to normalize or express them cumulative." (D.I. 217-1, Ex. 40, at 70:24–71:1). Pampinella stated further, "I wasn't concerned about ensuring that there was peer-reviewed information on team size and that kind of thing, and also that you could multiply these factors

together[.]" (*Id.* at 71:16–19). Fourth, as Jackson points out, "Because the value of the IPLytics indicators do not have any unit values, simply summing them over the number of patents (the Asserted Patents or the 2014 Agreement patents) does not mean the sums are comparable." (D.I. 207 at 38).

NuVasive, in response, argues that Pampinella used all seven IPLytics factors "for completeness" (D.I. 239 at 38), and that this decision was "conservative" because focusing solely on forward citations would have reduced his valuation of the asserted patents. (*Id.*). Neither of these arguments addresses the myriad reliability issues inherent in Pampinella's approach.

## IV.  CONCLUSION

For the reasons set forth above, Jackson's Renewed Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART. His Renewed Motion to Exclude Defendant NuVasive's Patent Damages Opinions is GRANTED.

An appropriate order will issue.