1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3
           JACKSON, M.D.,                    )
4                                            )
           --------------------Plaintiff,    )
5                                            ) Case No.
           vs.                               ) 21-CV-053-RGA
6                                            )
           NUVASIVE, INC.,                   )
7                                            )
           --------------------Defendant.    )
8

9              TRANSCRIPT OF PRETRIAL CONFERENCE

10

11         PRETRIAL CONFERENCE had before the Honorable Richard

12    G. Andrews, U.S.D.C.J., in Courtroom 6A on the 4th of

13    April, 2025.

14

15                       APPEARANCES

16         POLSINELLI
                BY:  STEPHEN KRAFTSCHIK, ESQ.
17                   TOM GEMMELL, ESQ.
                     AARON LEVINE, ESQ.
18                   DARREN DONNELLY, ESQ.

19                            Counsel for Plaintiff

20

21         MCCARTER & ENGLISH LLP
                BY:  ALEXANDRA JOYCE, ESQ.

22                          -and-

23         PROSKAUER ROSE LLP
                BY:  COLIN CABRAL, ESQ.
24                   JAMES ANDERSON, ESQ.

25                            Counsel for Defendant

```
1              THE COURT:  This is the pretrial conference in
2   Jackson versus NuVasive, Civil Action 21-53.
3              Mr. Kraftschik, good morning.
4              MR. KRAFTSCHIK:  Good morning, Your Honor.
5   Stephen Kraftschik from Polsinelli for Plaintiff Roger
6   Jackson.  I have with me at counsel table Tom Gemmell, Aaron
7   Levine, and Darren Donnelly, all also with Polsinelli.
8              THE COURT:  All right.  Thank you.
9              Ms. Joyce.
10             MS. JOYCE:  Good morning, Your Honor.  Alexandra
11  Joyce from McCarter & English on behalf of Defendant
12  NuVasive.  I'm joined today by Colin Cabral and James
13  Anderson and our client representative in the back from
14  NuVasive.
15             THE COURT:  Thank you, and good morning to
16  everyone.
17             Okay.  So I've read the pretrial order and I've
18  read the motions in limine.  I looked at some other stuff.
19  And I guess I should just start with -- well, okay.  Might
20  as well follow my checklist here.
21             So in terms of schedule, the week after next
22  when trial begins on the Monday, whichever day that is
23  exactly, we're not going to have trial on the Friday.  The
24  Friday is a state holiday and we close the courthouse when
25  there's a state holiday.  So the trial is going to go from
```

1    Monday to Thursday and then we'll continue on in the next

2    week regardless of whatever else is happening.

3         I think generally a lot of the things that I

4    will tell you are no different than what I told you before

5    we had the last trial.  Just to be clear, trial each day

6    will start at 9:30 and will end at 5:00, by 5:00 generally,

7    and there will be a break for lunch and an afternoon and

8    morning break, and I will meet with you at 9:00 a.m. to try

9    to resolve whatever issues you might have.

10        So one of the things that caught my attention is

11   in the pretrial order on page 16, each side says who their

12   witnesses are and there was no mention of a fellow named

13   Oxnard and yet I have an impression from other things that

14   were filed that he's a witness.  I'm wondering what's going

15   on.

16        MR. GEMMELL:  That's just a mistake, Your Honor.

17   Oxnard isn't going to be testifying.

18        THE COURT:  Seems hard when there's four live

19   witnesses to leave out the fourth, but obviously that's what

20   you did.

21        So the pretrial order raises the issue of the

22   certificate of correction for the '711 patent and the

23   back-and-forth, as I saw it, was that taking what both sides

24   said when this case was filed, there were many, many

25   complaints, the '711 patent was put in without the

1    certificate of correction.  At least one of the other

2    patents that had a certificate of correction included the

3    certificate of correction.  Nevertheless, as I would have

4    expected, in the initial discovery period early on,

5    Plaintiff gave the defendant the entire prosecution file for

6    each of the patents which had the certificate of correction

7    in it.

8              And according to the plaintiff, which I accept

9    unless Defendant tells me something different,

10    notwithstanding the fact that the patent that was filed for

11    the '711 before it was corrected had a certain phraseology.

12    From the beginning, whenever the parties have talked about

13    that, they used the phraseology in the corrected version.

14    And then the first time the certificate of correction issue

15    was raised was February 27, 2025, which was, essentially,

16    just in response to questions by me when I was -- well, it

17    was raised in response to questions by me.

18              Is that a fair factual summary?

19              MR. LEVINE:  Yes, Your Honor.  It was not on the

20    original exhibit in the complaint.  It was produced in our

21    first production.  It was used consistently through fact

22    discovery.

23              THE COURT:  You don't need to repeat what I said

24    if you agree with it.

25              MR. LEVINE:  That's generally my understanding

1    of the facts.

2            MR. CABRAL:  Good morning, Your Honor.  Colin

3    Cabral for Defendant NuVasive.

4            Your Honor, I think your summary is generally

5    accurate.  The one thing I would add is that at the

6    beginning of the case, there's actually an additional patent

7    as well, and we were dealing with, I think, in excess of 60

8    or 70 asserted claims or whatever it was.

9            THE COURT:  I saw the number 100 at one time.

10           MR. CABRAL:  It was over a hundred, so we were

11   dealing with a ton of patents and a ton of claims.  You are

12   correct that the certificate of correction for the '711 was

13   not included in any of their amended pleadings.

14           When Your Honor sent us a letter, we looked into

15   this to determine whether or not there was any remaining

16   defenses for claim 1 noninfringement defenses for '711.  We

17   noticed this issue and brought it to Your Honor's attention

18   right away, but it does not change the fact that we don't

19   know why they did not include the certificate of correction

20   in any of the amended pleadings.  When we moved forward in

21   the case, they were using the corrected language in the

22   claims.  As soon as the issue was caught by us buried in the

23   2,000-page prosecution history, we brought it to the Court's

24   attention.

25           THE COURT:  You know, Mr. Cabral, in some

1    circumstances, attorneys saying there's a lot of paper and I

2    overlooked it, maybe that would carry some force.  I don't

3    really think you all are not spending every -- I don't think

4    you're sparing any expense in defending the case, and so

5    while I what you say sounds -- I have no doubt what you say

6    is correct, that you don't notice it until you raised it,

7    but what that does mean is that nobody has -- it's kind of

8    late to be raising defenses at the time that you raised them

9    for whatever reason why you're doing it then.  Why shouldn't

10   I just consider it to be waived or forfeited?

11            MR. CABRAL:  I think there are two additional

12   points I'd make, Your Honor.  One is, obviously, we were

13   focused on nonpatent issues prior to this case with the

14   bifurcation in the case.

15            THE COURT:  But the bifurcation was pretty late

16   in the game.  You had plenty of time to be focusing on both.

17            MR. CABRAL:  Understood.  And obviously, the

18   primary thrust of our defense, as you know, has been on the

19   contract issues.  I think under the circumstances, where we

20   haven't heard an explanation about why the certificate of

21   correction was not included, I don't know what the

22   explanation is.

23            THE COURT:  I will tell you from my experience

24   of getting as many complaints in patent cases that I've

25   gotten, it's quite random that plaintiffs include

1   certificates of correction with their attached patents.  I

2   take it from the way you're shaking your head that you in

3   your experience are disagreeing with what I'm saying.

4        MR. CABRAL:  99.9 percent of certificates of

5   correction I've seen, Your Honor, have been legitimate

6   correction of typos.

7        THE COURT:  That's a different question, but

8   the -- people tend just not -- I mean, a lot of times, the

9   certificate of corrections are over, as you say, fairly

10  trivial things, but not having certificates of correction,

11  sometimes I get more trivial things and sometimes I don't.

12  It just, as I said, seems somewhat random.

13       MR. CABRAL:  I think typically, you're right,

14  Your Honor, sometimes they're not included.  But this is one

15  situation where the certificate of correction is focused on

16  the only asserted claims in the patent, and typically

17  certificates of correction will address a typo in the

18  specification or something else.  This is one scenario

19  because the correction goes to a non-typographical error in

20  the only asserted claim, we would argue that has to be

21  included in the original pleading.

22       That's why this particular issue, which is not

23  complicated, it's a really simple issue to litigate on the

24  merits, I'm not sure there's much of a response on the other

25  side because this is not a typographical error.  There's no

1    doubt if you swap the words, which is what this is, changing

2    third to second and second to third, that we don't infringe.

3    The question then is, is this a legitimate certificate of

4    correction under the statute?  And we laid out a simple case

5    in our letter to Your Honor.

6              THE COURT:  I saw that.  Right now we're just

7    talking about whether I should even consider it.

8              MR. CABRAL:  I think as a matter of fairness,

9    Your Honor, we submit that you should.  It's an important

10   issue.  It's the only asserted claim in there, and the

11   reason we were put in this position is because they buried

12   the information in the 2,000 page prosecution history

13   amongst over a hundred asserted claims.  When we identified

14   the issue, we brought it to Your Honor's attention, and to

15   litigate this issue does not require much effort because we

16   think the issue is a simple one that we could resolve before

17   the start of trial.

18             THE COURT:  All right.  Okay.  Mr. Cabral, thank

19   you.

20             Mr. Levine, do you have something you want to

21   say about that?

22             MR. LEVINE:  Just a few comments, Your Honor.

23             First, as I was saying, the corrected claim

24   language was used by both parties throughout discovery.

25   Both of their experts -- all the expert reports that

1    Mr. Channel relied on it, his invalidity report relied on

2    it.  Their interrogatory responses relied on the corrected

3    language.  Their supplemental interrogatory responses relied

4    on that language.

5         This was the only claim out of the '711 patent

6    that was ever asserted.  They knew what the correct claim

7    language was.  This issue never came up prior to

8    February 27, 2025, in a joint letter that we were not

9    entitled to a response to by right.  And so I think it's

10   fair to say that this has been abandoned with -- the fact

11   that they maybe came up with it in desperation at the very

12   last second highlights the fact that it shouldn't be

13   considered at this late date.  Thank you.

14        THE COURT:  Don't go away just yet.  Let's

15   assume that for whatever reason I consider this.  What's

16   your response on the merits?

17        MR. LEVINE:  Well, first, the Federal Circuit

18   has held that certificates of correction are presumed valid

19   because the issued patent is assumed valid.  You have to

20   petition within the office to obtain a certificate of

21   correction, so that was evaluated by not only the examiner

22   but also the special body inside the USPTO that handles

23   petitions.

24        They claim that it's not a typographical error,

25   but it's literally the transposition of the word "second"

1    with the word "third."  They say they don't infringe but

2    it's not clear that anyone could infringe or that it's

3    geometrically possible for the product described by the

4    incorrect language to function as advertised.

5                    THE COURT:  This is probably in their

6    submission.  The patent, the '711 patent, issued when,

7    roughly?

8                    MR. LEVINE:  2013, I believe, or maybe 2014.

9                    THE COURT:  When was the certificate of

10   correction?

11                   MR. LEVINE:  I don't remember the exact date,

12   Your Honor.

13                   MR. CABRAL:  Your Honor, the '711 issued

14   April 2014.  The correction is November 2014.

15                   THE COURT:  Okay.

16                   MR. LEVINE:  Let me also add there's no vehicle

17   to present this at trial.  There are no witnesses to

18   testify.

19                   THE COURT:  That is a different question.  That

20   is a different question.  I mean, this is not an issue for a

21   jury, and so I had been wondering how exactly --

22                   MR. LEVINE:  Further, Your Honor, if you were to

23   consider this issue, I think in fairness if you ultimately

24   reject their position, you should then immediately grant us

25   summary judgment of infringement on that claim, considering

1  this was their last-ditch attempt to prevent that from

2  happening.

3          THE COURT:  That's a reasonable request.  Why

4  don't you stand right there for a minute.

5          Mr. Cabral, how do -- I take it you agree this

6  is not an issue for trial; right?

7          MR. CABRAL:  Correct, Your Honor.  The validity

8  of the certificate of correction will be an issue for Your

9  Honor to decide.

10          THE COURT:  I can't remember, but even to this

11  day there's no request I do something about it; right?

12          MR. CABRAL:  Your Honor, I think that was

13  implied in the letter.  We would make that request

14  affirmatively.  We did not have a chance to be before Your

15  Honor.

16          THE COURT:  You haven't had a chance to be

17  before me, but there's practically more than a month since

18  February 27th and I do occasionally receive communications

19  in writing.

20          MR. CABRAL:  We did put the issue in the

21  pretrial order with hopes of addressing it here today.

22          THE COURT:  So here's what I think I ought to

23  do.  So it's not an issue for trial.  It also seems clear it

24  would be a good issue for me to resolve before trial,

25  whether I resolve it on the merits or some other basis.  I

1    think I have a pretty good understanding of the -- what I

2    call the waiver forfeiture issue.  What I would -- and I

3    think Mr. Cabral has put his best argument forward in the

4    2.7 letter; is that right?

5              MR. CABRAL:  I think that's fair, Your Honor.  I

6    think the only issue that I heard for the first time here

7    was the possibility that the language prior to the amendment

8    was somehow indefinite perhaps, and there's case law on that

9    as well when it comes to certificates of correction, when

10   they're appropriate when they're not, even if the

11   non-inventive language was indefinite as a matter of law.

12             THE COURT:  Mr. Levine, what I'd like do is give

13   you until Tuesday next week to put something in writing in

14   response on the merits.  You're not waiving anything on the

15   forfeiture waiver business, but I would like a response on

16   the merits.

17             MR. LEVINE:  By Tuesday, Your Honor?  I think

18   that's doable, Your Honor, and we will also yet again renew

19   our motion for summary judgment of infringement.

20             THE COURT:  I understand that.

21             (Cross-talk.)

22             THE COURT:  You should put it in writing but you

23   don't need to spend a lot of pages on it.

24             MR. LEVINE:  It will be one sentence, Your

25   Honor.

```
 1              THE COURT:  Okay.  Make it --

 2              MR. LEVINE:  A long sentence, Your Honor.

 3              THE COURT:  Thank you.  All right.  So we'll put

 4    that aside for the time being.

 5              Just to be clear, your response, Mr. Levine, is

 6    due Tuesday by the close of business.

 7              MR. LEVINE:  Thank you, Your Honor.  Noted.

 8              THE COURT:  Thank you.

 9              So the pretrial order.  In paragraph 121, there

10    is a request by Dr. Jackson that, essentially, Plaintiff

11    lawyers not be referred to as all the other things they do

12    for him other than this litigation.  There seemed to be some

13    suggestion this had come up before, which I don't know

14    whether it has or hasn't.

15              Mr. Cabral, do you object to this?

16              MR. CABRAL:  So, Your Honor, I think the short

17    answer is yes based on the scope of their request.  In the

18    last trial, I think there were maybe four or five questions

19    I asked before the break of Dr. Jackson, and during a

20    recess, we said what was that business about Polsinelli,

21    something to that effect.  And I said we're just making the

22    point that you do all this different work for him, and you

23    said, basically, just keep these guys out of it.  Keep these

24    guys at the table out of it.

25              THE COURT:  Maybe that's what happened.  Why
```

1   does Polsinelli the firm doing all this work for him make

2   any difference in the patent case?

3           MR. CABRAL:  I think the scope of this request,

4   Your Honor, there's no way to keep Polsinelli out of it

5   whether I refer to them as his lawyers or not.  They have

6   Polsinelli individuals on the witness list.  There's no way

7   to get around the fact that Polsinelli and its lawyers were

8   involved intimately in the prosecution of these patents and

9   Dr. Jackson himself refers to them because, as you might

10  have seen in the motions in limine, he can't explain what he

11  invented.  He says I defer to my lawyers and they're lawyers

12  for Polsinelli.

13          THE COURT:  If for some reason or other

14  Dr. Jackson is saying "I defer to my lawyers" is something

15  that happens, that doesn't mean you then say "who are your

16  lawyers"; right?  Because it's not like Polsinelli is going

17  to testify.

18          MR. CABRAL:  This is not going to be a focal

19  point of our defense, Your Honor.

20          THE COURT:  I think it should be that there's no

21  reason to do anything more than is necessary.  And I don't

22  know what exactly is necessary, but the aura that

23  Dr. Jackson is a litigation monster with his sharks sitting

24  in front of the jury over here is not an aura that ought to

25  be out there.

1      MR. CABRAL:  That, I think we're totally fine

2   with, Your Honor.  That's not an aura we want to create.

3      THE COURT:  All right.  Thank you.

4      Is there something in terms of -- it's hard to

5   deal with -- you can sit down.  I'm kind of asking

6   Mr. Kraftschik, I guess.

7      Is there something in particular?  It's hard to

8   talk in general terms.

9      MR. KRAFTSCHIK:  I don't think we're --

10  obviously, we work for Polsinelli.  If there's a stray

11  reference, that's fine, but at the first trial, there were

12  repeated references to the Polsinelli law firm does this,

13  the Polsinelli law firm does this, the Polsinelli law firm

14  does this, clearly trying to create, I think, exactly the

15  impression you were just talking to Mr. Cabral about and I

16  think that's what we want to avoid.  The fact that

17  Polsinelli does these other things for Dr. Jackson is

18  completely irrelevant.

19     THE COURT:  So I heard the view and perhaps

20  Mr. Cabral will agree with you, but how do I -- what would I

21  say now to -- that's more than what I already just said that

22  Mr. Cabral said he understands?

23     MR. KRAFTSCHIK:  Well, Your Honor, I mean, I

24  think at the last trial some of the -- transcript page 293,

25  you said, "I assume there's not going to be" -- I think you

1   may have said in the opening Polsinelli has a thousand

2   lawyers.  I assume there's not going to be testimony about

3   that and they shouldn't testify about that either.  I think

4   the size of the law firm.

5            Your Honor, I think Mr. Cabral's representation

6   that he's not going to do that, that's, I think, sufficient

7   for now.  If it comes up again, we may need to raise this.

8            THE COURT:  I have no problem with raising it.

9   I'd much rather it doesn't come up again at all, and the

10  size of the Polsinelli law firm is irrelevant.  I'm assuming

11  but I'm sure Mr. Cabral, you probably have lawyers connected

12  to you too, but that's just irrelevant.

13           And, yes, I -- there may be plenty of reasons

14  including, for all I know, that it appears on the face of

15  each of the patents, "prosecuted by Polsinelli," but there's

16  no reason why, if it appears on the face of the patent, at

17  least, there's no reason that occurs to me right now as to

18  why there would be any reason why you would actually ask a

19  question to bring that out.

20           MR. CABRAL:  Your Honor, I agree.  I think

21  they're concerned about questions and themes they're worried

22  about me raising that I do not intend to raise.  If they

23  think I cross the line, they can object and you can sustain

24  the objection in realtime.  That's not our intention.  We're

25  not going to create the aura that you referenced earlier and

1    try to make it seem like he's a litigation monster or

2    anything like that.  But Polsinelli may come up because

3    they're part of the story, but not in the way that the

4    plaintiff is concerned about.

5              THE COURT:  So part of the story business is

6    there's words and statements --

7              (Cross-talk.)

8              THE COURT:  I don't think there's a whole lot I

9    can actually do about it other than indicating to you, which

10   I have and which you would acknowledge, that, generally

11   speaking, Polsinelli's involvement is irrelevant.  They are

12   on the prosecution of the patents.  There may be some other

13   reasons why, but there's -- a lot of times it's not

14   something where the Polsinelli name is already there to talk

15   about Dr. Jackson's lawyers.  There's no reason to ask which

16   lawyers.

17             MR. CABRAL:  Exactly, Your Honor.  I don't

18   mean -- when I say "part of the story," I don't mean that in

19   a way or concerning.  They're on the witness list.  There

20   are Polsinelli lawyers on the witness list.

21             THE COURT:  I'm sorry.  What?  Okay.  That's --

22   I had forgotten who people are.  Is that Johnson?

23             MR. CABRAL:  Yes, and they had Polsinelli

24   witnesses, attorneys, testify at the last trial.

25             THE COURT:  This is not the last trial.  That's

1    irrelevant.

2              MR. CABRAL:  Same guys.  These are the same

3    guys.

4              THE COURT:  Like I said, I don't remember the

5    names too well but --

6              MR. CABRAL:  That's all I mean, and it's not to

7    say they're part of the story and raise it in some sort of

8    ominous way.  That's just the way the case played out.

9              THE COURT:  Okay.  Thank you.

10             MR. CABRAL:  Thank you, Your Honor.

11             MR. KRAFTSCHIK:  Your Honor, all I'll add is

12   they have names.  They're on the may-call witness list, but

13   they have names.  It could be asked if they're Dr. Jackson's

14   lawyers and be referred to as names.  The Polsinelli law

15   firm name doesn't need to come up.

16             THE COURT:  Tell me.  Why are they on the

17   possible may-call list?  Do you know?

18             MR. GEMMELL:  We originally had them "may call"

19   because we thought to use in rebuttal.  We don't need them,

20   necessarily, and we're considering if they're not using them

21   as their own witnesses, we would be dropping both of the

22   witnesses on ours.

23             THE COURT:  Okay.  Thank you.  All right.

24             So actually, there's a number of different

25   issues floating around about, in my mind, what I would call

1    the scope of the trial.  I counted up.  Based on the

2    presentence report, I gather that through Plaintiff's 15

3    claims and Defendant's numerous representative products that

4    Plaintiff, to prove infringement, has to do 84 different

5    claim charts.

6            MR. GEMMELL:  I'm sorry.  Could you repeat that,

7    Your Honor.

8            THE COURT:  Well, assuming that you have to do a

9    different claim chart for each product; right?  And you take

10   the number of products that are -- basically, if you take

11   page 6 of pretrial order which describes -- that's not page

12   6.  Page 4, 3, 4, 5, it's got the 15 claims, it's got how

13   many products each one is directed at, and I believe that's

14   a total of 84, if you count each product versus the claims a

15   separate entity.  And so I guess the first question I have

16   is, do you really expect to present 15 claims?

17           MR. GEMMELL:  No, we don't, Your Honor, to be

18   honest with you.  This is one of the issues that we had

19   raised before the other side had not disputed infringement

20   or that the elements for infringement were there in a number

21   of these patents that we -- and the asserted products.  And

22   what we had raised with the Court was we shouldn't have to

23   go through those.  You agreed that would be a waste of time.

24           THE COURT:  But whether you have to go through

25   them or not, are you getting something out of all these

1    extra claims?  Like, for example, you've got the '273 patent

2    claim 35 and the '273 patent claim 39.  Each of them is

3    against the exact same six products.

4              MR. GEMMELL:  So we do plan on reducing those,

5    but we were hopeful that the Court would, in fact, rule that

6    the twist-in-place patents, for example, that's one of them,

7    '273 patent claim 35 and 39, for which they don't have a

8    defense, a noninfringement defense, they have an invalidity

9    defense, would be one of the twist-in-place patents that we

10   could resolve in terms of we don't have to prove all the

11   elements if they didn't raise a claim or noninfringement

12   defense on through their expert, technical expert.  If the

13   Court was going to rule that way, clearly, that would speed

14   things up and make things a lot faster.  If the Court is not

15   going to rule that way, then we're going to have to reduce

16   the claims.  That's correct.

17             THE COURT:  I'm interested in doing both,

18   reducing the claims and speeding things up.  And I didn't go

19   through and try to figure out which ones -- I think it's

20   somewhere else in here but I don't have it in my head right

21   now.  Of the ones that are listed -- actually, let me go

22   back.

23             So one of the things that I saw when I was

24   reading some of this material is the twist-in-place patents,

25   which I had assumed was one patent family, is actually more

1    than one patent family.

2              MR. CABRAL:  That's correct, Your Honor.

3              MR. GEMMELL:  Your Honor, they are generally in

4    the same general category, twist-in-place.

5              THE COURT:  Saying they're in the same general

6    category, I'm curious.  How many different patent families

7    are we dealing with?

8              MR. LEVINE:  I believe it's two, Your Honor.

9              THE COURT:  So there's a total of four patent

10   families here, the two twist-in-place patent families and

11   the two hangers-on.  I forget what they're called, but

12   they're separate things.

13             MR. GEMMELL:  Correct.

14             THE COURT:  Well, so, Mr. Gemmell, don't go

15   away.

16             Mr. Cabral, here we are.  Do you have some

17   proposal -- not proposal.  Something you would agree to as

18   we're not challenging this limitation, we're not challenging

19   that limitation?  You know, you've said, okay, you don't

20   have an opinion on these things but we can still

21   cross-examine.  It's their burden to prove.  That's not a

22   good look to me, and it's a terrible look to a jury, don't

23   you think?

24             MR. CABRAL:  Your Honor, you and I had this

25   conversation before.  And if there's an element that's not

1    in dispute, there's something that can be worked out to

2    streamline this.

3           With that said, we have always thought there are

4    too many patents, too many claims being asserted here to try

5    a case in an efficient manner for exactly the reasons you

6    pointed out.  Let's take an example.  There are six

7    twist-in-place patent in two different families.

8           Dr. Becker, their damages expert, when you talk

9    about damages issues later, there's serious problems with

10   that, but he's basically saying if you infringe one, the

11   royalty rate is 3 percent.  If you infringe the other five,

12   there's no additional royalties associated with it.  We have

13   six patents here where it's really buy one, get five free in

14   a situation like that.  Do they not to move forward with how

15   many twist-in-place claims?  Probably 13 or 12.

16              THE COURT:  I think it's 13, but I'm not sure.

17              MR. CABRAL:  Of course not.  There's no

18   additional value, even from a damages perspective, for

19   trying that many claims.  We're all for streamlining this,

20   but the first I heard of them limiting beyond the 15

21   asserted claims is just now, which means they're trying to

22   get us to prepare an invalidity case for claims they know

23   they're going to drop.  If they want to drop claims --

24              THE COURT:  Mr. Gemmell didn't actually say he

25   was for sure going to drop anything.

1          MR. CABRAL:  Maybe I misheard.  I heard him say

2     he was going to reduce the claims that are currently

3     asserted from the 15.

4          THE COURT:  I think he said -- well, doesn't

5     matter what I think he said.

6          So isn't it -- so is it correct, Mr. Gemmell,

7     that whatever the two non-twist-in-place patents are there's

8     exactly one claim from each now so the other 13 are

9     twist-in-place claims?

10          MR. GEMMELL:  Those are the other twist-in-place

11     claims, Your Honor.

12          I know he had mentioned that somehow it's our

13     fault for raising these and he has to put on a damages case.

14     Really, he should -- the only thing he has on the

15     twist-in-place patents, nearly all of them, is his

16     invalidity defense.  He came up and said out of his own --

17     excuse me, him.

18          The defendants came up after the fact.  You had

19     told them we don't expect you to come back now and assert a

20     defense, a noninfringement defense, to all of these now

21     because their technical expert didn't do it.  He didn't do

22     it throughout the entire case, and they're pointing back to

23     an unverified interrogatory answer and then to certain

24     testimony on one element of one claim that was testified by

25     Dr. Erico in his deposition.

1    In reality, we shouldn't have to, and you said
2    this at the conference we had, the status conference.  We
3    shouldn't have to go through all of the elements that they
4    don't dispute.  It doesn't make any sense.  If we want to
5    narrow it, the best way is they should drop their --
6    acknowledge infringement for the twist-in-place patents so
7    we don't have to go through all those.

8    If that's the case, that determination will
9    decide on how we may need to limit.  I didn't say we were
10   going to limit.  We may need to just for time purposes, but
11   we were hoping the Court would see that and based on the
12   decisions that we had and the briefing we did on that issue
13   that the Court would, at a minimum, if not grant us summary
14   judgment on those patents and those patent claims, then to
15   limit their dispute -- I think it was on the one element of
16   one claim, only one element of one claim, where they say --
17   maybe it's three claims.  But one element.  It's "configured
18   to receive the rod."  That's the one element that they say
19   they have a dispute on and they just raised it for the first
20   time after the status conference.

21   That's the way we should narrow this.  We should
22   limit it that way, not be saying we should drop all the
23   claims and give them summary judgment on all the claims we
24   have.

25   THE COURT:  Mr. Cabral.

1          MR. CABRAL:  So, Your Honor, we had -- we

2     litigated this issue.  We had this conversation at the

3     status conference.  You said identify what elements you're

4     going to be contesting, and we did that in a letter

5     exchange.  This was all part of the summary judgment

6     briefing in the summary judgment motion that was filed by

7     Plaintiff.  We did that, there was an exchange there, and

8     you, ultimately, denied summary judgment.

9          Now, I agree with you that if the dispute has

10    been focused on a claim, what Mr. Gemmell said had a lot of

11    factual inaccuracies in it, let's assume there's one claim

12    and one element in dispute.  We don't have to waste the

13    jury's time and go through all the elements that are not in

14    dispute for purposes of infringement, and we're fine

15    focusing on that element if that's how they want to present

16    their case.  I'm not going to tell them how to present their

17    case.

18          We can be efficient about this.  The reason that

19    we're faced with this issue about time constraints is

20    because they insist on going forward with 8 patents and 15

21    claims where they clearly don't need to, especially when so

22    many of those claims are focused on the same underlying

23    twist-in-place technology, so to speak.  At least, that's

24    what it's been branded as.

25          MR. GEMMELL:  If I may, Your Honor, the summary

1    judgment was not decided on the merits.  As you know, it was

2    a procedural part.  After we had the status conference, you

3    asked us for briefing and said I'm certainly going to give

4    him credit.  He's definitely not going to come back and

5    contest all these now where there's infringement where

6    there's no contest before, but that's exactly what they did.

7    They came back and argued noninfringement for not one of the

8    claims where we moved for summary judgment, but we

9    highlighted that for the Court and said expressly in our

10   letter briefing to you, is that if the Court is going to

11   deny our motion for summary judgment, at a minimum we

12   shouldn't have to go through all the elements for all of

13   these claims that they don't contest exist.  That's what we

14   need to break down and knock that out.  That will be very

15   significant in terms of reducing the number of claims and

16   products that we have to go through.

17          THE COURT:  So I remember reading these letters.

18   But I don't remember that I spent a lot of time trying to

19   dig into the weeds when I saw that, essentially, other than

20   I think, I guess, the '711 patent, other than one that

21   seemed to have no actual defense.

22          Was -- the letter that I got from you,

23   Mr. Cabral, was just about the nine patents that were

24   supposed to be undisputed or I forget the phrase the

25   plaintiff used.  I didn't get anything because I didn't ask

1    for it about the -- how much was actually in dispute on the

2    rest of it; right?

3            MR. CABRAL:  I think my recollection, Your

4    Honor, is that after the status conference, you had -- at

5    the status conference, actually, you had asked us to

6    identify the disputed elements in their narrowed set of

7    claims or I think in advance of their narrowing, to be

8    honest with you.  And we identified the disputed elements in

9    those claims where we said we could cross-examine their

10   infringement expert on those issues.

11           Since that time, two things happened.  One was

12   you asked for a follow-up letter on claim 1 of the '711 and

13   we sent that in and talked about that.  The other thing that

14   happened is they narrowed from 30 to 15 claims, so they know

15   what the disputed elements are with respect to the asserted

16   claims among these 30 that were originally identified by

17   them.  They know what we're disputing, and I don't know what

18   more they want us to do besides that.

19           There's been no conversation since this exchange

20   and since Your Honor's ruling on summary judgment where we

21   somehow said we're contesting everything.  That's made up.

22   That never happened.  They know what elements that we're

23   disputing.  We identified them in a letter to Your Honor,

24   and we don't anticipate on deviating what we represent to

25   the Court.

1          MR. GEMMELL:  Your Honor, they have raised

2     disputes, uncontested, throughout discovery and also at the

3     end of their technical expert, Mr. Fallon, who moved for

4     summary judgment on those.  You said other than

5     invalidity -- remember, he said we need to be able to

6     contest those because the patent can't be infringed if it's

7     invalid.  You said, yes, I understand that.  We're not

8     talking about invalidity.  I'm going to give you credit,

9     Mr. Cabral.  You're not going to go back and contest

10    everything.

11          That's exactly what they did.  They either

12    contested infringement on unverified interrogatory

13    answers -- they can't verify them because there's no

14    evidence to support their verification.  They raised -- the

15    only one the only issue they raised is one element that

16    could be on three claims but one element, the same element,

17    and they point to Dr, Erico's testimony where he said I'm

18    not sure if there's a gap there or not.  He was being asked

19    if there's a little gap there.  It didn't go to the claim

20    element at all because there's no element.  There's no

21    limitation of a gap.

22          That's the only thing they pointed to.  So, yes,

23    they did contest all of them.  It's not an issue of they can

24    cross-examine our person it's issue.  They should drop

25    those.  We shouldn't have to prove all of those elements.

1    There's a ton of them, and it doesn't make sense for you or

2    the jury or any of us to have to go through that.

3           THE COURT:  All right.  Here's what I think

4    we're going to do.  When I'm finished here, I'll go back and

5    find the letters and look at them and see whether I gave up

6    on them -- why I gave up on them.  I have a thought in my

7    head as to why it was, but I'd rather not state what it is.

8           It seems to me that if, in fact, the defendant

9    is -- it depends how much NuVasive has actually conceded,

10   but it seems to me that what happened is that the elements

11   that are not being contested I ought to grant partial

12   summary judgment on.  Plaintiff ought to reduce its claims

13   from 15 to 5 and then we could go from there.

14           Alternatively, if, in fact, it strikes me that

15   the defendant's just dancing around for no particular

16   purpose, then I think -- and they can't do that -- then I

17   think we need -- I'll consider doing something I've never

18   actually done before, which is give Plaintiff more time than

19   Defendant because even though I think -- it's a terrible

20   thing for a plaintiff to have to go through 10 claims, 15

21   claims, whatever number to have claims.  It's a terrible

22   thing to have to go through one claim when you've got eight

23   products.  The jury can only listen to this for so long, so

24   giving the plaintiff more time might actually even things up

25   it at least means that they have enough time to respond to

1    the things that are actually in dispute, like damages and

2    invalidity.

3            But the main thing is I need to figure out what

4    I guess I've resisted figuring out before, of whether

5    NuVasive is just making stuff up or -- and I'm not -- I

6    don't care if they're making stuff up as long as it's only a

7    little bit of it.  So in any event, I don't think there's

8    anything more I can do about that right now, but I'll see if

9    I can't do something about that later today, and what we'll

10   do is break and you can hang around while I work on this.

11           Let's move on to some other things here.  So

12   paragraph 123 of the pretrial order talks about adding

13   Schlaffer alone as an obviousness argument against the '292

14   patent and that appears in the pretrial order, at least, as

15   invalidity challenge number four.

16           I went back and looked at Docket Item 170, and I

17   think this violates the stipulation.  It strikes me that the

18   parties are arguing over the interpretation -- or the

19   plaintiff's interpretation is that Defendant agreed and we

20   only have three invalidity defenses or three different

21   combinations but no more than three combinations that for

22   the entire, at that time -- well, let's say from 15 asserted

23   patents.  That hardly makes any sense given, that we have

24   four different families here.

25           When I've done this before and limited things,

1    what I've said is three different invalidity defenses per

2    claim, and it usually turns out that invalidity defenses

3    overlap a lot, so they're not really a whole lot more --

4    saying no more than three per claim, there's 15 claims, so

5    they have 45 invalidity defenses, that's not the way it

6    works, but that, in fact, three may not cover -- may not

7    possibly cover 15 different claims with three invalidity

8    combinations.

9             So in any event, I don't think the defendant

10   violated the order there.  We'll let them proceed with

11   invalidity.

12            MR. LEVINE:  Your Honor, can I add one or two

13   quick points on this issue?

14            THE COURT:  All right.  Go ahead.

15            MR. LEVINE:  First, it isn't that we are arguing

16   about the interpretation of the stipulation.  This was their

17   interpretation of the stipulation as of late as

18   February 28th.  They selected, as the stipulation calls for,

19   four different invalidity challenges for the claims we

20   selected for essentially trying.  They had three prior

21   art-based challenges as stipulated and one 112 challenge as

22   stipulated.  They made these selections prior to your ruling

23   on summary judgment issues concerning IPXL, so I think in

24   fairness that was their interpretation up until minute ago.

25            THE COURT:  Okay.  Thank you, Mr. Levine.

1          All right.  Just to get back to the witnesses

2    issue, I understood earlier someone on Plaintiff's side to

3    say they weren't planning on calling Mr. Cardon Johnson

4    unless you call Cardon Johnson.  Are you planning on calling

5    Cardon Johnson?

6          MR. ANDERSON:  No, Your Honor.  We can take him

7    off the list.

8          THE COURT:  So they're off both your lists?

9          MR. GEMMELL:  That's correct, Your Honor.

10          THE COURT:  Okay.  Thank you.

11          All right.  One other thing in the pretrial

12    order was there's a request, page 23, that the openings be

13    no more than 30 minutes per side.  It comes out of your

14    time.  I don't care how long the openings are.  It's your

15    discretion.  So I'm not going to adopt that statement.

16          So I have read the motions in -- well, is there

17    anything about the pretrial order itself that I haven't

18    addressed in one way or another that either side wants to

19    bring up?

20          MR. CABRAL:  Your Honor, I believe the only

21    issue that you haven't addressed yet, and you kind of

22    alluded to this before, would be the amount of time

23    allocated for each side.  They said nine hours.

24          THE COURT:  I'm putting that off until we have

25    the issues figured out.

1          MR. LEVINE:  Your Honor, a different issue.  We

2     had raised and filed a motion yesterday regarding the

3     Section 282.

4          THE COURT:  I saw that.

5          Do you want to respond to that by, say, Tuesday

6     close of business?

7          MR. ANDERSON:  Yes, Your Honor.

8          THE COURT:  Thank you, Mr. Levine.

9          MR. CABRAL:  Your Honor, one more thing, I

10    guess, in the idea of pending motions out there.  We still

11    have a pending Daubert motion against the damages expert for

12    Plaintiff.  We also have one of our motions in limine we may

13    get to now.  We're also challenging those opinions on 402

14    and 403.

15         The damages issues in this case we think are

16    problematic, and we don't want to be in a situation where we

17    have to come back here and do a third trial.  When we look

18    at these opinions Dr. Becker is basically saying this

19    twist-in-place technology is more valuable than all of the

20    other technologies licensed by --

21         THE COURT:  Can you hold that thought and we can

22    come back to that later?

23         MR. CABRAL:  Of course.  Thank you, Your Honor.

24         THE COURT:  And you should when we get through

25    the motions in limine.  You should bring that up again.

1          All right.  So the motions in limine.  Okay.

2     Docket Item 457, which is Plaintiff's Motion in Limine

3     Number One to Preclude Invasive Evidence and Argument

4     Regarding Issues Previously Decided by the Court in the

5     August 2024 Trial.  The opening motion was not very helpful

6     in terms of exactly what was at issue and the way things

7     tend to go around here, in the reply, it got a lot more

8     specific.  Wants to exclude the 2014 agreement; negotiations

9     about it; blah, blah, blah; evidence of the "forever free"

10    e-mail; Spangler's belief that it had a license; the

11    $30 million payment; the '689 heel flange patent; and

12    "evidence NuVasive intends to use to support its claim of

13    likeness to the asserted patents, see Exhibit A."  I didn't

14    look at Exhibit A so I don't know what that is.

15          So the difficulty here is there's some things

16    that cannot be retried.  It's a fact for these purposes that

17    NuVasive doesn't have a license.  So you can't argue in this

18    trial that you have a license.  On the other hand, the

19    plaintiff is putting your state of mind at issue in terms of

20    induced infringement and contributory infringement, willful

21    infringement.  And so your state of mind is up there and

22    your state of mind was not decided in the first trial.  All

23    that was decided is you were wrong to think you had a

24    license.

25          So in view of the state of mind being at issue,

1    how can you actually make the argument you're making?

2              MR. GEMMELL:  So, Your Honor, my co-counsel was

3    talking.  This more goes to the issue of the opinion of

4    counsel that they had and the issues that were discussed

5    internally rather than the opinion of counsel.

6              Do you want to speak to that?

7              But to be honest with you, I can speak to the

8    rest of it, to the extent we don't believe you need to go

9    there and you don't need to violate the issues --

10             THE COURT:  I don't need to violate the issue?

11             MR. GEMMELL:  I don't think we need to go into

12   the actual licenses that they're planning on going into in

13   order to claim that there is --

14             THE COURT:  So here's the way I was thinking

15   about it when I was trying to figure out how to draw the

16   right line between -- around here which seemed to me that --

17   well, seems to me there's a lot of possibilities.

18             One is, I don't know, practically mooting the

19   issue by a one-sentence stipulation which would be something

20   like "The parties agree that in 2014 NuVasive paid

21   $30 million to Dr. Jackson for a license which NuVasive

22   believed covered everything -- every invention Dr. Jackson

23   had made or would make, but the parties also stipulate that

24   that belief is wrong.  Or that in fact they did not have

25   such a license."

1          MR. GEMMELL:  The issue is part of that was

2     part -- and I think this was determined.  They argued they

3     need a refund of $30 million because they have freedom to

4     operate after that.  They had the ability to go out and do

5     whatever they want to do from that point forward.  They lost

6     on that.  I think if we're pointing back to it and saying

7     they paid $30 million but they were wrong in their belief, I

8     don't think that would be right.  I also think that would go

9     to what is the actual license.  They're going to say the

10    $30 million gave them a license but to be honest with you,

11    all of that goes to prior patents.  It doesn't go to the

12    asserted patents.  The asserted patents is completely

13    different.

14          THE COURT:  So you don't like the stipulation.

15          MR. GEMMELL:  I don't like the stipulation.

16          THE COURT:  Okay.

17          MR. DONNELLY:  One thing that may be helpful,

18    Your Honor, I don't want to get out of turn, but in our

19    motion in limine number two, NuVasive helpfully took a lot

20    of this off your plate because they were very clear that not

21    at all related to opinion of counsel is relevant to any

22    issue, claim, or defense in this case.

23          THE COURT:  I'm not with you on that either.

24          MR. DONNELLY:  I will just note for connecting

25    the issues of proof to that issue, their purported state of

1    mind comes only from their patent counsel, Mr. Spangler, the

2    only source of proof in any of the evidence they identified

3    that could possibly relate to the issue.  I do think it

4    takes the issue off the table because if the state of mind

5    of the patent counsel is not an opinion of counsel --

6              THE COURT:  Did you not depose Mr. Spangler over

7    his state of mind when you deposed him?

8              MR. DONNELLY:  We deposed him and we asked some

9    questions about that e-mail.  We did not -- he was not a

10   party witness when we served the 30(b)(6) notice for

11   NuVasive's state of mind.  Mr. Spangler had long left

12   NuVasive then, and we sought NuVasive's state of mind

13   because if NuVasive is going to be telling us now that they

14   had a pure state of mind throughout the period of

15   infringement, that has to come from NuVasive.  And if

16   Mr. Spangler had told someone in NuVasive who had

17   decision-making authority that NuVasive was licensed and the

18   people who had decision-making authority were going to come

19   and explain Mr. Spangler told us that and we relied on it

20   and decided to go forward based on what our patent counsel

21   told us, that's how I can imagine how an issue related to

22   scienter would play out.

23              But we were told very clearly that's not what

24   happened because NuVasive made very clear that no opinion of

25   counsel is relevant at all to any claim or defenses in this

1    case.

2            THE COURT:  Thank you, Mr. Donnelly.

3            MR. GEMMELL:  When we raised this, Your Honor --

4    I wanted to clarify that was discussed briefly.  When we

5    raised the 30(b)(6) notice, they objected and said they were

6    not going to rely on the opinions of counsel, so we were not

7    going to depose him on that issue.

8            THE COURT:  Mr. Cabral.

9            MR. CABRAL:  Thank you, Your Honor.

10           So staying with motion in limine number one

11   which is what started this discussion instead of opinion of

12   counsel, which is number two, you are correct that in the

13   first trial, the issue on our side was whether NuVasive had

14   a license to the patents-in-suit under the definition of

15   heel flange.  That was the issue.  The jury came back on it.

16   We had a post-trial motion in front of Your Honor on that

17   issue.

18           There's no doubt that the 2014 agreement

19   provided licenses to NuVasive on the specific technologies,

20   including heel flange.  Your Honor found that, made that

21   ruling in its May 31, 2024, summary judgment briefing.

22   There's also licenses in section 2.02 of the 2014 agreement

23   to the Mod implants issue that has been the subject of some

24   dialogue back and forth as well.

25           The 2014 agreement, for example, is an agreement

1    between the same parties involving the same products where

2    there are licenses, technology licenses, that were granted

3    to NuVasive in exchange for that $30 million.  It's relevant

4    to damages.  It's relevant --

5                THE COURT:  Did Dr. Becker use it in his damages

6    analysis?

7                MR. CABRAL:  That's one of the issues.  So

8    Dr. Becker --

9                THE COURT:  Is the answer no?

10                MR. CABRAL:  The answer is he considered it but

11    did not factor it into his analysis.

12                THE COURT:  Did your damages expert use it?

13                MR. CABRAL:  Absolutely.

14                And, Your Honor, one thing on that.  We

15    submitted an interrogatory to Plaintiff, to Dr. Jackson,

16    interrogatory number one.  We said, "Identify all of the

17    licenses that -- involving the patents-in-suit."  And in

18    their response they identified the 2014 agreement, and how

19    they can now argue it is not relevant to this case is beyond

20    me.  I don't understand how they could take that position or

21    make that argument in light of their interrogatory response,

22    which I have here if Your Honor would like to look at it.

23                Thank you, Your Honor.

24                MR. GEMMELL:  As you may recall, Your Honor,

25    there are universal license defenses expressly rejected by

1    this Court on the motion for summary judgment, so they don't

2    have this broad "we have a license for everything."  They

3    don't need to go into it.  They identified in their briefing

4    three particular areas where they want to raise the 2014

5    license agreement.  They say same parties, same products.

6    That's not the issue.  The issue here in the second trial is

7    the asserted patents.  It doesn't matter if they're the same

8    parties and same products.  The second one they said each is

9    relevant to damages --

10                 (Cross-talk.)

11                 THE COURT:  -- the first one, isn't that

12   relevant to the damages analysis or couldn't it be relevant

13   to the damages analysis?

14                 MR. GEMMELL:  That goes to the second question

15   they had.  It's only relevant in terms of the features.

16   They don't have to go to the licenses to say that this is

17   the helical flange.  They want to point, for example, to the

18   helical flange.  They want to retry that.  They want to

19   retry the license and --

20                 THE COURT:  You say they want to retry this and

21   retry that.  It's hard to tell exactly what it is they want

22   to do.

23                 MR. GEMMELL:  I tend to agree.  We asked them

24   expressly and they said we're not going to tell you what

25   we're going to do.  That's fine.  I get that.  That's why

1    you file a motion in limine on it.

2            We did find out, however, when they identified

3    in their exhibit list all of the areas they want to go into,

4    and I'd be happy to point to some of those.  That was

5    Exhibit A to our reply brief.  We put them in yellow.

6            For example, the assignments.  Why do they need

7    to have assignments?  The trademark licenses.  Why do they

8    want to talk about trademark licenses?  It's to raise the

9    issues of licenses again.  Plaintiff's marking.  They want

10   to do that because it goes to the issue of license.  The

11   ATEK license.  That's a license.  The e-mails regarding

12   royalties paid on a license.  What does that have anything

13   to do with the asserted patents?  None.  Royalty reports.

14   Again, this all goes to license.  They're trying to reargue

15   and retry the issues that were already determined by this

16   court and the jury.

17           This Court said there's not a broad license

18   arrangement.  The Court actually said that on -- I disagree

19   with the defendants that the 2014 agreement grants a broad

20   package license.  That was Court's ruling on a motion for

21   summary judgment.  Document --

22           THE COURT:  Let me interrupt you about -- while

23   you're talking about this.  Am I -- in terms of the

24   infringement theories, are there some combination of direct

25   and indirect infringement theories?

```
 1                    MR. GEMMELL:  We do have some of those, yes,
 2      Your Honor.
 3                    THE COURT:  Are there anything -- are there any
 4      of the asserted claims for which the products are only
 5      accused of direct infringement?
 6                    MR. GEMMELL:  I believe so, yes.
 7                    THE COURT:  All right.  Mr. Levine is helping
 8      out with his head nodding behind you.
 9                    MR. GEMMELL:  That's correct.
10                    THE COURT:  Are there some where there's only
11      indirect infringement theories?
12                    MR. GEMMELL:  No.  I believe there may be two.
13      So the answer is yes.
14                    THE COURT:  Okay.  For the most of the rest,
15      then, there's both direct and indirect?
16                    MR. GEMMELL:  There are some that are both
17      indirect and direct, and, well, they're both direct and
18      indirect, but if we're going to parcel out that it's direct
19      or indirect.
20                    THE COURT:  It's possible I once looked at these
21      patents at some point but I have no memory of doing that.
22      Are the patents -- are the asserted claims apparatus claims
23      or method claims or what?
24                    MR. GEMMELL:  Apparatus claims.
25                    THE COURT:  And the reason why there would be
```

1    indirect infringement and no direct infringement is because

2    why?

3                    MR. GEMMELL:  They directly infringe,

4    ultimately, but in terms of the indirect infringement, some

5    of the parts are made, for example, for purposes of putting

6    a boot together for the surgeon to use them.  So in their

7    final form, it's indirect infringement.

8                    THE COURT:  So the parts, so to speak, are

9    shipped separately and the surgeons assemble them to maybe

10   whatever assembly is claimed while doing the surgery?

11                   MR. GEMMELL:  Correct, and that's only in

12   certain instances, for example, the surgeon would be the

13   direct infringer but it's indirect infringement because

14   that's the only purpose for the product.  There's modular --

15   for example, there's a modular.  It's called Reline 1617

16   product, which is a modular product.

17                   THE COURT:  How big are those products?

18                   MR. GEMMELL:  Pretty small.  They're like this

19   big.  It depends on the screw length.  The receiver on the

20   top of the head is very small because in every instance,

21   they have to have a reduced profile.  Other than that, the

22   actual shank can be a variety of different sizes depending

23   on length and diameter, but maybe that big.

24                   THE COURT:  Were the parties expecting to -- I

25   would imagine the answer is yes, but they actually have a

1    physical one of the each of the eight accused products?

2            MR. GEMMELL:  We do, Your Honor.

3            THE COURT:  Can I ask you to bring them to

4    court, say next Wednesday at 2:00, and show them to me?

5            MR. GEMMELL:  We've got them here.  We'll bring

6    them to you.

7            THE COURT:  Obviously, both sides are welcome.

8    And one of the things I'm interested in is -- there's

9    usually a number of different issues in the case -- is how

10   is, in terms of the product, how does whatever it is that

11   you've got match up with the claims, each of the claims or

12   maybe each of the claims would take more energy than I have.

13   But I'm interested in trying to get a sense because

14   somewhere in the briefing, you know, it ranges from this is

15   a multicomponent product to -- by the defendant to your side

16   saying the product is exactly what's claimed so I can get an

17   idea where you're both coming from on that.

18           MR. GEMMELL:  So I think I'm getting what you're

19   asking, Your Honor.  Some of the products are the assembly

20   and we call it the assembly or system.  The entire assembly

21   has all the component parts in it itself.  That's not

22   included the closure tops and the rods that go along with

23   them, the kits and other collaterals that go along with them

24   for purposes of damages.

25           But that particular element itself, for example

1    Reline 1617, is a single assembled product.  They have their

2    manufacturers put it together, and that's how they sell it.

3    The other ones are modular so they are provided in a kit

4    with modular forms.  So, for example, a screw can be put it

5    or anchor part put in and then the receiver which has all

6    the components can be dropped on top of that or in other

7    ways put together before it's inserted into the patient.

8    It's more of a modular product, so there are multiple

9    components in that regard, but the ultimate assembly would

10    be the same thing.  It would be a Reline 1617, for example,

11    but it comes in a modular breakdown of components.

12         THE COURT:  Okay.  All right.  I'm sorry.  I

13    interrupted you.  You were.

14         MR. GEMMELL:  I was.  So I was just pointing out

15    that it became very clear in our rely brief we ended up

16    attaching all of what they want to do.  They want to attach,

17    for example, all of Dr. Jackson's other patents that are not

18    at issue in this case, and it's clear, I assume --

19         THE COURT:  So there's definitely a Rule 403

20    kind of overlay to all of this and getting -- in terms of

21    this first motion in limine.  Because state of mind is at

22    issue, I'm going to let the defendant put in some evidence

23    on state of mind.  Because the details are way beyond human

24    understanding and they're not for the jury, I'm not going to

25    let most of what's been argued before be reargued.  But --

1    and I take it -- actually, while I was on that thought, I

2    recall, I don't know whether it was -- I believe it's

3    Mr. Spangler's deposition testimony is on your list or he's

4    on your witness list; right?

5            MR. GEMMELL:  Yes, he's on the deposition

6    designations, and if he testifies, we'll ask him questions

7    about --

8            THE COURT:  I don't think he's -- nobody says

9    they're calling him live.  But presumably the reason why you

10   want him to testify or you want to play some of the

11   deposition is he basically was saying you practice the

12   patents; right?

13           MR. GEMMELL:  Well, he did admit that they do

14   include the twist-in-place technology of Dr. Jackson in the

15   asserted patents.  That's correct.  If there's going to be a

16   stipulation, Your Honor, I want to make sure it's not

17   NuVasive thought.  It's got to be Mr. Spangler's thought.

18           THE COURT:  I can't make up stipulations.  You

19   can make up stipulations.  I can't make them up, so I think

20   arguing to me what it should contain, that's not going to

21   help much.

22           MR. GEMMELL:  I was commenting you said maybe

23   there would be a stipulation on a different, the $30 million

24   and NuVasive thought it was getting more.  In reality this

25   whole issue of "forever free" and the argument that they

1   believed is actually one person.  And I believe actually in

2   the first trial we had this discussion before where the

3   Court either gave an instruction to the jury that that's not

4   something that the -- that was NuVasive.  They can say that

5   Mr. Spangler thought.  That goes to the issue of the opinion

6   of counsel as well.

7          So I was just saying if there is going to be a

8   stipulation, which you had raised regarding the $30 million

9   issue, it overlaps here, and it's actually Mr. Spangler.  So

10  the stipulation would have to be narrowed if the Court was

11  inclined to do such.

12         THE COURT:  Well, it really depends on the two

13  sides doing something.  There doesn't seem to be a lot of

14  communication back and forth.  I'm not confident you're

15  doing much, but if you stipulate to something, you stipulate

16  to something.  All right.

17         I take it the '689 helical flange patent, the

18  point of that is to argue that some of these products have a

19  helical flange so that means part of the product is

20  something that NuVasive actually does, for lack of a better

21  word, have a license to; right?

22         MR. GEMMELL:  They want to point to that patent,

23  but you don't have to point to a license or anything.  All

24  you have to say is here is a helical flange.  They want to

25  use it, as far as I understand, for purposes of identifying

1    attributes in a damages analysis, and they say the helical

2    flange is most important.  The helical flange in that patent

3    is irrelevant in the second trial.  In this trial coming up,

4    it has nothing to do with that.  They don't need to point to

5    the 2014 agreement, the helical flange patent, and they can

6    simply point to a feature and say this is a feature.

7                THE COURT:  The helical flange feature in the

8    Reline product, that's the noninfringing feature; right?

9                MR. GEMMELL:  We're not saying that's an

10   infringing feature.  There is a requirement that it's an

11   element of the claims but we're not saying -- just because

12   it's a feature of the asserted claims and we're saying it's

13   a guide and advancement structure.  It doesn't have to be

14   the helical flange, the proprietary helical flange of the

15   '689 patent.  It's a guiding advance structure, and that's a

16   separate issue.  There's lots of different guiding advance

17   structures.  We talked about this in depth during the last

18   trial.

19               THE COURT:  All right.  Well, so basically, I'm

20   not going to be able to grant Plaintiff's motion because I

21   think that state of mind is at issue.  At one point,

22   Plaintiff does not dispute it.  I'm not sure how to deal

23   with this.  Maybe the parties can come up with something,

24   but certainly if anybody -- certainly, I don't expect to

25   hear from Defendant that they, in fact, had a license.  If

1  so, I'm going to tell the jury they're wrong.  I'm going to

2  tell the jury I have determined they're wrong.

3          And it may be the case that the actual 2014

4  agreement is -- that what seems to me to be important is

5  that it's undisputed that NuVasive paid $30 million for this

6  2014 agreement, and that doesn't mean the 2014 agreement

7  itself needs to be put into evidence because I don't think

8  the jury ought to be getting an opportunity to second guess

9  whether or not they had a license.  So that's -- but we're

10 not going to spend a whole lot of time talking about any of

11 this, but I expect to allow NuVasive to -- and I think it's

12 going to come up anyhow when Mr. Spangler's deposition

13 testimony is played because some part of this is in there,

14 and I expect to allow some evidence on it.

15         MR. DONNELLY:  Your Honor, we are not going to

16 be playing Mr. Spangler's deposition testimony about

17 NuVasive's state of mind.

18         THE COURT:  You're going to be playing it

19 about -- what are you going to be playing it about?

20         MR. DONNELLY:  The trial testimony, I think, was

21 the issue about -- that the Court --

22         THE COURT:  Tell me.  What are you going to put

23 in from Spangler?

24         MR. DONNELLY:  We could probably get in very

25 little or nothing from Spangler unless they intend to get in

1    his testimony about "forever free" and --

2              THE COURT:  Are you telling me he's not part of

3    your case in chief?

4              MR. DONNELLY:  He's not part of our case in

5    chief.

6              THE COURT:  All right.  Then I will see what

7    they offer from Spangler, but in some ways, I think the

8    "forever free" e-mail speaks to the sincerity of their

9    belief, and it's a state-of-mind issue, and I don't think I

10   have to have somebody else from NuVasive say, yeah, I agree

11   with him.  He's the corporate patent counsel.  His state of

12   mind is part of the corporation's state of mind.

13             MR. DONNELLY:  Your Honor, the problem with that

14   is we sought discovery --

15             THE COURT:  All right.  I've heard that,

16   Mr. Donnelly.

17             MR. DONNELLY:  If we wanted to challenge that

18   with discovery from someone at NuVasive who had

19   responsibility to approve the products or decide whether or

20   not they should go forward based on a license or whether or

21   not they had determined that the patents that are at issue

22   in this case were within that, that's all fair game for us

23   to say, hey, the scienter they're claiming was pure is not

24   pure.  And that is the adversarial process.

25             But we were completely cut you have from

1    obtaining any of that discovery.  We could have gone to the

2    person who was responsible for designing the products and

3    say, "Did you ever talk to Mr. Spangler?"  We could have

4    gone to Mr. Valentine and said, "Did Mr. Spangler tell you

5    the patents-in-suit are licensed here when you were at

6    NuVasive?"

7            The relevant person is Mr. German, and if

8    Mr. German had words with Mr. Spangler, we could have

9    examined Mr. German about the state of mind.  But we were

10   told that's not relevant and you don't get to talk to him

11   about that.  So to say that Mr. Spangler can go in and say,

12   "I'm patent counsel.  I had a pure state of mind" and we

13   don't have any opportunity to adduce any evidence to counter

14   that to see whether there are any repercussions that had any

15   real effect inside NuVasive is terribly one-sided and

16   unfair.

17           THE COURT:  Thank you, Mr. Donnelly.

18           MR. CABRAL:  Hello, Your Honor.  Just a couple

19   things.  Mr. Spangler is on the will-call list so he's part

20   of the case in chief.  I don't know.

21           THE COURT:  So Mr. Cardon and Mr. Johnson,

22   they're gone now.  We've already been talking about how

23   there's way too much here to do in one trial, so getting rid

24   of the unnecessary is good by me.

25           MR. CABRAL:  I agree with that.  The issue with

1   Mr. Spangler, there is his deposition testimony.  Plaintiff

2   also wants to designate his prior trial testimony as well as

3   if they would do some sort of live reenactment of it as well

4   in addition to the deposition testimony.  If he's no longer

5   part of their case in chief, maybe that's not necessary.  I

6   don't know.

7           But Mr. Spangler and Mr. Fallon, who's the

8   president of the company at the time, will also be shown

9   testimony.  Both of their testimony speaks to the intent of

10  NuVasive in terms of what they thought they were getting

11  from this deal.

12          What I want to point out, Your Honor, which I

13  think is the most important part because I think there will

14  be a dispute about this is the 2014 agreement is relevant to

15  state of mind that you pointed out, but for some of the

16  reasons you previously alluded to, it's also highly relevant

17  to damages.  The 2014 agreement predates six of the eight

18  asserted patents.  It's an agreement between both parties

19  involving the same products and there were licenses to

20  specific technological features, including the helical

21  flange, including Mod implants, for which NuVasive paid $30

22  million.

23          It's highly relevant to damages, especially when

24  Dr. Becker is going to come in and presumably say this

25  twist-in-place technology is worth more than all those

1    features combines, in fact twice as much.  The 2014

2    agreement is relevant evidence of damages and of state of

3    mind, and I can promise Your Honor and represent to the

4    Court that we are not going to argue that we had a license

5    to the patents-in-suit because they meet the definition of

6    helical flange under the 2014 agreement.  That does not

7    change the fact that it's relevant to state of mind and

8    damages, and it has to be admissible, especially on

9    cross-examination.

10              THE COURT:  When you say it has to be

11   admissible, it doesn't have to be admitted into evidence.

12   It can be talked about.

13              MR. CABRAL:  In order for it to be in evidence

14   for us to argue about it, it has to be in evidence.

15              THE COURT:  It doesn't have to be.

16              MR. CABRAL:  Maybe there's an exception to the

17   rule but to make our defense.  One of the reasons --

18              THE COURT:  Under Rule 403, you can do lots of

19   things and one of which is rather than putting in an

20   incredibly confusing document where there's no actual

21   disagreement that there was an agreement and you paid

22   $30 million for it, putting in the agreement then just leads

23   to we're going to start parsing what the agreement is about.

24   Damages experts rely on things that are not in evidence.

25              MR. CABRAL:  I think a damages expert in an

1    expert testimony context, I think you're right.  But in

2    order to make arguments about what we received in exchange

3    for $30 million --

4              THE COURT:  You're not going to be making

5    arguments about what you received.  I'm not sure what you're

6    talking about.  If you -- there's only two things in the

7    world.  There's the things you don't have, which are the

8    eight patents that are asserted, and there's everything

9    else.  The only relevant distinction is whether something is

10   in the, yeah, we bought this it's the eight patents in

11   dispute or it's not.

12             MR. CABRAL:  Under the terms of the 2014

13   agreement, NuVasive received rights to almost every single

14   component of the accused products.

15             THE COURT:  It doesn't matter if you did or

16   didn't receive rights under that agreement.

17             MR. CABRAL:  We would say, Your Honor, we would

18   submit those are unpatented licensed features that need to

19   be accounted for as part of the damages analysis.  That's

20   why we believe --

21             THE COURT:  You can do that without putting the

22   agreement in evidence.

23             MR. CABRAL:  I hear Your Honor.  I'm not sure

24   how that would work, but we can think about that.

25             THE COURT:  I think we can figure that out.

1   It's one of the easier problems.  All right.

2              MR. GEMMELL:  Just so you're clear, I agree.  If

3   we have an issue with Spangler, as long as he's out for

4   everybody and out for us, that's fine with us.  That might

5   clarify things a little bit and remove the issue about the

6   "opinion of counsel" part of it.  They don't need that if

7   that's the case.

8              And again, please remember he's saying that this

9   is -- it's clear where they're going with what they just

10  said.  They're going to claim they have a license to all the

11  different components that's all under the 2014 agreement.

12  No.  The Court already determined on motion for summary

13  judgment that there is no -- I disagree, Defendant, that the

14  2014 agreement grants a broad licensing package, but that's

15  what they're trying to retry.  They also don't need to point

16  to that agreement at all.  They could simply -- there's

17  nothing in there they need to actually talk about in terms

18  of its relation to a license itself.

19             The $30 million, Your Honor, just so you're

20  aware, that's the 2008 agreement.  It has nothing to do with

21  the asserted patents in this case.  It doesn't have anything

22  to do with putting in the 2014 agreement.  The very

23  suggestion they're trying to create --

24             THE COURT:  What are you talking about?  The

25  $30 million was the 2014 agreement; right?

1          MR. GEMMELL:  No, it for payoff of royalties in

2     the 2008 agreement.

3          THE COURT:  But it was a 2014 payment?

4          MR. GEMMELL:  It was a payment but it covered

5     the royalties that were --

6          THE COURT:  And it was made pursuant to the 2014

7     agreement; right?  It's not like the 2014 agreement and

8     $30 million are two unrelated transactions.

9          MR. GEMMELL:  I agree, but it has nothing to do

10    with being licensed anything to do with the 2014

11    technologies.  There was a payment.  Part of the 2014

12    agreement was just to pay off the license -- the royalties

13    that were obligates they were obligated to pay --

14         THE COURT:  Let's move on.  So DI 459, which is

15    Plaintiff's Motion in Limine Number Two to Preclude Evidence

16    and Testimony Relating to Opinions of Counsel.

17         So, Mr. Cabral, Mr. Donnelly has strenuously and

18    well argued that you are foreclosed from this because of the

19    position you took during discovery.  What's your response?

20         MR. CABRAL:  Our response is, Your Honor, there

21    are no opinions of couple with respect to invalidity or

22    noninfringement of these patents.  They don't exist.  We

23    didn't know about the patents until 2019.  So I don't know

24    how this is even an issue.  I think the way I read their

25    motion is they're trying to expand the meaning of "opinions

1   of counsel" to anything Mr. Spangler thought, but that's not

2   what the case law is.  There are no opinions of counsel with

3   respect to noninfringement or invalidity of these patents

4   that would relate to a defense for willful infringement

5   under *Halo* or anything else.

6         THE COURT:  Aren't you, essentially, arguing

7   that NuVasive's patent counsel had the opinion that anything

8   Dr. Jackson invented was licensed to NuVasive?

9         MR. CABRAL:  No, that's not correct.  I think

10  what NuVasive believes was that the 2008 agreement, which

11  was extended and replaced by the 2014 agreement, that gave

12  NuVasive all the rights they needed to sell the products

13  that were the subject of that agreement, of the licenses and

14  the assignments that were part of that deal.  So NuVasive

15  believed they had freedom to operate, in simple terms, based

16  on that deal.  Your Honor disagreed with the interpretation

17  of the contract.  We get that.  We're not going to argue we

18  had licenses to these patents-in-suit but the intent was or

19  the state of mind of the NuVasive, rather, was that they

20  thought they were operating free and clear of Jackson

21  forever in Mr. Spangler's terms.  But there was no opinion

22  of counsel where counsel looked at, analyzed these patents,

23  determined they were invalid or not infringed and,

24  therefore, that would be our defense.

25        THE COURT:  And so in terms of the discovery

1   dispute is, essentially, that would be your response, is you

2   were talking about opinions of counsel kind of in the

3   context of in the way it's often used in patent litigation

4   to talk about formal opinions either by outside counsel or

5   by someone else doing very specific kind of analysis and

6   there was none of that.

7           MR. CABRAL:  That's right, Your Honor, as that

8   term is used in the Supreme Court's *Halo* decision and other

9   cases like it.

10          THE COURT:  All right.  Mr. Donnelly.

11          MR. DONNELLY:  I'll address some of the points,

12  but just to immediately address the last thing in your

13  colloquy with Mr. Cabral, if you review the specific

14  30(b)(6) topic that was propounded, we were not ignorant of

15  this issue.  It includes two things:  Any opinions of

16  counsel, one, obtained by NuVasive or, two, otherwise

17  intends to rely on.  So we intentionally did not limit to

18  this topic to some third-party law firm's opinion.

19          And the statement that NuVasive's patent

20  attorney, in his opinion, is not an opinion of patent

21  counsel, I think as soon as you speak the words, it's

22  revealed that they don't hold water.

23          And I think it's even more important to

24  underscore what Mr. Cabral told you.  He told you that he

25  was going to come up and present a case about what NuVasive

1    believed, but we don't know what NuVasive believed.  We have

2    one e-mail from Mr. Spangler.  When we sought discovery on

3    what NuVasive actually may have --

4              THE COURT:  Who did Mr. Spangler send that

5    e-mail to?

6              MR. DONNELLY:  Mr. Spangler sent that e-mail to

7    two people inside the legal department.  Didn't go to any

8    management, didn't go to anyone with decision-making

9    authority.  It went to Ms. Hannon --

10             THE COURT:  Two subordinates of his.

11             MR. DONNELLY:  Two colleagues.

12             To be clear what this was -- I've got a copy if

13   you want it -- it was a first draft of a term sheet.  It

14   wasn't him saying, I pulled out the 2014 agreement, I've

15   analyzed it, and here's where we stand.  The language from

16   his term sheet didn't even make it into the 2014 agreement.

17             Separate from their unequivocal statement none

18   of this is relevant, there's a separate question whether or

19   not this could possibly be relevant to their state of mind

20   under the license agreement which has different language.

21   That's -- there's a big gap in if we surround this we'll get

22   that.

23             But the suggestion that there's a difference

24   between the opinion of their patent counsel and their state

25   of mind, I think that's just word play because the only

1    thing that is different between Mr. Spangler's opinion and

2    the opinion of the gardener at NuVasive is that he's patent

3    counsel and, in theory, someone looks to his opinion to make

4    decisions, and those attributes that make him different is

5    what makes his opinion an opinion of counsel that was the

6    discovery we sought.

7            I don't think you can separate their clear

8    statement that there's no opinion of counsel relevant to any

9    claim or defense in this case and their patent counsel's

10   purported state of mind.

11           THE COURT:  Thank you, Mr. Donnelly.

12           MR. CABRAL:  The only thing I would add is that

13   the "forever free" e-mail you're mentioning, it went to two

14   colleagues, but they were in management.  It went up to

15   chain, not to subordinates.  He was -- Mr. Spangler was

16   questioned by Plaintiff's counsel about that e-mail about

17   his state of mind during that deposition.  There were also

18   30(b)(6) topics directed specifically to the 2014 agreement

19   and its impact on this case.  They've sought extensive

20   discovery on this issue.

21           Your Honor, we respectfully request the motion

22   be denied.  Again, there are no opinions of counsel related

23   to these patents-in-suit because NuVasive did not know the

24   patents existed until there was a notice letter in 2019, and

25   everyone that letter only identified half of them.

1          MR. DONNELLY:  Very briefly, just to correct

2   something I may have misheard from my friend on the other

3   side.  He said there was extensive 30(b)(6) testimony on

4   this.  There was testimony from their other 30(b)(6)

5   designee, Mr. German, who said he didn't know and it was a

6   legal issue, so we were completely foreclosed from examining

7   NuVasive on this.

8          THE COURT:  All right.  Thank you.  So we'll

9   take a recess for 15 minutes.

10          (A recess was taken, after which the following

11   proceedings were had:)

12          THE COURT:  When was the Reline 1601 launched,

13   more or less?

14          MR. LEVINE:  May of 2015, I believe, Your Honor,

15   just going off my memory.

16          THE COURT:  Right.  I understand.

17          MR. LEVINE:  Or maybe March.

18          THE COURT:  And the non-Reline products were all

19   launched before that?

20          MR. LEVINE:  Your Honor, yes.  Armada and

21   Spirits had been launched before that, and not a hundred

22   percent sure about Viewpoint 2, but I think that it had or

23   it was in its -- I think it had.  I'm not sure about that.

24          THE COURT:  And the Reline 1451 and 1617 were

25   launched after the 1601?

1          MR. LEVINE:  I believe that's the case, Your

2    Honor.

3          THE COURT:  Okay.  Mr. Cabral, is there -- on

4    your witness list, there's Robert German, and I guess that's

5    probably the last trial.  Remind me who he is.

6          MR. CABRAL:  So he did testify at the last

7    trial, Your Honor.  Rob German is an engineer, former

8    engineer, at NuVasive.  In the last trial, he gave

9    background of the company.  Now the design of the product is

10   more at issue, but he's a former NuVasive engineer involved

11   in the design of products that are accused of infringement.

12         THE COURT:  I take it he has either -- the

13   purpose is, essentially, the main purpose, of this testimony

14   is to explain the designs, maybe how he came up with them,

15   that sort of thing.

16         MR. CABRAL:  In that general category, yes, Your

17   Honor.  Explain the designs, the features, which ones are

18   more valuable than others, et cetera.

19         THE COURT:  All right.  And you also have Keith

20   Valentine by deposition, and I do recall Mr. Valentine

21   testified by deposition at the last trial.  What's his

22   testimony about this time?

23         MR. CABRAL:  It's more of a refined shorter

24   version of it.  As you may recall, he was involved in

25   negotiating the 2014 deal, the buyout agreement.  So all of

1    the stuff about the negotiations and evidence that was being

2    used by plaintiff to allege fraud, all of that's cut out.

3    But it's about the scope of the deal, what the reason for

4    the deal was, and basically he testified that the reason

5    they entered into this buyout arrangement was in advance of

6    the upcoming Reline product being launched in 2015.

7                 THE COURT:  And does he testify that, either

8    directly or impliedly, that as a result of the deal the

9    Reline product was free to launch?

10                MR. CABRAL:  He doesn't use those exact words,

11   Your Honor, but the takeaway from the testimony is that this

12   was a buyout deal for Reline to be free and clear.  He

13   doesn't use those exact words, but that's the thrust of his

14   testimony.

15                THE COURT:  All right.  And so, Mr. Donnelly,

16   when you're busy telling me that NuVasive needs some

17   somebody to take the agreement, the 2014 agreement and say

18   something about that, why doesn't Mr. Valentine meet that

19   box?

20                MR. DONNELLY:  Mr. Valentine did not have a

21   particularly clear or detailed recollection as he testified.

22   He may be perfectly satisfactory for their perspective, and

23   so if he, basically, is going to show its state of mind

24   through Mr. Valentine's testimony and we are -- if the Court

25   is inclined to say Mr. Valentine can carry NuVasive's water

1    on state of mind and otherwise follow NuVasive's instruction

2    that their opinions of counsel are not relevant to the

3    claims and defenses in this case, we're happy with that

4    sorting out that way.

5             THE COURT:  All right.  Thank you, Mr. Donnelly.

6             So, Mr. Cabral, why wouldn't it be a good

7    solution to this problem to, essentially, let Mr. Valentine

8    carry the water for your side?

9             MR. CABRAL:  I think more witnesses saying the

10   same thing corroborates the testimony and adds to the

11   credibility of the witnesses.

12            THE COURT:  But in terms of what the corporation

13   thought it could do and couldn't do, I don't remember how he

14   testified the first time around, but I don't think they're

15   going to say -- I don't know what they're going to say.  All

16   right.

17            But you agree that he can do -- he's a plausible

18   vehicle by deposition for explaining what NuVasive believed

19   it could do?

20            MR. CABRAL:  So Mr. Valentine, yes.  In general,

21   Mr. Valentine negotiated the deal and was pretty clear in

22   his testimony that he relied on lawyers, including

23   Mr. Spangler, to write up the paper and that communication

24   from the deal in terms of what it was that was communicated

25   to the lawyers who put it on paper for the agreement.

1  Mr. Spangler's understanding of the situation is likely to

2  be formed by Mr. Valentine's negotiation of the buyout

3  arrangement.

4           THE COURT:  Here's what I think I'm going to do.

5  I'm going to exclude the "forever free" e-mail under Rule

6  403.  It's barely related to the issues and injects -- would

7  inject the trial with -- starts to get too close to issues

8  that actually were resolved in the first trial, and I think

9  that the defendant has an adequate way to make its point

10  through Mr. Valentine.

11           So -- and I do take into account the fact that

12  it strikes me that maybe NuVasive did block discovery into

13  opinions of counsel and that the request of Plaintiff was

14  broad enough and so that NuVasive blocked maybe more than it

15  wanted to, so I'm going to exclude the "forever free"

16  e-mail.  Its probative value is substantially outweighed by

17  the risk of confusion, and it's part of the bigger side show

18  that -- the question of exactly what the license covers,

19  which I resolved, and the jurors aren't going to hear

20  anything about that.  All they're going to hear is it

21  doesn't cover these patents, so I'm going to grant DI 451 to

22  that extent.  All right.

23           MR. CABRAL:  Understood, Your Honor.  One

24  question for clarification.  I hear your argument about

25  excluding the e-mail, the "forever free" e-mail.  When it

1    comes to Mr. Spangler's testimony elicited at deposition

2    about his state of mind and the company's state of mind, is

3    Your Honor -- is there a view that that testimony would be

4    admissible but the e-mail itself would be excluded?

5            THE COURT:  It's hard for me to say without

6    actually seeing what the proposed testimony is, so why don't

7    you, when you're working on what the proposed testimony is,

8    bear that in mind and presumably someone will tee it up for

9    me to resolve at a later point.

10           MR. CABRAL:  My recollection is the questions

11   and testimony that's been designated is much more high level

12   in terms of what the company -- where their head was at as

13   opposed to the e-mail.  Understood.

14           THE COURT:  Okay.  Thank you.  All right.

15           So Docket Item 461, which is Plaintiff's Third

16   Motion in Limine to Include Undisclosed Expert Testimony

17   Pertaining to Infringement and Invalidity.  Defendant says

18   it's not going to use any undisclosed testimony, so that

19   part is moot.  To the extent there was a line in a footnote

20   about Mr. Valentine can used undisclosed art to show the

21   state of the art, is that something you intentionally said?

22           MR. ANDERSON:  That was not something we

23   intentionally said.  I don't think we said it that way.

24           THE COURT:  I was going to say you can't do

25   that.  So that resolves that.

1    There was -- and so there was some argument,

2    though I think Plaintiff backed off it, that he can't come

3    up with -- there was -- that he can't offer noninfringement

4    limitations other than the ones he's already disclosed.  The

5    way they put it was they're going to criticize him for not

6    having any of the nine claims and only some limitations of

7    others.  Of course, a noninfringement position only has to

8    find one problem but they have to deal with the rest.

9    And then the one thing that caused me to spend

10   more time on it than I wanted to, and I don't need to hear

11   from you, Mr. Levine, was on this obviousness combo of Gian,

12   Purcell, and Garen Zeggi.  So the question, as framed by the

13   motion in limine, essentially, was -- by Defendant was is

14   that -- or by Defendant, it was our original combination was

15   Gian and Purcell or Gian and Purcell and either Garen Zeggi

16   or Sherman.  And Plaintiff had some convoluted theory about

17   what the original combination was.

18   You all provided portions of Mr. Fallon's

19   report, and with some able assistance, I dutifully looked at

20   it.  And Docket Item 462 at 17 and 38 talking about the

21   invalidity of the asserted claims of U.S. Patent Number

22   11,051,856, the caption is, "Obviousness over Gian 781 in

23   view of Purcell 923 or Purcell 923 further in view of

24   Sherman 286 or Garen Zeggi 687."  Grammatically, looking at

25   it, it fits exactly right with what the defendant said.

1          But going further on page 32 of 38, when the

2     claim chart is going on, there is "Sherman 286 teaches at

3     least one flange in a rotatable position under the at least

4     one downwardly facing surface to prohibit upward movement of

5     the pressure insert out of receiver."  Okay.  Page 35 and

6     38, "Alternatively, Garen Zeggi teaches at least one flange

7     that is rotatably positionable under the at least one

8     downwardly facing surface to prohibit upward movement of the

9     pressure insert out of the receiver."

10          It's the exact same thing, so is claim chart

11     itself is consistent with caption, which I believe the

12     argument by the plaintiff that the defendant has come up

13     with a new combination is without any basis.  So I deny the

14     request to, I don't know, preclude that as some undisclosed

15     item.

16          All right.  So moving on to Defendant's

17     motions -- that was, by the way, Docket Item 461.

18          Docket Item 452 reads Secondary Considerations

19     of Nonobviousness.  I must admit that I was a little

20     concerned about this one because it seemed to deal with

21     Dr. Oxland, and I noticed there was no Dr. Oxland on the

22     witness list.  So is Dr. Oxland a medical doctor?

23          MR. LEVINE:  He's a professor of engineering,

24     Your Honor, at I forget exactly the university in British

25     Columbia.

1          THE COURT:  So he's an engineer?

2          MR. LEVINE:  Yes, Ph.D. biomedical engineer.

3          THE COURT:  Does he have any advanced degrees in

4     economics?

5          MR. LEVINE:  No, that's why he relies on

6     Dr. Becker's opinions regarding the extent of the sales of

7     the accused products, including particularly the Reline

8     1601.  And of course, he also relies on Dr. Erico's analysis

9     of the extent of infringement of the 1601 and also other

10    products as by way of comparison.

11         THE COURT:  Okay.  So the original motion said

12    preclude evidence concerning secondary considerations of

13    nonobviousness.  I take it the only one that's actually in

14    dispute is commercial success.

15         MR. LEVINE:  That's what Dr. Oxland put in his

16    report and discussions with counsel.

17         THE COURT:  So it's the only one that's in

18    dispute.

19         MR. LEVINE:  Yes.

20         THE COURT:  All right.  And the basic dispute is

21    whether or not there's a nexus between the products and the

22    commercial success that is attributable to the patents.  Do

23    I have that more or less right?

24         MR. LEVINE:  I believe that's correct.  That is

25    the position of the defendant.

1            THE COURT:  Okay.  So two things, one of which

2     is how can I resolve that now, and, two, I'm not going to

3     resolve that now because I would at least like to see these

4     products.  That's part of the reason why I want you to bring

5     them in next week, so I can get an idea, because on one

6     hand, I get a picture from the defendant that it's a

7     multicomponent product with many different features only

8     some of which are claimed by the patents, and the picture I

9     get from the plaintiff is practically that the Reline is in

10    the body of the patents.  So is there any further progress

11    we can make on this today?

12            MR. LEVINE:  I don't think so, Your Honor.  I

13    think we just have to let the testimony at trial play out,

14    and I'm sure we'll gee a JMOL from them on this issue again,

15    and perhaps that would be a better time to address it.

16            THE COURT:  Mr. Anderson.

17            MR. ANDERSON:  Your Honor, two quick points.

18            The reason I think you can resolve it before

19    trial is because Mr. Becker -- Dr. Becker didn't do any

20    analysis of whether -- or have any understanding of whether

21    the claims mapped directly onto the complete invention.

22    He's relying on simply the presumption of nexus.  But

23    moreover, he has not offered any opinions that tie the

24    secondary consideration to "the direct result of the unique

25    characteristics of the claimed invention," which is from the

1    *Fox Factory* case that Plaintiff cites to.

2              THE COURT:  Isn't this more like a Daubert

3    motion?

4              MR. ANDERSON:  I don't believe so, Your Honor,

5    because this is whether Dr. Becker is able to offer any

6    relevant testimony about secondary considerations.  And so

7    while there may have been flaws in his analysis, it's a 402

8    and 403 argument now for two reasons.

9              One, Dr. Becker can't make these arguments.  And

10   two, a point we developed elsewhere, part of the concern of

11   the circular nature of the way they're trying to make the

12   secondary considerations argument is there's a billion

13   dollars in sales and they want to bang the billion dollars

14   in sales number, probably in the opening, probably

15   throughout all of the witnesses.  I think that's prejudicial

16   for a number of reasons, but I think it's prejudicial to use

17   secondary considerations as a basis to be able to say all

18   billion dollars of those sales are attributable to the

19   unique features of the patented invention when Dr. Becker

20   isn't say anything about that.

21              THE COURT:  Thank you.

22              MR. LEVINE:  In response, he's complaining that

23   Dr. Becker didn't do what Dr. Erico did do.

24              THE COURT:  Why don't we do this.  I'm going to

25   not decide this today.  Actually, I guess what I would say

1    is I'm going to deny this today with leave to renew after

2    I've seen the products and heard some more argument next

3    Wednesday.  It still may be the case that even after that it

4    may be something I can't decide until I hear the testimony,

5    but I know the first thing I have to do is have that

6    understanding of the products.

7                All right.  So DI 450, which is Defendant's

8    Motion in Limine to Preclude Evidence Concerning 12 Theories

9    Previously Advanced by Dr. Jackson.  I will grant that

10   because there's no opposition.

11               DI 454 about reasonable royalty determinations.

12   So this has to do with Dr. Becker.  Part of it was -- part

13   of the defendant's motion was Dr. Jackson couldn't explain

14   incremental improvement.  Not the inventor's job to do that.

15   But I assume maybe Dr. Erico did that.

16               MR. DONNELLY:  Yes.  If you want, I can point to

17   the paragraphs, but there's paragraph after paragraph in his

18   report and Dr. Becker cites the paragraphs.

19               THE COURT:  All right.  I appreciate the

20   brevity, Mr. Donnelly.

21               MR. CABRAL:  As you can imagine, we disagree

22   with that.  The twist-in-place language that you've heard

23   refers to a twist-in-place insert.  It's a compression

24   insert.  It's otherwise called a pressure insert.  It's one

25   component among many within the screw itself which you'll

1   see next Wednesday.  Dr. Erico just says the improvement is

2   great, I wish I thought of it myself, and does not go into

3   what the actual improvement over the prior art is.  In fact,

4   Dr. Erico is the infringement expert and didn't address the

5   prior art at all.  So I don't know how we can say that Erico

6   talked about the improvement over the prior art.  They have

7   two different experts --

8           THE COURT:  I'm sorry.  I just all of a sudden

9   blanked on what you were saying.

10          MR. CABRAL:  Dr. Erico does not address any of

11  the prior art because he's focused on infringement.  I don't

12  know how Mr. Donnelly can argue he addressed the improvement

13  of the prior art when he didn't address the prior art at

14  all.

15          THE COURT:  All right.  Mr. Donnelly, I guess

16  you have to read me a paragraph.

17          MR. DONNELLY:  I will read you a paragraph under

18  the heading Background of the Patented Technology and Their

19  Advantages.  Or maybe I have paragraphs that span, goodness,

20  over ten pages, all of which are an identification of the

21  particular categories of the patents the two patents.  And

22  the other two talk about the background in the art and then

23  he talks about Dr. Jackson's innovation with twist-in-place

24  technology and goes on for paragraph after paragraph.

25          THE COURT:  When Mr. Cabral says he doesn't cite

1    any prior art, I take it you're saying that's wrong?

2              MR. DONNELLY:  Well, he -- I will refer to you

3    specifically he describes one of the patents that was the

4    prior technology to the twist-in-place technology, which was

5    the snap-in-place technology that Dr. Becker refers to on

6    paragraph 40 and he says, "All the prior solutions of which

7    I'm aware suffered from either a higher relative risk of

8    unintended disassembly during procedure" and goes on and on

9    referring to specific drawbacks.  That's a digression.

10              Dr. Erico, practicing surgeon, scores on his own

11    patents, very familiar with the realities of these, so he

12    addresses the advantages of the patented technology.  He

13    outlines drawbacks from his experience and then refers to

14    specifically one of the purported prior art patents, which

15    is the poster image of their invalidity defense and

16    described his disagreement over that reference.

17              THE COURT:  Sorry.  You said poster image?

18              MR. DONNELLY:  It's the Purcell patent.  You saw

19    all of their purported combinations for Purcell and

20    something else.

21              THE COURT:  I didn't understand a word you said.

22    All right.  Thank you, Mr. Donnelly.

23              MR. CABRAL:  So, Your Honor, there are six

24    different twist-in-place patents here with a bunch of

25    different claims, and what you see there in that report is a

1    sort of general reference to whatever he thinks the alleged

2    improvement is.

3                    Your Honor, we have evidence that NuVasive

4    developed.  What this element is, what they're pointing to

5    now, what's the improvement, you asked me that question

6    during the Markman hearing, and I did my best to answer.

7    Dr. Jackson couldn't say.  What we think it is, is this

8    rotational element of this compression insert, what NuVasive

9    calls a load ramp.  NuVasive developed that technology in

10   June 2008.  That was three and a half years before the first

11   twist-in-place patent issued and over two and a half years

12   before they even introduced that language into the claims in

13   the patent application.

14                   So that's what we have to figure out in terms of

15   deducing what we think their supposed improvement is over

16   the prior art because it didn't invent screws, spinal

17   implants.  Dr. Jackson didn't invent the individual

18   components of the screws.  That's undisputed.  The issue is

19   isn't this rotating from one position to a second position

20   of this one particular component during the assembly.

21                   What Dr. Erico points to is evidence of NuVasive

22   doing this in '08.  If that's the value or the alleged

23   improvement over the prior art, nobody says that.  Nobody

24   says it.  They just say this is an improvement over snap in

25   place.  What in the claims is the improvement?  And how does

1    one patent differ from the others?  There's two different

2    families here, and nobody actually does the analysis to say

3    here's what the improvement over the prior art is for patent

4    1, 2, 3, 4, 5, or 6.  Nobody does it, and the language

5    Mr. Donnelly pointed to doesn't do it either.

6              THE COURT:  All right.  Thank you.

7              Mr. Cabral, I guess the other question I need to

8    ask you about this is Plaintiff does mention that this is a

9    Daubert motion beyond the Daubert time.  I'm actually

10    inclined to agree with him on that.  What do you have to say

11    about that?

12              MR. CABRAL:  As you know, Your Honor, we also

13    challenged Dr. Becker's opinions under Rule 702.

14              THE COURT:  That's a Daubert challenge which

15    we're entertaining.

16              MR. CABRAL:  Absolutely.  As part of that

17    argument, we argue not just technological comparability,

18    economic comparability, how he didn't do the analyses.  We

19    also brought up the fact that he did not account for the

20    value of either conventional, unlicensed, unpatented

21    components --

22              THE COURT:  So you're saying this is subsumed in

23    the Daubert motion?

24              MR. CABRAL:  This is belt and suspenders.  It's

25    not just 702.  They haven't met their burden under 702.

1    It's admissible under 402 and 403 in our opinion.  It's belt

2    and suspenders.  As long as it's considered as part of the

3    702 analysis, we're fine with that.

4              THE COURT:  All right.  Thank you, Mr. Cabral.

5              All right.  Well, I -- I'm going to deny this as

6    being, essentially, either an untimely Daubert argument or

7    something that's covered in the actual Daubert argument, in

8    which case it will be resolved with the actual Daubert

9    argument.

10             So that resolves the motions in limine or

11   resolves as much as I can do today.

12             During the break, I was looking at the letters I

13   said I would look at.  I think I left them in my office.  So

14   looking at them, it appears to me from this letter of

15   January 31st that, giving NuVasive every benefit of the

16   doubt, in the '866, '200, '444, and '273 patents, they

17   challenge the "configured to receive the elongated rod"

18   indication.  That's one challenged element.

19             There seemed to be a minor dispute,

20   inconsequential dispute about who's -- which is a dispute,

21   according to the defendants, between Plaintiff's two

22   experts -- of course, one is not an infringement expert.

23   But in any event, for the '200 and '444 patents that there

24   are some limitations -- that this is not really about the

25   limitation this is about whether -- this is a defense to

 1   just direct infringement.

 2            MR. CABRAL:  You're right, Your Honor, because

 3   Plaintiff has asserted infringement under 271(a), direct;

 4   (b), inducement; (c) contributory; and (f)(1) and (f)(2).

 5   So the implication here is when infringement actually

 6   occurs, determines who's the infringer, is it direct or the

 7   indirect with the surgeon?  That the law is different with

 8   respect to each one of those.

 9            THE COURT:  In the end, if there's some direct

10   infringement, leaving aside the NuVasive state of mind,

11   NuVasive is going to be responsible; right?

12            MR. CABRAL:  It would depend on if they're

13   alleging inducement of the surgeon, for example.  They still

14   have to prove inducement occurred and the intent requirement

15   and everything else that goes with proving inducement under

16   271(b).

17            THE COURT:  In any event, that's -- the

18   limitation is not disputed.  It's just disputed who does it.

19            And then it says it has some specific claim

20   elements.  It has the particular claim element for claim 1

21   of the '711 patent.  It has what, essentially, appear to be

22   two or three related to the '866 patent, one word in the

23   '200 patent, one word in the '444 patent -- these are all

24   the word "cavity" -- and in the '273 patent, there's three

25   more limitations.

1    And because of the way this was presented to me,

2    and I'm not faulting NuVasive, it was very -- it would take

3    a lot of effort on my part to try to figure out how all this

4    related to a standard sort of chart that a jury would see

5    while the plaintiff's expert would be proving all of this.

6    But essentially, I assume between the parties that --

7    Two things, I guess, one of which is I don't see

8    in this letter, because I specifically asked it to address

9    the five patents that Dr. Jackson said there was no dispute

10   on, so I don't know what's happened with the other three

11   patents.

12   Mr. Cabral, is there some similar discussion

13   between the parties about the other three patents or that's

14   just left up to the imagination?

15   MR. CABRAL:  Obviously, we disclosed what those

16   defenses might be, but this conversation in particular was

17   specific to the motion for summary judgment, which is only

18   on the five patents because that was the whole framework

19   with which we moved for summary judgment.

20   THE COURT:  All right.  Well, so we'll come back

21   to the other three patents in a minute.

22   But, Mr. Gemmell, if I said, okay, everything

23   else is stipulated, would that narrow things down a lot?

24   MR. GEMMELL:  Yes, it would Your Honor.  It

25   would make things go a lot quicker.

1          THE COURT:  Okay.  Mr. Cabral, is there any

2     reason I shouldn't say everything else on the five is

3     stipulated?

4          MR. CABRAL:  I apologize, Your Honor, but I

5     think I got the gist of what you're saying here.  We can say

6     it's stipulated.  I don't think partial summary judgment

7     would be appropriate.

8          THE COURT:  Stipulation works better for you

9     than partial summary judgment because it's, essentially, the

10    same thing but it sounds better when, at some point,

11    Plaintiff's lawyer asked Plaintiff's expert do you

12    understand these are all agreed to.

13         MR. CABRAL:  That's right.  Stipulated or some

14    kind of framework along those lines works well for us.

15    We're fine with that.

16         THE COURT:  Mr. Gemmell, are you good with that?

17         MR. GEMMELL:  Yeah, I'd be fine with that.  What

18    he was saying, or some other kind of thing, there has to be

19    an actual order from the Court.

20         THE COURT:  Why don't we do this.  Why don't --

21    well, okay.  So hold the thought.  I'm happy to enter an

22    order, particularly under the circumstances in which you're

23    basically both agreeing to it, and -- but it would be a lot

24    better if you wrote this up than me.

25         MR. GEMMELL:  I mean, one is we can take a hack

1    at it, Your Honor, that would be fine, and put in the order.

2    But my concern is they're going to come back and say we're

3    contesting everything, which they did before.

4                THE COURT:  I don't think -- Mr. Cabral in his

5    letter pretty much said they weren't and he's just said now

6    more clearly, or at least as clearly, that they're not, so

7    let's get a stipulation in.  As far as I'm concerned, you

8    can take it that I'm ordering it based on the oral

9    representations, but it's good -- it's essential that it be

10   in writing and I would expect that you could work this out.

11               The other thing is I think, Mr. Cabral, you

12   ought to provide the same information to the other three

13   patents.

14               MR. GEMMELL:  That would be great, Your Honor.

15               MR. CABRAL:  We're happy to do that.  We'd also

16   ask as part of this, and as Your Honor alluded to earlier,

17   that there be a significant reduction in the amount of

18   asserted claims as well.

19               THE COURT:  That's a reasonable request and I

20   was going to get to that.  When can you write a similar

21   letter to the other three patents?

22               MR. CABRAL:  Similar letter to the Court or to

23   include as part of the stipulations?

24               THE COURT:  Why don't you write it to me but

25   really it's just for the -- I'm including it just for the

 1    benefit of this close to trial, I need to know what's going

 2    on.  It's really written to Mr. Gemmell so that his

 3    stipulation that he should be working on covers everything,

 4    not just the five patents.

 5              MR. CABRAL:  Understood, Your Honor.  Is

 6    Wednesday okay?

 7              THE COURT:  It would be better if you do it

 8    sooner.

 9              MR. CABRAL:  Tuesday we have the opposition to

10    the motion to strike that was filed, but we can do it

11    Tuesday if that works.

12              THE COURT:  All right.  Good.  That will be

13    good.

14              All right.  So that's kind of resolved.

15              So, Mr. Gemmell, I understand why you want the

16    two claims in two different non-twist-in-place families.

17    Why -- do you need all these other claims?

18              MR. GEMMELL:  Well, we wanted, obviously,

19    summary judgment on this, and if that were the case, then it

20    was going to knock out all the claims in that regard.  But

21    if we're going to enter into a stipulation to remove, I

22    think we need to analyze this, get back to you, and let you

23    know how we can reduce this down.  The answer is no, we

24    don't need to do all the claims, but we were hoping we would

25    get that decision because there was no debate -- no contest

1  as to elements of the tip and serve patents.

2              THE COURT:  Okay.  All right.  Well, I think you

3  ought to be thinking about -- and I'm sure you have -- about

4  which claims -- and I understand you might be wanting to

5  wait and see what Mr. Cabral says about the other three

6  patents.  That's understandable.  But you should be prepared

7  when you get that to figure out or to be able to advise him

8  and more importantly me which ones are unnecessary.

9              And I guess what I say is even with only a few

10  claims in dispute or a few elements in dispute, 15 claims

11  would still be pretty brutal for the jury, so I think you've

12  got plenty of incentive to knock it down to similar figures,

13  and I would encourage you to be ready to do that relatively

14  promptly so that the last couple days before the trial

15  aren't spent -- so you know what the target is, they know

16  what the target is.  All right.

17              Is there -- in terms of what's on from the

18  pretrial conference today, is there other stuff that people

19  want to bring up?

20              MR. CABRAL:  Your Honor, only one thing from

21  Defendant's point of view.  We talked about the Daubert

22  motion for Becker.  I'm not going to argue that here.  I

23  know Your Honor knows it's still pending and under your

24  consideration at the moment.

25              One aspect of one other motion that's pending is

1    a motion for reconsideration or clarification on the issue

2    of the Mod implant license.  There's an order Your Honor

3    issued saying that the patents which you had found to be

4    licensed -- sorry, the Mod implant products that you found

5    to be licensed, and Your Honor stipulated to identifying two

6    different products as licensed under the 2014 agreement.

7    You had said that you would treat them as unlicensed for

8    damages purposes in that order.

9            And in the motion, we pointed out that in Your

10   Honor's summary judgment decision, you had interpreted

11   Section 3.01 of the 2014 agreement.  And that was the

12   provision, if you remember, that said if -- I have the

13   agreement if you want to look at it -- the provision

14   basically said that NuVasive would be free from any

15   financial obligations past, present, or future.  And we had

16   argued, if you recall, that that provision was dispositive.

17   We had argued that that provision said that we were free

18   from further financial obligations to Dr. Jackson, period.

19           The way Your Honor interpreted that decision in

20   the summary judgment opinion was that opinion was

21   coextensive with the licenses granted under 2.02.  That

22   includes the licenses to the Mod implant products under

23   2.02(b).

24           So we have the summary judgment opinion saying

25   NuVasive has no additional financial obligations for Mod

1    implant products as it was defined in the agreement subject

2    to that provision coextensive with the license.  And then

3    Your Honor's subsequent ruling in light of the parties'

4    stipulation say that these products were unlicensed for

5    damages purposes, we think we can't reconcile the two.  And

6    we think that Your Honor's summary judgment decision, which

7    concluded as a matter of law that those products were

8    license and had that we had no further financial obligations

9    for licensed Mod implants, which the parties subsequently

10   stipulated include four different, distinct products, that

11   there's no way you can stipulate around we that in the

12   factual stipulation and that resolve the matter as a matter

13   of law.

14         That's the basis for the motion for

15   reconsideration, and it's a significant issue because of all

16   the royalties they're seeking, the entire royalty base --

17         THE COURT:  I get that goes to the two main

18   products or something.  So you raised that argument before I

19   issued the order.  So I, frankly, I hadn't noticed that you

20   filed a motion for reconsideration, but the -- and I forget

21   exactly what I said in support of the order, but because of

22   the way things transpired, there's no perfect solution.

23         MR. CABRAL:  So, Your Honor, we did not raise

24   that specific argument in the original.  We raised five or

25   six, to be fair, one of which was issue preclusion.  And one

1    of the bases on which Your Honor made the ruling that we're

2    seeking reconsideration of was that issue preclusion didn't

3    apply to the prior case because it wasn't a separate

4    proceeding.  Since that order, we had argued that it does

5    apply.  Plaintiff now agrees that issue preclusion applies

6    to bifurcated cases after we cited a bunch of case law

7    saying it does.

8              With that issue preclusion we raised the issue

9    of law in the case, but we did not point specifically to

10   your interpretation of the 3.01 in the original submission

11   to Your Honor.  We did point that out in the reconsideration

12   motion, and that's the decision, Your Honor, that should

13   have preclusive effect here because that's where collateral

14   estoppel applies because Your Honor has ruled under 3.01 we

15   have no additional financial obligations coextensive with

16   the licenses of 2.02, and that is the Mod implants.  They

17   stipulated that four of the products meet the definition

18   under Your Honor's ruling, and that's the one we think has

19   issue preclusion.  Where that doctrine applies, it has

20   collateral estoppel.

21             THE COURT:  I take it they responded to your

22   motion.

23             MR. CABRAL:  It's fully briefed, Your Honor.  It

24   hasn't been decided, it's still pending, but it's fully

25   briefed.

```
1          THE COURT:  All right.  So what is your request?
2     Your request is I decide this in the next week?
3          MR. CABRAL:  I request some sort of guidance on
4     that.  That will determine the scope of the damages case and
5     a decision on that would be appreciated.
6          THE COURT:  Okay.  Thank you.
7          Anything Plaintiff wants to raise?
8          MR. KRAFTSCHIK:  I don't need to respond to that
9     other than to say it's fully briefed and we think it should
10    have been raised in the original briefing.
11         THE COURT:  Okay.  Mr. Donnelly.
12         MR. DONNELLY:  Just one, which I'll call a
13    housekeeping matter, mindful that sometimes the later term.
14         Because of the year passed since the first
15    trial, we had asked NuVasive to update its sales figures and
16    wrote a bunch of letters to the Court trying to grease the
17    skids to get that happening.  It has not yet fully happened,
18    and we hope not to have to be swapping reports immediately
19    before trial.  So any encouragement from the Court.
20    NuVasive doesn't dispute that they're going to do this, just
21    haven't fully clarified the data that we're trying to bring
22    up --
23         THE COURT:  So you said you've written a number
24    of letters to the Court.  Were you asking me to do something
25    in these letters?
```

```
 1                    MR. DONNELLY:  Yeah, we were effectively

 2   asking -- so to play it out, we had asked NuVasive to

 3   provide its updated sales figures --

 4                    THE COURT:  I got that part.

 5                    MR. DONNELLY:  -- for a number of periods.  They

 6   were promising and didn't do it, so we asked the Court to

 7   order them to do.  They have provided --

 8                    THE COURT:  And after you asked the Court to

 9   order them to do that, when was that?

10                    MR. DONNELLY:  A month ago, so the 1st --

11                    THE COURT:  And is it something that I just

12   ignored?

13                    MR. DONNELLY:  The Court did not -- yes.

14                    THE COURT:  All right.

15                    MR. DONNELLY:  So NuVasive provided -- we have

16   new data.  There's a few outstanding questions that have

17   been pending for far too long to get resolved and --

18                    THE COURT:  So we're talking about NuVasive's

19   financials for these products.  When do you have data for

20   them?

21                    MR. DONNELLY:  So the original data we have was

22   in 2023 updated now through 2024.

23                    THE COURT:  So you got through the end of the

24   year 2024?

25                    MR. DONNELLY:  We have data through the end of
```

1    the year 2024.  There's questions about what the data means

2    and we're hoping to get that answered sooner rather than

3    latter.

4                THE COURT:  I take it the data is being

5    presented some different way than it was presented before?

6                MR. DONNELLY:  Yes.

7                THE COURT:  So you have data that -- sort of

8    you've gotten the timely data, but you say it's,

9    essentially, unintelligible to you.

10               MR. DONNELLY:  No.  I would say it's partially

11   intelligible.  There's data that looks like something in the

12   old data.  We just want confirmation it is what it appears

13   to be and there's question about what something was named in

14   the old data if it has the same meaning in the new data, and

15   it's a pretty --

16               THE COURT:  I get the gist, thank you.

17               Mr. Cabral.

18               MR. CABRAL:  I can deal with this in 30 seconds.

19               They asked for updated sales data because our

20   data ended in Q3 2023 prior to the last trial.  We told them

21   we were working on it.  They were going to get it.  They

22   sent a letter to Your Honor anyway.  Our response to that

23   letter was we're going to produce this by the end of the

24   week so hold off until Monday.  We produced all the U.S.

25   sales data, the supplemental sales data.  Since that time,

1    we produced outside the U.S., so O.U.S. sales data as well.

2    To my knowledge, the only questions they have are confirming

3    what the fields mean in that outside-the-U.S. data, and we

4    just sent a letter as recently as this morning to the client

5    to confirm that.  They have the data.  We're trying our best

6    to answer the questions, and it should be a nonissue before

7    trial.

8              THE COURT:  So the questions they're asking are

9    not questions that you all know the answer to.  You need to

10   get that from the client.

11             MR. CABRAL:  It is difficult because there has

12   been a system change, as you can imagine, with the

13   acquisition of NuVasive.  The legacy NuVasive people are

14   very difficult to find and to track down people with

15   knowledge of these systems.  We're doing our best.  We're

16   orbing on questions they asked about what specific fields

17   mean, which is what we're talking about now, and we're

18   trying to get that information to them.  It's been difficult

19   based on the changeover of personnel and the changeover in

20   the system.  We're working on it.

21             THE COURT:  So based on your history with your

22   client, you're not going to get an answer any time soon?

23             MR. CABRAL:  I hope we have the answer by now.

24   Hopefully today depending on the time change.  The issues is

25   some of the folks work in the UK and there's time

1    differentials.

2              THE COURT:  Keep trying, and if there's a

3    problem, tell me about it on Wednesday.

4              MR. CABRAL:  Sounds good.  Thank you, Your

5    Honor.

6              THE COURT:  Mr. Donnelly will tell me about it

7    on Wednesday.

8              All right.  I think we're just about done here.

9    I think I'll ask somebody from NuVasive -- sorry.  Somebody

10   from Plaintiff.

11             Sorry, Mr. Cabral.

12             Am I correct to understand that Dr. Becker's

13   reasonable royalty theory is, essentially, based on a

14   comparison of the value of the asserted patents here with

15   patents that were covered in other deals with Dr. Jackson?

16             MR. DONNELLY:  I'd say broadly yes.  I would not

17   have stated it in that way.

18             THE COURT:  So state it the way you state it.

19             MR. DONNELLY:  So Dr. Becker's analysis looked

20   at 30ish different license technologies from Dr. Jackson's

21   prior license agreements in the spinal fixation area.

22   Dr. Jackson has different technology.  That set of

23   agreements, I think it's unassailable.  By that I mean

24   NuVasive's expert agrees with those sets being relevant.

25   There are other ones they think Dr. Becker should have

1    considered, but what is in, there's no dispute that there's

2    properly in.  So Dr. Becker looked at the royalty rates for

3    those technologies, looked at sort of how they statistically

4    fall, what's the distribution of the --

5              THE COURT:  When you say "statistically," do you

6    mean 3 percent, 3 and a half percent?  What do you mean by

7    "statistically"?

8              MR. DONNELLY:  This is -- a picture may be worth

9    a thousand words.

10             THE COURT:  That's a bar chart.

11             MR. DONNELLY:  It's a histogram.  It's

12   effectively -- here he looked at -- and this is Appendix H

13   of his report -- different license technologies in

14   Dr. Jackson's licenses.  This technology 1 percent for this

15   other deal and he goes through 30 or so different license

16   technologies and roughly the agreements.  And then said, I

17   can look at the rates at which Dr. Jackson has historically

18   licensed these technologies, and he considered aspects of

19   the agreements separate from just the quantitative aspects

20   of them.  And then Dr. Erico informed his opinion on how

21   important the twist-in-place patents are relative to other

22   technologies in the field and informed based on Dr. Erico 's

23   opinion -- leaving out several details to respond to the

24   Court's question -- primarily based on the information from

25   Dr. Erico's opinion about the twist-in-place insert patent

1    being relatively valuable technology.

2         THE COURT:  Dr. Erico offered the opinion that

3    the twist-in-place technology is relevant value to the other

4    technologies in Dr. Jackson's patents?

5         MR. DONNELLY:  He offered it, I would say, in a

6    more general way.  Dr. Erico has licensed a number of his

7    own technologies and Dr. Erico's opinion says -- and I guess

8    Dr. Erico is licensed in a number of technologies and said

9    when I licensed my technologies, I got rates in the 3 to

10   7 percent rate.  And he said, "In my opinion, the rates from

11   licensing the twist-in-place technology would be" -- if you

12   find the exact language, but on the relatively high end of

13   other technologies in this field.  He was not saying it

14   would be close to the 7 percent that he came in, but he sort

15   of says calibrating on the distribution where tip is going

16   to be, he said tip is going to be high on the distribution.

17        And this is what Dr. Becker's analysis does in

18   part.  He has this distribution of license -- negotiated

19   license rates from Dr. Jackson's prior technologies and then

20   where on this distribution is he going to land.  And he's

21   informed, based on Dr. Erico, and he ended up concluding

22   that it was roughly right in the middle of Dr. Jackson's

23   historical license and growth rates, which was 3 percent,

24   and it's the same rate that NuVasive's expert said was the

25   starting point for his royalty analysis, 3 percent.  So

1    that's a long way to answer your question.

2                THE COURT:  But that's helpful.  So from that

3    starting point, did Becker make adjustments based on the

4    value of the twist-in-place patents?

5                MR. DONNELLY:  No, I mean, he looked at the

6    range, considered the other economic aspects of the

7    agreements, and said, "I'm settling on 3 percent.  I view

8    these other attributes as having or indicating an upward

9    royalty would be justified, but I'm not going to make that."

10   And I'll maybe paraphrase Dr. Becker's report that the

11   quantitative data is more important to him than some of the

12   other things and said "I can look at these other things.

13   This has an upward effect, this has an upward effect, I'm

14   not going to make that adjustment, I'm going to stick to

15   what the data tells me."

16               THE COURT:  So the starting point of 3 percent

17   for Becker was based on Dr. Erico saying something like I've

18   had my own patents and I licensed them, and relative to my

19   patents, 3 percent would be an appropriate starting point?

20               MR. DONNELLY:  I don't want to focus you too

21   much on that aspect of Dr. Erico's opinion.  I would say

22   from Dr. Becker's perspective, it was more the opinion from

23   Dr. Erico the twist-in-place technology is valuable and more

24   valuable than a mine run technology --

25               THE COURT:  More valuable than --

1          MR. DONNELLY:  Than a mine run technology in

2     this field.

3          So Dr. Erico's reference to his prior

4     experience, I would say, is one of the two things that

5     Dr. Becker relied on.  Between the two, Dr. Erico's past

6     licensing experience and Dr. Erico's opinion that the tip

7     technology is a relatively valuable technology and saying

8     Dr. Becker focused more on the --

9          THE COURT:  So normally when people are varied

10     technologies or technology licenses and usually one is a

11     starting point for another, they compare the technology;

12     right?

13          MR. DONNELLY:  Well, I think we're dealing with

14     here technologies that, as I said, the set of licenses that

15     Dr. Becker used, there's really no dispute or that are

16     comparable.  NuVasive's expert identified them all as in

17     informative or highly informative to the hypothetical

18     negotiation.  Those are the positive classifications.  These

19     are spinal implant technologies, and Dr. Becker has actual

20     comparisons from Dr. Jackson about the technologies in his

21     prior license relative to these technologies, so the --

22          THE COURT:  So the opinions -- you mentioned

23     Dr. Jackson has opinions about the value.  Do his opinions

24     count for anything?

25          MR. DONNELLY:  I would say his opinions are

1    informative about what his inventions are and the value that

2    he, from the perspective of a practicing surgeon and the

3    perspective of a licensor, assesses them as.  And I think it

4    is -- the perspective Dr. Jackson can offer I do think is

5    relevant for --

6            THE COURT:  So the perspective you're talking

7    about sounds a lot like an expert opinion.

8            MR. DONNELLY:  It was not.  I mean, Dr. Jackson

9    didn't do a report, but using the criteria of is he familiar

10   with his inventions, is he familiar with how surgeons

11   receive aspects of the technologies, including his

12   technologies, I think --

13           THE COURT:  Normally, when people are talking

14   about how other people perceive things they've got to be

15   experts.

16           MR. DONNELLY:  Well, I mean, I think an inventor

17   can normally come in and testify about his or her invention,

18   and I think Dr. Jackson was providing --

19           THE COURT:  But his invention -- you're not

20   testifying about his invention when he's busy comparing it

21   with other things.  His invention is I took a screw and

22   realized if I did this, it would be an improvement.

23           MR. DONNELLY:  I think what Dr. Jackson is

24   saying is I've got my prior licenses.  I did a deal with

25   Acme, whatever company, and I licensed this other technology

1    to Acme, and I understood that deal.  I understood what was

2    going into that deal and my technology and understood what

3    the parties were doing there.  And what Dr. Jackson told or

4    provided information for Dr. Becker was relative to this

5    past historical license, how does my tip technology feature

6    in what I would have or a surgeon would have understood as

7    part of the hypothetical negotiation?  That's it.

8            THE COURT:  If Dr. Becker's -- Dr. Jackson's

9    opinions about the value of his technology were not allowed

10   as a basis for Dr. Becker's opinions, would that affect

11   anything?

12           MR. DONNELLY:  I hadn't thought through all of

13   that.  It's one of the aspects that Dr. Becker says, "I've

14   considered these.  They would justify an upward enhancement

15   of my royalty rate, but I'm not making that enhancement."

16   So at some quantitative level if they came out and he said I

17   guess I could have made this but I didn't do it before and I

18   don't do it now, there's no economic impact of that.  As to

19   whether there's anything else that may have implications of

20   that, I don't want to scratch my head.

21           THE COURT:  Okay.  Thank you, Mr. Donnelly.

22           MR. CABRAL:  Just one point on that.

23           THE COURT:  All right, Mr. Cabral.

24           MR. CABRAL:  I did this windup a little bit

25   earlier and you told me to hold my train of thought.

1      THE COURT:  That's true.  I did.

2      MR. CABRAL:  Your Honor, Dr. Becker comes up

3  with this 3 percent by looking at past licenses Dr. Jackson

4  entered into.  Many of those, almost all of them, include

5  many of the same technologies that NuVasive licensed, the

6  helical flange and technologies like that, for an effective

7  rate of 3 percent.  That's 2.0 percent of the domestic sales

8  when you factor in U.S. sales you get 3 percent for the

9  technologies.  He's now saying based on Dr. Jackson's word

10  alone, because Dr. Becker did not compare the technologies

11  that were licensed in those prior agreements, he didn't do

12  the technological comparison, he's now --

13      THE COURT:  Not that he could because he's not

14  an economist.

15      MR. CABRAL:  What he relies on as part of his

16  opinions is Dr. Jackson's opinion that this twist-in-place

17  is now his most valuable patented family, his most available

18  invention, and there's a table in Dr. Becker's report where

19  he says -- where it's reflecting Dr. Jackson's opinions, his

20  own personal opinions, about whether twist-in-place is

21  greater, much greater, or slightly greater than these other

22  technologies.  That's the comparison that was done.  It was

23  Dr. Jackson's.

24      And if Dr. Jackson's opinions about this, which

25  we don't think he's qualified to give, fall away, so does

1  all of Dr. Becker's opinions.  The reason Dr. Becker is able

2  to argue or offer an opinion that 3 percent is the effective

3  royalty rate is because he didn't look at the only patent

4  that he identified that's actually -- the only license,

5  rather, that's a license to the patents-in-suit, is this

6  Alma Tech patent, that first initiated -- was signed in 2016

7  and later amended in 2017.  That's the only license he talks

8  about that's an actual license to the patents-in-suit.

9           In that patent despite, Dr. Jackson saying that

10 twist-in-place in the most valuable patent family, the

11 twist-in-place, which is the only time this is explicitly

12 laid out in Dr. Becker's opinion -- if offered at a lower

13 royalty rate than helical flange.  Helical flange is

14 3 percent and twist-in-place is 2 percent, so that's

15 objective evidence that shows that Dr. Jackson is wrong,

16 first of all.

17          And secondly, that technology is given away for

18 free in that agreement for any products using helical

19 flange, which is at the 3 percent rate.  As long as any

20 product has 3 percent for helical flange, you get

21 twist-in-place for no additional cost.  And the notion that

22 this twist-in-place technology is now more valuable than all

23 of the other technologies that NuVasive licensed and paid

24 for and paid royalties on is not supported by the evidence.

25 And because Dr. Becker doesn't do the technological

1    comparison between license agreements, because he doesn't

2    consider the economic circumstances of the different

3    parties, Medtronic, for example, being enormous in this

4    space versus some of the smaller ones who paid a higher rate

5    on lower sales, he doesn't consider any of that.  For the

6    technological comparison, he relies solely on Dr. Jackson,

7    who's not qualified to offer those opinions.  They're biased

8    and unreliable for all kinds of reasons.

9               THE COURT:  Bias is an issue.

10              MR. DONNELLY:  May I speak briefly about the

11   Alpha Tech agreement if it's helpful for the Court?

12              The Alpha Tech agreement, I'm actually surprised

13   that it features so prominently in NuVasive's position

14   because it doesn't matter.  We asked Dr. Becker, had you

15   included the Alpha Tech agreement, would it change anything?

16   And the Alpha Tech agreement is a complicated agreement with

17   a bunch of different royalty rate.  If Dr. Becker factored

18   them in the way he factored in the other agreements, it

19   makes no difference.  And Dr. Becker did not include the

20   Alpha Tech agreement in the considered set because it was

21   the hypothetical negotiation.  That is what it is.

22              But the Alpha Tech agreement is -- it's an

23   agreement where there are licenses to some of the

24   patents-in-suit that are higher than Dr. Becker's opined

25   rates and the ones NuVasive told you about which are lower

1    and they wash out.  In the agreement, it's a very different

2    agreement.  There's a cross-license back from Alpha Tech

3    exclusively to Dr. Jackson, so Dr. Jackson, license you this

4    stuff, Alpha Tech, I'm exclusively licensing you,

5    Dr. Jackson, under this patent that I, Alpha Tech own,

6    patent.

7              It's not your arm's length, hypothetical

8    negotiation, clean, here's one patent, and we're coming up

9    with a royalty rate.  There's consideration going both ways.

10             And we talked earlier about this Purcell patent

11   which basically said that Purcell was a prior technology to

12   the snap-in-place technology.  Alpha Tech developed the

13   Purcell technology, and Alpha Tech retained rights to use

14   the Purcell technology.  NuVasive never had rights to use

15   the Purcell technology, so it had an easy substitution just

16   to go back to the snap-in-place and makes perfect economic

17   logic that you may not want to pay the market rate for the

18   twist-in-place when it's got its own technology it can go

19   back to.

20             So I don't think the Alpha Tech agreement gets

21   NuVasive where I think it wants to say that Dr. Becker

22   skewed analysis by ignoring this one agreement that if he

23   had included it would have made a whole different world.  It

24   wouldn't have mattered.

25             THE COURT:  Okay.

1     MR. CABRAL:  Finally, Your Honor, this is the

2     last point I'll make.  I promise you this.

3          The -- Dr. Becker did not do the comparison of

4     the technologies.  He's an economist.  Okay.  Dr. Erico

5     didn't do it either.  That's what should have done the

6     comparison.  The comparison here was done by Dr. Jackson,

7     and Dr. Jackson alone, his say-so.  That's what we think is

8     unreliable under 703 because no reasonable expert offering

9     damages opinions would rely on the say-so of the inventor,

10    particularly when he's not qualified to give the opinions.

11    That's why, fundamentally, these opinions fall apart as

12    unreliable and should be excluded under 702.

13          THE COURT:  Thank you, Mr. Cabral.

14          Okay.  So we've got a few things you're going to

15    owe me in a few days, and I would certainly like to work on

16    the stipulation and narrow a number of claims, and I will

17    see you Wednesday at 2:00.

18          MR. KRAFTSCHIK:  Your Honor, I'm in the dark

19    about the Wednesday at 2:00.  Is that a teleconference?

20          THE COURT:  This is when I asked you to bring me

21    the models.

22          MR. GEMMELL:  Are we having them brought to you?

23          THE COURT:  I'd like you to come with them.  I

24    mean, you can send them on Monday if you wanted, but I'd

25    prefer -- from the sound of things, I'd prefer not to

1    actually take possession of them.  I was hoping you'd come

2    here and give me a show and tell.  So somebody, whoever is

3    the show-and-tell expert on your side.

4            MR. KRAFTSCHIK:  Is there an order about this,

5    Your Honor?

6            MR. GEMMELL:  I said it earlier.  We raised it

7    earlier.

8            You want one of us to be there to walk

9    through --

10          THE COURT:  Somebody who can say this is a

11    pedicle screw and this is a pronator, and I don't know what

12    the -- somebody who can educate me about what the products

13    have and also how the products relate -- if they're -- if

14    the twist-in-place is a disk or something and the product

15    has a bunch of other things, is the twist-in-place just a

16    disk?  I mean, I'd like to have a discussion.  I mean, we'll

17    have a court reporter there, but it's mostly an educational

18    session for my benefit.

19          MR. GEMMELL:  2:00, is that when you wanted?

20          THE COURT:  2:00 is what I said.

21          Thank you very much.

22

23

24

25

1                           **C E R T I F I C A T E**

2               I, Deanna L. Warner, a Registered Professional

3       Report, do hereby certify that as such Registered

4       Professional Reporter, I was present at and reported in

5       Stenotype shorthand the above and foregoing proceedings.

6

7       _____

8       Deanna L. Warner, RPR, CSR
        Official Court Reporter
        U.S. Federal Court

9

## $

**$30** [15] - 34:11, 35:21, 36:3, 36:7, 36:10, 39:3, 46:23, 47:8, 49:5, 52:21, 53:22, 54:3, 55:19, 55:25, 56:8

## '

**'08** [1] - 75:22
**'200** [3] - 77:16, 77:23, 78:23
**'273** [5] - 20:1, 20:2, 20:7, 77:16, 78:24
**'292** [1] - 30:13
**'444** [3] - 77:16, 77:23, 78:23
**'689** [3] - 34:11, 47:17, 48:15
**'711** [11] - 3:22, 3:25, 4:11, 5:12, 5:16, 9:5, 10:6, 10:13, 26:20, 27:12, 78:21
**'866** [2] - 77:16, 78:22

## 1

**1** [5] - 5:16, 27:12, 76:4, 78:20, 92:14
**10** [1] - 29:20
**100** [1] - 5:9
**11,051,856** [1] - 67:22
**112** [1] - 31:21
**12** [2] - 22:15, 72:8
**121** [1] - 13:9
**123** [1] - 30:12
**13** [3] - 22:15, 22:16, 23:8
**1451** [1] - 61:24
**15** [14] - 19:2, 19:12, 19:16, 22:20, 23:3, 25:20, 27:14, 29:13, 29:20, 30:22, 31:4, 31:7, 61:9, 83:10
**16** [1] - 3:11
**1601** [4] - 61:12, 61:25, 69:8, 69:9
**1617** [4] - 43:15, 45:1, 45:10, 61:24
**17** [1] - 67:20
**170** [1] - 30:16
**1st** [1] - 88:10

## 2

**2** [3] - 61:22, 76:4, 99:14
**2,000** [1] - 8:12
**2,000-page** [1] - 5:23
**2.0** [1] - 98:7
**2.02** [3] - 38:22, 84:21, 86:16
**2.02(b)** [1] - 84:23
**2.7** [1] - 12:4
**2008** [4] - 55:20, 56:2, 57:10, 75:10
**2013** [1] - 10:8
**2014** [37] - 10:8, 10:14, 34:8, 35:20, 38:18, 38:22, 38:25, 39:18, 40:4, 41:19, 48:5, 49:3, 49:6, 52:14, 52:17, 53:1, 53:6, 54:12, 55:11, 55:14, 55:22, 55:25, 56:3, 56:6, 56:7, 56:10, 56:11, 57:11, 59:14, 59:16, 60:18, 62:25, 63:17, 84:6, 84:11
**2015** [2] - 61:14, 63:6
**2016** [1] - 99:6
**2017** [1] - 99:7
**2019** [2] - 56:23, 60:24
**2023** [2] - 88:22, 89:20
**2024** [5] - 34:5, 38:21, 88:22, 88:24, 89:1
**2025** [3] - 1:13, 4:15, 9:8
**21-53** [1] - 2:2
**21-CV-053-RGA** [1] - 1:5
**23** [1] - 32:12
**27** [2] - 4:15, 9:8
**271(a** [1] - 78:3
**271(b)** [1] - 78:16
**27th** [1] - 11:18
**282** [1] - 33:3
**286** [2] - 67:24, 68:2
**28th** [1] - 31:18
**293** [1] - 15:24
**2:00** [5] - 44:4, 102:17, 102:19, 103:19, 103:20

## 3

**3** [18] - 19:12, 22:11, 76:4, 92:6, 93:9, 93:23, 93:25, 94:7, 94:16, 94:19, 98:3, 98:7, 98:8, 99:2,

99:14, 99:19, 99:20
**3.01** [3] - 84:11, 86:10, 86:14
**30** [5] - 27:14, 27:16, 32:13, 89:18, 92:15
**30(b)(6)** [6] - 37:10, 38:5, 58:14, 60:18, 61:3, 61:4
**30ish** [1] - 91:20
**31** [1] - 38:21
**31st** [1] - 77:15
**32** [1] - 68:1
**35** [3] - 20:2, 20:7, 68:5
**38** [3] - 67:20, 68:1, 68:6
**39** [2] - 20:2, 20:7

## 4

**4** [3] - 19:12, 76:4
**40** [1] - 74:6
**402** [3] - 33:13, 71:7, 77:1
**403** [6] - 33:14, 45:19, 53:18, 65:6, 71:8, 77:1
**45** [1] - 31:5
**450** [1] - 72:7
**451** [1] - 65:21
**452** [1] - 68:18
**454** [1] - 72:11
**457** [1] - 34:2
**459** [1] - 56:14
**461** [2] - 66:15, 68:17
**462** [1] - 67:20
**4th** [1] - 1:12

## 5

**5** [3] - 19:12, 29:13, 76:4
**5:00** [2] - 3:6

## 6

**6** [3] - 19:11, 19:12, 76:4
**60** [1] - 5:7
**687** [1] - 67:24
**6A** [1] - 1:12

## 7

**7** [2] - 93:10, 93:14
**70** [1] - 5:8
**702** [5] - 76:13, 76:25,

99:14, 99:19, 99:20
77:3, 102:12
**703** [1] - 102:8
**781** [1] - 67:22

## 8

**8** [1] - 25:20
**84** [2] - 19:4, 19:14

## 9

**923** [2] - 67:23
**99.9** [1] - 7:4
**9:00** [1] - 3:8
**9:30** [1] - 3:6

## A

**a.m** [1] - 3:8
**Aaron** [1] - 2:6
**AARON** [1] - 1:17
**abandoned** [1] - 9:10
**ability** [1] - 36:4
**able** [7] - 28:5, 48:20, 67:19, 71:5, 71:17, 83:7, 99:1
**absolutely** [2] - 39:13, 76:16
**accept** [1] - 4:8
**according** [2] - 4:8, 77:21
**account** [2] - 65:11, 76:19
**accounted** [1] - 54:19
**accurate** [1] - 5:5
**accused** [5] - 42:5, 44:1, 54:14, 62:11, 69:7
**acknowledge** [2] - 17:10, 24:6
**acme** [2] - 96:25, 97:1
**acquisition** [1] - 90:13
**action** [1] - 2:2
**actual** [12] - 26:21, 35:12, 36:9, 43:22, 49:3, 53:20, 73:3, 77:7, 77:8, 80:19, 95:19, 99:8
**add** [5] - 5:5, 10:16, 18:11, 31:12, 60:12
**adding** [1] - 30:12
**addition** [1] - 52:4
**additional** [7] - 5:6, 6:11, 22:12, 22:18, 84:25, 86:15, 99:21
**address** [8] - 7:17, 58:11, 58:12, 70:15, 73:4, 73:10, 73:13,

79:8
**addressed** [3] - 32:18, 32:21, 73:12
**addresses** [1] - 74:12
**addressing** [1] - 11:21
**adds** [1] - 64:10
**adduce** [1] - 51:13
**adequate** [1] - 65:9
**adjustment** [1] - 94:14
**adjustments** [1] - 94:3
**admissible** [4] - 53:8, 53:11, 66:4, 77:1
**admit** [2] - 46:13, 68:19
**admitted** [1] - 53:11
**adopt** [1] - 32:15
**advance** [4] - 27:7, 48:15, 48:16, 63:5
**advanced** [2] - 69:3, 72:9
**advancement** [1] - 48:13
**advantages** [2] - 73:19, 74:12
**adversarial** [1] - 50:24
**advertised** [1] - 10:4
**advise** [1] - 83:7
**affect** [1] - 97:10
**affirmatively** [1] - 11:14
**afternoon** [1] - 3:7
**ago** [1] - 31:24, 88:10
**agree** [14] - 4:24, 11:5, 15:20, 16:20, 21:17, 25:9, 35:20, 40:23, 50:10, 51:25, 55:2, 56:9, 64:17, 76:10
**agreed** [2] - 19:23, 30:19, 80:12
**agreeing** [1] - 80:23
**agreement** [61] - 34:8, 38:18, 38:22, 38:25, 39:18, 40:5, 41:19, 48:5, 49:4, 49:6, 52:14, 52:17, 52:18, 53:2, 53:6, 53:21, 53:22, 53:23, 54:13, 54:16, 54:22, 55:11, 55:14, 55:16, 55:20, 55:22, 55:25, 56:2, 56:7, 56:12, 57:10, 57:11, 57:13, 59:14, 59:16, 59:20, 60:18, 62:25, 63:17, 64:25, 84:6, 84:11, 84:13, 85:1, 99:18, 100:11, 100:12, 100:15, 100:16, 100:20, 100:22, 100:23, 101:1, 101:2,

101:20, 101:22
**agreements** [8] - 91:21, 91:23, 92:16, 92:19, 94:7, 98:11, 100:1, 100:18
**agrees** [2] - 86:5, 91:24
**ahead** [1] - 31:14
**ALEXANDRA** [1] - 1:21
**Alexandra** [1] - 2:10
**allege** [1] - 63:2
**alleged** [2] - 75:1, 75:22
**alleging** [1] - 78:13
**allocated** [1] - 32:23
**allow** [2] - 49:11, 49:14
**allowed** [1] - 97:9
**alluded** [3] - 32:22, 52:16, 81:16
**Alma** [1] - 99:6
**almost** [2] - 54:13, 98:4
**alone** [3] - 30:13, 98:10, 102:7
**alpha** [9] - 100:11, 100:12, 100:15, 100:16, 100:20, 100:22, 101:2, 101:4, 101:5
**Alpha** [3] - 101:12, 101:13, 101:20
**alternatively** [2] - 29:14, 68:6
**amended** [3] - 5:13, 5:20, 99:7
**amendment** [1] - 12:7
**amount** [2] - 32:22, 81:17
**analyses** [1] - 76:18
**analysis** [16] - 39:6, 39:11, 40:12, 40:13, 48:1, 54:19, 58:5, 69:8, 70:20, 71:7, 76:2, 77:3, 91:19, 93:17, 93:25, 101:22
**analyze** [1] - 82:22
**analyzed** [2] - 57:22, 59:15
**anchor** [1] - 45:5
**AND** [1] - 1:2
**Anderson** [2] - 2:13, 70:16
**ANDERSON** [6] - 1:24, 32:6, 33:7, 66:22, 70:17, 71:4
**Andrews** [1] - 1:12
**answer** [13] - 13:17, 23:23, 39:9, 39:10,

42:13, 43:25, 75:6, 82:23, 90:6, 90:9, 90:22, 90:23, 94:1
**answered** [1] - 89:2
**answers** [1] - 28:13
**anticipate** [1] - 27:24
**anyhow** [1] - 49:12
**anyway** [1] - 89:22
**apart** [1] - 102:11
**apologize** [1] - 80:4
**apparatus** [2] - 42:22, 42:24
**appear** [1] - 78:21
**APPEARANCES** [1] - 1:15
**Appendix** [1] - 92:12
**application** [1] - 75:13
**applies** [3] - 86:5, 86:14, 86:19
**apply** [2] - 86:3, 86:5
**appreciate** [1] - 72:19
**appreciated** [1] - 87:5
**appropriate** [3] - 12:10, 80:7, 94:19
**approve** [1] - 50:19
**April** [2] - 1:13, 10:14
**area** [1] - 91:21
**areas** [2] - 40:4, 41:3
**argue** [11] - 7:20, 34:17, 39:19, 47:18, 53:4, 53:14, 57:17, 73:12, 76:17, 83:22, 99:2
**argued** [7] - 26:7, 36:2, 45:25, 56:18, 84:16, 84:17, 86:4
**arguing** [4] - 30:18, 31:15, 46:20, 57:6
**argument** [18] - 12:3, 30:13, 34:3, 35:1, 39:21, 46:25, 65:24, 67:1, 68:12, 71:8, 71:12, 72:2, 76:17, 77:6, 77:7, 77:9, 85:18, 85:24
**arguments** [3] - 54:2, 54:5, 71:9
**arm's** [1] - 101:7
**Armada** [1] - 61:20
**arrangement** [3] - 41:18, 63:5, 65:3
**art** [15] - 31:21, 66:20, 66:21, 73:3, 73:5, 73:6, 73:11, 73:13, 73:22, 74:1, 74:14, 75:16, 75:23, 76:3
**art-based** [1] - 31:21
**aside** [2] - 13:4, 78:10
**aspect** [2] - 83:25, 94:21

**aspects** [5] - 92:18, 92:19, 94:6, 96:11, 97:13
**assemble** [1] - 43:9
**assembled** [1] - 45:1
**assembly** [6] - 43:10, 44:19, 44:20, 45:9, 75:20
**assert** [1] - 23:19
**asserted** [28] - 5:8, 7:16, 7:20, 8:10, 8:13, 9:6, 19:21, 22:4, 22:21, 23:3, 27:15, 30:22, 34:13, 36:12, 40:7, 41:13, 42:4, 42:22, 46:15, 48:12, 52:18, 54:8, 55:21, 67:21, 78:3, 81:18, 91:14
**assesses** [1] - 96:3
**assignments** [3] - 41:6, 41:7, 57:14
**assistance** [1] - 67:19
**associated** [1] - 22:12
**assume** [7] - 9:15, 15:25, 16:2, 25:11, 45:18, 72:15, 79:6
**assumed** [2] - 9:19, 20:25
**assuming** [2] - 16:10, 19:8
**ATEK** [1] - 41:11
**attach** [1] - 45:16
**attached** [1] - 7:1
**attaching** [1] - 45:16
**attempt** [1] - 11:1
**attention** [4] - 3:10, 5:17, 5:24, 8:14
**attorney** [1] - 58:20
**attorneys** [2] - 6:1, 17:24
**attributable** [2] - 69:22, 71:18
**attributes** [3] - 48:1, 60:4, 94:8
**August** [1] - 34:5
**aura** [4] - 14:22, 14:24, 15:2, 16:25
**authority** [3] - 37:17, 37:18, 59:9
**available** [1] - 98:17
**avoid** [1] - 15:16
**aware** [2] - 55:20, 74:7

**B**

**back-and-forth** [1] - 3:23
**backed** [1] - 67:2

**background** [3] - 62:9, 73:18, 73:22
**bang** [1] - 71:13
**bar** [1] - 92:10
**barely** [1] - 65:6
**base** [1] - 85:16
**based** [17] - 13:17, 19:1, 24:11, 31:21, 37:20, 50:20, 57:15, 81:8, 90:19, 90:21, 91:13, 92:22, 92:24, 93:21, 94:3, 94:17, 98:9
**bases** [1] - 86:1
**basic** [1] - 69:20
**basis** [5] - 11:25, 68:13, 71:17, 85:14, 97:10
**bear** [1] - 66:8
**became** [1] - 45:15
**becker** [12] - 39:8, 52:24, 70:19, 71:5, 71:9, 71:19, 71:23, 72:12, 74:5, 83:22, 94:3
**Becker** [22] - 22:8, 33:18, 39:5, 72:18, 91:25, 92:2, 94:17, 95:5, 95:8, 95:15, 95:19, 97:4, 97:13, 98:2, 98:10, 99:1, 99:25, 100:14, 100:17, 100:19, 101:21, 102:3
**becker's** [4] - 69:6, 76:13, 91:12, 93:17
**Becker's** [9] - 91:19, 94:10, 94:22, 97:8, 97:10, 98:18, 99:1, 99:12, 100:24
**beginning** [2] - 4:12, 5:6
**begins** [1] - 2:22
**behalf** [1] - 2:11
**behind** [1] - 42:8
**belief** [4] - 34:10, 35:24, 36:7, 50:9
**believes** [1] - 57:10
**belt** [2] - 76:24, 77:1
**benefit** [3] - 77:15, 82:1, 103:18
**best** [5] - 12:3, 24:5, 75:6, 90:5, 90:15
**better** [6] - 47:20, 70:15, 80:8, 80:10, 80:24, 82:7
**between** [11] - 35:16, 39:1, 52:18, 59:24, 60:1, 69:21, 77:21, 79:6, 79:13, 95:5,

100:1
**beyond** [4] - 22:20, 39:19, 45:23, 76:9
**bias** [1] - 100:9
**biased** [1] - 100:7
**bifurcated** [1] - 86:6
**bifurcation** [2] - 6:14, 6:15
**big** [4] - 43:17, 43:19, 43:23, 59:21
**bigger** [1] - 65:17
**billion** [3] - 71:12, 71:13, 71:18
**biomedical** [1] - 69:2
**bit** [3] - 30:7, 55:5, 97:24
**blah** [3] - 34:9
**blanked** [1] - 73:9
**block** [1] - 65:12
**blocked** [1] - 65:14
**body** [2] - 9:22, 70:10
**boot** [1] - 43:6
**bought** [1] - 54:10
**box** [1] - 63:19
**branded** [1] - 25:24
**break** [6] - 3:7, 3:8, 13:19, 26:14, 30:10, 77:12
**breakdown** [1] - 45:11
**brevity** [1] - 72:20
**brief** [2] - 41:5, 45:15
**briefed** [1] - 86:23, 86:25, 87:9
**briefing** [8] - 24:12, 25:6, 26:3, 26:10, 38:21, 40:3, 44:14, 87:10
**briefly** [3] - 38:4, 61:1, 100:10
**bring** [9] - 16:19, 32:19, 33:25, 44:3, 44:5, 70:4, 83:19, 87:21, 102:20
**British** [1] - 68:24
**broad** [5] - 40:2, 41:17, 41:19, 55:14, 65:14
**broadly** [1] - 91:16
**brought** [5] - 5:17, 5:23, 8:14, 76:19, 102:22
**brutal** [1] - 83:11
**bunch** [5] - 74:24, 86:6, 87:16, 100:17, 103:15
**burden** [2] - 21:21, 76:25
**buried** [2] - 5:22, 8:11
**business** [5] - 12:15, 13:6, 13:20, 17:5,

33:6
**busy** [2] - 63:16, 96:20
**buy** [1] - 22:13
**buyout** [4] - 62:25, 63:5, 63:12, 65:2
**BY** [1] - 1:16

# C

**Cabral** [33] - 2:12, 5:3, 5:25, 8:18, 11:5, 12:3, 13:15, 15:15, 15:20, 15:22, 16:11, 21:16, 24:25, 26:23, 28:9, 38:8, 56:17, 58:13, 58:24, 62:3, 64:6, 73:25, 76:7, 77:4, 79:12, 80:1, 81:4, 81:11, 83:5, 89:17, 91:11, 97:23, 102:13
**CABRAL** [84] - 1:23, 5:2, 5:10, 6:11, 6:17, 7:4, 7:13, 8:8, 10:13, 11:7, 11:12, 11:20, 12:5, 13:16, 14:3, 14:18, 15:1, 16:20, 17:17, 17:23, 18:2, 18:6, 18:10, 21:2, 21:24, 22:17, 23:1, 25:1, 27:3, 32:20, 33:9, 33:23, 38:9, 39:7, 39:10, 39:13, 51:18, 51:25, 53:13, 53:16, 53:25, 54:12, 54:17, 54:23, 56:20, 57:9, 58:7, 60:12, 62:6, 62:16, 62:23, 63:10, 64:9, 64:20, 65:23, 66:10, 72:21, 73:10, 74:23, 76:12, 76:16, 76:24, 78:2, 78:12, 79:15, 80:4, 80:13, 81:15, 81:22, 82:5, 82:9, 83:20, 85:23, 86:23, 87:3, 89:18, 90:11, 90:23, 91:4, 97:22, 97:24, 98:2, 98:15, 102:1
**Cabral's** [1] - 16:5
**calibrating** [1] - 93:15
**cannot** [1] - 34:16
**caption** [2] - 67:22, 68:11
**Cardon** [4] - 32:3, 32:4, 32:5, 51:21
**care** [2] - 30:6, 32:14
**carry** [3] - 6:2, 63:25, 64:8
**Case** [1] - 1:5

**case** [45] - 3:24, 5:6, 5:21, 6:4, 6:13, 6:14, 8:4, 12:8, 14:2, 18:8, 22:5, 22:22, 23:13, 23:22, 24:8, 25:16, 25:17, 33:15, 36:22, 38:1, 39:19, 44:9, 45:18, 49:3, 50:3, 50:4, 50:22, 51:20, 52:5, 55:7, 55:21, 57:2, 58:25, 60:9, 60:19, 62:1, 64:3, 71:1, 72:3, 77:8, 82:19, 86:3, 86:6, 86:9, 87:4
**cases** [3] - 6:24, 58:9, 86:6
**categories** [1] - 73:21
**category** [3] - 21:4, 21:6, 62:16
**caught** [2] - 3:10, 5:22
**caused** [1] - 67:9
**cavity** [1] - 78:24
**certain** [3] - 4:11, 23:23, 43:12
**certainly** [4] - 26:3, 48:24, 102:15
**certificate** [15] - 3:22, 4:1, 4:2, 4:3, 4:6, 4:14, 5:12, 5:19, 6:20, 7:9, 7:15, 8:3, 9:20, 10:9, 11:8
**certificates** [6] - 7:1, 7:4, 7:10, 7:17, 9:18, 12:9
**certify** [1] - 104:3
**cetera** [1] - 62:18
**chain** [1] - 60:15
**challenge** [5] - 30:15, 31:21, 50:17, 76:14, 77:17
**challenged** [2] - 76:13, 77:18
**challenges** [2] - 31:19, 31:21
**challenging** [3] - 21:18, 33:13
**chance** [2] - 11:14, 11:16
**change** [5] - 5:18, 53:7, 90:12, 90:24, 100:15
**changeover** [1] - 90:19
**changing** [1] - 8:1
**Channel** [1] - 9:1
**characteristics** [1] - 70:25
**chart** [5] - 19:9, 68:2, 68:10, 79:4, 92:10

**charts** [1] - 19:5
**checklist** [1] - 2:20
**chief** [4] - 50:3, 50:5, 51:20, 52:5
**Circuit** [1] - 9:17
**circular** [1] - 71:11
**circumstances** [4] - 6:1, 6:19, 80:22, 100:2
**cite** [1] - 73:25
**cited** [1] - 86:6
**cites** [2] - 71:1, 72:18
**civil** [1] - 2:2
**claim** [36] - 5:16, 7:20, 8:10, 8:23, 9:5, 9:6, 9:24, 10:25, 19:5, 19:9, 20:2, 20:7, 20:11, 23:8, 23:24, 24:16, 25:10, 25:11, 27:12, 28:19, 29:22, 31:2, 31:4, 34:12, 35:13, 36:22, 37:25, 55:10, 60:9, 68:2, 68:10, 78:19, 78:20
**claimed** [4] - 43:10, 44:16, 70:8, 70:25
**claiming** [1] - 50:23
**claims** [68] - 5:8, 5:11, 5:22, 7:16, 8:13, 19:3, 19:12, 19:14, 19:16, 20:1, 20:16, 20:18, 22:4, 22:15, 22:19, 22:21, 22:22, 22:23, 23:2, 23:9, 23:11, 24:14, 24:17, 24:23, 25:21, 25:22, 26:8, 26:13, 26:15, 27:7, 27:9, 27:14, 27:16, 28:16, 29:12, 29:20, 29:21, 31:4, 31:7, 31:19, 42:4, 42:22, 42:23, 42:24, 44:11, 44:12, 48:11, 48:12, 64:3, 67:6, 67:21, 70:21, 74:25, 75:12, 75:25, 81:18, 82:16, 82:17, 82:20, 82:24, 83:4, 83:10, 102:16
**clarification** [2] - 65:24, 84:1
**clarified** [1] - 87:21
**clarify** [2] - 38:4, 55:5
**classifications** [1] - 95:18
**clean** [1] - 101:8
**clear** [16] - 3:5, 10:2, 11:23, 13:5, 36:20, 37:24, 45:15, 45:18, 55:2, 55:9, 57:20,

59:12, 60:7, 63:12, 63:21, 64:21
**clearly** [6] - 15:14, 20:13, 25:21, 37:23, 81:6
**client** [4] - 2:13, 90:4, 90:10, 90:22
**close** [6] - 2:24, 13:6, 33:6, 65:7, 82:1, 93:14
**closure** [1] - 44:22
**co** [1] - 35:2
**co-counsel** [1] - 35:2
**coextensive** [3] - 84:21, 85:2, 86:15
**COLIN** [1] - 1:23
**Colin** [2] - 2:12, 5:2
**collateral** [2] - 86:13, 86:20
**collaterals** [1] - 44:23
**colleagues** [2] - 59:11, 60:14
**colloquy** [1] - 58:13
**Columbia** [1] - 68:25
**combination** [4] - 41:24, 67:14, 67:17, 68:13
**combinations** [4] - 30:21, 31:8, 74:19
**combines** [1] - 53:1
**combo** [1] - 67:11
**coming** [3] - 44:17, 48:3, 101:8
**commenting** [1] - 46:22
**comments** [1] - 8:22
**commercial** [2] - 69:14, 69:22
**communicated** [1] - 64:24
**communication** [2] - 47:14, 64:23
**communications** [1] - 11:18
**company** [4] - 52:8, 62:9, 66:12, 96:25
**company's** [1] - 66:2
**comparability** [2] - 76:17, 76:18
**comparable** [1] - 95:16
**compare** [2] - 95:11, 98:10
**comparing** [1] - 96:20
**comparison** [9] - 69:10, 91:14, 98:12, 98:22, 100:1, 100:6, 102:3, 102:6
**comparisons** [1] - 95:20

**complaining** [1] - 71:22
**complaint** [1] - 4:20
**complaints** [2] - 3:25, 6:24
**complete** [1] - 70:21
**completely** [4] - 15:18, 36:12, 50:25, 61:6
**complicated** [2] - 7:23, 100:16
**component** [4] - 44:21, 54:14, 72:25, 75:20
**components** [6] - 45:6, 45:9, 45:11, 55:11, 75:18, 76:21
**compression** [2] - 72:23, 75:8
**conceded** [1] - 29:9
**concern** [2] - 71:10, 81:2
**concerned** [4] - 16:21, 17:4, 68:20, 81:7
**concerning** [4] - 17:19, 31:23, 69:12, 72:8
**concluded** [1] - 85:7
**concluding** [1] - 93:21
**CONFERENCE** [2] - 1:9, 1:11
**conference** [9] - 2:1, 24:2, 24:20, 25:3, 26:2, 27:4, 27:5, 83:18
**confident** [1] - 47:14
**configured** [2] - 24:17, 77:17
**confirm** [1] - 90:5
**confirmation** [1] - 89:12
**confirming** [1] - 90:2
**confusing** [1] - 53:20
**confusion** [1] - 65:17
**connected** [1] - 16:11
**connecting** [1] - 36:24
**consider** [7] - 6:10, 8:7, 9:15, 10:23, 29:17, 100:2, 100:5
**consideration** [3] - 70:24, 83:24, 101:9
**considerations** [5] - 68:18, 69:12, 71:6, 71:12, 71:17
**considered** [8] - 9:13, 39:10, 77:2, 92:1, 92:18, 94:6, 97:14, 100:20
**considering** [2] - 10:25, 18:20

**consistent** [1] - 68:11
**consistently** [1] - 4:21
**constraints** [1] - 25:19
**contain** [1] - 46:20
**contest** [7] - 26:5, 26:6, 26:13, 28:6, 28:9, 28:23, 82:25
**contested** [2] - 28:12, 29:11
**contesting** [3] - 25:4, 27:21, 81:3
**context** [2] - 54:1, 58:3
**continue** [1] - 3:1
**contract** [2] - 6:19, 57:17
**contributory** [2] - 34:20, 78:4
**conventional** [1] - 76:20
**conversation** [4] - 21:25, 25:2, 27:19, 79:16
**convoluted** [1] - 67:16
**copy** [1] - 59:12
**corporate** [1] - 50:11
**corporation** [1] - 64:12
**corporation's** [1] - 50:12
**correct** [17] - 5:12, 6:6, 9:6, 11:7, 20:16, 21:2, 21:13, 23:6, 32:9, 38:12, 42:9, 43:11, 46:15, 57:9, 61:1, 69:24, 91:12
**corrected** [5] - 4:11, 4:13, 5:21, 8:23, 9:2
**correction** [23] - 3:22, 4:1, 4:2, 4:3, 4:6, 4:14, 5:12, 5:19, 6:21, 7:1, 7:5, 7:6, 7:10, 7:15, 7:17, 7:19, 8:4, 9:18, 9:21, 10:10, 10:14, 11:8, 12:9
**corrections** [1] - 7:9
**corroborates** [1] - 64:10
**cost** [1] - 99:21
**counsel** [36] - 1:19, 2:6, 35:2, 35:4, 35:5, 36:21, 37:1, 37:5, 37:20, 37:25, 38:6, 38:12, 47:6, 50:11, 51:12, 55:6, 56:16, 57:1, 57:2, 57:7, 57:22, 58:2, 58:4, 58:16, 58:21, 59:24, 60:3, 60:5, 60:8,

60:16, 60:22, 64:2, 65:13, 69:16
**Counsel** [1] - 1:25
**counsel's** [1] - 60:9
**count** [2] - 19:14, 95:24
**counted** [1] - 19:1
**counter** [1] - 51:13
**couple** [3] - 51:18, 56:21, 83:14
**course** [5] - 22:17, 33:23, 67:7, 69:8, 77:22
**Court** [29] - 19:22, 20:5, 20:14, 24:11, 24:13, 26:9, 26:10, 27:25, 34:4, 40:1, 41:17, 41:18, 47:3, 47:10, 49:21, 53:4, 55:12, 63:24, 80:19, 81:22, 87:16, 87:19, 87:24, 88:6, 88:8, 88:13, 100:11, 104:8, 104:8
**COURT** [211] - 1:1, 2:1, 2:8, 2:15, 3:18, 4:23, 5:9, 5:25, 6:15, 6:23, 7:7, 8:6, 8:18, 9:14, 10:5, 10:9, 10:15, 10:19, 11:3, 11:10, 11:16, 11:22, 12:12, 12:20, 12:22, 13:1, 13:3, 13:8, 13:25, 14:13, 14:20, 15:3, 15:19, 16:8, 17:5, 17:8, 17:21, 17:25, 18:4, 18:9, 18:16, 18:23, 19:8, 19:24, 20:17, 21:5, 21:9, 21:14, 22:16, 22:24, 23:4, 24:25, 26:17, 29:3, 31:14, 31:25, 32:8, 32:10, 32:24, 33:4, 33:8, 33:21, 33:24, 35:10, 35:14, 36:14, 36:16, 36:23, 37:6, 38:2, 38:8, 39:5, 39:9, 39:12, 40:11, 40:20, 41:22, 42:3, 42:7, 42:10, 42:14, 42:20, 42:25, 43:8, 43:17, 43:24, 44:3, 44:7, 45:12, 45:19, 46:8, 46:18, 47:12, 48:7, 48:19, 49:18, 49:22, 50:2, 50:6, 50:15, 51:17, 51:21, 53:10, 53:15, 53:18, 54:4, 54:15, 54:21, 54:25,

55:24, 56:3, 56:6, 56:14, 57:6, 57:25, 58:10, 59:4, 59:10, 60:11, 61:8, 61:12, 61:16, 61:18, 61:24, 62:3, 62:12, 62:19, 63:7, 63:15, 64:5, 64:12, 65:4, 66:5, 66:14, 66:24, 69:1, 69:3, 69:11, 69:17, 69:20, 70:1, 70:16, 71:2, 71:21, 71:24, 72:19, 73:8, 73:15, 73:25, 74:17, 74:21, 76:6, 76:14, 76:22, 77:4, 78:9, 78:17, 79:20, 80:1, 80:8, 80:16, 80:20, 81:4, 81:19, 81:24, 82:7, 82:12, 83:2, 85:17, 86:21, 87:1, 87:6, 87:11, 87:23, 88:4, 88:8, 88:11, 88:14, 88:18, 88:23, 89:4, 89:7, 89:16, 90:8, 90:21, 91:2, 91:6, 91:18, 92:5, 92:10, 93:2, 94:2, 94:16, 94:25, 95:9, 95:22, 96:6, 96:13, 96:19, 97:8, 97:21, 97:23, 98:1, 98:13, 100:9, 101:25, 102:13, 102:20, 102:23, 103:10, 103:20
**court** [4] - 20:13, 41:16, 44:4, 103:17
**Court's** [4] - 5:23, 41:20, 58:8, 92:24
**courthouse** [1] - 2:24
**Courtroom** [1] - 1:12
**cover** [3] - 31:6, 31:7, 65:21
**covered** [4] - 35:22, 56:4, 77:7, 91:15
**covers** [2] - 65:18, 82:3
**create** [4] - 15:2, 15:14, 16:25, 55:23
**credibility** [1] - 64:11
**credit** [2] - 26:4, 28:8
**criteria** [1] - 96:9
**criticize** [1] - 67:5
**Cross** [3] - 12:21, 17:7, 40:10
**cross** [6] - 16:23, 21:21, 27:9, 28:24, 53:9, 101:2
**cross-examination** [1] - 53:9

**cross-examine** [3] - 21:21, 27:9, 28:24
**cross-license** [1] - 101:2
**Cross-talk** [3] - 12:21, 17:7, 40:10
**CSR** [1] - 104:7
**curious** [1] - 21:6
**cut** [2] - 50:25, 63:2

**D**

**damages** [26] - 22:8, 22:9, 22:18, 23:13, 30:1, 33:11, 33:15, 39:4, 39:5, 39:12, 40:9, 40:12, 40:13, 44:24, 48:1, 52:17, 52:23, 53:2, 53:8, 53:24, 53:25, 54:19, 84:8, 85:5, 87:4, 102:9
**dancing** [1] - 29:15
**dark** [1] - 102:18
**Darren** [1] - 2:7
**DARREN** [1] - 1:18
**data** [22] - 87:21, 88:16, 88:19, 88:21, 88:25, 89:1, 89:4, 89:7, 89:8, 89:11, 89:12, 89:14, 89:19, 89:20, 89:25, 90:1, 90:3, 90:5, 94:11, 94:15
**date** [2] - 9:13, 10:11
**Daubert** [10] - 33:11, 71:2, 76:9, 76:14, 76:23, 77:6, 77:7, 77:8, 83:21
**days** [2] - 83:14, 102:15
**deal** [19] - 15:5, 48:22, 52:11, 57:14, 57:16, 62:25, 63:3, 63:4, 63:8, 63:12, 64:21, 64:24, 67:8, 68:20, 89:18, 92:15, 96:24, 97:1, 97:2
**dealing** [4] - 5:7, 5:11, 21:7, 95:13
**deals** [1] - 91:15
**Deanna** [2] - 104:2, 104:7
**debate** [1] - 82:25
**decide** [6] - 11:9, 24:9, 50:19, 71:25, 72:4, 87:2
**decided** [6] - 26:1, 34:4, 34:22, 34:23,

37:20, 86:24
**decision** [10] - 37:17, 37:18, 58:8, 59:8, 82:25, 84:10, 84:19, 85:6, 86:12, 87:5
**decision-making** [3] - 37:17, 37:18, 59:8
**decisions** [2] - 24:12, 60:4
**deducing** [1] - 75:15
**Defendant** [2] - 1:7, 1:25
**defendant** [20] - 2:11, 4:5, 4:9, 5:3, 29:8, 29:19, 30:19, 31:9, 44:15, 45:22, 48:25, 55:13, 65:9, 66:17, 67:13, 67:14, 67:25, 68:12, 69:25, 70:6
**defendant's** [6] - 19:3, 29:15, 68:16, 72:7, 72:13, 83:21
**defendants** [3] - 23:18, 41:19, 77:21
**defending** [1] - 6:4
**defense** [17] - 6:18, 14:19, 20:8, 20:9, 20:12, 23:16, 23:20, 26:21, 36:22, 53:17, 57:4, 57:24, 60:9, 74:15, 77:25
**defenses** [11] - 5:16, 6:8, 30:20, 31:1, 31:2, 31:5, 37:25, 39:25, 64:3, 79:16
**defer** [2] - 14:11, 14:14
**defined** [1] - 85:1
**definitely** [2] - 26:4, 45:19
**definition** [3] - 38:14, 53:5, 86:17
**degrees** [1] - 69:3
**DELAWARE** [1] - 1:2
**denied** [2] - 25:8, 60:22
**deny** [4] - 26:11, 68:13, 72:1, 77:5
**department** [1] - 59:7
**depose** [2] - 37:6, 38:7
**deposed** [2] - 37:7, 37:8
**deposition** [13] - 23:25, 46:3, 46:5, 46:11, 49:12, 49:16, 52:1, 52:4, 60:17, 62:20, 62:21, 64:18, 66:1
**depth** [1] - 48:17

**described** [2] - 10:3, 74:16
**describes** [2] - 19:11, 74:3
**design** [2] - 62:9, 62:11
**designate** [1] - 52:2
**designated** [1] - 66:11
**designations** [1] - 46:6
**designee** [1] - 61:5
**designing** [1] - 51:2
**designs** [2] - 62:14, 62:17
**desperation** [1] - 9:11
**despite** [1] - 99:9
**detailed** [1] - 63:21
**details** [2] - 45:23, 92:23
**determination** [1] - 24:8
**determinations** [1] - 72:11
**determine** [2] - 5:15, 87:4
**determined** [6] - 36:2, 41:15, 49:2, 50:21, 55:12, 57:23
**determines** [1] - 78:6
**developed** [4] - 71:10, 75:4, 75:9, 101:12
**deviating** [1] - 27:24
**DI** [4] - 56:14, 65:21, 72:7, 72:11
**dialogue** [1] - 38:24
**diameter** [1] - 43:23
**differ** [1] - 76:1
**difference** [3] - 14:2, 59:23, 100:19
**different** [44] - 3:4, 4:9, 7:7, 10:19, 10:20, 13:22, 18:24, 19:4, 19:9, 21:6, 22:7, 30:20, 30:24, 31:1, 31:7, 31:19, 33:1, 36:13, 43:22, 44:9, 46:23, 48:16, 55:11, 59:20, 60:1, 60:4, 70:7, 73:7, 74:24, 74:25, 76:1, 78:7, 82:16, 84:6, 85:10, 89:5, 91:20, 91:22, 92:13, 92:15, 100:2, 100:17, 101:1, 101:23
**differentials** [1] - 91:1
**difficult** [3] - 90:11, 90:14, 90:18
**difficulty** [1] - 34:15
**dig** [1] - 26:19

**digression** [1] - 74:9
**direct** [13] - 41:24, 42:5, 42:15, 42:17, 42:18, 43:1, 43:13, 70:24, 78:1, 78:3, 78:6, 78:9
**directed** [2] - 19:13, 60:18
**directly** [3] - 43:3, 63:8, 70:21
**disagree** [3] - 41:18, 55:13, 72:21
**disagreed** [1] - 57:16
**disagreeing** [1] - 7:3
**disagreement** [2] - 53:21, 74:16
**disassembly** [1] - 74:8
**disclosed** [2] - 67:4, 79:15
**discovery** [13] - 4:4, 4:22, 8:24, 28:2, 50:14, 50:18, 51:1, 56:19, 57:25, 59:2, 60:6, 60:20, 65:12
**discretion** [1] - 32:15
**discussed** [2] - 35:4, 38:4
**discussion** [4] - 38:11, 47:2, 79:12, 103:16
**discussions** [1] - 69:16
**disk** [2] - 103:14, 103:16
**dispositive** [1] - 84:16
**dispute** [25] - 22:1, 24:4, 24:15, 24:19, 25:9, 25:12, 25:14, 27:1, 30:1, 48:22, 52:14, 54:11, 58:1, 69:14, 69:18, 69:20, 77:19, 77:20, 79:9, 83:10, 87:20, 92:1, 95:15
**disputed** [6] - 19:19, 27:6, 27:8, 27:15, 78:18
**disputes** [1] - 28:2
**disputing** [2] - 27:17, 27:23
**distinct** [1] - 85:10
**distinction** [1] - 54:9
**distribution** [5] - 92:4, 93:15, 93:16, 93:18, 93:20
**DISTRICT** [2] - 1:1, 1:2
**ditch** [1] - 11:1
**doable** [1] - 12:18
**Docket** [6] - 30:16, 34:2, 66:15, 67:20,

68:17, 68:18
**doctor** [1] - 68:22
**doctrine** [1] - 86:19
**document** [2] - 41:21, 53:20
**dollars** [3] - 71:13, 71:18
**domestic** [1] - 98:7
**done** [6] - 29:18, 30:25, 91:8, 98:22, 102:5, 102:6
**DONNELLY** [44] - 1:18, 36:17, 36:24, 37:8, 49:15, 49:20, 49:24, 50:4, 50:13, 50:17, 58:11, 59:6, 59:11, 61:1, 63:20, 72:16, 73:17, 74:2, 74:18, 87:12, 88:1, 88:5, 88:10, 88:13, 88:15, 88:21, 88:25, 89:6, 89:10, 91:16, 91:19, 92:8, 92:11, 93:5, 94:5, 94:20, 95:1, 95:13, 95:25, 96:8, 96:16, 96:23, 97:12, 100:10
**Donnelly** [17] - 2:7, 38:2, 50:16, 51:17, 56:17, 58:10, 60:11, 63:15, 64:5, 72:20, 73:12, 73:15, 74:22, 76:5, 87:11, 91:6, 97:21
**doubt** [4] - 6:5, 8:1, 38:18, 77:16
**down** [6] - 15:5, 26:14, 79:23, 82:23, 83:12, 90:14
**downwardly** [2] - 68:4, 68:8
**Dr** [123] - 13:10, 13:19, 14:9, 14:14, 14:23, 15:17, 17:15, 18:13, 22:8, 23:25, 28:17, 33:18, 35:21, 35:22, 39:5, 39:8, 39:15, 45:17, 46:14, 52:24, 57:8, 68:21, 68:22, 69:6, 69:8, 69:15, 70:19, 71:5, 71:9, 71:19, 71:23, 72:9, 72:12, 72:13, 72:15, 72:18, 73:1, 73:4, 73:10, 73:23, 74:5, 74:10, 75:7, 75:17, 75:21, 76:13, 79:9, 84:18, 91:12, 91:15, 91:19, 91:20, 91:22, 91:25, 92:2, 92:14,

92:17, 92:20, 92:22, 92:25, 93:2, 93:4, 93:6, 93:7, 93:8, 93:17, 93:19, 93:21, 93:22, 94:10, 94:17, 94:21, 94:22, 94:23, 95:3, 95:5, 95:6, 95:8, 95:15, 95:19, 95:20, 95:23, 96:4, 96:8, 96:18, 96:23, 97:3, 97:4, 97:8, 97:10, 97:13, 98:2, 98:3, 98:9, 98:10, 98:16, 98:18, 98:19, 98:23, 98:24, 99:1, 99:9, 99:12, 99:15, 99:25, 100:6, 100:14, 100:17, 100:19, 100:24, 101:3, 101:5, 101:21, 102:3, 102:4, 102:6, 102:7
**draft** [1] - 59:13
**draw** [1] - 35:15
**drawbacks** [2] - 74:9, 74:13
**drop** [6] - 22:23, 22:25, 24:5, 24:22, 28:24
**dropped** [1] - 45:6
**dropping** [1] - 18:21
**due** [1] - 13:6
**during** [8] - 13:19, 48:17, 56:19, 60:17, 74:8, 75:6, 75:20, 77:12
**dutifully** [1] - 67:19

**E**

**e-mail** [14] - 34:10, 37:9, 50:8, 59:2, 59:5, 59:6, 60:13, 60:16, 65:5, 65:16, 65:25, 66:4, 66:13
**e-mails** [1] - 41:11
**early** [1] - 4:4
**easier** [1] - 55:1
**easy** [1] - 101:15
**economic** [5] - 76:18, 94:6, 97:18, 100:2, 101:16
**economics** [1] - 69:4
**economist** [2] - 98:14, 102:4
**educate** [1] - 103:12
**educational** [1] - 103:17
**effect** [5] - 13:21,

51:15, 86:13, 94:13
**effective** [2] - 98:6, 99:2
**effectively** [2] - 88:1, 92:12
**efficient** [2] - 22:5, 25:18
**effort** [2] - 8:15, 79:3
**eight** [5] - 29:22, 44:1, 52:17, 54:8, 54:10
**either** [4] - 16:3, 28:11, 32:18, 36:23, 47:3, 58:4, 62:12, 63:7, 67:15, 74:7, 76:5, 76:20, 77:6, 102:5
**element** [19] - 21:25, 23:24, 24:15, 24:16, 24:17, 24:18, 25:12, 25:15, 28:15, 28:16, 28:20, 44:25, 48:11, 75:4, 75:8, 77:18, 78:20
**elements** [15] - 19:20, 20:11, 24:3, 25:3, 25:13, 26:12, 27:6, 27:8, 27:15, 27:22, 28:25, 29:10, 78:20, 83:1, 83:10
**elicited** [1] - 66:1
**elongated** [1] - 77:17
**elsewhere** [1] - 71:10
**encourage** [1] - 83:13
**encouragement** [1] - 87:19
**end** [7] - 3:6, 28:3, 78:9, 88:23, 88:25, 89:23, 93:12
**ended** [3] - 45:15, 89:20, 93:21
**energy** [1] - 44:12
**engineer** [5] - 62:7, 62:8, 62:10, 69:1, 69:2
**engineering** [1] - 68:23
**English** [1] - 2:11
**ENGLISH** [1] - 1:20
**enhancement** [2] - 97:14, 97:15
**enormous** [1] - 100:3
**enter** [2] - 80:21, 82:21
**entered** [2] - 63:5, 98:4
**entertaining** [1] - 76:15
**entire** [5] - 4:5, 23:22, 30:22, 44:20, 85:16
**entitled** [1] - 9:9

**entity** [1] - 19:15
**Erico** [18] - 23:25, 71:23, 72:15, 73:1, 73:4, 73:5, 73:10, 74:10, 75:21, 92:20, 92:22, 93:2, 93:6, 93:8, 93:21, 94:17, 94:23, 102:4
**Erico's** [8] - 28:17, 69:8, 92:25, 93:7, 94:21, 95:3, 95:5, 95:6
**error** [3] - 7:19, 7:25, 9:24
**especially** [3] - 25:21, 52:23, 53:8
**ESQ** [7] - 1:16, 1:17, 1:17, 1:18, 1:21, 1:23, 1:24
**essential** [1] - 81:9
**essentially** [15] - 4:15, 13:10, 26:19, 31:20, 57:6, 58:1, 62:13, 64:7, 67:13, 77:6, 78:21, 79:6, 80:9, 89:9, 91:13
**estoppel** [2] - 86:14, 86:20
**et** [1] - 62:18
**evaluated** [1] - 9:21
**event** [4] - 30:7, 31:9, 77:23, 78:17
**evidence** [23] - 28:14, 34:3, 34:9, 34:12, 37:2, 45:22, 49:7, 49:14, 51:13, 53:2, 53:11, 53:13, 53:14, 53:24, 54:22, 56:15, 63:1, 69:12, 72:8, 75:3, 75:21, 99:15, 99:24
**exact** [6] - 10:11, 20:3, 63:10, 63:13, 68:10, 93:12
**exactly** [16] - 2:23, 10:21, 14:22, 15:14, 17:17, 22:5, 23:8, 26:6, 28:11, 34:6, 40:21, 44:16, 65:18, 67:25, 68:24, 85:21
**examination** [1] - 53:9
**examine** [3] - 21:21, 27:9, 28:24
**examined** [1] - 51:9
**examiner** [1] - 9:21
**examining** [1] - 61:6
**example** [15] - 20:1, 20:6, 22:6, 38:25, 40:17, 41:6, 43:5, 43:12, 43:15, 44:25,

45:4, 45:10, 45:17, 78:13, 100:3
**exception** [1] - 53:16
**excess** [1] - 5:7
**exchange** [5] - 25:5, 25:7, 27:19, 39:3, 54:2
**exclude** [3] - 34:8, 65:5, 65:15
**excluded** [2] - 66:4, 102:12
**excluding** [1] - 65:25
**exclusively** [2] - 101:3, 101:4
**excuse** [1] - 23:17
**exhibit** [5] - 4:20, 34:13, 34:14, 41:3, 41:5
**exist** [2] - 26:13, 56:22
**existed** [1] - 60:24
**expand** [1] - 66:25
**expect** [6] - 19:16, 23:19, 48:24, 49:11, 49:14, 81:10
**expected** [1] - 4:4
**expecting** [1] - 43:24
**expense** [1] - 6:4
**experience** [6] - 6:23, 7:3, 74:13, 95:4, 95:6
**expert** [22] - 8:25, 20:12, 22:8, 23:21, 27:10, 28:3, 33:11, 39:12, 53:25, 54:1, 66:16, 73:4, 77:22, 79:5, 80:11, 91:24, 93:24, 95:16, 96:7, 102:8, 103:3
**experts** [6] - 8:25, 53:24, 73:7, 77:22, 96:15
**explain** [5] - 14:10, 37:19, 62:14, 62:17, 72:13
**explaining** [1] - 64:18
**explanation** [2] - 6:20, 6:22
**explicitly** [1] - 99:11
**expressly** [3] - 26:9, 39:25, 40:24
**extended** [1] - 57:11
**extensive** [2] - 60:19, 61:3
**extent** [5] - 35:8, 65:22, 66:19, 69:6, 69:9
**extra** [1] - 20:1

**F**

**f)(1** [1] - 78:4
**f)(2)** [1] - 78:4
**face** [2] - 16:14, 16:16
**faced** [1] - 25:19
**facing** [2] - 68:4, 68:8
**fact** [20] - 4:10, 4:21, 5:18, 9:10, 9:12, 14:7, 15:16, 20:5, 23:18, 29:8, 29:14, 31:6, 34:16, 35:24, 48:25, 53:1, 53:7, 65:11, 73:3, 76:19
**factor** [2] - 39:11, 98:8
**factored** [2] - 100:17, 100:18
**Factory** [1] - 71:1
**facts** [1] - 5:1
**factual** [3] - 4:18, 25:11, 85:12
**fair** [5] - 4:18, 9:10, 12:5, 50:22, 85:25
**fairly** [1] - 7:9
**fairness** [3] - 8:8, 10:23, 31:24
**fall** [3] - 92:4, 98:25, 102:11
**Fallon** [2] - 28:3, 52:7
**fallon's** [1] - 67:18
**familiar** [3] - 74:11, 96:9, 96:10
**families** [7] - 21:6, 21:10, 22:7, 30:24, 76:2, 82:16
**family** [4] - 20:25, 21:1, 98:17, 99:10
**far** [3] - 47:25, 81:7, 88:17
**faster** [1] - 20:14
**fault** [1] - 23:13
**faulting** [1] - 79:2
**feature** [7] - 48:6, 48:7, 48:8, 48:10, 48:12, 97:5
**features** [8] - 40:15, 52:20, 53:1, 54:18, 62:17, 70:7, 71:19, 100:13
**February** [4] - 4:15, 9:8, 11:18, 31:18
**Federal** [2] - 9:17, 104:8
**fellow** [1] - 3:12
**few** [6] - 8:22, 83:9, 83:10, 88:16, 102:14, 102:15
**field** [3] - 92:22, 93:13, 95:2

**fields** [2] - 90:3, 90:16
**figure** [7] - 20:19, 30:3, 35:15, 54:25, 75:14, 79:3, 83:7
**figured** [1] - 32:25
**figures** [3] - 83:12, 87:15, 88:3
**figuring** [1] - 30:4
**file** [2] - 4:5, 41:1
**filed** [7] - 3:14, 3:24, 4:10, 25:6, 33:2, 82:10, 85:20
**final** [1] - 43:7
**finally** [1] - 102:1
**financial** [5] - 84:15, 84:18, 84:25, 85:8, 86:15
**financials** [1] - 88:19
**fine** [9] - 15:1, 15:11, 25:14, 40:25, 55:4, 77:3, 80:15, 80:17, 81:1
**finished** [1] - 29:4
**firm** [7] - 14:1, 15:12, 15:13, 16:4, 16:10, 18:15
**firm's** [1] - 58:18
**first** [23] - 4:14, 4:21, 8:23, 9:17, 12:6, 15:11, 19:15, 22:20, 24:19, 31:15, 34:22, 38:13, 40:11, 45:21, 47:2, 59:13, 64:14, 65:8, 72:5, 75:10, 87:14, 99:6, 99:16
**fits** [1] - 67:25
**five** [6] - 13:18, 22:11, 22:13, 79:9, 79:18, 80:2, 82:4, 85:24
**fixation** [1] - 91:21
**flange** [23] - 34:11, 38:15, 38:20, 40:17, 40:18, 47:17, 47:19, 47:24, 48:2, 48:5, 48:7, 48:14, 52:21, 53:6, 68:3, 68:6, 98:6, 99:13, 99:19, 99:20
**flaws** [1] - 71:7
**floating** [1] - 18:25
**focal** [1] - 14:18
**focus** [1] - 94:20
**focused** [6] - 6:13, 7:15, 25:10, 25:22, 73:11, 95:8
**focusing** [2] - 6:16, 25:15
**folks** [1] - 90:25
**follow** [3] - 2:20, 27:12, 64:1

**follow-up** [1] - 27:12
**following** [1] - 61:10
**footnote** [1] - 66:19
**FOR** [1] - 1:2
**force** [1] - 6:2
**foreclosed** [2] - 56:18, 61:6
**foregoing** [1] - 104:5
**forever** [9] - 34:9, 46:25, 50:1, 50:8, 57:21, 60:13, 65:5, 65:15, 65:25
**forfeited** [1] - 6:10
**forfeiture** [2] - 12:2, 12:15
**forget** [4] - 21:11, 26:24, 68:24, 85:20
**forgotten** [1] - 17:22
**form** [1] - 43:7
**formal** [1] - 58:4
**formed** [1] - 65:2
**former** [2] - 62:7, 62:10
**forms** [1] - 45:4
**forth** [3] - 3:23, 38:24, 47:14
**forward** [7] - 5:20, 12:3, 22:14, 25:20, 36:5, 37:20, 50:20
**four** [8] - 3:18, 13:18, 21:9, 30:15, 30:24, 31:19, 85:10, 86:17
**fourth** [1] - 3:19
**fox** [1] - 71:1
**framed** [1] - 67:12
**framework** [2] - 79:18, 80:14
**frankly** [1] - 85:19
**fraud** [1] - 63:2
**free** [15] - 22:13, 34:9, 46:25, 50:1, 50:8, 57:20, 60:13, 63:9, 63:12, 65:5, 65:15, 65:25, 84:14, 84:17, 99:18
**freedom** [2] - 36:3, 57:15
**Friday** [2] - 2:23, 2:24
**friend** [1] - 61:2
**front** [2] - 14:24, 38:16
**fully** [5] - 86:23, 86:24, 87:9, 87:17, 87:21
**function** [1] - 10:4
**fundamentally** [1] - 102:11
**future** [1] - 84:15

# G

game [2] - 6:16, 50:22
gap [4] - 28:18, 28:19, 28:21, 59:21
gardener [1] - 60:2
Garen [4] - 67:12, 67:15, 67:24, 68:6
gather [1] - 19:2
gee [1] - 70:14
Gemmell [9] - 2:6, 21:14, 22:24, 23:6, 25:10, 79:22, 80:16, 82:2, 82:15
GEMMELL [50] - 1:17, 3:16, 18:18, 19:6, 19:17, 20:4, 21:3, 21:13, 23:10, 25:25, 28:1, 32:9, 35:2, 35:11, 36:1, 36:15, 38:3, 39:24, 40:14, 40:23, 42:1, 42:6, 42:9, 42:12, 42:16, 42:24, 43:3, 43:11, 43:18, 44:2, 44:5, 44:18, 45:14, 46:5, 46:13, 46:22, 47:22, 48:9, 55:2, 56:1, 56:4, 56:9, 79:24, 80:17, 80:25, 81:14, 82:18, 102:22, 103:6, 103:19
general [7] - 15:8, 21:4, 21:5, 62:16, 64:20, 75:1, 93:6
generally [6] - 3:3, 3:6, 4:25, 5:4, 17:10, 21:3
geometrically [1] - 10:3
German [6] - 51:7, 51:8, 51:9, 61:5, 62:4, 62:7
Gian [4] - 67:11, 67:15, 67:22
gist [2] - 80:5, 89:16
given [2] - 30:23, 99:17
goodness [1] - 73:19
grammatically [1] - 67:24
grant [6] - 10:24, 24:13, 29:11, 48:20, 65:21, 72:9
granted [2] - 39:2, 84:21
grants [2] - 41:19, 55:14
grease [1] - 87:16

great [2] - 73:2, 81:14
greater [3] - 98:21
growth [1] - 93:23
guess [15] - 2:19, 15:6, 19:15, 26:20, 30:4, 33:10, 49:8, 62:4, 71:25, 73:15, 76:7, 79:7, 83:9, 93:7, 97:17
guidance [1] - 87:3
guide [1] - 48:13
guiding [2] - 48:15, 48:16
guys [4] - 13:23, 13:24, 18:2, 18:3

# H

hack [1] - 80:25
half [4] - 60:25, 75:10, 75:11, 92:6
Halo [2] - 57:5, 58:8
hand [2] - 34:18, 70:6
handles [1] - 9:22
hang [1] - 30:10
hangers [1] - 21:11
hangers-on [1] - 21:11
Hannon [1] - 59:9
happy [4] - 41:4, 64:3, 80:21, 81:15
hard [5] - 3:18, 15:4, 15:7, 40:21, 66:5
hardly [1] - 30:23
head [7] - 7:2, 20:20, 29:7, 42:8, 43:20, 66:12, 97:20
heading [1] - 73:18
hear [7] - 48:25, 54:23, 65:19, 65:20, 65:24, 67:10, 72:4
heard [8] - 6:20, 12:6, 15:19, 22:20, 23:1, 50:15, 72:2, 72:22
hearing [1] - 75:6
heel [3] - 34:11, 38:15, 38:20
held [1] - 9:18
helical [18] - 40:17, 40:18, 47:17, 47:19, 47:24, 48:1, 48:2, 48:5, 48:7, 48:14, 52:20, 53:6, 98:6, 99:13, 99:18, 99:20
hello [1] - 51:18
help [1] - 46:21
helpful [4] - 34:5, 36:17, 94:2, 100:11
helpfully [1] - 36:19

helping [1] - 42:7
hereby [1] - 104:3
high [3] - 66:11, 93:12, 93:16
higher [3] - 74:7, 100:4, 100:24
highlighted [1] - 26:9
highlights [1] - 9:12
highly [3] - 52:16, 52:23, 95:17
himself [1] - 14:9
histogram [1] - 92:11
historical [2] - 93:23, 97:5
historically [1] - 92:17
history [3] - 5:23, 8:12, 90:21
hold [5] - 33:21, 58:22, 80:21, 89:24, 97:25
holiday [2] - 2:24, 2:25
honest [4] - 19:18, 27:8, 35:7, 36:10
Honor [121] - 2:4, 2:10, 3:16, 4:19, 5:2, 5:4, 5:14, 6:12, 7:5, 7:14, 8:5, 8:9, 8:22, 10:12, 10:13, 10:22, 11:7, 11:9, 11:12, 11:15, 12:5, 12:17, 12:18, 12:25, 13:2, 13:7, 13:16, 14:4, 14:19, 15:2, 15:23, 16:5, 16:20, 17:17, 18:10, 18:11, 19:7, 19:17, 21:2, 21:3, 21:8, 21:24, 23:11, 25:1, 25:25, 27:4, 27:23, 28:1, 31:12, 32:6, 32:9, 32:20, 33:1, 33:7, 33:9, 33:23, 35:2, 36:18, 38:3, 38:9, 38:16, 38:20, 39:14, 39:22, 39:23, 39:24, 42:2, 44:2, 44:19, 46:16, 49:15, 50:13, 51:18, 52:12, 53:3, 54:17, 54:23, 55:19, 56:20, 57:16, 58:7, 60:21, 61:14, 61:20, 62:2, 62:7, 62:17, 63:11, 65:23, 66:3, 68:24, 70:12, 70:17, 71:4, 74:23, 75:3, 76:12, 78:2, 79:24, 80:4, 81:1, 81:14, 81:16, 82:5, 83:20, 83:23, 84:2, 84:5, 84:19,

85:23, 86:1, 86:11, 86:12, 86:14, 86:23, 89:22, 91:5, 98:2, 102:1, 102:18, 103:5
Honor's [7] - 5:17, 8:14, 27:20, 84:10, 85:3, 85:6, 86:18
Honorable [1] - 1:11
hope [2] - 87:18, 90:23
hopeful [1] - 20:5
hopefully [1] - 90:24
hopes [1] - 11:21
hoping [4] - 24:11, 82:24, 89:2, 103:1
hours [1] - 32:23
housekeeping [1] - 87:13
human [1] - 45:23
hundred [3] - 5:10, 8:13, 61:21
hypothetical [4] - 95:17, 97:7, 100:21, 101:7

# I

idea [3] - 33:10, 44:17, 70:5
identification [1] - 73:20
identified [11] - 8:13, 27:8, 27:16, 27:23, 37:2, 39:18, 40:3, 41:2, 60:25, 95:16, 99:4
identify [3] - 25:3, 27:6, 39:16
identifying [2] - 47:25, 84:5
ignorant [1] - 58:14
ignored [1] - 88:12
ignoring [1] - 101:22
image [2] - 74:15, 74:17
imagination [1] - 79:14
imagine [4] - 37:21, 43:25, 72:21, 90:12
immediately [3] - 10:24, 58:12, 87:18
impact [2] - 60:19, 97:18
implant [5] - 84:2, 84:4, 84:22, 85:1, 95:19
implants [5] - 38:23, 52:21, 55:17, 85:9, 86:16

implication [1] - 78:5
implications [1] - 97:19
implied [1] - 11:13
impliedly [1] - 63:8
important [7] - 8:9, 48:2, 49:4, 52:13, 58:23, 92:21, 94:11
importantly [1] - 83:8
impression [2] - 3:13, 15:15
improvement [13] - 72:14, 73:1, 73:3, 73:6, 73:12, 75:2, 75:5, 75:15, 75:23, 75:24, 75:25, 76:3, 96:22
IN [2] - 1:1, 1:2
inaccuracies [1] - 25:11
INC [1] - 1:6
incentive [1] - 83:12
inclined [3] - 47:11, 63:25, 76:10
include [8] - 5:19, 6:25, 46:14, 66:16, 81:23, 85:10, 98:4, 100:19
included [8] - 4:2, 5:13, 6:21, 7:14, 7:21, 44:22, 100:15, 101:23
includes [2] - 58:15, 84:22
including [8] - 16:14, 38:20, 52:20, 52:21, 64:22, 69:7, 81:25, 96:11
inconsequential [1] - 77:20
incorrect [1] - 10:4
incredibly [1] - 53:20
incremental [1] - 72:14
indefinite [2] - 12:8, 12:11
indicating [2] - 17:9, 94:8
indication [1] - 77:18
indirect [11] - 41:25, 42:11, 42:15, 42:17, 42:18, 42:19, 43:1, 43:4, 43:7, 43:13, 78:7
individual [1] - 75:17
individuals [1] - 14:6
induced [1] - 34:20
inducement [4] - 78:4, 78:13, 78:14, 78:15
information [5] - 8:12,

81:12, 90:18, 92:24, 97:4
**informative** [3] - 95:17, 96:1
**informed** [3] - 92:20, 92:22, 93:21
**infringe** [6] - 8:2, 10:1, 10:2, 22:10, 22:11, 43:3
**infringed** [2] - 28:6, 57:23
**infringement** [34] - 10:25, 12:19, 19:4, 19:19, 19:20, 24:6, 25:14, 26:5, 27:10, 28:12, 34:20, 34:21, 37:15, 41:24, 41:25, 42:5, 42:11, 43:1, 43:4, 43:7, 43:13, 57:4, 62:11, 66:17, 69:9, 73:4, 73:11, 77:22, 78:1, 78:3, 78:5, 78:10
**infringer** [2] - 43:13, 78:6
**infringing** [1] - 48:10
**initial** [1] - 4:4
**initiated** [1] - 99:6
**inject** [1] - 65:7
**injects** [1] - 65:6
**innovation** [1] - 73:23
**insert** [7] - 68:5, 68:9, 72:23, 72:24, 75:8, 92:25
**inserted** [1] - 45:7
**inside** [3] - 9:22, 51:15, 59:7
**insist** [1] - 25:20
**instance** [1] - 43:20
**instances** [1] - 43:12
**instead** [1] - 38:11
**instruction** [2] - 47:3, 64:1
**intelligible** [1] - 89:11
**intend** [2] - 16:22, 49:25
**intends** [2] - 34:12, 58:17
**intent** [3] - 52:9, 57:18, 78:14
**intention** [1] - 16:24
**intentionally** [3] - 58:17, 66:21, 66:23
**interested** [3] - 20:17, 44:8, 44:13
**internally** [1] - 35:5
**interpretation** [7] - 30:18, 30:19, 31:16, 31:17, 31:24, 57:16, 86:10

**interpreted** [2] - 84:10, 84:19
**interrogatory** [7] - 9:2, 9:3, 23:23, 28:12, 39:15, 39:16, 39:21
**interrupt** [1] - 41:22
**interrupted** [1] - 45:13
**intimately** [1] - 14:8
**introduced** [1] - 75:12
**invalid** [2] - 28:7, 57:23
**invalidity** [20] - 9:1, 20:8, 22:22, 23:16, 28:5, 28:8, 30:2, 30:15, 30:20, 31:1, 31:2, 31:5, 31:7, 31:11, 31:19, 56:21, 57:3, 66:17, 67:21, 74:15
**invasive** [1] - 34:3
**invent** [2] - 75:16, 75:17
**invented** [2] - 14:11, 57:8
**invention** [9] - 35:22, 70:21, 70:25, 71:19, 96:17, 96:19, 96:20, 96:21, 98:18
**inventions** [2] - 96:1, 96:10
**inventive** [1] - 12:11
**inventor** [2] - 96:16, 102:9
**inventor's** [1] - 72:14
**involved** [3] - 14:8, 62:10, 62:24
**involvement** [1] - 17:11
**involving** [3] - 39:1, 39:17, 52:19
**IPXL** [1] - 31:23
**irrelevant** [6] - 15:18, 16:10, 16:12, 17:11, 18:1, 48:3
**issue** [79] - 3:21, 4:14, 5:17, 5:22, 7:22, 7:23, 8:10, 8:14, 8:15, 8:16, 9:7, 10:20, 10:23, 11:6, 11:8, 11:20, 11:23, 11:24, 12:2, 12:6, 24:12, 25:2, 25:19, 28:15, 28:23, 28:24, 31:13, 32:2, 32:21, 33:1, 34:6, 34:19, 34:25, 35:3, 35:10, 35:19, 36:1, 36:22, 36:25, 37:3, 37:4, 37:21, 38:7, 38:13, 38:15, 38:17, 38:23,

40:6, 41:10, 45:18, 45:22, 46:25, 47:5, 47:9, 48:16, 48:21, 49:21, 50:9, 50:21, 51:25, 55:3, 55:5, 56:24, 58:15, 60:20, 61:6, 62:10, 70:14, 75:18, 84:1, 85:15, 85:25, 86:2, 86:5, 86:8, 86:19, 100:9
**issued** [6] - 9:19, 10:6, 10:13, 75:11, 84:3, 85:19
**issues** [21] - 3:9, 6:13, 6:19, 18:25, 19:18, 22:9, 27:10, 31:23, 32:25, 33:15, 34:4, 35:4, 35:9, 36:25, 39:7, 41:9, 41:15, 44:9, 65:6, 65:7, 90:24
**Item** [6] - 30:16, 34:2, 66:15, 67:20, 68:17, 68:18
**item** [1] - 68:15
**itself** [8] - 32:17, 44:21, 44:25, 49:7, 55:18, 66:4, 68:11, 72:25

## J

**JACKSON** [1] - 1:3
**Jackson** [39] - 2:2, 2:6, 13:10, 13:19, 14:9, 14:14, 14:23, 15:17, 35:21, 35:22, 39:15, 46:14, 57:8, 57:20, 72:9, 72:13, 75:7, 75:17, 79:9, 84:18, 91:15, 91:22, 92:17, 95:20, 95:23, 96:4, 96:8, 96:18, 96:23, 97:3, 98:3, 99:9, 99:15, 100:6, 101:3, 101:5, 102:6, 102:7
**Jackson's** [15] - 17:15, 18:13, 45:17, 73:23, 91:20, 92:14, 93:4, 93:19, 93:22, 97:8, 98:9, 98:16, 98:19, 98:23, 98:24
**James** [1] - 2:12
**JAMES** [1] - 1:24
**January** [1] - 77:15
**JMOL** [1] - 70:14
**job** [1] - 72:14
**Johnson** [5] - 17:22, 32:3, 32:4, 32:5,

51:21
**joined** [1] - 2:12
**joint** [1] - 9:8
**Joyce** [2] - 2:9, 2:11
**JOYCE** [2] - 1:21, 2:10
**judgment** [27] - 10:25, 12:19, 24:14, 24:23, 25:5, 25:6, 25:8, 26:1, 26:8, 26:11, 27:20, 28:4, 29:12, 31:23, 38:21, 40:1, 41:21, 55:13, 79:17, 79:19, 80:6, 80:9, 82:19, 84:10, 84:20, 84:24, 85:6
**June** [1] - 75:10
**jurors** [1] - 65:19
**jury** [14] - 10:21, 14:24, 21:22, 29:2, 29:23, 38:15, 41:16, 45:24, 47:3, 49:1, 49:2, 49:8, 79:4, 83:11
**jury's** [1] - 25:13
**justified** [1] - 94:9
**justify** [1] - 97:14

## K

**keep** [4] - 13:23, 14:4, 91:2
**Keith** [1] - 62:19
**kind** [9] - 6:7, 15:5, 32:21, 45:20, 58:2, 58:5, 80:14, 80:18, 82:14
**kinds** [1] - 100:8
**kit** [1] - 45:3
**kits** [1] - 44:23
**knock** [3] - 26:14, 82:20, 83:12
**knowledge** [2] - 90:2, 90:15
**knows** [1] - 83:23
**KRAFTSCHIK** [8] - 1:16, 2:4, 15:9, 15:23, 18:11, 87:8, 102:18, 103:4
**Kraftschik** [3] - 2:3, 2:5, 15:6

## L

**lack** [1] - 47:20
**laid** [2] - 8:4, 99:12
**land** [1] - 93:20
**language** [14] - 5:21, 8:24, 9:3, 9:4, 9:7, 10:4, 12:7, 12:11,

51:21
59:15, 59:20, 72:22, 75:12, 76:4, 93:12
**last** [16] - 3:5, 9:12, 11:1, 13:18, 15:24, 17:24, 17:25, 48:17, 58:12, 62:5, 62:6, 62:8, 62:21, 83:14, 89:20, 102:2
**last-ditch** [1] - 11:1
**late** [4] - 6:8, 6:15, 9:13, 31:17
**latter** [1] - 89:3
**launch** [1] - 63:9
**launched** [5] - 61:12, 61:19, 61:21, 61:25, 63:6
**law** [15] - 12:8, 12:11, 15:12, 15:13, 16:4, 16:10, 18:14, 57:2, 58:18, 78:7, 85:7, 85:13, 86:6, 86:9
**lawyer** [1] - 80:11
**lawyers** [15] - 13:11, 14:5, 14:7, 14:11, 14:14, 14:16, 16:2, 16:11, 17:15, 17:16, 17:20, 18:14, 64:22, 64:25
**leads** [1] - 53:22
**least** [11] - 4:1, 16:17, 25:23, 29:25, 30:14, 68:3, 68:6, 68:7, 70:3, 81:6
**leave** [2] - 3:19, 72:1
**leaving** [2] - 78:10, 92:23
**left** [3] - 37:11, 77:13, 79:14
**legacy** [1] - 90:13
**legal** [2] - 59:7, 61:6
**legitimate** [2] - 7:5, 8:3
**length** [3] - 43:19, 43:23, 101:7
**less** [2] - 61:13, 69:23
**letter** [20] - 5:14, 8:5, 9:8, 11:13, 12:4, 25:4, 26:10, 26:22, 27:12, 27:23, 60:24, 60:25, 77:14, 79:8, 81:5, 81:21, 81:22, 89:22, 89:23, 90:4
**letters** [6] - 26:17, 29:5, 77:12, 87:16, 87:24, 87:25
**level** [2] - 66:11, 97:16
**Levine** [8] - 2:7, 8:20, 12:12, 13:5, 31:25, 33:8, 42:7, 67:11
**LEVINE** [29] - 1:17,

4:19, 4:25, 8:22, 9:17, 10:8, 10:11, 10:16, 10:22, 12:17, 12:24, 13:2, 13:7, 21:8, 31:12, 31:15, 33:1, 61:14, 61:17, 61:20, 62:1, 68:23, 69:2, 69:5, 69:15, 69:19, 69:24, 70:12, 71:22

**license** [50] - 34:10, 34:17, 34:18, 34:24, 35:21, 35:25, 36:9, 36:10, 38:14, 39:25, 40:2, 40:5, 40:19, 41:10, 41:11, 41:12, 41:14, 41:17, 41:20, 47:21, 47:23, 48:25, 49:9, 50:20, 53:4, 55:10, 55:18, 56:12, 59:20, 65:18, 84:2, 85:2, 85:8, 91:20, 91:21, 92:13, 92:15, 93:18, 93:19, 93:23, 95:21, 97:5, 99:4, 99:5, 99:7, 99:8, 100:1, 101:2, 101:3

**licensed** [19] - 33:20, 37:17, 51:5, 54:18, 56:10, 57:8, 84:4, 84:5, 84:6, 85:9, 92:18, 93:6, 93:8, 93:9, 94:18, 96:25, 98:5, 98:11, 99:23

**licenses** [22] - 35:12, 38:19, 38:22, 39:2, 39:17, 40:16, 41:7, 41:8, 41:9, 52:19, 57:13, 57:18, 84:21, 84:22, 86:16, 92:14, 95:10, 95:14, 96:24, 98:3, 100:23

**licensing** [4] - 55:14, 93:11, 95:6, 101:4

**licensor** [1] - 96:3

**light** [2] - 39:21, 85:3

**likely** [1] - 65:1

**likeness** [1] - 34:13

**limine** [15] - 2:18, 14:10, 33:12, 33:25, 34:1, 34:2, 36:19, 38:10, 41:1, 45:21, 56:15, 66:16, 67:13, 72:8, 77:10

**limit** [5] - 24:9, 24:10, 24:15, 24:22, 58:17

**limitation** [5] - 21:18, 21:19, 28:21, 77:25, 78:18

**limitations** [4] - 67:4,

67:6, 77:24, 78:25

**limited** [1] - 30:25

**limiting** [1] - 22:20

**line** [3] - 16:23, 35:16, 66:19

**lines** [1] - 80:14

**list** [12] - 14:6, 17:19, 17:20, 18:12, 18:17, 32:7, 41:3, 46:3, 46:4, 51:19, 62:4, 68:22

**listed** [1] - 20:21

**listen** [1] - 29:23

**lists** [1] - 32:8

**literally** [1] - 9:25

**litigate** [2] - 7:23, 8:15

**litigated** [1] - 25:2

**litigation** [4] - 13:12, 14:23, 17:1, 58:3

**live** [3] - 3:18, 46:9, 52:3

**LLP** [2] - 1:20, 1:23

**load** [1] - 75:9

**logic** [1] - 101:17

**look** [11] - 21:22, 29:5, 33:17, 34:14, 39:22, 77:13, 84:13, 92:17, 94:12, 99:3

**looked** [11] - 2:18, 5:14, 30:16, 42:20, 57:22, 67:19, 91:19, 92:2, 92:3, 92:12, 94:5

**looking** [4] - 67:24, 77:12, 77:14, 98:3

**looks** [2] - 60:3, 89:11

**lost** [1] - 36:5

**lower** [3] - 99:12, 100:5, 100:25

**lunch** [1] - 3:7

## M

**M.D** [1] - 1:3

**mail** [14] - 34:10, 37:9, 50:8, 59:2, 59:5, 59:6, 60:13, 60:16, 65:5, 65:16, 65:25, 66:4, 66:13

**mails** [1] - 41:11

**main** [3] - 30:3, 62:13, 85:17

**management** [2] - 59:8, 60:14

**manner** [1] - 22:5

**manufacturers** [1] - 45:2

**mapped** [1] - 70:21

**March** [1] - 61:17

**market** [1] - 101:17

**marking** [1] - 41:9

**Markman** [1] - 75:6

**match** [1] - 44:11

**material** [1] - 20:24

**matter** [10] - 8:8, 12:11, 23:5, 40:7, 54:15, 85:7, 85:12, 87:13, 100:14

**mattered** [1] - 101:24

**may-call** [2] - 18:12, 18:17

**McCarter** [1] - 2:11

**MCCARTER** [1] - 1:20

**mean** [21] - 6:7, 7:8, 10:20, 14:15, 15:23, 17:18, 18:6, 49:6, 80:25, 90:3, 90:17, 91:23, 92:6, 94:5, 96:8, 96:16, 102:24, 103:16

**meaning** [2] - 56:25, 89:14

**means** [4] - 22:21, 29:25, 47:19, 89:1

**medical** [1] - 68:22

**medtronic** [1] - 100:3

**meet** [4] - 3:8, 53:5, 63:18, 86:17

**memory** [2] - 42:21, 61:15

**mention** [2] - 3:12, 76:8

**mentioned** [2] - 23:12, 95:22

**mentioning** [1] - 60:13

**merits** [6] - 7:24, 9:16, 11:25, 12:14, 12:16, 26:1

**met** [1] - 76:25

**method** [1] - 42:23

**middle** [1] - 93:22

**might** [7] - 2:19, 3:9, 14:9, 29:24, 55:4, 79:16, 83:4

**million** [15] - 34:11, 35:21, 36:3, 36:7, 36:10, 39:3, 46:23, 47:8, 49:5, 52:22, 53:22, 54:3, 55:19, 55:25, 56:8

**mind** [34] - 18:25, 34:19, 34:21, 34:22, 34:25, 37:1, 37:4, 37:7, 37:11, 37:12, 37:14, 45:21, 45:23, 48:21, 49:17, 50:9, 50:12, 51:9, 51:12, 52:15, 53:3, 53:7, 57:19, 59:19, 59:25,

60:10, 60:17, 63:23, 64:1, 66:2, 66:8, 78:10

**mindful** [1] - 87:13

**mine** [2] - 94:24, 95:1

**minimum** [2] - 24:13, 26:11

**minor** [1] - 77:19

**minute** [3] - 11:4, 31:24, 79:21

**minutes** [2] - 32:13, 61:9

**misheard** [2] - 23:1, 61:2

**mistake** [1] - 3:16

**Mod** [8] - 38:23, 52:21, 84:2, 84:4, 84:22, 84:25, 85:9, 86:16

**models** [1] - 102:21

**modular** [7] - 43:14, 43:15, 43:16, 45:3, 45:4, 45:8, 45:11

**moment** [1] - 83:24

**Monday** [4] - 2:22, 3:1, 89:24, 102:24

**monster** [2] - 14:23, 17:1

**month** [2] - 11:17, 88:10

**moot** [1] - 66:19

**mooting** [1] - 35:18

**moreover** [1] - 70:23

**morning** [7] - 2:3, 2:4, 2:10, 2:15, 3:8, 5:2, 90:4

**most** [7] - 42:14, 45:25, 48:2, 52:13, 98:17, 99:10

**mostly** [1] - 103:17

**motion** [37] - 12:19, 25:6, 26:11, 33:2, 33:11, 34:2, 34:5, 36:19, 38:10, 38:16, 40:1, 41:1, 41:20, 45:21, 48:20, 55:12, 56:15, 56:25, 60:21, 66:16, 67:13, 69:11, 71:3, 72:8, 72:13, 76:9, 76:23, 79:17, 82:10, 83:22, 83:25, 84:1, 84:9, 85:14, 85:20, 86:12, 86:22

**motions** [9] - 2:18, 14:10, 32:16, 33:10, 33:12, 33:25, 34:1, 68:17, 77:10

**move** [3] - 22:14, 30:11, 56:14

**moved** [4] - 5:20, 26:8, 28:3, 79:19

**movement** [2] - 68:4, 68:8

**moving** [1] - 68:16

**MR** [215] - 2:4, 3:16, 4:19, 4:25, 5:2, 5:10, 6:11, 6:17, 7:4, 7:13, 8:8, 8:22, 9:17, 10:8, 10:11, 10:13, 10:16, 10:22, 11:7, 11:12, 11:20, 12:5, 12:17, 12:24, 13:2, 13:7, 13:16, 14:3, 14:18, 15:1, 15:9, 15:23, 16:20, 17:17, 17:23, 18:2, 18:6, 18:10, 18:11, 18:18, 19:6, 19:17, 20:4, 21:2, 21:3, 21:8, 21:13, 21:24, 22:17, 23:1, 23:10, 25:1, 25:25, 27:3, 28:1, 31:12, 31:15, 32:6, 32:9, 32:20, 33:1, 33:7, 33:9, 33:23, 35:2, 35:11, 36:1, 36:15, 36:17, 36:24, 37:8, 38:3, 38:9, 39:7, 39:10, 39:13, 39:24, 40:14, 40:23, 42:1, 42:6, 42:9, 42:12, 42:16, 42:24, 43:3, 43:11, 43:18, 44:2, 44:5, 44:18, 45:14, 46:5, 46:13, 46:22, 47:22, 48:9, 49:15, 49:20, 49:24, 50:4, 50:13, 50:17, 51:18, 51:25, 53:13, 53:16, 53:25, 54:12, 54:17, 54:23, 55:2, 56:1, 56:4, 56:9, 56:20, 57:9, 58:7, 58:11, 59:6, 59:11, 60:12, 61:1, 61:14, 61:17, 61:20, 62:1, 62:6, 62:16, 62:23, 63:10, 63:20, 64:9, 64:20, 65:23, 66:10, 66:22, 68:23, 69:2, 69:5, 69:15, 69:19, 69:24, 70:12, 70:17, 71:4, 71:22, 72:16, 72:21, 73:10, 73:17, 74:2, 74:18, 74:23, 76:12, 76:16, 76:24, 78:2, 78:12, 79:15, 79:24, 80:4, 80:13, 80:17, 80:25, 81:14, 81:15, 81:22, 82:5, 82:9, 82:18, 83:20, 85:23, 86:23, 87:3, 87:8,

87:12, 88:1, 88:5, 88:10, 88:13, 88:15, 88:21, 88:25, 89:6, 89:10, 89:18, 90:11, 90:23, 91:4, 91:16, 91:19, 92:8, 92:11, 93:5, 94:5, 94:20, 95:1, 95:13, 95:25, 96:8, 96:16, 96:23, 97:12, 97:22, 97:24, 98:2, 98:15, 100:10, 102:1, 102:18, 102:22, 103:4, 103:6, 103:19
**MS** [1] - 2:10
**multicomponent** [2] - 44:15, 70:7
**multiple** [1] - 45:8
**must** [1] - 68:19

**N**

**name** [2] - 17:14, 18:15
**named** [2] - 3:12, 89:13
**names** [4] - 18:5, 18:12, 18:13, 18:14
**narrow** [4] - 24:5, 24:21, 79:23, 102:16
**narrowed** [3] - 27:6, 27:14, 47:10
**narrowing** [1] - 27:7
**nature** [1] - 71:11
**nearly** [1] - 23:15
**necessarily** [1] - 18:20
**necessary** [3] - 14:21, 14:22, 52:5
**need** [32] - 4:23, 12:23, 16:7, 18:15, 18:19, 24:9, 24:10, 25:21, 26:14, 28:5, 29:17, 30:3, 35:8, 35:9, 35:10, 35:11, 36:3, 40:3, 41:6, 48:4, 54:18, 55:6, 55:15, 55:17, 67:10, 76:7, 82:1, 82:17, 82:22, 82:24, 87:8, 90:9
**needed** [1] - 57:12
**needs** [2] - 49:7, 63:16
**negotiated** [2] - 64:21, 93:18
**negotiating** [1] - 62:25
**negotiation** [5] - 65:2, 95:18, 97:7, 100:21, 101:8
**negotiations** [2] -

34:8, 63:1
**never** [4] - 9:7, 27:22, 29:17, 101:14
**nevertheless** [1] - 4:3
**new** [3] - 68:13, 88:16, 89:14
**next** [8] - 2:21, 3:1, 12:13, 44:4, 70:5, 72:2, 73:1, 87:2
**nexus** [2] - 69:21, 70:22
**nine** [3] - 26:23, 32:23, 67:6
**nobody** [6] - 6:7, 46:8, 75:23, 76:2, 76:4
**non** [5] - 7:19, 12:11, 23:7, 61:18, 82:16
**non-inventive** [1] - 12:11
**non-Reline** [1] - 61:18
**non-twist-in-place** [2] - 23:7, 82:16
**non-typographical** [1] - 7:19
**none** [3] - 41:13, 58:6, 59:17
**noninfringement** [9] - 5:16, 20:8, 20:11, 23:20, 26:7, 56:22, 57:3, 67:3, 67:7
**noninfringing** [1] - 48:8
**nonissue** [1] - 90:6
**nonobviousness** [2] - 68:19, 69:13
**nonpatent** [1] - 6:13
**normally** [3] - 95:9, 96:13, 96:17
**note** [1] - 36:24
**noted** [1] - 13:7
**nothing** [5] - 48:4, 49:25, 55:17, 55:20, 56:9
**notice** [4] - 6:6, 37:10, 38:5, 60:24
**noticed** [3] - 5:17, 68:21, 85:19
**notion** [1] - 99:21
**notwithstanding** [1] - 4:10
**November** [1] - 10:14
**Number** [1] - 67:21
**number** [21] - 5:9, 18:24, 19:10, 19:20, 26:15, 29:21, 30:15, 34:3, 36:19, 38:10, 38:12, 39:16, 44:9, 56:15, 71:14, 71:16, 87:23, 88:5, 93:6, 93:8, 102:16

**numerous** [1] - 19:3
**NUVASIVE** [1] - 1:6
**NuVasive** [73] - 2:2, 2:12, 2:14, 5:3, 29:9, 30:5, 34:12, 34:17, 35:20, 35:21, 36:19, 37:12, 37:13, 37:15, 37:16, 37:17, 37:24, 38:13, 38:19, 39:3, 46:17, 46:24, 47:4, 47:20, 49:5, 49:11, 50:10, 50:18, 51:6, 51:15, 52:10, 52:21, 54:13, 57:8, 57:10, 57:12, 57:14, 57:19, 58:16, 58:25, 59:1, 59:3, 60:2, 60:23, 61:7, 62:8, 62:10, 63:16, 64:18, 65:12, 65:14, 75:3, 75:8, 75:9, 75:21, 77:15, 78:10, 78:11, 79:2, 84:14, 84:25, 87:15, 87:20, 88:2, 88:15, 90:13, 91:9, 98:5, 99:23, 100:25, 101:14, 101:21
**NuVasive's** [12] - 37:11, 37:12, 49:17, 57:7, 58:19, 63:25, 64:1, 88:18, 91:24, 93:24, 95:16, 100:13

**O**

**O.U.S** [1] - 90:1
**object** [2] - 13:15, 16:23
**objected** [1] - 38:5
**objection** [1] - 16:24
**objective** [1] - 99:15
**obligated** [1] - 56:13
**obligates** [1] - 56:13
**obligations** [5] - 84:15, 84:18, 84:25, 85:8, 86:15
**obtain** [1] - 9:20
**obtained** [1] - 58:16
**obtaining** [1] - 51:1
**obviously** [7] - 3:19, 6:12, 6:17, 15:10, 44:7, 79:15, 82:18
**obviousness** [3] - 30:13, 67:11, 67:22
**occasionally** [1] - 1:18
**occurred** [1] - 78:14
**occurs** [2] - 16:17, 78:6

**OF** [2] - 1:2, 1:9
**offer** [6] - 50:7, 67:3, 71:5, 96:4, 99:2, 100:7
**offered** [4] - 70:23, 93:2, 93:5, 99:12
**offering** [1] - 102:8
**office** [2] - 9:20, 77:13
**Official** [1] - 104:8
**often** [1] - 58:3
**old** [2] - 89:12, 89:14
**ominous** [1] - 18:8
**once** [1] - 42:20
**one** [103] - 3:10, 4:1, 5:5, 5:9, 6:12, 7:14, 7:18, 8:16, 12:24, 19:13, 19:18, 20:6, 20:9, 20:23, 20:25, 21:1, 22:10, 22:13, 23:8, 23:24, 24:15, 24:16, 24:17, 24:18, 25:11, 25:12, 26:7, 26:20, 27:11, 28:15, 28:16, 29:22, 31:12, 31:21, 32:11, 32:18, 33:9, 33:12, 34:3, 35:18, 35:19, 36:17, 38:10, 39:7, 39:14, 39:16, 40:8, 40:11, 44:1, 44:8, 47:1, 48:21, 51:15, 51:23, 53:17, 53:19, 55:1, 58:16, 59:2, 65:23, 67:8, 67:9, 68:3, 68:4, 68:6, 68:7, 68:20, 69:13, 69:17, 70:1, 70:5, 71:9, 72:24, 74:3, 74:14, 75:19, 75:20, 76:1, 77:18, 77:22, 78:8, 78:22, 78:23, 79:7, 80:25, 83:20, 83:25, 85:25, 86:18, 87:12, 95:4, 95:10, 97:13, 97:22, 101:8, 101:22, 103:8
**one-sentence** [1] - 35:19
**one-sided** [1] - 51:15
**ones** [9] - 20:19, 20:21, 45:3, 62:17, 67:4, 83:8, 91:25, 100:4, 100:25
**opening** [3] - 16:1, 34:5, 71:14
**openings** [2] - 32:12, 32:14
**operate** [2] - 36:4, 57:15
**operating** [1] - 57:20

**opined** [1] - 100:24
**opinion** [38] - 21:20, 35:3, 35:5, 36:21, 37:5, 37:24, 38:11, 47:5, 55:6, 57:7, 57:21, 58:18, 58:20, 59:24, 60:1, 60:2, 60:3, 60:5, 60:8, 77:1, 84:20, 84:24, 92:20, 92:23, 92:25, 93:2, 93:7, 93:10, 94:21, 94:22, 95:6, 96:7, 98:16, 99:2, 99:12
**opinions** [31] - 33:13, 33:18, 38:6, 56:16, 56:21, 56:25, 57:2, 58:2, 58:4, 58:15, 60:22, 64:2, 65:13, 69:6, 70:23, 76:13, 95:22, 95:23, 95:25, 97:9, 97:10, 98:16, 98:19, 98:20, 98:24, 99:1, 100:7, 102:9, 102:10, 102:11
**opportunity** [2] - 49:8, 51:13
**opposed** [1] - 66:13
**opposition** [2] - 72:10, 82:9
**oral** [1] - 81:8
**orbing** [1] - 90:16
**order** [25] - 2:17, 3:11, 3:21, 11:21, 13:9, 19:11, 30:12, 30:14, 31:10, 32:12, 32:17, 35:13, 53:13, 54:2, 80:19, 80:22, 81:1, 84:2, 84:8, 85:19, 85:21, 86:4, 88:7, 88:9, 103:4
**ordering** [1] - 81:8
**original** [9] - 4:20, 7:21, 67:14, 67:17, 69:11, 85:24, 86:10, 87:10, 88:21
**originally** [2] - 18:18, 27:16
**otherwise** [3] - 58:16, 64:1, 72:24
**ought** [7] - 11:22, 14:24, 29:11, 29:12, 49:8, 81:12, 83:23
**outlines** [1] - 74:13
**outside** [3] - 58:4, 90:1, 90:3
**outside-the-U.S** [1] - 90:3
**outstanding** [1] - 88:16

**outweighed** [1] - 65:16
**overlap** [1] - 31:3
**overlaps** [1] - 47:9
**overlay** [1] - 45:20
**overlooked** [1] - 6:2
**owe** [1] - 102:15
**own** [8] - 18:21, 23:16, 74:10, 93:7, 94:18, 98:20, 101:5, 101:18
**oxland** [2] - 68:21
**Oxland** [2] - 68:22, 69:15
**Oxnard** [2] - 3:13, 3:17

**P**

**package** [2] - 41:20, 55:14
**page** [9] - 3:11, 8:12, 15:24, 19:11, 19:12, 32:12, 68:1, 68:5
**pages** [2] - 12:23, 73:20
**paid** [9] - 35:20, 36:7, 41:12, 49:5, 52:21, 53:21, 99:23, 99:24, 100:4
**paper** [3] - 6:1, 64:23, 64:25
**paragraph** [9] - 13:9, 30:12, 72:17, 73:16, 73:17, 73:24, 74:6
**paragraphs** [3] - 72:17, 72:18, 73:19
**paraphrase** [1] - 94:10
**parcel** [1] - 42:18
**parsing** [1] - 53:23
**part** [36] - 17:3, 17:5, 17:18, 18:7, 25:5, 26:2, 36:1, 36:2, 45:5, 47:19, 49:13, 50:2, 50:4, 50:12, 51:19, 52:5, 52:13, 54:19, 55:6, 56:11, 57:14, 65:17, 66:19, 70:4, 71:10, 72:12, 76:16, 77:2, 79:3, 81:16, 81:23, 88:4, 93:18, 97:7, 98:15
**partial** [3] - 29:11, 80:6, 80:9
**partially** [1] - 89:10
**particular** [9] - 7:22, 15:7, 29:15, 40:4, 44:25, 73:21, 75:20, 78:20, 79:16
**particularly** [4] -

63:21, 69:7, 80:22, 102:10
**parties** [16] - 4:12, 8:24, 30:18, 35:20, 35:23, 39:1, 40:5, 40:8, 43:24, 48:23, 52:18, 79:6, 79:13, 85:9, 97:3, 100:3
**parties'** [1] - 85:3
**parts** [3] - 43:5, 43:8, 44:21
**party** [2] - 37:10, 58:18
**passed** [1] - 87:14
**past** [4] - 84:15, 95:5, 97:5, 98:3
**patent** [62] - 3:22, 3:25, 4:10, 5:6, 6:24, 7:16, 9:5, 9:19, 10:6, 14:2, 16:16, 20:1, 20:2, 20:7, 20:25, 21:1, 21:6, 21:9, 21:10, 22:7, 24:14, 26:20, 28:6, 30:14, 34:11, 37:1, 37:5, 37:20, 47:17, 47:22, 48:2, 48:5, 48:15, 50:11, 51:12, 57:7, 58:3, 58:19, 58:20, 59:24, 60:2, 60:9, 74:18, 75:11, 75:13, 76:1, 76:3, 78:21, 78:22, 78:23, 78:24, 92:25, 99:3, 99:6, 99:9, 99:10, 101:5, 101:6, 101:8, 101:10
**Patent** [1] - 67:21
**patented** [4] - 71:19, 73:18, 74:12, 98:17
**patents** [80] - 4:2, 4:6, 5:11, 7:1, 14:8, 16:15, 17:12, 19:21, 20:6, 20:9, 20:24, 22:4, 22:13, 23:7, 23:15, 24:6, 24:14, 25:20, 26:23, 30:23, 34:13, 36:11, 36:12, 38:14, 39:17, 40:7, 41:13, 42:21, 42:22, 45:17, 46:12, 46:15, 50:21, 51:5, 52:18, 53:5, 54:8, 54:10, 55:21, 56:22, 56:23, 57:3, 57:18, 57:22, 60:23, 60:24, 65:21, 69:22, 70:8, 70:10, 73:21, 74:3, 74:11, 74:14, 74:24, 77:16, 77:23, 79:9, 79:11, 79:13, 79:18, 79:21,

81:13, 81:21, 82:4, 83:1, 83:6, 84:3, 91:14, 91:15, 92:21, 93:4, 94:4, 94:18, 94:19, 99:5, 99:8, 100:24
**patents-in-suit** [9] - 38:14, 39:17, 51:5, 53:5, 57:18, 60:23, 99:5, 99:8, 100:24
**patient** [1] - 45:7
**pay** [3] - 56:12, 56:13, 101:17
**payment** [4] - 34:11, 56:3, 56:4, 56:11
**payoff** [1] - 56:1
**pedicle** [1] - 103:11
**pending** [6] - 33:10, 33:11, 83:23, 83:25, 86:24, 88:17
**people** [10] - 7:8, 17:22, 37:18, 59:7, 83:18, 90:13, 90:14, 95:9, 96:13, 96:14
**per** [3] - 31:1, 31:4, 32:13
**perceive** [1] - 96:14
**percent** [22] - 7:4, 22:11, 61:22, 92:6, 92:14, 93:10, 93:14, 93:23, 93:25, 94:7, 94:16, 94:19, 98:3, 98:7, 98:8, 99:2, 99:14, 99:19, 99:20
**perfect** [2] - 85:22, 101:16
**perfectly** [1] - 63:22
**perhaps** [2] - 12:8, 15:19, 70:15
**period** [3] - 4:4, 37:14, 84:18
**periods** [1] - 88:5
**person** [4] - 28:24, 47:1, 51:2, 51:7
**personal** [1] - 98:20
**personnel** [1] - 90:19
**perspective** [7] - 22:18, 63:22, 94:22, 96:2, 96:3, 96:4, 96:6
**pertaining** [1] - 66:17
**petition** [1] - 9:20
**petitions** [1] - 9:23
**Ph.D** [1] - 69:2
**phrase** [1] - 26:24
**phraseology** [2] - 4:11, 4:13
**physical** [1] - 44:1
**picture** [3] - 70:6, 70:8, 92:8

**place** [43] - 20:6, 20:9, 20:24, 21:4, 21:10, 22:7, 22:15, 23:7, 23:9, 23:10, 23:15, 24:6, 25:23, 33:19, 46:14, 52:25, 72:22, 72:23, 73:23, 74:4, 74:5, 74:24, 75:11, 75:25, 82:16, 92:21, 92:25, 93:3, 93:11, 94:4, 94:23, 98:16, 98:20, 99:10, 99:11, 99:14, 99:21, 99:22, 101:12, 101:16, 101:18, 103:14, 103:15
**Plaintiff** [2] - 1:4, 1:19
**plaintiff** [29] - 2:5, 4:5, 4:8, 13:10, 17:4, 19:4, 25:7, 26:25, 29:12, 29:18, 29:20, 29:24, 33:12, 34:19, 39:15, 48:22, 52:1, 63:2, 65:13, 67:2, 67:16, 68:12, 70:9, 71:1, 76:8, 78:3, 86:5, 87:7, 91:10
**plaintiff's** [13] - 19:2, 30:19, 32:2, 34:2, 41:9, 48:20, 56:15, 60:16, 66:15, 77:21, 79:5, 80:11
**plaintiffs** [1] - 6:25
**plan** [1] - 20:4
**planning** [2] - 32:3, 32:4, 35:12
**plate** [1] - 36:20
**plausible** [1] - 64:17
**play** [5] - 37:22, 46:10, 59:25, 70:13, 88:2
**played** [2] - 18:8, 49:13
**playing** [3] - 49:16, 49:18, 49:19
**pleading** [1] - 7:21
**pleadings** [2] - 5:13, 5:20
**plenty** [3] - 6:16, 16:13, 83:12
**point** [30] - 13:22, 14:19, 28:17, 36:5, 40:17, 41:4, 42:21, 47:18, 47:22, 47:23, 48:4, 48:6, 48:21, 52:12, 55:15, 65:9, 66:9, 71:10, 72:16, 80:10, 83:21, 86:9, 86:11, 93:25, 94:3, 94:16, 94:19, 95:11, 97:22, 102:2

**pointed** [5] - 22:6, 28:22, 52:15, 76:5, 84:9
**pointing** [4] - 23:22, 36:6, 45:14, 75:4
**points** [5] - 6:12, 31:13, 58:11, 70:17, 75:21
**Polsinelli** [22] - 2:5, 2:7, 13:20, 14:1, 14:4, 14:6, 14:7, 14:12, 14:16, 15:10, 15:12, 15:13, 15:17, 16:1, 16:10, 16:15, 17:2, 17:14, 17:20, 17:23, 18:14
**POLSINELLI** [1] - 1:16
**Polsinelli's** [1] - 17:11
**portions** [1] - 67:18
**position** [10] - 8:11, 10:24, 39:20, 56:19, 67:7, 68:3, 69:25, 75:19, 100:13
**positionable** [1] - 68:7
**positive** [1] - 95:18
**possession** [1] - 103:1
**possibilities** [1] - 35:17
**possibility** [1] - 12:7
**possible** [3] - 10:3, 18:17, 42:20
**possibly** [3] - 31:7, 37:3, 59:19
**post** [1] - 38:16
**post-trial** [1] - 38:16
**poster** [2] - 74:15, 74:17
**practically** [3] - 11:17, 35:18, 70:9
**practice** [1] - 46:11
**practicing** [2] - 74:10, 96:2
**preclude** [5] - 34:3, 56:15, 68:14, 69:12, 72:8
**preclusion** [5] - 85:25, 86:2, 86:5, 86:8, 86:19
**preclusive** [1] - 86:13
**predates** [1] - 52:17
**prefer** [2] - 102:25
**prejudicial** [2] - 71:15, 71:16
**prepare** [1] - 22:22
**prepared** [1] - 83:6
**present** [7] - 10:17, 19:16, 25:15, 25:16, 58:25, 84:15, 104:4
**presented** [3] - 79:1,

89:5
**presentence** [1] - 19:2
**president** [1] - 52:8
**pressure** [3] - 68:5, 68:9, 72:24
**presumably** [3] - 46:9, 52:24, 66:8
**presumed** [1] - 9:18
**presumption** [1] - 70:22
**PRETRIAL** [2] - 1:9, 1:11
**pretrial** [12] - 2:1, 2:17, 3:11, 3:21, 11:21, 13:9, 19:11, 30:12, 30:14, 32:11, 32:17, 83:18
**pretty** [7] - 6:15, 12:1, 43:18, 64:21, 81:5, 83:11, 89:15
**prevent** [1] - 11:1
**Previously** [1] - 72:9
**previously** [2] - 34:4, 52:16
**primarily** [1] - 92:24
**primary** [1] - 6:18
**probative** [1] - 65:16
**problem** [5] - 16:8, 50:13, 64:7, 67:8, 91:3
**problematic** [1] - 33:16
**problems** [2] - 22:9, 55:1
**procedural** [1] - 26:2
**procedure** [1] - 74:8
**proceed** [1] - 31:10
**proceeding** [1] - 86:4
**proceedings** [2] - 61:11, 104:5
**process** [1] - 50:24
**produce** [1] - 89:23
**produced** [3] - 4:20, 89:24, 90:1
**product** [19] - 10:3, 19:9, 19:14, 43:14, 43:16, 44:10, 44:15, 44:16, 45:1, 45:8, 47:19, 48:8, 62:9, 63:6, 63:9, 70:7, 99:20, 103:14
**production** [1] - 4:21
**products** [41] - 19:3, 19:10, 19:13, 19:21, 20:3, 26:16, 29:23, 39:1, 40:5, 40:8, 42:4, 43:17, 44:1, 44:19, 47:18, 50:19, 51:2, 52:19, 54:14, 57:12, 61:18, 62:11,

69:7, 69:10, 69:21, 70:4, 72:2, 72:6, 84:4, 84:6, 84:22, 85:1, 85:4, 85:7, 85:10, 85:18, 86:17, 88:19, 99:18, 103:12, 103:13
**Professional** [2] - 104:2, 104:4
**professor** [1] - 68:23
**profile** [1] - 43:21
**progress** [1] - 70:10
**prohibit** [2] - 68:4, 68:8
**prominently** [1] - 100:13
**promise** [2] - 53:3, 102:2
**promising** [1] - 88:6
**promptly** [1] - 83:14
**pronator** [1] - 103:11
**proof** [2] - 36:25, 37:2
**properly** [1] - 92:2
**proposal** [1] - 21:17
**proposed** [2] - 66:6, 66:7
**propounded** [1] - 58:14
**proprietary** [1] - 48:14
**prosecuted** [1] - 16:15
**prosecution** [5] - 4:5, 5:23, 8:12, 14:8, 17:12
**PROSKAUER** [1] - 1:23
**prove** [5] - 19:4, 20:10, 21:21, 28:25, 78:14
**provide** [2] - 81:12, 88:3
**provided** [6] - 38:19, 45:3, 67:18, 88:7, 88:15, 97:4
**providing** [1] - 96:18
**proving** [2] - 78:15, 79:5
**provision** [5] - 84:12, 84:13, 84:16, 84:17, 85:2
**pulled** [1] - 59:14
**Purcell** [12] - 67:12, 67:15, 67:23, 74:18, 74:19, 101:10, 101:11, 101:13, 101:14, 101:15
**pure** [4] - 37:14, 50:23, 50:24, 51:12
**purported** [4] - 36:25, 60:10, 74:14, 74:19
**purpose** [4] - 29:16,

43:14, 62:13
**purposes** [8] - 24:10, 25:14, 34:16, 43:5, 44:24, 47:25, 84:8, 85:5
**pursuant** [1] - 56:6
**put** [20] - 3:25, 8:11, 11:20, 12:3, 12:13, 12:22, 13:3, 23:13, 41:5, 45:2, 45:4, 45:5, 45:7, 45:22, 49:7, 49:22, 64:25, 67:5, 69:15, 81:1
**putting** [7] - 32:24, 34:19, 43:5, 53:19, 53:22, 54:21, 55:22

## Q

**Q3** [1] - 89:20
**qualified** [3] - 98:25, 100:7, 102:10
**quantitative** [3] - 92:19, 94:11, 97:16
**questioned** [1] - 60:16
**questions** [14] - 4:16, 4:17, 13:18, 16:21, 37:9, 46:6, 66:10, 88:16, 89:1, 90:2, 90:6, 90:8, 90:9, 90:16
**quick** [2] - 31:13, 70:17
**quicker** [1] - 79:25
**quite** [1] - 6:25

## R

**raise** [8] - 16:7, 16:22, 18:7, 20:11, 40:4, 41:8, 85:23, 87:7
**raised** [19] - 4:15, 4:17, 6:6, 6:8, 19:19, 19:22, 24:19, 28:1, 28:14, 28:15, 33:2, 38:3, 38:5, 47:8, 85:18, 85:24, 86:8, 87:10, 103:6
**raises** [1] - 3:21
**raising** [4] - 6:8, 16:8, 16:22, 23:13
**ramp** [1] - 75:9
**random** [2] - 6:25, 7:12
**range** [1] - 94:6
**ranges** [1] - 44:14
**rate** [12] - 22:11, 93:10, 93:24, 97:15, 98:7, 99:3, 99:13,

99:19, 100:4, 100:17, 101:9, 101:17
**rates** [7] - 92:2, 92:17, 93:9, 93:10, 93:19, 93:23, 100:25
**rather** [7] - 16:9, 29:7, 35:5, 53:19, 57:19, 89:2, 99:5
**read** [6] - 2:17, 2:18, 32:16, 56:24, 73:16, 73:17
**reading** [2] - 20:24, 26:17
**reads** [1] - 68:18
**ready** [1] - 83:13
**real** [1] - 51:15
**realities** [1] - 74:11
**reality** [2] - 24:1, 46:24
**realized** [1] - 96:22
**really** [11] - 6:3, 7:23, 19:16, 22:13, 23:14, 31:3, 47:12, 77:24, 81:25, 82:2, 95:15
**realtime** [1] - 16:24
**reargue** [1] - 41:14
**reargued** [1] - 45:25
**reason** [18] - 6:9, 8:11, 9:15, 14:13, 14:21, 16:16, 16:17, 16:18, 17:15, 25:18, 42:25, 46:9, 63:3, 63:4, 70:4, 70:18, 80:2, 99:1
**reasonable** [5] - 11:3, 72:11, 81:19, 91:13, 102:8
**reasons** [8] - 16:13, 17:13, 22:5, 52:16, 53:17, 71:8, 71:16, 100:8
**rebuttal** [1] - 18:19
**receive** [5] - 11:18, 24:18, 54:16, 77:17, 96:11
**received** [3] - 54:2, 54:5, 54:13
**receiver** [4] - 43:19, 45:5, 68:5, 68:9
**recently** [1] - 90:4
**recess** [3] - 13:20, 61:9, 61:10
**recollection** [3] - 27:3, 63:21, 66:10
**reconcile** [1] - 85:5
**reconsideration** [5] - 84:1, 85:15, 85:20, 86:2, 86:11
**reduce** [4] - 20:15, 23:2, 29:12, 82:23

**reduced** [1] - 43:21
**reducing** [3] - 20:4, 20:18, 26:15
**reduction** [1] - 81:17
**reenactment** [1] - 52:3
**refer** [2] - 14:5, 74:2
**reference** [4] - 15:11, 74:16, 75:1, 95:3
**referenced** [1] - 16:25
**references** [1] - 15:12
**referred** [2] - 13:11, 18:14
**referring** [1] - 74:9
**refers** [4] - 14:9, 72:23, 74:5, 74:13
**refined** [1] - 62:23
**reflecting** [1] - 98:19
**refund** [1] - 36:3
**regard** [2] - 45:9, 82:20
**regarding** [5] - 33:2, 34:4, 41:11, 47:8, 69:6
**regardless** [1] - 3:2
**Registered** [2] - 104:2, 104:3
**reject** [1] - 10:24
**rejected** [1] - 39:25
**relate** [3] - 37:3, 57:4, 103:13
**related** [6] - 36:21, 37:21, 60:22, 65:6, 78:22, 79:4
**relating** [1] - 56:16
**relation** [1] - 55:18
**relative** [5] - 74:7, 92:21, 94:18, 95:21, 97:4
**relatively** [4] - 83:13, 93:1, 93:12, 95:7
**relevant** [5] - 36:21, 37:25, 39:3, 39:4, 39:19, 40:9, 40:12, 40:15, 51:7, 51:10, 52:14, 52:16, 52:23, 53:2, 53:7, 54:9, 59:18, 59:19, 60:8, 64:2, 71:6, 91:24, 93:3, 96:5
**relied** [7] - 9:1, 9:2, 9:3, 37:19, 64:22, 95:5
**relies** [6] - 69:5, 69:8, 98:15, 100:6
**reline** [2] - 43:15, 45:10
**Reline** [10] - 45:1, 48:8, 61:12, 61:18, 61:24, 63:6, 63:9, 63:12, 69:7, 70:9

**rely** [5] - 38:6, 45:15, 53:24, 58:17, 102:9
**relying** [1] - 70:22
**remaining** [1] - 5:15
**remember** [9] - 10:11, 11:10, 18:4, 26:17, 26:18, 28:5, 55:8, 64:13, 84:12
**remind** [1] - 62:5
**remove** [2] - 55:5, 82:21
**renew** [2] - 12:18, 72:1
**repeat** [2] - 4:23, 19:6
**repeated** [1] - 15:12
**repercussions** [1] - 51:14
**replaced** [1] - 57:11
**reply** [2] - 34:7, 41:5
**Report** [1] - 104:3
**report** [10] - 9:1, 19:2, 67:19, 69:16, 72:18, 74:25, 92:13, 94:10, 96:9, 98:18
**reported** [1] - 104:4
**reporter** [1] - 103:17
**Reporter** [2] - 104:4, 104:8
**reports** [3] - 8:25, 41:13, 87:18
**represent** [2] - 27:24, 53:3
**representation** [1] - 16:5
**representations** [1] - 81:9
**representative** [2] - 2:13, 19:3
**request** [14] - 11:3, 11:11, 11:13, 13:10, 13:17, 14:3, 32:12, 60:21, 65:13, 68:14, 81:19, 87:1, 87:2, 87:3
**require** [1] - 8:15
**requirement** [2] - 48:10, 78:14
**resisted** [1] - 30:4
**resolve** [6] - 3:9, 8:16, 11:24, 11:25, 20:10, 66:9, 70:2, 70:3, 70:18, 85:12
**resolved** [5] - 65:8, 65:19, 77:8, 82:14, 88:17
**resolves** [3] - 66:25, 77:10, 77:11
**respect** [4] - 27:15, 56:21, 57:3, 78:8
**respectfully** [1] - 60:21

**respond** [4] - 29:25, 33:5, 87:8, 92:23
**responded** [1] - 86:21
**response** [15] - 4:16, 4:17, 7:24, 9:9, 9:16, 12:14, 12:15, 13:5, 39:18, 39:21, 56:19, 56:20, 58:1, 71:22, 89:22
**responses** [2] - 9:2, 9:3
**responsibility** [1] - 50:19
**responsible** [2] - 51:2, 78:11
**rest** [4] - 27:2, 35:8, 42:14, 67:8
**result** [2] - 63:8, 70:24
**retained** [1] - 101:13
**retried** [1] - 34:16
**retry** [6] - 40:18, 40:19, 40:20, 40:21, 41:15, 55:15
**revealed** [1] - 58:22
**review** [1] - 58:13
**Richard** [1] - 1:11
**rid** [1] - 51:23
**rights** [5] - 54:13, 54:16, 57:12, 101:13, 101:14
**risk** [2] - 65:17, 74:7
**Rob** [1] - 62:7
**Robert** [1] - 62:4
**rod** [2] - 24:18, 77:17
**rods** [1] - 44:22
**Roger** [1] - 2:5
**ROSE** [1] - 1:23
**rotatable** [1] - 68:3
**rotatably** [1] - 68:7
**rotating** [1] - 75:19
**rotational** [1] - 75:8
**roughly** [3] - 10:7, 92:16, 93:22
**royalties** [7] - 22:12, 41:12, 56:1, 56:5, 56:12, 85:16, 99:24
**royalty** [13] - 22:11, 41:13, 72:11, 85:16, 91:13, 92:2, 93:25, 94:9, 97:15, 99:3, 99:13, 100:17, 101:9
**RPR** [1] - 104:7
**Rule** [4] - 45:19, 53:18, 65:5, 76:13
**rule** [4] - 20:5, 20:13, 20:15, 53:17
**ruled** [1] - 86:14
**ruling** [7] - 27:20, 31:22, 38:21, 41:20, 85:3, 86:1, 86:18

**run** [2] - 94:24, 95:1

**S**

**sales** [13] - 69:6, 71:13, 71:14, 71:18, 87:15, 88:3, 89:19, 89:25, 90:1, 98:7, 98:8, 100:5
**satisfactory** [1] - 63:22
**saw** [7] - 3:23, 5:9, 8:6, 20:23, 26:19, 33:4, 74:18
**say-so** [2] - 102:7, 102:9
**scenario** [1] - 7:18
**schedule** [1] - 2:21
**Schlaffer** [1] - 30:13
**scienter** [2] - 37:22, 50:23
**scope** [5] - 13:17, 14:3, 19:1, 63:3, 87:4
**scores** [1] - 74:10
**scratch** [1] - 97:20
**screw** [5] - 43:19, 45:4, 72:25, 96:21, 103:11
**screws** [2] - 75:16, 75:18
**second** [10] - 8:2, 9:12, 9:25, 40:6, 40:8, 40:14, 48:3, 49:8, 75:19
**secondary** [6] - 68:18, 69:12, 70:24, 71:6, 71:12, 71:17
**secondly** [1] - 99:17
**seconds** [1] - 89:18
**section** [3] - 33:3, 38:22, 84:11
**see** [13] - 24:11, 29:5, 30:8, 34:13, 50:6, 51:14, 70:3, 73:1, 74:25, 79:4, 79:7, 83:5, 102:17
**seeing** [1] - 66:6
**seeking** [2] - 85:16, 86:2
**seem** [2] - 17:1, 47:13
**selected** [2] - 31:18, 31:20
**selections** [1] - 31:22
**sell** [2] - 45:2, 57:12
**send** [2] - 59:4, 102:24
**sense** [4] - 24:4, 29:1, 30:23, 44:13
**sent** [5] - 5:14, 27:13,

59:6, 89:22, 90:4
**sentence** [3] - 12:24, 13:2, 35:19
**separate** [8] - 19:15, 21:12, 48:16, 59:17, 59:18, 60:7, 86:3, 92:19
**separately** [1] - 43:9
**serious** [1] - 22:9
**serve** [1] - 83:1
**served** [1] - 37:10
**session** [1] - 103:18
**set** [4] - 27:6, 91:22, 95:14, 100:20
**sets** [1] - 91:24
**settling** [1] - 94:7
**several** [1] - 92:23
**shaking** [1] - 7:2
**shank** [1] - 43:22
**sharks** [1] - 14:23
**sheet** [2] - 59:13, 59:16
**Sherman** [3] - 67:16, 67:24, 68:2
**shipped** [1] - 43:9
**short** [1] - 13:16
**shorter** [1] - 62:23
**shorthand** [1] - 104:5
**show** [6] - 44:4, 63:23, 65:17, 66:20, 103:2, 103:3
**show-and-tell** [1] - 103:3
**shown** [1] - 52:8
**shows** [1] - 99:15
**side** [13] - 3:11, 7:25, 19:19, 32:2, 32:13, 32:18, 32:23, 38:13, 44:15, 61:3, 64:8, 65:17, 103:3
**sided** [1] - 11:24
**sides** [3] - 3:23, 44:7, 47:13
**signed** [1] - 99:6
**significant** [3] - 26:15, 81:17, 85:15
**similar** [4] - 79:12, 81:20, 81:22, 83:12
**simple** [4] - 7:23, 8:4, 8:16, 57:15
**simply** [3] - 48:6, 55:16, 70:22
**sincerity** [1] - 50:8
**single** [2] - 45:1, 54:13
**sit** [1] - 15:5
**sitting** [1] - 14:23
**situation** [4] - 7:15, 22:14, 33:16, 65:1
**six** [6] - 20:3, 22:6, 22:13, 52:17, 74:23,

85:25
**size** [2] - 16:4, 16:10
**sizes** [1] - 43:22
**skewed** [1] - 101:22
**skids** [1] - 87:17
**slightly** [1] - 98:21
**small** [2] - 43:18, 43:20
**smaller** [1] - 100:4
**snap** [4] - 74:5, 75:24, 101:12, 101:16
**snap-in-place** [3] - 74:5, 101:12, 101:16
**solely** [1] - 100:6
**solution** [2] - 64:7, 85:22
**solutions** [1] - 74:6
**someone** [6] - 32:2, 37:16, 50:18, 58:5, 60:3, 66:8
**sometimes** [4] - 7:11, 7:14, 87:13
**somewhat** [1] - 7:12
**somewhere** [2] - 20:20, 44:14
**soon** [3] - 5:22, 58:21, 90:22
**sooner** [2] - 82:8, 89:2
**sorry** [8] - 17:21, 19:6, 45:12, 73:8, 74:17, 84:4, 91:9, 91:11
**sort** [9] - 18:7, 52:3, 62:15, 75:1, 79:4, 87:3, 89:7, 92:3, 93:14
**sorting** [1] - 64:4
**sought** [5] - 37:12, 50:14, 59:2, 60:6, 60:19
**sound** [1] - 102:25
**sounds** [4] - 6:5, 80:10, 91:4, 96:7
**source** [1] - 37:2
**space** [1] - 100:4
**span** [1] - 73:19
**Spangler** [24] - 37:1, 37:6, 37:11, 37:16, 37:19, 47:5, 47:9, 49:23, 49:25, 50:7, 51:3, 51:4, 51:8, 51:11, 51:19, 52:1, 52:7, 55:3, 57:1, 59:2, 59:4, 59:6, 60:15, 64:23
**Spangler's** [8] - 34:10, 46:3, 46:17, 49:12, 49:16, 57:21, 65:1, 66:1
**spangler's** [1] - 60:1
**sparing** [1] - 6:4

**speaking** [1] - 17:11
**speaks** [2] - 50:8, 52:9
**special** [1] - 9:22
**specific** [10] - 34:8, 38:19, 52:20, 58:5, 58:13, 74:9, 78:19, 79:17, 85:24, 90:16
**specifically** [5] - 60:18, 74:3, 74:14, 79:8, 86:9
**specification** [1] - 7:18
**speed** [1] - 20:13
**speeding** [1] - 20:18
**spend** [3] - 12:23, 49:10, 67:9
**spending** [1] - 6:3
**spent** [2] - 26:18, 83:15
**spinal** [3] - 75:16, 91:21, 95:19
**Spirits** [1] - 61:21
**stand** [2] - 11:4, 59:15
**standard** [1] - 79:4
**start** [4] - 2:19, 3:6, 8:17, 53:23
**started** [1] - 38:11
**starting** [5] - 93:25, 94:3, 94:16, 94:19, 95:11
**starts** [1] - 65:7
**state** [38] - 2:24, 2:25, 29:7, 34:19, 34:21, 34:22, 34:25, 36:25, 37:4, 37:7, 37:11, 37:12, 37:14, 45:21, 45:23, 48:21, 49:17, 50:9, 50:11, 50:12, 51:9, 51:12, 52:15, 53:2, 53:7, 57:19, 59:19, 59:24, 60:10, 60:17, 63:23, 64:1, 66:2, 66:21, 78:10, 91:18
**state-of-mind** [1] - 50:9
**statement** [4] - 32:15, 58:19, 59:17, 60:8
**statements** [1] - 17:6
**STATES** [1] - 1:1
**statistically** [3] - 92:3, 92:5, 92:7
**status** [6] - 24:2, 24:20, 25:3, 26:2, 27:4, 27:5
**statute** [1] - 8:4
**staying** [1] - 38:10
**Stenotype** [1] - 104:5
**Stephen** [1] - 2:5
**STEPHEN** [1] - 1:16

**stick** [1] - 94:14
**still** [7] - 21:20, 33:10, 72:3, 78:13, 83:11, 83:23, 86:24
**stipulate** [4] - 35:23, 47:15, 85:11
**stipulated** [9] - 31:21, 31:22, 79:23, 80:3, 80:6, 80:13, 84:5, 85:10, 86:17
**stipulation** [18] - 30:17, 31:16, 31:17, 31:18, 35:19, 36:14, 36:15, 46:16, 46:23, 47:8, 47:10, 80:8, 81:7, 82:3, 82:21, 85:4, 85:12, 102:16
**stipulations** [3] - 46:18, 46:19, 81:23
**story** [4] - 17:3, 17:5, 17:18, 18:7
**stray** [1] - 15:10
**streamline** [1] - 22:2
**streamlining** [1] - 22:19
**strenuously** [1] - 56:17
**strike** [1] - 82:10
**strikes** [3] - 29:14, 30:17, 65:12
**structure** [2] - 48:13, 48:15
**structures** [1] - 48:17
**stuff** [6] - 2:18, 30:5, 30:6, 63:1, 83:18, 101:4
**subject** [3] - 38:23, 57:13, 85:1
**submission** [2] - 10:6, 86:10
**submit** [2] - 8:9, 54:18
**submitted** [1] - 39:15
**subordinates** [2] - 59:10, 60:15
**subsequent** [1] - 85:3
**subsequently** [1] - 85:9
**substantially** [1] - 65:16
**substitution** [1] - 101:15
**subsumed** [1] - 76:22
**success** [2] - 69:14, 69:22
**sudden** [1] - 73:8
**suffered** [1] - 74:7
**sufficient** [1] - 16:6
**suggestion** [3] - 13:13, 55:23, 59:23
**suit** [9] - 38:14, 39:17,

51:5, 53:5, 57:18, 60:23, 99:5, 99:8, 100:24
**summary** [29] - 4:18, 5:4, 10:25, 12:19, 24:13, 24:23, 25:5, 25:6, 25:8, 25:25, 26:8, 26:11, 27:20, 28:4, 29:12, 31:23, 38:21, 40:1, 41:21, 55:12, 79:17, 79:19, 80:6, 80:9, 82:19, 84:10, 84:20, 84:24, 85:6
**supplemental** [2] - 9:3, 89:25
**support** [3] - 28:14, 34:12, 85:21
**supported** [1] - 99:24
**supposed** [2] - 26:24, 75:15
**Supreme** [1] - 58:8
**surface** [2] - 68:4, 68:8
**surgeon** [7] - 43:6, 43:12, 74:10, 78:7, 78:13, 96:2, 97:6
**surgeons** [2] - 43:9, 96:10
**surgery** [1] - 43:10
**surprised** [1] - 100:12
**surround** [1] - 59:21
**suspenders** [2] - 76:24, 77:2
**sustain** [1] - 16:23
**swap** [1] - 8:1
**swapping** [1] - 87:18
**system** [3] - 44:20, 90:12, 90:20
**systems** [1] - 90:15

**T**

**table** [4] - 2:6, 13:24, 37:4, 98:18
**takeaway** [1] - 63:11
**talks** [3] - 30:12, 73:23, 99:7
**target** [2] - 83:15, 83:16
**teaches** [2] - 68:2, 68:6
**tech** [10] - 99:6, 100:11, 100:12, 100:15, 100:16, 100:20, 100:22, 101:2, 101:4, 101:5
**Tech** [3] - 101:12, 101:13, 101:20

**technical** [3] - 20:12, 23:21, 28:3
**technological** [5] - 52:20, 76:17, 98:12, 99:25, 100:6
**technologies** [29] - 33:20, 38:19, 56:11, 91:20, 92:3, 92:13, 92:16, 92:18, 92:22, 93:4, 93:7, 93:8, 93:9, 93:13, 93:19, 95:10, 95:14, 95:19, 95:20, 95:21, 96:11, 96:12, 98:5, 98:6, 98:9, 98:10, 98:22, 99:23, 102:4
**technology** [36] - 25:23, 33:19, 39:2, 46:14, 52:25, 73:18, 73:24, 74:4, 74:5, 74:12, 75:9, 91:22, 92:14, 93:1, 93:3, 93:11, 94:23, 94:24, 95:1, 95:7, 95:10, 95:11, 96:25, 97:2, 97:5, 97:9, 99:17, 99:22, 101:11, 101:12, 101:13, 101:14, 101:15, 101:18
**tee** [1] - 66:8
**teleconference** [1] - 102:19
**ten** [1] - 73:20
**tend** [3] - 7:8, 34:7, 40:23
**term** [4] - 58:8, 59:13, 59:16, 87:13
**terms** [23] - 2:21, 15:4, 15:8, 20:10, 26:15, 34:6, 34:19, 40:15, 41:23, 43:4, 44:10, 45:20, 52:10, 54:12, 55:17, 57:15, 57:21, 57:25, 64:12, 64:24, 66:12, 75:14, 83:17
**terrible** [3] - 21:22, 29:19, 29:21
**terribly** [1] - 51:15
**testified** [5] - 23:24, 62:21, 63:4, 63:21, 64:14
**testifies** [1] - 46:6
**testify** [8] - 10:18, 14:17, 16:3, 17:24, 46:10, 62:6, 63:7, 96:17
**testifying** [2] - 3:17, 96:20
**testimony** [34] - 16:2,

23:24, 28:17, 46:3, 49:13, 49:16, 49:20, 50:1, 52:1, 52:2, 52:4, 52:9, 54:1, 56:16, 61:3, 61:4, 62:13, 62:22, 63:11, 63:14, 63:24, 64:10, 64:22, 66:1, 66:3, 66:6, 66:7, 66:11, 66:16, 66:18, 70:13, 71:6, 72:4
**THE** [212] - 1:1, 1:2, 2:1, 2:8, 2:15, 3:18, 4:23, 5:9, 5:25, 6:15, 6:23, 7:7, 8:6, 8:18, 9:14, 10:5, 10:9, 10:15, 10:19, 11:3, 11:10, 11:16, 11:22, 12:12, 12:20, 12:22, 13:1, 13:3, 13:8, 13:23, 14:13, 14:20, 15:3, 15:19, 16:8, 17:5, 17:8, 17:21, 17:25, 18:4, 18:9, 18:16, 18:23, 19:8, 19:24, 20:17, 21:5, 21:9, 21:14, 22:16, 22:24, 23:4, 24:25, 26:17, 29:3, 31:14, 31:25, 32:8, 32:10, 32:24, 33:4, 33:8, 33:21, 33:24, 35:10, 35:14, 36:14, 36:16, 36:23, 37:6, 38:2, 38:8, 39:5, 39:9, 39:12, 40:11, 40:20, 41:22, 42:3, 42:7, 42:10, 42:14, 42:20, 42:25, 43:8, 43:17, 43:24, 44:3, 44:7, 45:12, 45:19, 46:8, 46:18, 47:12, 48:7, 48:19, 49:18, 49:22, 50:2, 50:6, 50:15, 51:17, 51:21, 53:10, 53:15, 53:18, 54:4, 54:15, 54:21, 54:25, 55:24, 56:3, 56:6, 56:14, 57:6, 57:25, 58:10, 59:4, 59:10, 60:11, 61:8, 61:12, 61:16, 61:18, 61:24, 62:3, 62:12, 62:19, 63:7, 63:15, 64:5, 64:12, 65:4, 66:5, 66:14, 66:24, 69:1, 69:3, 69:11, 69:17, 69:20, 70:1, 70:16, 71:2, 71:21, 71:24, 72:19, 73:8, 73:15, 73:25, 74:17, 74:21,

76:6, 76:14, 76:22, 77:4, 78:9, 78:17, 79:20, 80:1, 80:8, 80:16, 80:20, 81:4, 81:19, 81:24, 82:7, 82:12, 83:2, 85:17, 86:21, 87:1, 87:6, 87:11, 87:23, 88:4, 88:8, 88:11, 88:14, 88:18, 88:23, 89:4, 89:7, 89:16, 90:8, 90:21, 91:2, 91:6, 91:18, 92:5, 92:10, 93:2, 94:2, 94:16, 94:25, 95:9, 95:22, 96:6, 96:13, 96:19, 97:8, 97:21, 97:23, 98:1, 98:13, 100:9, 101:25, 102:13, 102:20, 102:23, 103:10, 103:20

**themes** [1] - 16:21

**theories** [4] - 41:24, 41:25, 42:11, 72:8

**theory** [3] - 60:3, 67:16, 91:13

**therefore** [1] - 57:24

**they've** [2] - 60:19, 96:14

**thinking** [2] - 35:14, 83:3

**thinks** [1] - 75:1

**third** [6] - 8:2, 10:1, 33:17, 58:18, 66:15

**third-party** [1] - 58:18

**thousand** [2] - 16:1, 92:9

**three** [20] - 24:17, 28:16, 30:20, 30:21, 31:1, 31:4, 31:6, 31:7, 31:20, 40:4, 75:10, 78:22, 78:24, 79:10, 79:13, 79:21, 81:12, 81:21, 83:5

**throughout** [5] - 8:24, 23:22, 28:2, 37:14, 71:15

**thrust** [2] - 6:18, 63:13

**Thursday** [1] - 3:1

**tie** [1] - 70:23

**timely** [1] - 89:8

**tip** [5] - 83:1, 93:15, 93:16, 95:6, 97:5

**today** [9] - 2:12, 11:21, 30:9, 70:11, 71:25, 72:1, 77:11, 83:18, 90:24

**together** [3] - 43:6, 45:2, 45:7

**Tom** [1] - 2:6

**TOM** [1] - 1:17

**ton** [3] - 5:11, 29:1

**took** [3] - 36:19, 56:19, 96:21

**top** [2] - 43:20, 45:6

**topic** [2] - 58:14, 58:18

**topics** [1] - 60:18

**tops** [1] - 44:22

**total** [2] - 19:14, 21:9

**totally** [1] - 15:1

**track** [1] - 90:14

**trademark** [2] - 41:7, 41:8

**train** [1] - 97:25

**transactions** [1] - 56:8

**TRANSCRIPT** [1] - 1:9

**transcript** [1] - 15:24

**transpired** [1] - 85:22

**transposition** [1] - 9:25

**treat** [1] - 84:7

**trial** [44] - 2:22, 2:23, 2:25, 3:5, 8:17, 10:17, 11:6, 11:23, 11:24, 13:18, 15:11, 15:24, 17:24, 17:25, 19:1, 33:17, 34:5, 34:18, 34:22, 38:13, 38:16, 40:6, 47:2, 48:3, 48:18, 49:20, 51:23, 52:2, 62:5, 62:7, 62:8, 62:21, 65:7, 65:8, 70:13, 70:19, 82:1, 83:14, 87:15, 87:19, 89:20, 90:7

**trivial** [2] - 7:10, 7:11

**true** [1] - 98:1

**try** [5] - 3:8, 17:1, 20:19, 22:4, 79:3

**trying** [17] - 15:14, 22:19, 22:21, 26:18, 31:20, 35:15, 41:14, 44:13, 55:15, 55:23, 56:25, 71:11, 87:16, 87:21, 90:5, 90:18, 91:2

**Tuesday** [6] - 12:13, 12:17, 13:6, 33:5, 82:9, 82:11

**turn** [1] - 36:18

**turns** [1] - 31:2

**twice** [1] - 53:1

**twist** [39] - 20:6, 20:9, 20:24, 21:4, 21:10, 22:7, 22:15, 23:7, 23:9, 23:10, 23:15, 24:6, 25:23, 33:19, 46:14, 52:25, 72:22,

72:23, 73:23, 74:4, 74:24, 75:11, 82:16, 92:21, 92:25, 93:3, 93:11, 94:4, 94:23, 98:16, 98:20, 99:10, 99:11, 99:14, 99:21, 99:22, 101:18, 103:14, 103:15

**twist-in-place** [37] - 20:6, 20:9, 20:24, 21:4, 21:10, 22:7, 22:15, 23:9, 23:10, 23:15, 24:6, 25:23, 33:19, 46:14, 52:25, 72:22, 72:23, 73:23, 74:4, 74:24, 75:11, 92:21, 92:25, 93:3, 93:11, 94:4, 94:23, 98:16, 98:20, 99:10, 99:11, 99:14, 99:21, 99:22, 101:18, 103:14, 103:15

**two** [44] - 6:11, 21:8, 21:10, 21:11, 22:7, 23:7, 27:11, 31:12, 36:19, 38:12, 42:12, 47:12, 54:6, 56:8, 56:15, 58:15, 58:16, 59:7, 59:10, 59:11, 60:13, 70:1, 70:2, 70:17, 71:8, 71:10, 73:7, 73:21, 73:22, 75:11, 76:1, 77:21, 78:22, 79:7, 82:16, 84:5, 85:5, 85:17, 95:4, 95:5

**typically** [2] - 7:13, 7:16

**typo** [1] - 7:17

**typographical** [3] - 7:19, 7:25, 9:24

**typos** [1] - 7:6

## U

**U.S** [6] - 67:21, 89:24, 90:1, 90:3, 98:8, 104:8

**U.S.D.C.J** [1] - 1:12

**UK** [1] - 90:25

**ultimate** [1] - 45:9

**ultimately** [3] - 10:23, 25:8, 43:4

**unassailable** [1] - 91:23

**uncontested** [1] - 28:2

**under** [29] - 6:19, 8:4, 38:14, 53:6, 53:18, 54:12, 54:16, 55:11, 57:5, 59:20, 65:5,

68:3, 68:7, 73:17, 76:13, 76:25, 77:1, 78:3, 78:15, 80:22, 83:23, 84:6, 84:21, 84:22, 86:14, 86:18, 101:5, 102:8, 102:12

**underlying** [1] - 25:22

**underscore** [1] - 58:24

**understandable** [1] - 83:6

**understood** [9] - 6:17, 32:2, 65:23, 66:13, 82:5, 97:1, 97:2, 97:6

**undisclosed** [4] - 66:16, 66:18, 66:20, 68:14

**undisputed** [3] - 26:24, 49:5, 75:18

**unequivocal** [1] - 59:17

**unfair** [1] - 51:16

**unintelligible** [1] - 89:9

**unintended** [1] - 74:8

**unique** [2] - 70:24, 71:19

**UNITED** [1] - 1:1

**universal** [1] - 39:25

**university** [1] - 68:24

**unless** [3] - 4:9, 32:4, 49:25

**unlicensed** [3] - 76:20, 84:7, 85:4

**unnecessary** [2] - 51:24, 83:8

**unpatented** [2] - 54:18, 76:20

**unrelated** [1] - 56:8

**unreliable** [3] - 100:8, 102:8, 102:12

**untimely** [1] - 77:6

**unverified** [2] - 23:23, 28:12

**up** [46] - 9:7, 9:11, 13:13, 16:7, 16:9, 17:2, 18:15, 19:1, 20:14, 20:18, 23:16, 23:18, 27:12, 27:21, 29:5, 29:6, 29:24, 30:5, 30:6, 31:24, 32:19, 33:25, 34:21, 44:11, 45:15, 46:18, 46:19, 48:3, 48:23, 49:12, 58:25, 60:14, 62:14, 64:23, 66:8, 67:3, 68:12, 76:19, 79:14, 80:24, 83:19, 87:22, 93:21, 98:2, 101:8

**upcoming** [1] - 63:6

**update** [1] - 87:15

**updated** [3] - 88:3, 88:22, 89:19

**upward** [6] - 68:4, 68:8, 94:8, 94:13, 97:14

**USPTO** [1] - 9:22

## V

**Valentine** [11] - 51:4, 62:20, 63:18, 63:20, 63:25, 64:7, 64:20, 64:21, 65:10, 66:20

**Valentine's** [2] - 63:24, 65:2

**valid** [2] - 9:18, 9:19

**validity** [1] - 11:7

**valuable** [10] - 33:19, 62:18, 93:1, 94:23, 94:24, 94:25, 95:7, 98:17, 99:10, 99:22

**value** [10] - 22:18, 65:16, 75:22, 76:20, 91:14, 93:3, 94:4, 95:23, 96:1, 97:9

**varied** [1] - 95:9

**variety** [1] - 43:22

**vehicle** [2] - 10:16, 64:18

**verification** [1] - 28:14

**verify** [1] - 28:13

**version** [2] - 4:13, 62:24

**versus** [3] - 2:2, 19:14, 100:4

**view** [7] - 15:19, 34:25, 66:3, 67:23, 83:21, 94:7

**viewpoint** [1] - 61:22

**violate** [2] - 35:9, 35:10

**violated** [1] - 31:10

**violates** [1] - 30:17

**vs** [1] - 1:5

## W

**wait** [1] - 83:5

**waived** [1] - 6:10

**waiver** [2] - 12:2, 12:15

**waiving** [1] - 12:14

**walk** [1] - 103:8

**wants** [5] - 32:18, 34:8, 52:2, 87:7, 101:21

**warner** [1] - 104:2
**Warner** [1] - 104:7
**wash** [1] - 101:1
**waste** [2] - 19:23, 25:12
**water** [3] - 58:22, 63:25, 64:8
**ways** [3] - 45:7, 50:7, 101:9
**Wednesday** [8] - 44:4, 72:3, 73:1, 82:6, 91:3, 91:7, 102:17, 102:19
**weeds** [1] - 26:19
**week** [6] - 2:21, 3:2, 12:13, 70:5, 87:2, 89:24
**welcome** [1] - 44:7
**whichever** [1] - 2:22
**whole** [6] - 17:8, 31:3, 46:25, 49:10, 79:18, 101:23
**will-call** [1] - 51:19
**willful** [2] - 34:20, 57:4
**windup** [1] - 97:24
**wish** [1] - 73:2
**witness** [9] - 3:14, 14:6, 17:19, 17:20, 18:12, 37:10, 46:4, 62:4, 68:22
**witnesses** [10] - 3:12, 3:19, 10:17, 17:24, 18:21, 18:22, 32:1, 64:9, 64:11, 71:15
**wondering** [2] - 3:14, 10:21
**word** [9] - 9:25, 10:1, 47:21, 59:25, 74:21, 78:22, 78:23, 78:24, 98:9
**words** [7] - 8:1, 17:6, 51:8, 58:21, 63:10, 63:13, 92:9
**works** [4] - 31:6, 80:8, 80:14, 82:11
**world** [2] - 54:7, 101:23
**worried** [1] - 16:21
**worth** [2] - 52:25, 92:8
**write** [3] - 64:23, 81:20, 81:24
**writing** [4] - 11:19, 12:13, 12:22, 81:10
**written** [2] - 82:2, 87:23
**wrote** [2] - 80:24, 87:16

## Y

**year** [3] - 87:14, 88:24, 89:1
**years** [2] - 75:10, 75:11
**yellow** [1] - 41:5
**yesterday** [1] - 33:2

## Z

**Zeggi** [4] - 67:12, 67:15, 67:24, 68:6