## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ROGER P. JACKSON, M.D., <br><br> Plaintiff, <br><br> v. <br><br> NUVASIVE, INC., <br><br> Defendant. | Civil Action No. 21-53-RGA |

<u>MEMORANDUM ORDER</u>

Before me is NuVasive's Motion for Summary Judgment and to Exclude the Testimony of Dr. Brian Becker. (D.I. 416). I have considered the parties' briefing. (D.I. 417, 423, 428). For the reasons set forth below, NuVasive's Motion for Summary Judgment is DISMISSED AS MOOT and its Motion to Exclude the Testimony of Dr. Brian Becker is GRANTED.

## I.    BACKGROUND

Jackson asserts a total of fifteen claims in eight patents against NuVasive. (D.I. 467 at 4–5). The patents "generally relate to spinal implant systems composed of separately inserted components used to fixate or align" a patient's vertebrae. (D.I. 191 ¶ 8). On October 10, 2024, following a jury trial, I entered a final judgment over the parties' contractual disputes, which related to a license agreement entered into between the parties in 2014. (D.I. 385). A trial is set for this month to resolve the parties' remaining disputes. (D.I. 396).

NuVasive's current motion (D.I. 416) renews its previous *Daubert* motion (D.I. 209) and calls for summary judgment of indefiniteness of three of the asserted patents. I have already

granted summary judgment against NuVasive on the issue of indefiniteness (D.I. 443, 444),[1] so

this order is focused solely on whether to exclude Dr. Becker's testimony. NuVasive's motion for

summary judgment is DISMISSED AS MOOT.

## II.  LEGAL STANDARD

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."
>
> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset,

---

[1] Separately, NuVasive forfeited this argument when it failed to bring it in its first round of briefing. I indicated at a status conference that I would not be considering this argument. (D.I. 424-1 at 11 of 19 ("[T]here's four or five pages that are devoted to the argument [that] the asserted claims of three of the patents are indefinite[.], I don't think that was raised in the first round of briefing, so I'm not going to consider that now.")).

pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[2]

## III.    DISCUSSION

Dr. Becker's report concerns three patent families. "Six of the patents . . . relate to technology the parties refer to as 'twist-in-place.' . . . [There are also] two other (single member) families—'cannulated poly-axial screw' and 'circumferential tool engagement groove' families, respectively." (D.I. 211-2 at 176 of 516). I refer to the "twist-in-place" patents as the "TIP" patent family and the "cannulated poly-axial screw" and "circumferential tool engagement groove" patents as the "Lower Value Patents."[3]

I begin by noting that I am addressing the parties' disputes as they were initially briefed. (D.I. 210, 237, 248). I do not consider NuVasive's new arguments related to (1) Dr. Becker's alleged failure to apportion for unpatented and licensed features, and to (2) the BOT implant products. (D.I. 417 at 16–20). I do not credit NuVasive's argument that intervening events post-dating the original *Daubert* briefing justify the inclusion of new arguments. (D.I. 428 at 8–9). Even if NuVasive is correct that it "had no way of knowing how the Court would rule in the future when it filed its original Daubert motion" (D.I. 428 at 9), that is no basis on which to allow new

---

[2] The Court of Appeals wrote under an earlier version of Rule 702. Subsequent amendments affect the substance of the rule, but I do not think they alter the applicability of the quoted discussion.

[3] So named "in light of the twist-in-place patents (family) being thought of as Dr. Jackson's most valuable invention." (D.I. 211-2 at 188 of 516).

arguments. NuVasive had a fair opportunity to make its case in its original round of briefs. (D.I. 210, 248).

That leads to the disagreement at issue in this motion. NuVasive's re-submission and the bulk of the briefing from both parties focus on one dispute: did Dr. Becker establish the technical comparability[4] of the licenses to which he compared the TIP patent family and the Lower Value Patents? Dr. Becker's reasonable royalty analysis essentially adopts the following steps: (1) for the TIP family, take the median royalty rate for previous licenses into which Dr. Jackson had entered into for "broadly similar technology" (D.I. 211-2 at 186 of 516); (2) increase that figure by 0.5 for one additional patent family or 1.0 for two additional patent families beyond the TIP family. (*Id.* at 191 of 516). Table 4C of Dr. Becker's report summarizes this approach.

**Table 4C: Summary of BECKER REPORT Opined Royalty Rates by Patent Family**

| Patent Family Infringed | Worldwide Rate Opined | Statistics /1/ |
|---|---|---|
| Twist-in-place | 3.0% | NuVasive 2008 Agreement, Median of Comparable Jackson Agreements (Total/Median Rates) |
| Twist-in-place AND One Other Family | 3.5% | Upper Quartile of Comparable Jackson Agreements (Total/Median Rates) |
| Twist-in-place AND Two Other Families | 4.0% | Maximum of Comparable Jackson Agreements (Total/Median Rates) |

Note:
/1/: The statistics provided show the median, upper quartile, and maximum of the median royalty rate in each agreement. That is, the midpoint rate if the agreement specifies more than one rate.

---

[4] The parties dispute whether Dr. Becker adequately analyzed economic comparability as well. (D.I. 417 at 14–15; D.I. 423 at 15–16). The briefing on this issue is extremely limited, however—only about a page from each side, not counting NuVasive's reply—and the issue of technical comparability is dispositive.

4

(*Id.*).  The focus of the parties' dispute is whether Dr. Becker adequately showed that the licenses to which he compared the products at issue were, in fact, "broadly similar. . . ." (D.I. 211-2 at 186 of 516).  I agree with NuVasive that he did not.

### A. Dr. Becker Did Not Establish the Technical Comparability Between Dr. Jackson's Past Licenses and the TIP Patents.

"[The second *Georgia-Pacific*] factor examines whether the licenses [to patents not in suit] relied upon . . . in proving damages are sufficiently comparable to the hypothetical license at issue in suit." *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1325 (Fed. Cir. 2009).  "[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue." *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1317 (Fed. Cir. 2011).  It is improper to "rely on license agreements that were radically different from the hypothetical agreement under consideration to determine a reasonable royalty." *Id.* at 1316 (internal quotation marks omitted).  "[C]omparisons of past patent licenses to the infringement must account for the technological and economic differences between them." *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.,* 609 F.3d 1308, 1320 (Fed. Cir. 2010) (internal quotation marks omitted).  "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 79 (Fed. Cir. 2012).  "The testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate should be excluded." *DataQuill Ltd. v. High Tech Computer Corp.,* 887 F.Supp.2d 999, 1022 (S.D. Cal. 2011).

Here, Dr. Becker adopted two hypothetical negotiation dates, one in 2013 and another in 2017. (D.I. 211-2 at 209 of 516).  He then looked to Dr. Jackson's history of license agreements and "considered agreements which pre-dated the 2013 hypothetical negotiation date" to formulate

5

a reasonable royalty rate. (*Id.* at 183 of 516). After concluding that the rates in those agreements "statistically coalesce around three percent" (*id.* at 187 of 516), he adopted 3% as a reasonable royalty rate for the TIP patents. (*Id.* at 191 of 516).

NuVasive argues that Dr. Becker failed to "account for differences in the technologies and economic circumstances of the contracting parties." (D.I. 417 at 12) (quoting *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010)). At least with respect to technology,[5] I agree. Dr. Becker's technical comparability analysis is summarized by the following excerpt of his report:

> In addition to the attributes noted above, in my valuation, I also considered differences between the underlying technology licensed and the hypothetical reasonable royalty negotiation(s) for the patent-in-suit. I was supplied evaluations from Dr. Jackson addressing the technological differences between the patented technologies licensed in some of the licenses noted in **Table 3D** compared to the value of the patents-in-suit to NuVasive's products. In particular, Dr. Jackson provided a metric (ranging from "Much Greater" to "Much Less") comparing the importance of the patents-in-suit to the corresponding patents in the evaluated licenses. Dr. Jackson makes this comparison from the perspective of the licensee and its consumers (surgeons). See also **Table 3E**.

(D.I. 211-2 at 185 of 516). The bulk of Dr. Becker's technical comparability analysis, therefore, rests on a conversation he had with Dr. Jackson, the inventor of the asserted patents. Dr. Becker also supplements his technical comparability analysis with occasional references to the report of Dr. Jackson's technical expert, Dr. Errico, at one point noting that the TIP patents are similar to the technology licensed in a previous agreement because of his "understanding based on an interview with Dr. Errico." (D.I. 211-2 at 217 of 516).

---

[5] As I noted above, the parties' briefing on economic comparability was far more limited. In any event, Table 3D of Dr. Becker's report suggests that his economic comparability analysis was more thorough than his technical comparability analysis. (D.I. 211-2 at 218 of 516).

6

Table 3C:

**Comparability of 2008 Agreement and Hypothetical Negotiation for Twist-in-place Patent '932 and Patents in Twist-in-place Family**

| Factor | Hypothetical Negotiation | 2008 Agreement | Similarity |
|---|---|---|---|
| Timing of Agreement | January 2013 | December 2008 | ✔ |
| Licensor | Dr. Jackson | Dr. Jackson | ✔ |
| Licensee | NuVasive | NuVasive | ✔ |
| Products as of 2013 /1/ | | | ✔ |
|   Armada | ✔ | ✔ | |
|   Precept | ✔ | ✔ | |
|   Reline | ✔ | ✔ | |
|   SpheRx | ✔ | ✔ | |
|   VuePoint II | ✔ | — | |
| Technology/Patents | Twist-in-place Family | Polyaxial Screw IP<br>Helical Flange<br>Instruments/Methodologies<br>MIS IP | ✔ /2/ |
| Exclusivity | Non-exclusive | Non-exclusive /4/ | ✔ |
| Territory | Products Made in the U.S. and Sold Worldwide | Worldwide | ✔ |
| Term | Patent Life | Patent Life | ✔ |
| Royalty Rate | | | |
|   United States | — | 2.0% /5/ | |
|   International | — | Formula | |
|   Total/Worldwide | To Be Determined | 3.0% /3/ | |

Notes:
/1/: The 2008 Agreement products and the asserted products do not precisely overlap, but it is my understanding that they generally cover the same types of products/product lines. In particular, around 2013, NuVasive used or planned to use the 2008 Agreement technology in Armada, Precept, Reline/Falcon Plate, and SpheRx, as is shown by the product lines included in buy-out projections. See Tables D1-D6.
/2/: This is my understanding based on an interview with Dr. Errico.
/3/: See Table 3A.
/4/: Technologies excluding the Polyaxial Screw IP were licensed non-exclusively.
/5/: Royalty payment included an additional $3 million upfront payment.

Sources:
(1) Agreement Between NuVasive and Jackson Group. (March 5, 2008). "Development and Licensing Agreement."
(2) Interview with Dr. Thomas Errico, December 3, 2023.
(3) Expert Report of Dr. Thomas Errico Regarding Defendant NuVasive Inc.'s Infringement, § VII, Paragraph 32.
(4) Tables 3A, 4B & D1-D6.

(*Id.*) (highlight added).

This is not enough to establish technical comparability. First, Dr. Becker arrives at his 3% figure after comparing the TIP patents to Dr. Jackson's previously licensed technologies. He never specifies, however, what those technologies are or why they are similar enough to the TIP patents

7

to warrant the same royalty rate. Instead, Dr. Becker describes the previous licenses' technology with vague terms such as "Products," "Instruments," or "Patents." (D.I. 211-2 at 219 of 516). It is impossible to determine whether the technology in the previous licenses is comparable to the TIP patents when it is unclear what those technologies even are. "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics*, 694 F.3d at 79. Even in instances where Dr. Becker uses a more descriptive term to identify past licenses' technology—"Helical Flange" or "Polyaxial Screw," for example (D.I. 211-2 at 219 of 516)—he still fails to engage in any discussion as to what those terms mean.[6]

---

[6] I have gained some familiarity with these technologies over the course of litigation, but I am not the jury, and, in any event, my knowledge of these products is irrelevant to the question of whether Dr. Becker's method is reliable.

Table 3E:

**Value Comparison by Dr. Jackson of Patent Families in Suit and Previously Licensed Technology**

| Licensee | Year | Technology Licensed | Value of Patent Family in Suit to NuVasive Relative to Technology Licensed to Licensee | | |
|---|---|---|---|---|---|
| | | | Twist-in-place | Cannulated Polyaxial Screw | Tool Engagement Groove |
| Interpore (Non-Breakoff) | 2001 | Products | Much Greater | Greater | Greater |
| Interpore (Non-Breakoff) | 2001 | Instruments | Much Greater | Greater | Greater |
| Interpore (Breakoff) | 2002 | Products | Much Greater | Greater | Greater |
| Interpore (Breakoff) | 2002 | Helical Flange | Greater | Slightly Greater | Slightly Greater |
| Interpore (Breakoff) | 2002 | Instrument | Much Greater | Much Greater | Much Greater |
| Interpore (Non-Breakoff) | 2002 | Products | Greater | Slightly Greater | Slightly Greater |
| DePuy AcroMed | 2003 | Products within scope of Licensed Patents | Greater | Slightly Greater | Slightly Greater |
| DePuy AcroMed | 2003 | Dual Closure Products | Greater | Slightly Greater | Slightly Greater |
| DePuy AcroMed | 2003 | Helical Flange and thread form | Greater | Slightly Greater | Slightly Greater |
| IST | 2004 | Products | Much Greater | Greater | Greater |
| IST | 2004 | Helical Flange | Greater | Slightly Greater | Slightly Greater |
| IST | 2004 | Domed Bottom | Much Greater | Greater | Greater |
| EBI | 2005 | Instruments | Much Greater | Much Greater | Much Greater |
| EBI | 2005 | Patents | Much Greater | Much Greater | Much Greater |
| EBI | 2005 | Products/Polyaxial Screw | Much Greater | Greater | Greater |
| EBI | 2005 | Helical Flange | Greater | Slightly Greater | Slightly Greater |
| Interpore (Non-Breakoff) | 2005 | Patents | Greater | Slightly Greater | Slightly Greater |
| Interpore (Non-Breakoff) | 2005 | Helical Flange | Greater | Slightly Greater | Slightly Greater |
| Interpore (Non-Breakoff) | 2005 | Medtronic Sublicense | Greater | Greater | Greater |
| Aesculap | 2006 | Licensed Products | Greater | Slightly Greater | Slightly Greater |
| Aesculap | 2006 | Licensed BOT Application | Greater | Slightly Greater | Slightly Greater |
| NuVasive | 2008 | BOT Implants | Greater | Slightly Greater | Slightly Greater |
| NuVasive | 2008 | Helical Flange | Greater | Slightly Greater | Slightly Greater |
| NuVasive | 2008 | Instrument | Much Greater | Much Greater | Much Greater |
| NuVasive | 2008 | Medtronic Agreement | Greater | Slightly Greater | Slightly Greater |
| NuVasive | 2008 | Methodologies | Much Greater | Much Greater | Much Greater |
| NuVasive | 2008 | MIS Tools | Much Greater | Much Greater | Much Greater |
| NuVasive | 2008 | Polyaxial Screw | Much Greater | Greater | Greater |
| NuVasive | 2008 | Products | Much Greater | Greater | Greater |
| NuVasive | 2008 | Related System Components | Much Greater | Much Greater | Much Greater |
| NuVasive | 2008 | Abbott MIS/LIS Sublicense | Much Greater | Much Greater | Much Greater |
| Synergy Surgical | 2009 | Polyaxial Screw | Much Greater | Greater | Greater |
| Synergy Surgical | 2009 | Helical Flange | Greater | Slightly Greater | Slightly Greater |
| Synergy Surgical | 2009 | BOT | Greater | Slightly Greater | Slightly Greater |
| Synergy Surgical | 2009 | Products | Much Greater | Greater | Greater |

Source:
(1) Interview with Dr. Roger Jackson, December 10, 2023.

(*Id.*).

Second, Dr. Becker's reliance on Dr. Jackson and Dr. Errico only highlights the deficiencies in Dr. Becker's approach. Dr. Becker relies on "evaluations from Dr. Jackson

addressing the technological differences" between the TIP patents and the previously licensed technologies. (D.I. 211-2 at 185 of 516). Dr. Jackson's "evaluations" are simply his opinions "from the perspective of the licensee and its consumers (surgeons)." (*Id.*). These are expert opinions. Plaintiff has not complied, however, with the requirements for using Dr. Jackson as an expert. Dr. Jackson wrote no reports disclosing his opinions. Since Plaintiff has not complied with the rules for disclosing expert opinions, Dr. Becker cannot rely upon the opinions. Furthermore, based on Table 3E, it seems Dr. Jackson's evaluations were more focused on comparing the *value* of the technologies than they were on demonstrating technical comparability.

Dr. Becker's references to Dr. Errico's report are no more helpful, despite Dr. Jackson's arguments. (D.I. 423 at 12). For one, Dr. Becker's references to Dr. Errico's report are just as vague as his conversations with Dr. Jackson. (*See, e.g.*, D.I. 211-2 at 217 of 516 (concluding that the TIP patents and the technologies in a 2008 agreement between Dr. Jackson and NuVasive are similar "based on an interview with Dr. Errico")). And just as with Dr. Jackson, Dr. Errico's analysis is aimed more at comparing the value of the technologies than establishing technological comparability.

> 51. With respect to the twist-in-place technology, because of the aforementioned advantages of the technology, I would have expected potential licensees of the technology in 2013 (when the first of the asserted twist-in-place patents issued) to place significant value on access to this technology, particularly when compared to technology that was directed to other, less critical and complex aspects of implant systems such as closure tops, rods and the like. In that regard, I would have expected licenses to twist-in-place technology to skew towards the higher range of royalty rates for products in this field.

(D.I. 212-2 at 29 of 806) (cited by Dr. Becker at D.I. 211-2 at 181 of 516).

Finally, I note that while Dr. Becker's hypothetical negotiation analysis considered decade-old license agreements to "Products" and "Instruments" (D.I. 211-2 at 219 of 516), it excluded a license agreement from 2018 between Dr. Jackson and a company called Alphatec Spine Inc. that

10

actually licensed the TIP patents. (D.I. 423 at 9–10, 9 n.5). Dr. Becker does not mention the agreement in his report, but at deposition he stated that he was aware of it and excluded it because it post-dated the date of hypothetical negotiation. (D.I. 418-1 at 142:25–144:16). Taken alone, the exclusion of a license post-dating the hypothetical negotiation is not usually a reason to grant a *Daubert* motion.[7]  *See, e.g., Third Wave Techs., Inc. v. Stratagene Corp.*, 405 F. Supp. 2d 991, 1011 (W.D. Wis. 2005) (finding that "it was not improper for [an expert] to look solely at the situation as it would have appeared to two companies attempting to enter into a licensing agreement" on the date infringement began). Any inconsistencies between Dr. Becker's decision to include licenses to other (in some cases, unidentified) technology that would be over a decade old by the time of the hypothetical negotiation and the decision to exclude the Alphatec license is simply a topic for cross-examination.

Dr. Becker's royalty analysis with respect to the TIP patents is excluded.

### B.  Dr. Becker's Analysis of the Lower Value Patents Violates Rule 702.

For the same reasons, Dr. Becker's analysis of the Lower Value Patents must also be excluded. Specifically, I see no indication in Dr. Becker's report that he considered the technical comparability between the technology in Dr. Jackson's previous licenses and the Lower Value Patents. Instead, the entirety of Dr. Becker's analysis is as follows:

> I understand the other two patent families both have some value, but relatively less value than the twist-in-place family. As the infringement of the other families generally occurs after—and in conjunction with—infringement of the twist-in-place patents, I consider Dr. Jackson's history of licensing and/or "stacking" multiple patented technologies. In particular, Dr. Jackson has been able to charge a royalty of 3.5 percent for one quarter of his licenses (upper quartile). He has reached a total/median royalty as high as 4.0 percent. See **Table 3A.**

---

[7] NuVasive's argument to the contrary (D.I. 417 at 11–12) only establishes that considering post-dating licenses is permitted under certain circumstances, not that failure to consider post-dating licenses warrants exclusion of testimony under Rule 702. NuVasive does not cite a single case in which an expert's testimony was excluded on that basis.

> I treat these upper quartile and maximum royalties achieved on actual agreements by Dr. Jackson as a reasonable expectation of a limit on Dr. Jackson's royalty with twist-in-place patents and one (3.5 percent) and two (4.0 percent) other patent families, respectively.  See **Table 4C** below.

(D.I. 211-2 at 190 of 516) (citation omitted).  The implication is the Lower Value Patents each add 0.5 percent to the royalty rate.  It is not at all clear where the 0.5 figure comes from.  Dr. Becker's report does not attempt to tie that figure to whatever value the Lower Value Patents have, or to explain why the cannulated poly-axial screw and circumferential tool engagement groove patents are effectively indistinguishable for the purposes of Dr. Becker's analysis.  Because Dr. Becker's report provides even less support for its conclusions regarding the Lower Value Patents than it does for the TIP patents, I find that his reasonable royalty opinions must be excluded with respect to them as well.

NuVasive's *Daubert* motion is therefore GRANTED.

IT IS SO ORDERED.

Entered this 10th day of April, 2025

_____
United States District Judge