**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROGER P. JACKSON, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>NUVASIVE, INC.,<br><br>Defendant | Civil Action No. 21-53-RGA |

MEMORANDUM OPINION

Stephen J. Kraftschik, POLSINELLI PC, Wilmington, DE; Thomas L. Gemmell, POLSINELLI PC, Chicago, IL; Aaron M. Levine, Bobbie J. Horocofsky, POLSINELLI PC, Houston, TX; Darren E. Donnelly, POLSINELLI PC, San Francisco, CA; Kevin R. Davis, POLSINELLI PC, Los Angeles, CA,

Attorneys for Plaintiff.

Daniel M. Silver, Alexandra M. Joyce, MCCARTER & ENGLISH, LLP, Wilmington, DE; Colin G. Cabral, James R. Anderson, PROSKAUER ROSE LLP, Boston, MA; Jessica M. Griffith, PROSKAUER ROSE LLP, Los Angeles, CA; Hannah G. Silverman, Connor J. Villar, PROSKAUER ROSE LLP, New York, NY; Elizabeth C. Shrieves, PROSKAUER ROSE LLP, Washington, DC,

Attorneys for Defendant.

August 24, 2026

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me are a set of motions from two related trials. From the first trial, I have Plaintiff Roger P. Jackson, M.D.'s Renewed Motion for Judgment as a Matter of Law (D.I. 382) and Motion to Stay Enforcement of the Judgment (D.I. 389), and Defendant NuVasive's Motion to Alter or Amend the Judgment and/or for a New Trial under Rule 59 (D.I. 383). From the second trial, I have Dr. Jackson's Renewed Motion for Judgment as a Matter of Law and/or Motion for a New Trial (D.I. 541), Motion for Equitable Remedies (D.I. 542), and Motion for Damages Trial (D.I. 543), and NuVasive's Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) and Motion to Alter or Amend the Judgment under Rule 59(e) (D.I. 544). I have reviewed the briefing for these motions. (D.I. 387, 388, 389, 392, 393, 394, 395, 402, 403, 548, 549, 550, 557, 558, 559, 561, 562, 563). For the reasons set forth below,

- Dr. Jackson's Renewed Motion for Judgment as a Matter of Law (D.I. 382) is DISMISSED as moot.
- NuVasive's Motion to Alter or Amend the Judgment and/or for a New Trial under Rule 59 (D.I. 383) is DENIED.
- Dr. Jackson's Motion to Stay Enforcement of the Judgment (D.I. 389) is DISMISSED as unripe.
- Dr. Jackson's Renewed Motion for Judgment as a Matter of Law and/or Motion for a New Trial (D.I. 541) is DENIED IN PART AND DISMISSED AS MOOT IN PART.
- Dr. Jackson's Motion for Equitable Remedies (D.I. 542) and Motion for Damages Trial (D.I. 543) are DENIED with leave to renew after the appeal is decided.

- NuVasive's Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) and Motion to Alter or Amend the Judgment under Rule 59(e) (D.I. 544) is GRANTED IN PART AND DENIED IN PART.

## I. BACKGROUND

In his Third Amended Complaint, Dr. Jackson alleged that NuVasive's Armada, Reline, and VuePoint II products (together, "the accused products") infringe U.S. Patent Nos. 8,353,932 (the "'932 patent"), 8,696,711 (the "'711 patent"), 9,788,866 (the "'866 patent"), 9,808,292 (the "'292 patent"), 10,335,200 (the "'200 patent"), 10,561,444 (the "'444 patent"),[1] 10,722,273 (the "'273 patent"), and 11,051,856 (the "'856 patent"). (D.I. 191 at 22–61). The patents "generally relate to spinal implant systems composed of separately inserted components used to fixate or align" a patient's vertebrae. (*Id.* at ¶ 8). As part of its defense, NuVasive asserted a set of counterclaims based on a 2014 Agreement between it and Dr. Jackson (the "2014 Agreement"). (D.I. 201 at 40–51). The 2014 Agreement licensed certain rights to NuVasive, including the "helical flange" technology, and provided a covenant not to sue for products practicing the licensed technology. (*Id.* at 23–40).

At my request, the parties stipulated to litigating the issues in two separate trials, agreeing to have the contractual issues decided in the first trial (the "contract trial") and the patent issues decided in the second (the "patent trial"). (D.I. 274 at 1–2).

The contract trial included Dr. Jackson's fraudulent inducement claim (D.I. 191, Count Nine) and NuVasive's breach of contract (D.I. 201, First Counterclaim), breach of implied covenant of good faith and fair dealing (*id.*, Second Counterclaim), and unjust enrichment claims

---

[1] The '444 patent was asserted at the time of the contract trial but was dropped shortly before the patent trial. (D.I. 549 at 2).

(*id.*, Fourth Counterclaim). The jury found in favor of NuVasive on Dr. Jackson's fraudulent inducement claim, and in favor of Dr. Jackson on NuVasive's breach of contract, breach of implied covenant of good faith and fair dealing, and unjust enrichment counterclaims. (D.I. 364; D.I. 372). Due to my earlier rulings, Dr. Jackson was liable for one breach of contract claim, and the parties stipulated that the damages for that breach were $337,500. (D.I. 355).

Prior to the patent trial, I excluded the testimony of Dr. Jackson's damages expert under Federal Rule of Evidence 702. (D.I. 489). The patent trial addressed infringement of seven asserted claims, one from each of the '932, '711, '866, '292, '200, '273, and '856 patents. This trial included questions of direct infringement, induced infringement, willful infringement, contributory infringement, indirect infringement abroad,[2] and the affirmative defense of obviousness. The jury concluded that NuVasive was not liable for induced or willful infringement of any asserted patent and that NuVasive did not infringe the '866 or '292 patents at all. (D.I. 537). However, the jury found NuVasive liable for direct infringement of the '273, '200, and '856 patents, and contributory and indirect infringement abroad for the '273, '200, '856, '932, and '711 patents. (*Id.*). The jury rejected the affirmative defense of obviousness for the '273, '200, '856, '932, and '711 patents. (D.I. 534 at 17). Damages for infringement were not addressed as part of the patent trial.

## II. LEGAL STANDARD

### A. Judgment as a Matter of Law

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. FED. R. CIV. P.

[2] "Indirect infringement abroad" is a phrase used at trial as shorthand for infringement under 35 U.S.C. § 271(f).

50(a)(1). "Entry of judgment as a matter of law is a 'sparingly' invoked remedy, 'granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citation omitted).

"A post-trial Rule 50 motion can only be made on grounds specifically advanced in a motion for a directed verdict at the end of plaintiff's case." *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 220 (3d Cir. 2021) (cleaned up). "To prevail on a renewed motion for JMOL following a jury trial, a party must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the Court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). The Court "must not weigh evidence, engage in credibility determinations, or substitute its version of the facts for the jury's." *Pitts v. State*, 646 F.3d 151, 155 (3d Cir. 2011); *Perkin-Elmer*, 732 F.2d at 893. Rather, the Court must determine whether the evidence supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); 9B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2524 (3d

ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury might reasonably find a verdict for that party.").

**B. Alter or Amend a Judgment**

Rule 59(e) permits a party to file a motion to alter or amend a judgment. FED. R. CIV. P. 59(e). The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). "A proper Rule 59(e) motion . . . must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010).

**C. Motion For New Trial**

Federal Rule of Civil Procedure 59(a)(1)(A) provides:

> The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . .

Among the most common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *Zarow-Smith v. N.J. Transit Rail Operations, Inc.*, 953 F. Supp. 581, 584–85 (D.N.J. 1997) (citations omitted).

The decision to grant or deny a new trial is committed to the sound discretion of the district court. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir. 1993) (reviewing district court's grant or denial of

new trial motion under the "abuse of discretion" standard). Although the standard for granting a new trial is less rigorous than the standard for granting judgment as a matter of law—in that the Court need not view the evidence in the light most favorable to the verdict winner—a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks [the] conscience." *Williamson*, 926 F.2d at 1352–53.

### D. Stay of Enforcement of a Judgment

"A court may stay the enforcement of a final judgment entered under Rule 54(b) until it enters a later judgment or judgments, and may prescribe terms necessary to secure the benefit of the stayed judgment for the party in whose favor it was entered." FED. R. CIV. P. 62(h). The Supreme Court has noted that under the second portion of this rule, "it would be within the power of the District Court to protect all parties by having the losing party deposit the amount of the judgment with the court." *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 13 n.3 (1980).

## III. DISCUSSION

### A. Dr. Jackson's Renewed Motion for Judgment as a Matter of Law Related to the Contract Trial

Dr. Jackson makes the "unique request" of moving for judgment as a matter of law on the three NuVasive counterclaims litigated in the contract trial: (1) breach of the covenant not to sue, (2) breach of the implied covenant of good faith and fair dealing, and (3) unjust enrichment. (D.I. 387 at 1). What makes the request "unique" is that Dr. Jackson prevailed on all three of these defenses at trial. (D.I. 372). As such, Dr. Jackson's current motion is not aimed at changing the jury's verdict; instead, he seeks recognition that the law and facts were so clear that the defenses should not have been presented to the jury. (D.I. 387 at 1). NuVasive responds by arguing that

Dr. Jackson's motion should be denied as moot because a party cannot renew its motion of judgment as a matter of law on an issue after receiving a jury verdict in its favor. (D.I. 394 at 1).

I agree that the prevailing party cannot bring a motion for judgment as a matter of law on an issue on which it prevailed. As the Advisory Committee on Rules explained, "a jury verdict for the moving party moots the issue." Notes of Advisory Committee of Rules, 1991 Amendment to Subdivision (b). "It would waste time and resources to require a party to move for judgment as a matter of law under Rule 50(b), formerly denominated 'judgment *nothwithstanding* the verdict,' if that party has obtained a jury verdict in its favor." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 n.3 (7th Cir. 2012) (internal quotation omitted). Other courts have come to the same conclusion. *See Bell v. Williams*, 108 F.4th 809, 818–19 (9th Cir. 2024); *Lyon Dev. Co. v. Bus. Men's Assur. Co.*, 76 F.3d 1118, 1122 (10th Cir. 1996); *Woodall v. Walt Disney Co.*, 2025 WL 2955505, at *3 (C.D. Cal. Sept. 23, 2025); *Genband US LLC v. Metaswitch Networks Corp.*, 2016 WL 7650735, at 4 (E.D. Tex. Sept. 29, 2016); *TransWeb, LLC v. 3M Innovative Props. Co.*, 16 F. Supp. 3d 385, 407 (D.N.J. 2014); *Peeler v. KVH Indus.*, 13 F. Supp. 3d 1241, 1248 (M.D. Fla. 2014).

Thus, Dr. Jackson's renewed motion for a judgment as a matter of law (D.I. 382) is dismissed as moot.

### B. NuVasive's Motion to Alter or Amend the Judgment and/or for a New Contract Trial

#### 1. Alter or Amend the Judgment

NuVasive presents three arguments to support its motion to alter or amend the judgment under Rule 59(e) on its counterclaims related to the 2014 Agreement. (D.I. 388 at 1, 12–13).

##### a. Interpretation of Section 3.03

First, NuVasive argues that the Court's interpretation of Section 3.03 of the 2014 Agreement was clear error. (D.I. 388 at 13). NuVasive argues that Section 3.03 was intended to serve as a buyout payment for all financial obligations that it may have owed Dr. Jackson, not just financial obligations related to the rights granted in Section 2.02 of the Agreement. (*Id.* at 13–14). NuVasive previously raised these arguments in its summary judgment motion. (*See* D.I. 210 at 24–26). In response, Dr. Jackson argues that this argument improperly relitigates issues without any new evidence or legal changes. (D.I. 395 at 8–9).

I agree with Dr. Jackson. A motion to alter or amend a judgment "may not be used to relitigate old matters." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 n.5 (2008) (internal quotation omitted). NuVasive notes that it had previously raised this argument in its summary judgment motion. (D.I. 388 at 13). The only new evidence NuVasive identifies to support this motion is a brief section of testimony from the attorney who negotiated the 2014 Agreement on behalf of Dr. Jackson. (*Id.* at 15 (citing Tr. 547:18–23)).[3] This testimony simply confirms that the buyout was for $30 million. (*Id.*). Nothing in the cited testimony overrides the clear meaning of the 2014 Agreement, nor does it show the parties intended the Agreement to be a universal buyout. NuVasive's "motion was essentially a repeat of [its] prior motions, and thus was an improper attempt to relitigate matters." *Reardon v. New Jersey*, 822 F. App'x 153, 155 (3d Cir. 2020).

**b. Question of Law or Fact**

NuVasive argues that whether the asserted patents meet the definition of "Helical Flange" in the 2014 Agreement was a question of law for the Court, not a question of fact for the jury. (D.I. 388 at 1). Dr. Jackson responds by arguing that the Court correctly identified which portions

---

[3] The trial transcripts for the two trials are at D.I. 374–378 for the contract trial and at D.I. 552–556 for the patent trial. Each set of transcripts is consecutively paginated, and I refer to them as "Tr. ___." The context should make clear the trial to which the trial transcript refers.

of the dispute were questions of law and which were questions of fact. (D.I. 395 at 11). Dr. Jackson points to the Joint Pretrial Order to show that NuVasive agreed with sending the disputed issues to the jury. (*Id.* at 10–11 (citing D.I. 335 at ¶¶ 73–76)).

NuVasive either raised this issue long before trial (and lost) or it did not raise it. If the former, a motion to alter or amend a judgment "may not be used to relitigate old matters." *Exxon Shipping*, 554 U.S. at 487 n.5 (2008) (internal quotation omitted). If the latter, then it forfeited the issue by not raising it until after the trial, since it had long known how I intended to handle the issue.

Long before trial, NuVasive filed a motion for summary judgment in which it argued that the asserted patents could not be asserted against NuVasive because they were "related technology" covered by the definition of "Helical Flange." They were covered because they either incorporated the '689 patent by reference or otherwise used language describing a Helical Flange. (D.I. 210 at 26–28). I interpreted the 2014 Agreement, and I denied NuVasive's motion because the Agreement did not provide a "broad package license." (D.I. 261 at 12). Rather, the Agreement required analyzing whether the Helical Flange was related to the subject matter claimed in the asserted patent and how the accused products use both licensed and unlicensed technologies. (*Id.* at 9–16). NuVasive filed a motion for clarification of my denial of its motion for summary judgment. (D.I. 265 at 4–8). In my Order on NuVasive's Motion for Clarification, I wrote: "The parties dispute whether the asserted patents meet the Helical Flange definition. That is a fact question for the jury to resolve." (D.I. 283 at 9). I entered this Order on July 25; the trial began on August 12. In both the Proposed Pretrial Order and the Revised Proposed Pretrial Order, NuVasive stated that whether the asserted patents met the definition of "Helical Flange" was an issue for the jury. (D.I. 308 at ¶¶ 73–74; D.I. 335 at ¶¶ 73–75). By July 25, if not before, NuVasive

should have known of its argument that whether the asserted patents meet the Helical Flange definition was a question of law; NuVasive does not dispute that it knew of the argument long before trial began. (*See* D.I. 402 at 3–4). But NuVasive took no action to make its view known. In a motion to alter or amend a judgment, "courts will not address new arguments or evidence that the moving party could have raised before the decision issued." *Banister v. Davis*, 590 U.S. 504, 508 (2020). Contrary to NuVasive's assertion that it "had no choice but to proceed in compliance with the Court's Order" (*id.* at 4), there was nothing stopping NuVasive from raising this argument earlier. It is too late to litigate the issue post-trial.[4]

In any event, I do not believe there was a legal error. Prior to trial, I interpreted the meaning of "Helical Flange" as used in the 2014 Agreement. (*See* D.I. 261 at 13–14). This ruling addressed the legal question of contract interpretation; the only issue left was to determine if the asserted patents met the definition of "Helical Flange." The remaining issue did not involve contract interpretation or patent claim construction.[5] As such, the only remaining issue was a question of fact for the jury to determine.

**c. Interpretation of "Helical Flange" and "Related Intellectual Property"**

Last, NuVasive moves to alter or amend the judgment because my interpretation of the "Helical Flange" definition "established an impracticable standard." (D.I. 388 at 1). The only

[4] The law versus fact analysis was an element in NuVasive's larger summary judgment and clarification arguments. However, NuVasive does not cite anything submitted before trial where it explicitly argued that whether the asserted patents met the definition of Helical Flange was a question of law.

[5] I note that anticipation is a question of fact, about which experts testify, even when the anticipating reference is a patent. By NuVasive's logic, anticipation by a prior art patent would always be a question of law. I think that is wrong.

aspect of my "Helical Flange" interpretation that NuVasive discusses is the "related to intellectual property" portion. (*Id.* at 15).[6]

The 2014 Agreement defined "helical flange" as:

> the proprietary helically wound mating and interlocking structures owned by the Jackson Group and utilized as the means by which closure tops engage polyaxial screws and other spinal implants, instead of threads, with the proprietary elements claimed or disclosed in U.S. Patent No. 6,726,689, and any continuations, patent applications, substitutions, amendments, extensions, reexaminations, continuations-in-part, divisions, reissues, additions and counterparts thereto and to any other related intellectual property invented and owned by the Jackson Group.

(D.I. 211-1, Ex. A at 3). In a summary judgment opinion, I explained, "Mere incorporation by reference of the '689 patent is insufficient to bring an otherwise non-Helical-Flange patent within the scope of the Helical Flange definition." (*Id.* at 15 (citing D.I. 261 at 13)). NuVasive argues this interpretation was clear error.

NuVasive is again attempting to relitigate an issue that I already resolved. For the most part, NuVasive presents the same arguments it previously offered at the summary judgment stage (*see* D.I. 239 at 8–9) without identifying any new evidence or intervening changes in the law. The only new issue NuVasive raises is potential confusion from Jury Instruction 3.1.[7] (D.I. 388 at 18). NuVasive argues the instruction created an impossible standard by informing the jury that "incorporation by reference of the '689 patent was not sufficient, but also that other descriptions

---

[6] At points, NuVasive's briefing seems to indicate that the interpretation of the "Helical Flange" definition and the interpretation of "other related property" are two separate issues. (*See* D.I. 388 at 16 ("to determine whether the asserted patents were 'related intellectual property' based on the definition of 'Helical Flange.'")). Any arguments about these being two separate issues were "raised in passing, and therefore, have been waived." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997); *see also DLJ Mortg. Cap., Inc. v. Stevens*, 167 F. 4th 632, 635 (3d Cir. 2026).

[7] NuVasive argues that if the definition of "Helical Flange" and "related intellectual property" were interpreted correctly, then the evidence presented at trial would support its license defense. (D.I. 388 at 4–12, 17–18). I do not address this argument as it is premised on NuVasive's argument that it is a question of law whether the asserted patents meet the definition of "Helical Flange."

and depictions of the technology-at-issue were not enough either." (*Id.*). Specifically, NuVasive identifies the following portion of the jury instructions as a source of confusion:

> an Asserted Patent *merely* mentioning or depicting a helical flange, flange form, guide and advancement structure, or incorporating by reference the '689 Helical Flange patent (from the 2014 Agreement) is insufficient to bring a patent that is not specifically directed to Dr. Jackson's proprietary helically wound mating and interlocking structures within the scope of the Helical Flange definition.

(D.I. 362 at 7) (emphasis added).

I disagree with NuVasive's characterization. This portion of the jury instruction began by using the word "merely," indicating that there had to be something more than simply mentioning or depicting the Helical Flange. Consider the quoted portion in the context of the full instruction, which states:

> It is my job as the judge to provide to you any meaning of contractual language that I have already interpreted. You must accept the meanings I give you and use them when you decide whether the Asserted Patents are "related intellectual property" under the Helical Flange definition of the 2014 Agreement.
>
> I have interpreted the term "related" in "related intellectual property" to mean "technology that is related to the subject matter at issue, which is 'the proprietary helically wound mating and interlocking structures . . . utilized as the means by which closure tops engage polyaxial screws and other spinal implants, instead of threads.'" Therefore, when determining whether the Asserted Patents are "related intellectual property" under the Helical Flange definition, you must decide whether the Asserted Patents are specifically directed to Dr. Jackson's proprietary helically wound mating and interlocking structures utilized as the means by which closure tops engage polyaxial screws and other spinal implants, instead of threads. Two points: (1) A patent can be a "related" patent within the meaning of the 2014 Agreement without being a family member of the '689 patent; and (2) *an Asserted Patent merely mentioning or depicting a helical flange, flange form, guide and advancement structure, or incorporating by reference the '689 Helical Flange patent (from the 2014 Agreement) is insufficient to bring a patent that is not specifically directed to Dr. Jackson's proprietary helically wound mating and interlocking structures within the scope of the Helical Flange definition.*

(D.I. 362 at 7) (emphasis added). The portion NuVasive argues caused confusion simply acts as a second point of clarification. Thus, I find no mistake that warrants altering or amending the judgment.

For the reasons addressed above, NuVasive's motion to alter or amend the judgment (D.I. 383) is denied.

**2. New Trial**

In the alternative, NuVasive presents three arguments for a new trial under Rule 59(a). (D.I. 388 at 1, 18–19).

**a. Clear Weight of the Evidence**

First, NuVasive argues the jury's verdict determining that the asserted patents do not meet the "Helical Flange" definition was against the clear weight of the evidence. (D.I. 388 at 19). NuVasive argues that the '200, '711, and '932 patents are "related intellectual property" because they incorporate by reference the '689 patent and because the three patents have the same specification, with identical written description, that describes a helical flange as one of the options for use in a closure structure. (*Id.* at 5–7; *see* '200 patent, col. 6, lines 49–61; '711 patent, col. 6, lines 45–57; '932 patent, col. 6, lines 48–60). The '273 and '866 patents are "related intellectual property," NuVasive argues, because the specification of the two patents describes a receiver with the same mating and interlocking helically wound flange as the '689 patent. (*Id.* at 7–9). To argue the '292 and '856 patents are "related intellectual property," NuVasive cites to portions of the summaries of inventions, the detailed descriptions, and portions of the claims to argue that the patents have a helical flange that functions the same as the one claimed in the '689 patent.[8] (*Id.* at 9–12).

---

[8] The 2014 Agreement defined "helical flange" as "the proprietary helically wound mating and interlocking structures . . . with the proprietary elements claimed or disclosed in U.S. Patent No. 6,726,689 . . . ." (D.I. 211-1, Ex. A at 3). The '689 patent claims a helical flange. As stated in the '689 patent's background of the invention:

> The present invention is directed to a structure for use in interlocking together two elements and, in particular, to a structure for joining together parts of a medical implant. The structure includes a first interlocking form on a closure and a mating

Dr. Jackson responds by arguing that the evidence he presented at trial counters NuVasive's position. (D.I. 395 at 4–7, 14–16). Dr. Jackson also notes, "NuVasive does not cite to the trial in any capacity" beyond references to some exhibits. (*Id.* at 14–15).

NuVasive's paragraph saying the verdict was against the clear weight of the evidence at trial contains no citations to the trial testimony. It does say, "as explained above," the verdict was against the clear weight of the evidence, but this vague reference on page 19 of the brief is not any more helpful, and, indeed, while the earlier pages cite the various patents, they do not cite any trial testimony. (*See* D.I. 388). I thus think that NuVasive has not shown that a verdict in favor of Plaintiff was against the clear weight of the evidence.

**b. Improper Conduct**

Second, NuVasive argues that Dr. Jackson's counsel unfairly influenced the verdict by repeatedly stating that the asserted patents were not in the same family as the '689 patent. (D.I. 388 at 19–21). NuVasive argues that this was improper conduct because it directly violated an agreement made during the charge conference, ran afoul of the jury instructions, and disregarded my rulings. (*Id.*). As a result, NuVasive argues that a new trial is necessary to prevent a miscarriage of justice. (*Id.* at 21).

Dr. Jackson responds that there was never an order prohibiting discussion of the patent families. (D.I. 395 at 17–18). He argues that the discussion of patent families was relevant as one

---

> second interlocking form on a receiver. The closure is operably rotated into the receiver. The first and second interlocking forms are both helically wound so that the first interlocking form advances relative to the second interlocking form, when the closure with the first interlocking form is inserted in the receiver and rotated. At least one of the first or second interlocking forms includes a projection that overlaps and radially locks with the other interlocking form when the two forms are mated.

('689 patent, col. 1, lines 6–18).

of many factors involved in determining whether the asserted patents were related intellectual property. (*Id.* at 17). In response to NuVasive's argument that Dr. Jackson's statements during closing were improper, Dr. Jackson points out that NuVasive has not identified "a complaint from the Court or an objection by NuVasive." (*Id.* at 20). Taken as a whole, Dr. Jackson argues that this is not an "exceptional circumstance" that justifies a new trial. (*Id.* at 20–21).

NuVasive has only identified two times that it objected to testimony discussing patent families during the presentation of evidence, with the testimony being struck after one of these instances. (D.I. 388 at 20). I agreed to instruct the jury that "a patent can be a 'related' patent within the meaning of the 2014 Agreement without being a family member of the '689 patent." (Tr. 1021:1–2; *see also* Tr. 902:20–23; D.I. 362 at 9). I think these actions remedied any potential prejudice that arose during the presentation of evidence.

Before closing arguments, the parties disputed whether patent family status was a relevant factor in determining if a patent qualified as "related intellectual property" under the 2014 Agreement. (Tr. 899:21–905:24). After this discussion, I concluded that "there's a question of law here about whether or not [related intellectual property] can include something that's not a family member." (Tr. 906:5–7). To align with the contract interpretation (D.I. 261 at 12–13; D.I. 285 at 7–9), I then discussed a potential jury instruction to communicate that a patent may be relevant even without being a family member. (Tr. 906:10–14). Nowhere in this discussion did I determine that the parties may not discuss whether a patent was a family member to the '689 patent. Although Dr. Jackson's closing placed a heavy emphasis on the patent family factor, he was within the proper bounds to do so. Or, at least he was close enough so there was no objection from NuVasive. While I agree that Dr. Jackson may have approached the boundary at times by

overemphasizing the patent family factor, I do not believe his conduct ultimately created a miscarriage of justice or unfairly influenced the verdict so as to warrant a new trial.

**c. Legal Error**

Third, NuVasive argues that Jury Instruction 3.1 included legal error. (D.I. 388 at 21–23). NuVasive claims that the Jury Instruction was deficient because it "did not explain what would be enough to prove that any of the asserted patents were 'specifically directed' to 'Helical Flange' technology." (*Id.* at 22–23).[9] Dr. Jackson responds by arguing that the Jury Instruction, when read as a whole, properly identified the relevant issue and was not prejudicial. (D.I. 395 at 22–25).

In evaluating a motion for a new trial based on an inadequacy in jury instructions, the jury instructions are viewed "as a whole" to determine whether they "properly apprise[d] the jury of the issues and the applicable law." *Gutzan v. Altair Airlines, Inc.*, 766 F.2d 135, 138 (3d Cir. 1985). As discussed above, Jury Instruction 3.1 included multiple parts. First, the Instruction directed the jury to use the Court's interpretations of "Helical Flange" and "related intellectual property." (D.I. 362 at 9). The Instruction then provided the interpretations of these terms. (*Id.*). Next, the instruction explained how the jury must use those interpretations to determine whether the asserted patents qualified as "related intellectual property." (*Id.*). The instruction then provided two points of clarification. (*Id.*). Both points of clarification were developed through a discussion with the parties. I added the first of them at the request of NuVasive. (*See* Tr. 896:24–906:23).

[9] NuVasive also argues that Dr. Jackson exploited this confusion in his closing argument. (D.I. 388 at 23). This argument is essentially the same as NuVasive's improper conduct argument addressed in the immediately preceding section. As I have already addressed these concerns, I do not analyze the arguments a second time here.

Contrary to NuVasive's argument, the Jury Instruction explained what the jury must find for an asserted patent to be "related intellectual property." After providing definitions of the relevant terms, the Instruction informed the jury that it "must decide whether the Asserted Patents are specifically directed to Dr. Jackson's proprietary helically wound mating and interlocking structures." (D.I. 362 at 9). The Instruction then explains that for the asserted patents to qualify as "related intellectual technology," the technology must be "utilized as the means by which closure tops engage polyaxial screws and other spinal implants, instead of threads." (*Id.*). This portion of the instruction informed the jury what it must determine and what qualifies as "related intellectual property."

NuVasive's argument focuses on the second clarifying note, arguing that the negative framing led the jury to "focus[] only on what was not enough." (D.I. 388 at 23). I disagree with NuVasive's characterization. Even when viewing the second point in isolation, nothing about it is improper. Although disputed by NuVasive, the use of the word "merely" is consistent with my previous interpretations of the 2014 Agreement. (*See* D.I. 261 at 12–13; D.I. 285 at 7–9). However, the second note cannot be read in isolation; the two points are contained in the same sentence and prefaced with a "(1)" and "(2)." (D.I. 362 at 9). The first note explains that a patent may be "related" without being a family member. (*Id.*). This point of clarification—which NuVasive specifically requested—expands what qualifies as "related." (*See* Tr. 896:24–897:9). This context is important as the "restrictive" second note is balanced with the "permissive" first note. While the second note may be longer than the first, this portion of the instruction begins with "Two points," placing equal weight on both considerations. (D.I. 362 at 9). The clarifying portion is also the last portion of the Instruction, indicating that the sentence is simply explaining

or clarifying the preceding Instruction. Thus, I do not believe any portion of Jury Instruction 3.1 created an error sufficient to warrant a new trial.

For the reasons discussed above, NuVasive's motion for a new trial (D.I. 383) is denied.

### C. Dr. Jackson's Motion to Stay Enforcement of Damages in the Contract Trial

I entered a "final judgment" shortly after the contract trial ended. It included damages in the amount of $337,500 awarded to NuVasive. (D.I. 385). Pursuant to Rule 62(h), Dr. Jackson moves to stay enforcement of the judgment until all claims in the case are resolved. (D.I. 389 at 1). NuVasive refuses to agree to a stay unless Dr. Jackson posts bond in the amount of the judgment. (*Id.* at 2; D.I. 392 at 1). The parties seem to dispute whether Rule 62(h) is available and if it has a bond requirement.

Rule 62(h) permits a court to "stay the enforcement of a final judgment entered under Rule 54(b) until it enters a later judgment." FED. R. CIV. P. 62(h). This Rule has two preliminary requirements. First, the Rule is applicable to cases in which at least one later judgment is pending. Second, the Rule applies to final judgments entered under Rule 54(b). The parties do not dispute that the first requirement is met. However, they disagree on whether a final judgment under Rule 54(b) has been entered. (*See* D.I. 389 at 2; D.I. 392 at 1–2). Rule 54(b) states:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

FED. R. CIV. P. 54(b). To enter final judgment under Rule 54(b), "the court must make an express determination that there is no just reason for delay." *Curtiss-Wright*, 446 U.S. at 3. "[I]f the court does not make that determination, 'any order or other decision, however designated' that does not

dispose of all claims against all parties is not final under Rule 54(b)." *Elliott v. Archdiocese of N.Y.*, 682 F.3d 213, 221 (3d Cir. 2012) (citing FED. R. CIV. P. 54(b)). Dr. Jackson is correct; the "final judgment" entered at D.I. 385 did not include the express determination that there is no just reason for delay. Without this express determination, the judgment is not a final judgment under Rule 54(b).

To explain why he filed the motion despite simultaneously asserting that there was no final judgment under Rule 54(b), Dr. Jackson argues that his motion was filed "in the alternative and out of an abundance of caution." (D.I. 393 at 2). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotations omitted). When Dr. Jackson filed the motion, it was not ripe. Dr. Jackson's motion to stay the enforcement of the judgment (D.I. 389) is dismissed as unripe and with leave to refile.

As discussed below, I will certify the judgments from the contract and infringement trials under Rule 54(b). Alternatively, they may soon be final judgments. In any event, considering the amount of the judgment, I would expect the parties could work out an agreement to stay the contract judgment without the necessity for further motion practice.

### D. NuVasive's Motion for Judgment as a Matter of Law and to Amend or Alter the Judgment Related to the Patent Trial

NuVasive renews its motion for judgment as a matter of law that, for the five patents on which there was a finding of infringement and no invalidity, there was no contributory, direct, or indirect infringement, and that the asserted claims were invalid as obvious. (D.I. 544: *see* D.I. 549 at 1).

#### 1. Contributory Infringement

NuVasive argues that Dr. Jackson failed to present evidence sufficient to meet two requirements of contributory infringement. (D.I. 549 at 3–9). "The language of the statute [35 U.S.C. § 271(c)] incorporates the core notion that one who sells a component especially designed for use in a patented invention may be liable as a contributory infringer, provided that the component is not a staple article of commerce suitable for substantial noninfringing use." *Ricoh Co. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1337 (Fed. Cir. 2008). "[L]iability for contributory infringement reflects that 'one who makes a special device constituting the heart of a patented machine and supplies it to others with directions (specific or implied) to complete the machine is obviously appropriating the benefit of the patented invention.'" *Id.* (quoting H.R. Rep. No. 82–1923, at 9 (1952)) (cleaned up).

**a. Specific Infringing Components**

First, NuVasive argues the contributory infringement verdict was improper because Dr. Jackson did not prove that specific components of the accused devices infringed. (D.I. 549 at 3). For each accused product, NuVasive argues it sells the entire screw assembly, not just a component. (*Id.* at 5–6). Dr. Jackson responds by arguing that the evidence was undisputed that NuVasive sells surgical trays with the unassembled components and directs surgeons to assemble the components in a way that directly infringes. (D.I. 558 at 3). Thus, Dr. Jackson argues, the evidence demonstrates that NuVasive, by selling the unassembled components to its customers, enables them to directly infringe. (*Id.* at 4).[10]

[10] Dr. Jackson argues that NuVasive has "waived and/or failed to preserve this argument." (D.I. 558 at 5). I do not devote much time to addressing this argument as (1) it was Dr. Jackson's burden to prove infringement, and (2) NuVasive clearly included the component issue in its motion for judgment as a matter of law. (D.I. 511 at ¶ 26).

The relevant question is whether Dr. Jackson presented sufficient evidence for a reasonable jury to conclude that NuVasive supplied components to be assembled in such a way as to infringe each asserted claim. At trial, evidence was presented for two different classes of accused products. The first class is the fully assembled or preassembled implants. (Tr. 116:21–120:1, 251:23–252:8). These implants come with the receiver attached to the shank and, if applicable to the product, the pressure insert already assembled in the receiver. (Tr. 117:5–16, 252:4–8). The only assembly the surgery team is responsible for is inserting the rod and closure top, both of which are supplied by NuVasive. (Tr. 118:11–119:1). The second class of product is the modular system. (Tr. 120:2–9, 252:9–22). In the modular system, the shank and receiver come unassembled to allow for the surgeon to place the shank into a bone before connecting the receiver to it. (Tr. 120:9–121:1, 252:11–14). The Reline 1617 product was the only modular system among the accused products. (Tr. 121:2–6, 381:11–18).

For both the preassembled and modular products, NuVasive supplies trays of the components and tools necessary for assembling and installing the products. (Tr. 115:21–121:6; 252:19–21; *see* JX-019 at 12, 98–131; JX-024 at 2, 28–45; JX-046 at 49–62). The components are of different lengths, diameters, and threads, from which the surgeon chooses the components appropriate for the patient. (Tr. 116:12–20; 120:28–13; *see* JX-019 at 5–6, 100; JX-024 at 41; JX-046 at 11, 58–61). NuVasive offers certain components as "extras" (*see* JX-019 at 103) and offers "optional" trays of specialized components (*see id.* at 12; JX-024 at 2). Along with the trays of components and tools, NuVasive also provides surgical guides that detail how to assemble the components. (Tr. 119:18–120:1; 250:25–251:19; 419:3–421:22; *see* JX-019 (Reline surgical guide); JX-024 (Armada surgical guide); JX-046 (VuePoint surgical guide)). In general, the components of a spine system (for example, the Reline products are a part of the Reline system)

are intended to be used only in that system and with other components from that system. (Tr. 118:21–22). However, the surgical guide for Reline products notes that the Reline system may be used with the Armada system. (JX-019 at 133).

i. Claim 39 of the '273 Patent

The jury determined that NuVasive was responsible for contributory infringement of claim 39 of the '273 patent with the Reline 1601, Reline 1451, Reline 1617, Armada, and VuePoint II products. (D.I. 534 at 9). Claim 39 requires an assembled shank, receiver, and pressure insert.[11]

The evidence presented at trial supports the conclusion that only the Reline 1617 product contains an unassembled shank, receiver, and pressure insert components for the consumer to assemble; the evidence shows that NuVasive sells the other accused products with the shank, receiver, and pressure insert already assembled. (Tr. 259:5–360:12, 308:4–15, 381:11–18). The consumer receives the Reline 1601, Reline 1451, Armada, and VuePoint III products with the

[11] Claim 39 of the '273 patent states:

> 39. A bone anchor assembly for securing an elongate rod to a bone of a patient, the bone anchor assembly comprising:
>
> a shank having a proximal capture portion and an anchor portion extending distally from the capture portion configured for fixation to the bone;
>
> a receiver having a longitudinal axis, an upper portion defining a U-shaped channel with a pair of inner sidewall surfaces configured to receive the elongate rod therebetween, and a lower portion defining a cavity communicating with the U-shaped channel and with a bottom opening, the upper portion of the receiver including a guide and advancement structure, at least one of the pair of inner sidewall surfaces including a discontinuous downward-facing shoulder pre-formed therein between the guide and advancement structure and the bottom opening; and
>
> a pressure, (sic) insert sized and shaped to be positioned downwardly within the receiver into a first position, the pressure, (sic) insert having at least one upward-facing contact surface and being rotatable about the longitudinal axis into a second position that locates the at least one upward-facing contact surface at least partially under the discontinuous downward-facing shoulder of the receiver to prevent the pressure insert from moving back up within the receiver.

('272 patent, certificate of correction p. 4 of 5).

components already assembled; there was no evidence from which a reasonable jury could conclude that the consumer assembled any component of these products to infringe claim 39. Thus, I will grant judgment as a matter of law that NuVasive is not liable for contributory infringement of claim 39 of the '273 patent for the Reline 1601, Reline 1451, Armada, and VuePoint II products. On the other hand, there was sufficient evidence presented at trial for a reasonable jury to conclude that NuVasive supplied components in the Reline 1617 that were especially made for the consumers to assemble in a way that infringes claim 39 of the '273 patent.

ii. Claim 10 of the '200 Patent

The jury found NuVasive liable for contributory infringement of claim 10 of the '200 patent by the Reline 1601, Reline 1451, Armada, and VuePoint II products. (D.I. 534 at 10). Claim 10, which depends from claim 1, requires an assembled receiver, shank, and pressure insert.[12] Although the preamble of claim 1 specifies that the assembly is intended for securing a

---

[12] Claim 10 of the '200 patent depends from claim 1. Claim 1 provides:

> 1. A pivotal bone anchor assembly for securing an elongate rod to a bone via a closure top, the pivotal bone anchor assembly comprising:
>
> a receiver having a longitudinal axis, a base, and a pair of upstanding arms extending upwardly from the base with opposed inner surfaces defining an upwardly-opening rod-receiving channel configured to receive the elongate rod, the arm inner surfaces having a closure top mating feature formed thereon, the base including a cavity in communication with the channel and with a bottom surface of the base through a bottom opening to define a receiver bore centered about the longitudinal axis, the cavity having a spherical seating surface proximate the bottom opening, the receiver bore including:
>
> a downwardly-facing surface below the closure top mating feature; and
>
> at least one integral structure protruding inwardly toward the longitudinal axis between the closure top mating feature and the cavity;
>
> a shank having a proximal capture portion with a spherical outer surface and an anchor portion extending distally from the capture portion for fixation to the bone, the shank capture portion being positionable within the receiver cavity with the shank anchor portion extending downwardly through the bottom opening; and
>
> a pressure insert having an upwardly-facing curvate seating surface configured

"rod to a bone via a closure top," the claim only requires the assembly of the receiver, shank, and pressure insert in such a way as to be able to receive a rod and closure top; nothing in the claim requires assembling the shank with the rod and closure top.

As discussed above, the evidence presented at trial demonstrated that the Reline 1601, Reline 1451, Armada, and VuePoint II products are sold with the receiver, shank, and pressure insert already assembled. There was no evidence presented at trial from which a reasonable jury could conclude that any of the four accused products at issue have components that the consumer must assemble for the products to infringe claim 10. Thus, I will grant judgment as a matter of law that NuVasive is not liable for contributory infringement of claim 10 of the '200 patent for the Reline 1601, Reline 1451, Armada, and VuePoint II products.

iii. Claim 9 of the '856 Patent

---

to receive at least an underside portion of the elongate rod, a central opening for a tool to pass through, at least one notch formed in an outer side surface thereof, a lower surface configured to engage the shank capture portion spherical outer surface to directly apply downward pressure to the shank capture portion, and an upwardly-facing surface positioned radially outward from the curvate seating surface, the pressure insert being installed into a first position within the receiver bore with the curvate seating surface in a non-alignment orientation with respect to the receiver rod-receiving channel,

wherein upon rotation of the pressure insert about the longitudinal axis into a second position within the receiver, with the insert curvate seating surface in a co-linear alignment with the receiver rod-receiving channel,

the at least one receiver inwardly-protruding integral structure is positioned in the at least one insert outer side surface notch so as to prevent further rotation of the pressure insert within the receiver bore, and

the insert upwardly-facing surface is rotated under the receiver downwardly-facing surface so as to inhibit upward movement of the pressure insert within the receiver bore along the longitudinal axis.

('200 patent, col. 14, line 23–col. 15, line 8). Claim 10 states:

10. The bone anchor assembly of claim 1, wherein the pressure insert is top loaded into the receiver bore when installed in the first position.

(*Id.* at col. 15, lines 46–48).

The jury determined that NuVasive contributorily infringed claim 9 of the '856 patent with the Reline 1601 and Reline 1617 products. (D.I. 534 at 11). Claim 9, which depends from claim 1, requires a pivotal bone anchor assembly comprised of a receiver, shank, and pressure insert.[13]

---

[13] Claim 1 of the '856 patent states:

1. A pivotal bone anchor assembly for securing an elongate rod to a bone of a patient via a closure top, the pivotal bone anchor assembly comprising:

a receiver comprising a base defining a cavity with a seating surface adjacent a bottom opening, and a pair of upright arms extending upward from the base to define a receiver channel configured to receive the elongate rod, the receiver channel opening upwardly onto top surfaces on the upright arms and opening laterally onto front and back outer faces of the upright arms, the cavity communicating with the channel to define an axial bore centered about a receiver longitudinal axis and extending upwardly from the bottom opening to the top surfaces of the upright arms, the base and upright arms together defining a substantially-cylindrical outer shape, and at least one inwardly-protruding structure integrally-formed with the receiver and projecting inwardly into the axial bore, the upright arms further including:

opposed interior surfaces with a discontinuous helically wound guide and advancement structure formed therein and configured to rotatably mate with the closure top to lock the elongate rod within the channel;

side outer surfaces opposite the interior surfaces extending downward across the base toward a bottom of the receiver; and

a non-threaded radiused tool engagement groove extending horizontally and circumferentially entirely around the side outer surface of each upright arm to the front surface and the back surface of the receiver, each tool engagement groove being isolated from the axial bore and located below the top surface of the respective upright arm;

a shank comprising a proximal capture portion configured for positioning within the cavity of the receiver and having an at least partially-spherical upper surface, and a distal anchor portion opposite the capture portion configured to attachment to the bone; and

a pressure insert configured for positioning within in the axial bore of the receiver above the capture portion of the shank and comprising:

a substantially cylindrical body with a through-bore centered about an insert longitudinal axis;

a downwardly-facing bottom surface surrounding the through-bore and being sized and shaped to frictionally engage and mate with the partially-spherical upper surface of the capture portion;

an upwardly open insert channel formed into an upper portion of the pressure insert and configured to receive the elongate rod; and

at least one vertically-elongate groove or notch formed into an outer side surface of the pressure insert,

Like claim 10 of the '200 patent, claim 9 of the '856 patent requires that the shank is assembled in such a way so that it can receive a rod and closure top for use in securing the assembly to a bone. The claim does not require that the shank be assembled with the rod and closure top.

As discussed above, the evidence presented at trial supports the conclusion that only NuVasive's Reline 1617 product contained individual components that the consumer had to assemble in order to infringe claim 9 of the '856 patent. This was sufficient evidence for a reasonable jury to conclude that NuVasive supplied components in the Reline 1617 product especially made for the consumers to assemble in such a way that infringes claim 9 of the '856 patent. However, there was no evidence from which a reasonable juror could determine that the Reline 1601 product contained an unassembled receiver, shank, or pressure insert that the user must assemble for the product to infringe. Thus, I will grant judgment as a matter of law that NuVasive is not liable for contributory infringement of claim 9 of the '856 patent for the Reline 1601 product.

iv. Claim 31 of the '932 Patent

---

wherein the at least one groove or notch formed into the outer side surface of the pressure insert is configured to receive and engage the at least one inwardly-protruding structure of the receiver when the pressure insert is positioned within the axial bore with the pressure insert channel co-aligned with the receiver channel.

('856 patent, col. 24, line 39–col. 25, line 31). Claim 9 provides:

9. The pivotal bone anchor assembly of claim 1, further comprising:

at least one downwardly facing surface formed into the axial bore below the discontinuous helically wound guide and advancement structure; and

at least one flange projecting radially outward from the outer side surface of the pressure insert,

wherein the at least one flange is rotatably positionable under the at least one downwardly facing surface to prohibit upward movement of the pressure insert out of the receiver.

(*Id.* at col. 25, line 65–col. 26, line 9).

The jury determined that NuVasive contributorily infringed claim 31 of the '932 patent with the Reline 1601, Reline 1451, Reline 1617, and Armada products. (D.I. 534 at 8). Broadly, this claim requires a bone screw to be attached to a connecting member (i.e., the rod) by a channel created by the receiver and compression insert.[14] As a Jepson claim, "the claim preamble is used 'to define the claimed invention, thereby limiting claim scope.'" *In re Xencor, Inc.*, 130 F.4th 1350, 1361 (Fed. Cir. 2025) (quoting *Catalina Mktg. Int'l. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). "[T]he claimed invention consists of the preamble in combination with the improvement." *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315 (Fed. Cir. 1985). In claim 31 of the '932 patent, the preamble requires "a medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member." ('932 patent, col. 17, lines 22–24). Thus, claim 31 requires the screw to be attached to the rod.

---

[14] Claim 31 of the '932 patent states:

> 31. In a medical implant assembly having at least one polyaxial bone screw attached to a longitudinal connecting member, the bone screw having a receiver with a channel, the improvement wherein:
>
> a) at least a portion of the longitudinal connecting member is sized and shaped to be received in the receiver channel; the assembly further comprising:
>
> b) a compression insert directly engaging both the longitudinal connecting member and a shank of the polyaxial bone screw, the insert having a base, a pair of opposed arms with receiver engaging portions, a lower connecting member seating surface, and a connecting member receiving channel; wherein
>
> c) the insert is top-loadable in the receiver in a first orientation, wherein when in the first orientation in insert arms are substantially perpendicular to the receiver channel, and then rotated to a second orientation, such that the insert arms are substantially parallel to the receiver channel;
>
> d) the receiver has an integral alignment structure cooperating with the insert, the receiver alignment structure directly engaging the insert and aligning the insert connecting member receiving channel with the receiver channel, the receiver alignment structure being a first structure that is at least one of a first pressure tab and a first groove; and
>
> e) the insert has a second structure that is at least one of a second groove cooperating with the first pressure tab and a second pressure tab cooperating with the first groove.

('932 patent, col.17, line 23–col. 18, line 13).

The evidence clearly describes how the consumer receives the Reline 1617 product in separate components and assembles it according to instructions provided by NuVasive. (Tr. 259:5–360:12, 308:4–15, 381:11–18). The preassembled products—the Reline 1601, Reline 1451, and Armada products—are sold by NuVasive with the shank, pressure insert, and receiver components already assembled by NuVasive. The only separate components are the rod and closure top; evidence at trial indicated that NuVasive made specific rods for use in each product. While this claim does not require a closure top, it requires the bone screw to be attached to the rod. The preassembled shank, pressure insert, and receiver do not infringe until the rod is inserted. Once the surgeon inserts the rod into the preassembled screw, the Reline 1601, Reline 1451, and Armada products infringe claim 31.

Thus, there was sufficient evidence presented at trial for a reasonable jury to conclude that NuVasive supplied components of the Reline 1601, Reline 1451, Reline 1617, and Armada products that were especially made for the consumers to assemble in such a way that infringes claim 31 of the '932 patent.

v. Claim 1 of the '711 Patent

The jury determined NuVasive contributorily infringed claim 1 of the '711 patent with the Reline 1451, Reline 1601, and Reline 1617 products. (D.I. 534 at 8). This claim requires a bone screw to be attached to a "longitudinal connecting member" (i.e., a rod), with the screw having a shank, receiver, and compression insert.[15] Like claim 31 of the '932 patent, claim 1 is a Jepson

---

[15] Claim 1 of the '711 patent states:
1. In a medical implant assembly having a polyaxial bone screw attached to a longitudinal connecting member, the bone screw having a shank, a receiver, and a compression insert, the improvement wherein:

> a) the receiver has a central bore with a first diameter and a connecting member receiving first channel

claim. The limiting preamble of this claim requires that the screw is attached to a rod. ('711 patent, col. 11, line 9).

The evidence presented at trial indicates that NuVasive manufactures and sells the Reline 1617 product with unassembled components of the screw and rod. (Tr. 259:5–360:12, 308:4–15, 381:11–18). NuVasive makes the other two Reline products at issue with the screw components, the shank, receiver, and compression insert, already assembled. However, the Reline 1451 and 1601 products do not come with an assembled rod. (Tr. 461:11–462:14, 463:19–464:7). Instead, the surgeon must insert the rod that is specifically made for use in the receiver channel. Once in the receiver channel, the rod is attached to the screw, and the Reline 1451 and 1601 products infringe claim 1 of the '711 patent.

Thus, there was sufficient evidence presented at trial for a reasonable jury to conclude that NuVasive supplied components of the Reline 1451, Reline 1601, and Reline 1617 products that were especially made for the consumers to assemble in such a way that infringes claim 1 of the '711 patent.

**b. Knowledge**

---

> b) the insert has a circular base with an outer second diameter, the first diameter being larger than the second diameter, so as to allow the insert to be positionable within the first channel, and an upper portion with a pair of opposed arms each having an inward facing semi-circular surface defining a connecting member receiving second channel, the distance along a straight line intersecting the center of the central bore from one opposed arm inward facing surfaces to the other creating a third diameter, the second diameter being larger than the third diameter; and
>
> c) the insert is top-loadable in the receiver in a first orientation such that the second channel is substantially perpendicular to the first channel, and then rotated to a second orientation such that the second channel is substantially parallel to the first channel.

('711 patent, col. 14, lines 8–29 (as amended by the certificate of correction)).

Second, NuVasive argues that Dr. Jackson did not present evidence demonstrating "that NuVasive knew of a 'component' that was 'especially made or especially adapted for use in an infringement' of the asserted patents." (D.I. 549 at 6). NuVasive argues that evidence offered at trial showed that, prior to the issuance of the asserted claims, NuVasive had independently developed the technology for use in its own products. (*Id.* at 6–7). NuVasive further argues that any evidence of knowledge was negated based on its belief that it had a license to sell the accused products. (*Id.* at 7–8).

Dr. Jackson responds by arguing that NuVasive admitted during trial that independent development was irrelevant to the knowledge requirement and that the Court established the notice dates. (D.I. 558 at 8). Dr. Jackson points to a range of evidence presented at trial that, he argues, demonstrates knowledge and counters NuVasive's license argument. (*Id.* at 9).

"Contributory infringement under 35 U.S.C. § 271(c) requires proof that (1) the defendant had knowledge of the patent in suit, (2) the defendant had knowledge of patent infringement, and (3) the accused product is not a staple article or commodity of commerce suitable for a substantial noninfringing use." *Bio-Rad Labs., Inc v. Int'l Trade Comm'n*, 998 F.3d 1320, 1335 (Fed. Cir. 2021) (internal quotations omitted).

NuVasive argues that no evidence presented at trial satisfies the second and third requirements. (*See* D.I. 561 at 3). I disagree. Of course, since the verdict was in Dr. Jackson's favor, I interpret the evidence in the light most favorable to him. The notice letter Dr. Jackson sent to NuVasive informed it of the patents and of Dr. Jackson's belief that the accused products were infringing the patents. (Tr. 143:13–150:17). A reasonable jury may have interpreted the evidence of NuVasive's invention story in favor of either party. (*See* Tr. 202:24–222:12). The evidence of the license agreement may also be interpreted by a reasonable jury to favor either party. (*See* Tr.

578:6–582:20). Thus, there is substantial evidence from which a reasonable jury could have found the second element met. There was more than enough evidence presented throughout the trial that the accused products and the specific components were created for specific uses and could not be easily used in non-infringing ways. (*See* Tr. 118:14–119:1, 121:13–23, 384:6–16). Thus, there was substantial evidence presented at trial from which reasonable jury could have found the third element met. The elements of contributory infringement were met for the products NuVasive sold with components that must be assembled for the product to infringe.

NuVasive's motion for judgment as a matter of law of no contributory infringement is granted with respect to contributory infringement of claim 39 of the '273 patent by the Reline 1601, Reline 1451, Armada, and VuePoint II products, claim 10 of the '200 patent by the Reline 1601, Reline 1451, Armada, and VuePoint II products, and claim 9 of the '856 patent by the Reline 1601 product. NuVasive's motion is denied with respect to contributory infringement of claim 31 of the '932 patent by the Reline 1451, Reline 1601, Reline 1617, and Armada products, claim 1 of the '711 patent by the Reline 1451, Reline 1601, and Reline 1617 products, and claim 39 of the '273 patent and claim 31 of the '292 patent by the Reline 1617 product.

**2. Indirect Infringement Abroad**

NuVasive argues that the jury's verdict for indirect infringement abroad has the same component and knowledge deficiencies as Dr. Jackson's contributory infringement arguments. (D.I. 549 at 8–9). Dr. Jackson responds by arguing that NuVasive's arguments fail for the same reasons they fail in connection with contributory infringement. (D.I. 558 at 9–10).

Section 271(f) "contains two provisions that work in tandem by addressing different scenarios." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 410 (2018) (internal quotation omitted). The first "addresses the act of exporting a substantial portion of an invention's

components." *Id.* The second "addresses the act of exporting components that are specially adapted for an invention." *Id.* Both scenarios involve exporting components that must be assembled to infringe.

The jury returned a verdict that NuVasive was liable for indirect infringement abroad for the same set of claims and products for which it found contributory infringement. (D.I. 534 at 12–15). As addressed above, the evidence at trial showed that the Reline 1617 was the only accused product with an unassembled shank, receiver, and pressure insert. The evidence indicated that all other accused products had these components assembled by NuVasive. The asserted claims of the '273, '200, and '856 patents only require the assembly of these three components. Thus, there could be no indirect infringement abroad for claim 39 of the '273 patent by the Reline 1601, Reline 1451, Armada, and VuePoint II products, claim 10 of the '200 patent by the Reline 1601, Reline 1451, Armada, and VuePoint II products, or claim 9 of the '856 patent by the Reline 1601 product. However, the asserted claims of the '932 and '711 patents require the screw and rod to be assembled. As addressed above, NuVasive sold the accused products with an unassembled rod and screw. (Tr. 420:13–18, 461:11–462:14, 463:19–464:7).

As there was no substantial evidence to support the conclusion that the products other than the Reline 1617 contained components that must be assembled by the consumer, NuVasive's motion for a judgment as a matter of law of no indirect infringement abroad is granted for claim 39 of the '273 patent by the Reline 1601, Reline 1451, Armada, and VuePoint II products, claim 10 of the '200 patent by the Reline 1601, Reline 1451, Armada, and VuePoint II products, and claim 9 of the '856 patent by the Reline 1601 product. For the same reasons as addressed above, NuVasive's motion is denied with respect to indirect infringement abroad of claim 39 of the '273 patent by the Reline 1617 product, claim 9 of the '856 patent by the Reline 1617 product, claim

31 of the ’932 patent by the Reline 1617, Reline 1451, Reline 1601, and Armada products, and claim 1 of the ’711 patent by the Reline 1617, Reline 1451 and Reline 1601 products.

### 3. Indirect Infringement of the ’932 Patent

The jury found that NuVasive infringed the ’932 patent under only two theories—contributory infringement and indirect infringement abroad. I am denying NuVasive’s motion for judgment as a matter of law that no accused products infringe under those two theories. NuVasive has one more argument, which is that there was insufficient evidence from which the jury could conclude that the accused products meet the “at least one of a first pressure tab and first groove” limitation in claim 31 of the ’932 patent. (D.I. 549 at 9). If the Reline 1451, Reline 1601, Reline 1617, and Armada products did not meet that limitation, then there could be no literal infringement and consequently (since there were no DOE assertions) there could be no indirect infringement.

According to NuVasive, the only testimony to support Dr. Jackson’s literal infringement theory identified a portion of the accused products that “functions as a tab.” (*Id.* at 9–10 (citing Tr. 456:8–458:6)). NuVasive states that Dr. Jackson’s expert would not identify the structure as a tab. (*Id.* at 10). Dr. Jackson responds by arguing that NuVasive is raising an issue of claim construction for the first time in post-trial motions. (D.I. 558 at 10–12). Dr. Jackson argues that the evidence he presented on the limitation supported his conclusion and was not as narrow as NuVasive makes it out to be. (*Id.* at 12–13).

I agree with Dr. Jackson. To a large extent, NuVasive is raising an issue of claim construction. It is too late to do so for the first time in a post-trial motion, and the claim construction issue is forfeited. I consider “tab” to have its plain and ordinary meaning, which I think is quite broad. For example, the Merriam Webster Dictionary defines “tab” as “a short

projecting device," an "appendage, extension," or "a small insert, addition, or remnant."[16] Dr. Jackson presented evidence identifying a "bump," "male portion," or "big spoon" portion of the accused products that "functions as a tab" (Tr. 408:6–13, 456:18–458:6), which he concluded is a "tab." It "functions like one so it is one." (Tr. 457:12). The testimony of multiple witnesses supported the conclusion that the "bump" satisfies the "tab" limitation. (*See* Tr. 268:17–23, 272:18–273:7, 302:19–303:1, 337:17–339:22, 449:22–451:18). Thus, there was substantial evidence from which a reasonable jury could conclude that the accused products met the "tab" limitation of the '932 patent. NuVasive's motion for judgment as a matter of law of no indirect infringement of the '932 patent is denied.

**4. Indirect Infringement of the '711 Patent**

The jury found that NuVasive infringed the '711 patent under only two theories—contributory infringement and indirect infringement abroad. I am denying judgment as a matter of law that no accused products infringe under those two theories. NuVasive has one more argument, which is that the '711 patent's § 255 Certificate of Correction is invalid because it included more changes than the correction of a clerical or typographical error. (D.I. 549 at 12). If this were so, then there was no evidence from which a reasonable jury could conclude that the accused products infringe the uncorrected version of the patent. (D.I. 544 at 2). If the Reline 1451, Reline 1601, and Reline 1617 products did not infringe the uncorrected version of the patent (and Dr. Jackson does not argue that they could have), then there could be no literal infringement and consequently (since there were no DOE assertions) there could be no indirect infringement.

---

[16] *Tab*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/tab (last updated July 28, 2026).

NuVasive moves to alter or amend the judgment based on the supposed invalidity of the Certificate of Correction. Dr. Jackson responds that I already determined this issue was waived or forfeited. (D.I. 558 at 13). Dr. Jackson argues that NuVasive did not preserve the argument in its Rule 50(a) motion. (*Id.* at 13–14). Dr. Jackson argues, even if the issue had been properly argued and preserved, NuVasive's argument fails because transposing "second" and "third" is the type of mistake that is permissible to correct with a § 255 Certificate. (*Id.* at 14–15).

Dr. Jackson is correct. I previously ruled on this issue during the April 11, 2025, status conference, held the Friday before the start of the trial on the following Monday. (*See* D.I. 564 at 3:8–6:9). A that time, I explained that "the certificate of correction issue is now out of the case" due to NuVasive's improper delay in raising the issue. (*Id.* at 6:7–8). NuVasive did not raise the issue again until its post-trial motions. NuVasive has waived this argument; its motion to alter or amend the judgment relating to the certificate of correction is denied.

**5. Direct and Indirect Infringement of the '856 Patent**

The jury found that NuVasive infringed the '856 patent under three theories. The only decisions supported by substantial evidence are that the Reline 1601 directly infringed and the Reline 1617 contributorily infringed and indirectly infringed abroad. NuVasive has one more argument, which is that the jury did not have a sufficient basis for finding that the accused products had a "substantially cylindrical outer shape" as required to infringe claim 9 of the '856 patent. (D.I. 549 at 15). If the Reline 1601 and Reline 1617 did not meet that limitation, then there could be no literal infringement and consequently (since there were no DOE assertions) there could be no direct infringement by the Reline 1601 and no indirect infringement by the Reline 1617.

In support of NuVasive's argument, NuVasive points to Dr. Jackson's technical expert's testimony, in which the expert testified that the receiver is "slightly more round than flat." (*Id.* at

15–17). Dr. Jackson responds by arguing that NuVasive's argument requires that the Court construe "substantially spherical" for the first time in post-trial motions. (D.I. 558 at 15).

I agree with Dr. Jackson. The term "substantially spherical" was not construed prior to trial. (D.I. 510). Instead, the parties were to use the ordinary meaning of the term. (D.I. 531 at 8). At trial, Dr. Jackson's technical expert testified that the accused products had "a slightly more round than flat" receiver and that met the "substantially spherical" limitation. (Tr. 486:19–488:23). This opinion was supported by testimony that described how the "substantially spherical" portion functioned in relation to other portions of the device that required the claimed shape. (*See* Tr. 277:4–285:11, 302:11–15, 309:9–18, 350:19–351:22, 354:20–355:13). There was substantial evidence from which a reasonable jury could conclude that the accused products met the plain and ordinary meaning of "substantially spherical." Thus, NuVasive's motion is denied as to the '856 patent.

### 6. Direct and Indirect Infringement of the '200 Patent

The jury found that NuVasive infringed the '200 patent under three theories. The only decisions supported by substantial evidence are that the Reline 1601, the Reline 1451, the Armada, and the VuePoint II directly infringed and the Reline 1617 contributorily infringed and indirectly infringed abroad. NuVasive has one more argument, which is that Dr. Jackson's evidence was insufficient to show that the accused products have a "rod receiving channel." (D.I. 549 at 18–19). If the accused products did not meet that limitation, then there could be no literal infringement and consequently (since there were no DOE assertions) there could be no direct infringement by the Reline 1601, the Reline 1451, the Armada, and the VuePoint II, and no indirect infringement by the Reline 1617.

NuVasive argues that the evidence at trial demonstrates that the "rod receiving channels" of the accused products do not allow for a rod to make direct contact at the bottom of the channel, nor does the bottom of the channel directly support the rod. (*Id.* at 19). In response, Dr. Jackson argues that the claim language focuses on the arms of the rod receiving channel, not the bottom of the channel. (D.I. 558 at 17).

There is nothing in claim 10 of the '200 patent that requires the rod to make direct contact with the bottom of the channel. Claim 10 requires that the pressure insert is top loaded into the receiver when the receiver is in the first position of claim 1. ('200 patent, col. 15, line 46–48). Claim 10 does not add any additional limitation about the rod or the rod receiving channel. Claim 1, from which claim 10 depends, requires, in relevant part, "a pair of upstanding arms extending upwardly from the base with opposed inner surfaces defining an upwardly opening rod-receiving channel configured to receive the elongate rod." (*Id.* at col. 14, lines 26–30). The rod receiving channel is defined by the arms and their internal surfaces. There is nothing in the claim that requires the rod to make direct contact with the bottom of the rod receiving channel. Thus, it does not matter whether Dr. Jackson's evidence showed a gap between the bottom of the channel and the rod.

Contrary to NuVasive's argument, Dr. Jackson presented substantial evidence from which a reasonable jury could conclude that the accused products met the "rod receiving channel" limitation. Dr. Errico identified the rod receiving channel on a diagram of each of the accused products. (Tr. 410:14–411:5). Dr. Errico further supported the testimony by assembling the accused products and presenting NuVasive's surgical guides. (Tr. 385:14–392:10; PTXs 157–175). Although Dr. Errico's testimony on the rod receiving channel limitation does not have the same technical depth as many of his opinions on other elements, the testimony is not conclusory.

The "rod receiving channel" is not a difficult concept; there was no need for a detailed explanation of the rod receiving channel after having just seen a demonstration of the products being assembled, the surgical guides, and the diagrams identifying how the other components interact with the rod receiving channel.

Thus, NuVasive's motion for judgment as a matter of law of no infringement of the '200 patent is denied.

**7. Direct and Indirect Infringement of the '273 Patent**

**a. Motion to Alter or Amend the Judgment**

NuVasive argues that the accused products cannot infringe claim 39 of the '273 patent because claim 39 was added to the patent on March 9, 2021, after the litigation began in January 2021. (D.I. 549 at 20). Accordingly, NuVasive moves to alter or amend the judgment under Rule 59(e). (D.I. 544 at 1). Dr. Jackson responds by arguing that NuVasive forfeited the argument by failing to raise it at any time before the present motion. (D.I. 558 at 18–19). Regardless, Dr. Jackson argues that NuVasive's argument fails on the merits because the Certificate of Correction was accepted in June 2020, before this litigation commenced. (*Id.* at 19–20).

The Federal Circuit has explained that a "certificate of correction is only effective for causes of action arising after it was issued." *Sw. Software. Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1294 (Fed. Cir. 2000). "For causes of action that arise before the correction becomes effective, the patent must be considered without the benefit of the certificate of correction." *Novo Indus., L.P. v. Mico Molds Corp.*, 350 F.3d 1348, 1356 (Fed. Cir. 2003). However, acts of infringement occurring after the effective date of the Certificate of Correction give rise to a new cause of action. *E.I. du Pont de Nemours & Co. v. MacDermid Printing Solutions, L.L.C.*, 525 F.3d 1353, 1362 (Fed. Cir. 2008). Thus, when a "plaintiff has asserted infringement based on the corrected claims,

. . . [the] plaintiff may not recover damages prior to the date of correction." *Parallel Networks Licensing, LLC v. IBM*, 83 F. Supp. 3d 571, 574 (D. Del. 2015). However, a plaintiff may recover damages "for any alleged infringement after the date of the COC's issuance." *Express Mobile, Inc. v. Godaddy.com, LLC*, 2021 WL 2209868, at *7 (D. Del. June 1, 2021).

The Certificate of Correction took effect once it was issued by the U.S. Patent and Trademark Office on March 9, 2021. It does not matter that Dr. Jackson may have requested the corrections shortly after filing the patent; infringement of claims added by a certificate of correction can only be infringed "after [the certificate] was issued." *Sw. Software*, 226 F.3d at 1294. As other courts have determined, "the critical date for purposes of determining whether the certificate of correction applies is the date the cause of action arose, i.e., the date the infringing conduct occurred, and not the date the complaint was filed." *Lamoureux v. AnazaoHealth Corp.*, 669 F. Supp. 2d 227, 236 (D. Conn. 2009); *see STMicroelectronics, Inc. v. Motorola, Inc.*, 327 F. Supp. 2d 687, 701 (E.D. Tex. 2004).

Thus, the fact that Dr. Jackson filed this suit before the Certificate of Correction was issued does not preclude all liability for infringement of claim 39; NuVasive could infringe the corrected claim after the PTO issued the Certificate of Correction on March 9, 2021. The jury was not tasked with determining the date of infringement.[17] This was a question left to be determined in a separate damages trial. As there is no verdict determining the date of infringement, NuVasive's motion is denied.

**b. Motion for Judgment as a Matter of Law**

---

[17] There was no date included on the jury instructions for direct infringement. (D.I. 531 at 10). To the extent that there were any dates included in the instructions for contributory infringement or indirect infringement abroad, the dates simply stated when "Dr. Jackson asserts that NuVasive" infringed. (*Id.* at 13–15). Nothing in the instructions indicated that the jury was responsible for finding that infringement began on any particular date.

The jury found that NuVasive infringed the '273 patent under three theories. The only decisions supported by substantial evidence are that the Reline 1601, the Reline 1451, the Armada, and the VuePoint II directly infringed and the Reline 1617 contributorily infringed and indirectly infringed abroad. NuVasive has one more argument, which is that Dr. Jackson did not present sufficient evidence for the jury to conclude that the accused products had a "discontinuous downward facing shoulder," as required to infringe claim 39 of the '273 patent. (D.I. 549 at 21). If the accused products did not meet that limitation, then there could be no literal infringement and consequently (since there were no DOE assertions) there could be no direct infringement by the Reline 1601, the Reline 1451, the Armada, and the VuePoint II, and no indirect infringement by the Reline 1617.

The only evidence that Dr. Jackson presented, according to NuVasive, is "conclusory expert testimony completely lacking in any evidentiary support." (*Id.* at 22). Dr. Jackson responds by identifying Dr. Errico's expert testimony and how it was supported by other testimony and exhibits. (D.I. 558 at 20–21).

I believe there was substantial evidence from which a reasonable jury could have concluded that the accused products have a "discontinuous downward facing shoulder." The portion of Dr. Errico's testimony that NuVasive identified is more than conclusory. Dr. Errico's testimony explains the requirement of a "discontinuous downward facing shoulder," and he then uses the manufacturing diagrams to show how the shoulder must be discontinuous in the accused products. (Tr. 402:15–403:21). He noted that NuVasive's expert did not opine that the accused products did not have a discontinuous downward facing shoulder. (*Id.* 403:22–403:25). Dr. Errico's opinion was further supported by video testimony of NuVasive's engineers Mr. Lish (Tr. 268:20–273:1,

282:21–283:3, 295:12–297:24) and Mr. German (Tr.346:11–348:20, 354:7–355:3). Thus, NuVasive's motion for judgment as a matter of law is denied.

**8. Invalidity**

NuVasive argues that no reasonable jury could conclude that claim 31 of the '932 patent, claim 1 of the '711 patent, claim 39 of the '273 patent, claim 10 of the '200 patent, and claim 9 of the '856 patent are not invalid as obvious. (D.I. 549 at 22). To make this argument, NuVasive points to Dr. Jackson's testimony in which he could not explain how the patents improved the prior art or how the patents were different from one another. (*Id.* at 23). NuVasive argues that its expert Mr. Fallin provided unrebutted testimony supporting its obviousness argument. (*Id.* at 24). Dr. Jackson responds by arguing that NuVasive relies on improper legal standards and misrepresents the testimony it cited. (D.I. 558 at 21–22). Dr. Jackson argues that his expert Dr. Oxland fully responded to Mr. Fallin's arguments. (*Id.* at 22–25).

In determining the validity of a patent, "The question is not whether the [invention] was obvious to the patentee but whether the [invention] was obvious to a person with ordinary skill in the art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). The Federal Circuit has explained:

> What controls the patentability of the fruits of the inventor's labors are the statutory conditions of novelty, utility, and unobviousness "to a person having ordinary skill in the art to which said subject matter pertains" as stated in § 103. It should be clear that that hypothetical person is not the inventor, but an imaginary being possessing "ordinary skill in the art" created by Congress to provide a *standard of patentability* . . . . Realistically, courts never have judged patentability by what the real inventor/applicant/patentee could or would do. Real inventors, as a class, vary in their capacities from ignorant geniuses to Nobel laureates; the courts have always applied a standard based on an imaginary worker of their own devising whom they have equated with the inventor.

*Kimberly-Clark Corp. v. Johnson & Johnson Pers. Prods. Co.*, 745 F.2d 1437, 1454 (Fed. Cir. 1984). Thus, while Dr. Jackson's testimony could be used to support either party's validity

arguments,[18] it does not take the place of expert testimony about whether the inventions would have been obvious to a hypothetical person skilled in the art.

As the party that asserted invalidity, it was NuVasive's burden to establish by clear and convincing evidence that the patents were invalid as obvious. If the evidentiary burden is not met, the asserted claims are not proven invalid. After NuVasive presented Mr. Fallin's testimony to support its invalidity argument (*see* Tr. 589:10–707:7), Dr. Jackson offered the expert testimony of Dr. Oxland to rebut NuVasive's arguments (*see* Tr. 790:19–830:8).

NuVasive's briefing in support of its request for judgment as a matter of law for obviousness is inadequate. The briefing is little more than two pages. (D.I. 549 at 22–25). It is not helpful. It is not the Court's role to make an obviousness case when a defendant has not done so. Thus, NuVasive's motion for judgment as a matter of law is denied.

### E. Dr. Jackson's Renewed Motion for Judgment as a Matter of Law and/or New Trial Related to the Patent Trial

Dr. Jackson identifies multiple issues that he argues warrant judgment as a matter of law or the grant of a new trial.[19] (D.I. 541, D.I. 550). "[W]here the movant bore the burden of proof on an issue, JMOL is only granted where 'there is insufficient evidence for permitting any different

[18] To the extent that Dr. Jackson's testimony was relied on, NuVasive largely mischaracterizes the exchange. The cited portion of the cross examination starts by referring Dr. Jackson to his prior deposition testimony. (Tr. 160:19–23). Dr. Jackson then explains that, in his deposition, he had testified that he "couldn't describe it any better than it was described in great detail in a written description in the patent" (Tr. 160:24–161:1) and that he "recall[ed] saying many times [he] can't define the technology any better than my patent attorney did." (Tr. 163:2–4). At one point, Dr. Jackson testified, "I don't feel it's proper for me to try and interpret these words in a layman's way when they have very legal meaning." (Tr. 165:14–16). Dr. Jackson's inability or unwillingness to engage with NuVasive's attempts to prove their obviousness case through him is essentially meaningless to the ultimate determination of the obviousness issue.

[19] Dr. Jackson's briefing only presents arguments in favor of a new trial for willfulness and notice dates. (*See* D.I. 550). For willfulness, Dr. Jackson argues for a new trial in the alternative. (*Id.* at 17–21). For notice dates, he argues only for a new trial. (*Id.* at 22–24). For all other aspects of his motion, Dr. Jackson only presents arguments in favor of judgment as a matter of law.

finding.'" *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1333 (Fed. Cir. 2019) (quoting *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976)). "The movant who has the burden of proof must have established his case by testimony that the jury is not at liberty to disbelieve." *Fireman's Fund Ins.*, 540 F.2d at 1177 (internal quotation omitted). "It is not sufficient that the facts be undisputed; there must also be no sufficient ground for inconsistent inferences to be drawn therefrom." *Id.*

**1. Infringement of Claim 9 of the '866 Patent**

Dr. Jackson seeks judgment as a matter of law that two of NuVasive's products infringed Claim 9 of the '866 Patent. (D.I. 550-1). By trial, the only dispute regarding the elements of claim 9 of the '866 patent[20] was whether the Reline 1601 and Reline 1451 products had a "U-shaped

[20] Claim 9 of the '866 patent states:

> A bone anchor assembly for securing an elongate rod to a bone, the bone anchor assembly comprising:
>
> a shank having a proximal capture portion with a top surface and an anchor portion extending distally from the proximal capture portion for fixation to the bone;
>
> a receiver having a longitudinal axis, an upper portion defining a U-shaped channel with inner sidewall surfaces configured to receive the elongate rod, and a lower portion defining a cavity communicating with the U-shaped channel and a receiver bottom opening with the shank anchor portion extending therethrough, the inner sidewall surfaces including a guide and advancement structure formed therein, the receiver having an internal downward-facing surface located between the guide and advancement structure and the receiver bottom opening;
>
> a retainer sized and shaped for loading into the cavity to engage and hold the shank proximal capture portion within the receiver while an outer surface of the retainer engages an interior surface of the cavity to allow for pivoting motion between the receiver and the shank to provide for a pivotal orientation therebetween; and
>
> a pressure insert sized and shaped to be disposed downwardly into a first position within the receiver adjacent the downward-facing surface, with the shank proximal capture portion top surface frictionally engaging the pressure insert for directly receiving downward pressure from the pressure insert, the pressure insert having an upward-facing surface configured to engage the receiver downward-facing surface,
>
> wherein the pressure insert is rotatable with a tool about the longitudinal axis into

channel." (D.I. 508 at 3–4). Dr. Jackson argues that he presented "overwhelming" evidence showing the two accused products contained a U-shaped channel—the same U-shaped channel that had to be present in multiple other patents that the jury determined were infringed—and that NuVasive did not attempt to rebut any of Dr. Jackson's evidence. (D.I. 550 at 4–5). NuVasive responds by arguing that a reasonable jury could find that Dr. Jackson did not prove infringement because his evidence did not show how the two accused products met the specific "U-shaped channel" limitation in claim 9 of the '866 patent. (D.I. 557 at 5–6). NuVasive points out that it also disputed whether it was "the party who makes, uses, sells, or offers to sell the entire bone anchor assembly as claimed." (*Id.* at 6).

Dr. Jackson presented a range of evidence including expert testimony from Dr. Errico who briefly testified to his opinion that the accused products meet the "U-shaped channel" limitation of the '866 patent (Tr. 403:15–21, 404:21–405:9),[21] Dr. Errico's live assembly of the accused

> a second position within the receiver, with the upward-facing surface entering into frictional engagement with the downward-facing surface, so as to apply downward pressure to the shank proximal capture portion top surface to frictionally secure the pivotal orientation of the shank with respect to the receiver prior to the elongate rod being received within the receiver.

('866 patent, 30:43–31:16).

[21] Dr. Errico's entire testimony directed to infringement of the '866 patent follows:

> Next slide. Okay. Now we're moving to a new patent, the '866 patent. It's another twist-in-place. And there are – we're going to Claim 9 and we believe that it infringes these two products, the Reline 1601 and the Reline 1451. Next slide, please. Okay. Once again, patent on your left. You've seen it from the first day. On the right, you see Claim 9. That's every element. Thank God we don't have to go through every word of that because it's been pre-agreed to. Next slide. This is a breakdown of those elements. Next slide. This is what we have to -- this is what's not in the agreement. Okay. That there is a U-shaped channel. I'm not sure why this is not in the agreement, by the way, but this is not in the agreement. There is a U-shaped channel. Next slide. Here's the engineering drawings. Here's the drawings from the surgical guide. This is yet another depiction on the right. There's a U-shaped channel where the rod goes and that screw comes down from the top. This is true in the Reline 1601 -- next slide -- and the Reline 1451. Next slide. So, therefore, independent Claim 9 all of the elements are checked for infringement on the Reline 1601 and the Reline 1451.

products (Tr. 383:3–391:4), physical versions of the accused products (PTX-038; PTX-161; PTX-162; PTX-170; PTX-175), NuVasive's drawings of and guides for the accused products (JX-011; JX-013; JX-016; JX-019), and video deposition testimony from NuVasive's engineer Mr. Lish describing the accused products (Tr. 265:22–266:5, 295:4–21). It does not matter that NuVasive presented limited rebuttal evidence because it was Dr. Jackson's burden to prove that the accused products infringed the disputed claim elements.

It was the jury's role to determine the credibility of the witnesses and assign weight to the evidence. *Pitts v. State*, 646 F.3d 151, 155 (3d Cir. 2011); *Perkin-Elmer*, 732 F.2d at 893. While Dr. Jackson presented a significant amount of evidence, the presentation on the '866 patent was abbreviated. For example, Dr. Errico's testimony regarding the U-shaped channel was limited to stating, "There is a U-shaped channel," showing the jury the engineering drawings, agreeing that NuVasive had not presented evidence to the contrary, and offering a final conclusion that the two accused products infringed. (Tr. 404:21–405:22). As Dr. Jackson presented additional evidence to support his arguments related to other asserted patents, it is not inconsistent that the jury determined that the accused products infringed other patents that also required a U-shaped channel.[22] The evidence is not so overwhelming as to constitute an extreme circumstance and require that I grant Dr. Jackson's motion for judgment as a matter of law that the two accused products infringed claim 9 of the '866 patent. Dr. Jackson's motion is denied.

**2. Infringement of Claim 31 of the '292 Patent**

**a. Claim Construction**

---

(Tr. 404:9–405:9) (paragraphing eliminated).

[22] Even if it were inconsistent, inconsistent verdicts do not require that a court make them consistent.

The only claim element in dispute for claim 31 of the '292 patent[23] was whether the Reline 1601 had a "radiused upper surface." (D.I. 508 at 8–9). "Radiused upper surface" was construed

---

[23] Claim 31 of the '292 patent depends from claim 27. Claim 27 states:

> A cannulated polyaxial bone screw assembly implantable in a bone and for mechanically coupling a rod member to the bone, the cannulated polyaxial bone screw assembly comprising:
>
> an anchor member comprising a first proximal end portion, a first distal end portion and a central opening extending entirely through the anchor member along a first central longitudinal axis from the first proximal end portion to the first distal end portion, the central opening being closed laterally and having a constant width along an entire length of the first distal end portion, the first proximal end portion comprising a radiused upper surface with the central opening exiting onto a top end thereof, the first distal end portion comprising an implant portion to be implanted into the bone;
>
> a head member comprising:
>
> a second proximal end portion and a second distal end portion, the head member defining a second central longitudinal axis from the second proximal end portion to the second distal end portion;
>
> a channel extending through the head member perpendicular to, and intersecting, the second central longitudinal axis and configured to receive the rod member to be mechanically coupled to the bone;
>
> a distal opening at the second distal end portion centered about the second central longitudinal axis; and
>
> a chamber in communication with the channel and the distal opening and having an internal surface, the chamber pivotally receiving the first proximal end portion of the anchor member therein as the implant portion extends through the distal opening so that the first central longitudinal axis is orientable coaxially with the second central longitudinal axis and at any of a plurality of angles relative to the second central longitudinal axis; and
>
> a closure member comprising a body with a head member mating structure thereon, the body at least partially positionable within the head member second proximal end portion so as to lock the anchor member at a fixed angle with respect to the head member,
>
> wherein when the anchor member and head member are coupled together, the anchor member and head member are insertable over a guide wire as a unit and implantable into the bone with only the rod member and the closure member remaining to be inserted into the head member channel.

('292 patent, col. 14, lines 62–col. 16, line 3). Claim 31 states:

> The cannulated polyaxial bone screw assembly of claim 27, wherein the head member includes a tool attachment structure recessed within an external surface thereof so as to not extend outwardly beyond the external surface.

(*Id.* at col. 16, lines 16–19).

to mean "curved upper surface." (D.I. 510 at 1). Dr. Jackson argues that he is entitled to judgment as a matter of law in his favor because NuVasive used a previously abandoned claim construction in its closing argument. (D.I. 550 at 6). Specifically, NuVasive argued that "the very upper surface at the top of the screw" or "the uppermost surface" must be curved. (Tr. 950:9–10, 950:14–15).[24] Dr. Jackson made no contemporaneous objection, and he made no objection after NuVasive finished its closing argument. NuVasive responds that the jury's verdict was supported by substantial evidence and that Dr. Jackson has not presented any reason to depart from the jury's determination. (D.I. 557 at 8–9).

The claim construction of "radiused upper surface" was "curved upper surface." NuVasive made two small wording changes in its closing argument. It added the word "very" before "upper surface," and it used the word "uppermost" rather than "upper." These are such small distinctions that they passed by Dr. Jackson unnoticed. It seems unlikely that the jurors would have noticed the difference in wording. In any event, the jury was instructed that they "must accept my definition of these [construed] words in the patent claims" and "must ignore any different definitions used by witnesses or the attorneys." (D.I. 531 at 8). The jury was given a copy of the claims I had construed, including the "radiused upper surface" term, to reference in deliberations.

---

[24] In full, this portion of NuVasive's closing argument states:

> Now, for this patent, there's only one product accused of infringement, it's the 16 -- the Reline 1601 here at bottom right corner. And on the right-hand side, you see the evidence that plaintiff went into in this case, the technical drawings for that product. And what we're looking at is the very upper surface at the top of the screw.
>
> The claim requires that it be a radiused upper surface. And the Court has included in the paper that you just received interpreted that to mean curved upper surface.
>
> So the issue here is does the top, the uppermost surface of this, is it curved or is it flat? It's a simple issue. We don't need an expert to testify about this. It's just is it curved or is it flat.

(Tr: 950:5–17).

(Tr. 947:17–21; *see* D.I. 510). The unobjected-to error was sufficiently trivial so that it cannot serve as a basis for a new trial or any other relief.[25]

While Dr. Jackson includes argument that sounds like a request for judgment as a matter of law in relation to the "upper radiused surface" claim construction, he concedes that "the only question is whether NuVasive's closing argument claim construction is correct." (D.I. 550 at 9). I do not think that a slight bit of imprecision in connection with closing argument is a basis to grant Dr. Jackson judgment as a matter of law.

Thus, Dr. Jackson's motion is denied.

**b. Indirect Infringement**

Dr. Jackson argues that he is entitled to judgment as a matter of law that NuVasive indirectly infringed claim 31 of the '292 patent. (D.I. 550 at 9). However, this argument fails because there cannot be indirect infringement without finding someone directly infringed. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921–25 (2014). Dr. Jackson's motion is denied.

**3. Invalidity of Claim 9 of the '866 Patent and Claim 31 of the '292 Patent**

Dr. Jackson argues that because "JMOL should be granted to Dr. Jackson on the issues of infringement for both claim 9 of the '866 patent and claim 31 of the '292 patent, the issue of validity should be addressed." (D.I. 550 at 11). However, I am denying Dr. Jackson's motions for judgment as a matter of law related to the two claims. As I explained at the conclusion of the trial, the jury's invalidity finding is "superfluous" since NuVasive asserted invalidity only as an affirmative defense and the jury separately determined that NuVasive did not infringe the claims.

---

[25] Dr. Jackson has not argued that there was any error relating to the usage of "radiused upper surface" during testimony.

(*See* Tr. 1000:7–1001:7). Nothing about this finding has changed. The jury's determination on the affirmative defense is functionally an advisory opinion because it has "no tangible, demonstrable consequence," *Samsung Elecs. Co. v. Rambus, Inc.*, 523 F.3d 1374, 1380 (Fed. Cir. 2008) (internal quotation omitted), on the jury's finding that NuVasive did not infringe the two claims. Thus, Dr. Jackson's motion for judgment as a matter of law of no invalidity of the two claims is dismissed as moot.

**4. Willful Infringement**

**a. Independent Development**

The jury found no willful infringement of any of the asserted claims.

Dr. Jackson argues that NuVasive's only defense to willfulness was improperly admitted because evidence of independent development is only admissible to rebut an allegation of copying, which was not present in this case. (D.I. 550 at 17–21). NuVasive responds by arguing that independent development is a "mitigating factor" to willfulness generally.[26] (D.I. 557 at 21).

As the Federal Circuit has explained, "the issue of willfulness not only raises issues of reasonableness and prudence, but is often accompanied by questions of intent, belief, and credibility." *SRI Int'l, Inc. v. Advanced Tech. Lab'ys., Inc.*, 127 F.3d 1462, 1465 (Fed. Cir. 1997). To address these questions, "All of the circumstances must be considered in determination of the issue of willful infringement." *Nat'l Presto Indus. v. West Nend Co.*, 76 F.3d 1185, 1193 (Fed. Cir. 1996). One such circumstance is "whether there was copying or independent development by the infringer." *Id.* As independent development can help reveal a party's intent or belief, there

[26] "Aspects in mitigation, such as whether there was independent invention or attempts to design around and avoid the patent or any other factors tending to show good faith, should be taken into account and given appropriate weight." *SRI Int'l, Inc. v. Advanced Tech. Lab'ys, Inc.*, 127 F.3d at 1465.

does not need to be an allegation of copying for this evidence to be relevant. *See Imprenta Services, Inc. v. Karll*, 2022 WL 3012820, at *15 (C.D. Cal. May 13, 2022); *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 2009 WL 8725107, at *8 (E.D. Tex. Oct. 8, 2009).

NuVasive's evidence of independent development was properly admitted to refute the allegation of willful infringement. Therefore, the admission of this evidence does not support Dr. Jackson's motion for judgment as a matter of law or a new trial. Both motions are denied.

**b. Substantial Evidence to Support Verdict**

While Dr. Jackson argues that the evidence was unrebutted that NuVasive willfully infringed the asserted claims (D.I. 550 at 17–18), he also claims that he should get a new trial (*id.* at 21). NuVasive responds by pointing to its independent development and license arguments. (D.I. 557 at 19–21).

"Willful infringement is a question of fact." *SRI Int'l v. Advanced Tech. Lab'ys*, 127 F.3d at 1465 (internal citation omitted). "[T]he concept of 'willfulness' requires a jury to find no more than deliberate or intentional infringement." *SRI Int'l, Inc. v. Cisco Sys.*, 14 F.4th 1323, 1329 (Fed. Cir. 2021) (quoting *Eko Brands, LLC v. Adrian Rivera Maynez Enters.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020)). It is the plaintiff's burden to demonstrate the defendant willfully infringed. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–10 (2016).

In addition to the independent development argument, NuVasive presented evidence that it believed it had a license that would cover the use of any of Dr. Jackson's patents. (Tr. 578:15–582:20). This evidence helps the jury answer questions such as "whether the infringer exercised care to respect the legal rights of the patentee, whether sound legal advice was timely obtained, whether the actions taken were reasonable, whether there was copying or independent development by the infringer, and various aspects of the actual relationship between the patentee

and the infringer." *Nat'l Presto*, 76 F.3d at 1193. It was the role of the jury—not the Court—to determine the credibility and assign weight to the evidence. *Pitts v. State*, 646 F.3d 151, 155 (3d Cir. 2011); *Perkin-Elmer*, 732 F.2d at 893. There is no reason to disrupt the jury's factual determination of no willful infringement. Dr. Jackson's motion is denied.

**5. Notice Dates**

Dr. Jackson argues that a new trial is warranted because the Court improperly determined the notice dates for the '711, '932, and '273 patents. (D.I. 550 at 22). At trial, I ruled on NuVasive's motion for judgment as a matter of law. Relevant to the present argument over notice dates, I explained in my ruling:

> Basically, until the -- I believe it was until the March 7, 2019, letter sent to NuVasive, which asserted, I believe, four -- three of the patents in this case and the -- at least listed a patent application for something that I think had already matured into a patent,[[27]] that's the earliest notice that . . . NuVasive had of any of these patents. So there is no indirect infringement, period, before March 7th of 2019. . . . [T]hat basically applies to everything where there is a state of mind requirement that NuVasive had for knowing that the patents existed at least, and so that will carry through to induced infringement, contributory infringement, section 271(f)(2) infringement, section 271(f)(2) infringement.
>
> Then the '711 patent and the '273 patent, they were both in the complaint that was filed, I believe, in early 2021. I don't have the exact date in front of me, but there's no indirect infringement by them before that date.[[28]]

(Tr. 864:18–865:25). Dr. Jackson makes his argument in two parts.

**a. Notice of the '711 and '932 Patents Prior to 2019**

First, Dr. Jackson argues that there was sufficient evidence for the jury to determine that NuVasive had knowledge of the '711 and '932 patents prior to 2019. (D.I. 550 at 22). Dr. Jackson argues that these patents were issued in 2014 and 2013, respectively, before NuVasive released its

---

[27] During my ruling, [Dr. Jackson's counsel] confirmed that the letter identified the "'866, '932, '200, [and] '292" patents, with the letter identifying the '200 patent by its application number. (Tr. 865:8–14).

[28] The jury was instructed that notice began on April 19, 2021, the date that NuVasive returned its waiver of service in this case (D.I. 7). (D.I. 531 at 11, 13, 14).

Reline product in 2015. (*Id.*). Evidence presented by NuVasive, which Dr. Jackson argues that the Court should have considered when ruling on the Rule 50(a) motions, supports this theory. (*Id.* at 22–23). NuVasive responds by arguing that Dr. Jackson waived this argument by previously asserting that notice began in 2021. (D.I. 557 at 22). Alternatively, NuVasive argues that there was no evidence presented at trial from which a reasonable jury could determine that NuVasive had notice of the patents any earlier. (*Id.*).

Dr. Jackson is correct that the Court must consider all the evidence in the record at the time that a Rule 50(a) motion is ruled on. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150–51 (2000). However, this does not change my original ruling. The only evidence that Dr. Jackson identified demonstrating notice prior to 2021 was the testimony of NuVasive's Chief Patent Counsel Mr. Spangler. (D.I. 550 at 22). This testimony did not indicate that NuVasive knew of the '711 or '932 patents; the testimony simply revealed that NuVasive had procedures to search for patents related to the products it was developing. (*See* Tr. 783:3–790:2). While Mr. Spangler believed Dr. Jackson's patents would have likely been discovered in the search, he never testified that the '711 or '932 patents specifically would have been revealed or when NuVasive would have discovered the two patents. (*Id.*). Without evidence demonstrating NuVasive had knowledge of the patents, it does not matter whether there was evidence that NuVasive was making and using the accused products prior to 2019. Thus, Dr. Jackson's motion for a new trial is denied.

**b. Notice Dates for the '711 and '273 Patents**

Second, Dr. Jackson argues that the jury could have found that NuVasive knew of the '711 and '273 patents prior to 2021 based on either (1) Dr. Jackson's testimony that he sued NuVasive for infringing the '711 and '273 patents in the Southern District of California in 2020 or (2)

NuVasive's opening statement detailing how the first lawsuit over the patents began in January 2021. (D.I. 550 at 24).

Neither of these arguments serve as grounds for notice. First, Dr. Jackson testified that he sent notice in "2020 or 2021." (Tr. 150:24). This is not testimony that NuVasive received notice in 2020; it is testimony that notice possibly was sent as early as 2020, but possibly not until 2021. Nor does this testimony support the theory that Dr. Jackson provided notice by filing the suit in the Southern District of California; there was no evidence introduced at trial of the California lawsuit or evidence that NuVasive received the Complaint in the California case. Second, in its opening statement, NuVasive's counsel stated that on "January 19th of 2021[,] Dr. Jackson filed a lawsuit—filed this lawsuit against NuVasive." (Tr. 88:17–19). First, opening statements are not evidence. Second, counsel's statement, if it were evidence, would not be an admission that NuVasive received notice on that day or before; this statement simply reflects the date listed on Dr. Jackson's initial complaint. As Dr. Jackson has not identified any evidence that demonstrates NuVasive received notice before 2021, his motion for a new trial is denied.

**6. Direct Infringement of the '711 Patent**

Dr. Jackson argues that the Court erred by granting NuVasive's motion for judgment as a matter of law of no direct infringement of the '711 patent.[29] (D.I. 550 at 24–25). There was evidence presented at trial that, according to Dr. Jackson, demonstrates that NuVasive made the accused products, and that the accused products infringed the patent. (*Id.* at 25). NuVasive responds by arguing that a renewed motion for judgment as a matter of law is not procedurally proper, and even if it was, the Court's earlier ruling was correct. (D.I. 557 at 24).

[29] "As far as direct infringement goes, . . . -- I believe without opposition from plaintiff, I'm going to grant that the -- none of the accused products directly infringe the '932 patent, none of the accused products directly infringe the '711 patent." (Tr. 863:6–10).

Dr. Jackson has waived this argument. I granted NuVasive's motion for judgment as a matter of law of no direct infringement of the'711 patent after Dr. Jackson submitted a letter to the Court stating, "Plaintiff is not seeking direct infringement against NuVasive on these categories of claims," with "these categories of claims" including claim 1 of the '711 patent. (D.I. 518 at 3). As Dr. Jackson waived his direct infringement theory,[30] I do not consider whether the motion was properly brought under Rule 50(b). Dr. Jackson's motion for judgment as a matter of law or a new trial is denied.

**F. Dr. Jackson's Motion for Damages Trial and Equitable Remedies**

Dr. Jackson moves to set a damages trial as the next step in this case. (D.I. 548 at 2). Having prevailed on some of his infringement claims, Dr. Jackson argues that he is entitled to a damages trial under the Patent Act. (*Id.* at 3). A damages trial, Dr. Jackson argues, promotes judicial efficiency and is the only pathway to making the case appealable. (*Id.* at 3–8). NuVasive responds by arguing that Dr. Jackson has waived his right to a damages trial by pursuing an invalid damages theory. (D.I. 559 at 7–8). Instead, NuVasive argues that the Court should enter a judgment of no damages or nominal damages.[31] (*Id.* at 9–11). NuVasive argues that the final judgment should be certified under Rule 54(b) to allow for any liability issues to be appealed prior to a damages trial. (*Id.* at 12–18).

---

[30] Even if Dr. Jackson had not waived his argument, there was no evidence presented at trial which supports his direct infringement theory. Dr. Errico, Dr. Jackson's expert, confirmed that NuVasive could only indirectly infringe the '711 patent because the accused products are not sold with a rod attached to the screws. (*See* Tr. 462:19–464:15, 492:18–495:25). Although Dr. Jackson argues there was evidence that NuVasive fully assembled the products in an infringing way during the testing process (D.I. 550 at 25), there is no evidence demonstrating that NuVasive assembled the accused products with a rod. (*See* Tr. 558:25–562:24). Even if the evidence did show that NuVasive was responsible for assembling the products with a rod during development and testing, this would have taken place before NuVasive received notice of the asserted patents.

[31] NuVasive references this as "summary judgment of no damages or nominal damages." (*See* D.I. 559 at 12). However, it has not moved for summary judgment on damages.

### 1. Jury Trial on Damages

After a finding for the claimant, Section 284 of the Patent Act states that "the court shall award the claimant damages adequate to compensate for the infringement." 35 U.S.C. § 284. Although it is generally the plaintiff's burden to prove damages, "the exclusion of the patentee's damages evidence is not sufficient to justify granting summary judgment." *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1372 (Fed. Cir. 2015). Even when the plaintiff's only damages expert is excluded, the Court must attempt to determine a reasonable royalty from other evidence in the record. *Dow Chem. Co. v. Mee Indus.*, 341 F.3d 1370, 1381–82 (Fed. Cir. 2003). "Certainly, if the patentee's proof is weak, the court is free to award a low, perhaps nominal, royalty, as long as that royalty is supported by the record." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1328 (Fed. Cir. 2014) (citing *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 895 F.2d 1403, 1407–08 (Fed. Cir. 1990)). As I stated at the status conference where I bifurcated the damages case from the rest of the patent case, I think Dr. Jackson's expert was close to having an admissible damages theory, and it was only because I excluded his opinions on the eve of trial that I split the case. (D.I. 564 at 6–13). As such, Dr. Jackson is entitled to a damages trial despite the exclusion of the testimony of his only damages expert. I do not think this is a case where Dr. Jackson has waived any right to a damages award.[32]

---

[32] The Federal Circuit has explained that:

> a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory. When a plaintiff deliberately takes a risk by relying at trial exclusively on a damages theory that ultimately proves unsuccessful, and, when challenged, does not dispute that it failed to present an alternative case for damages, a district court does not abuse its discretion by declining to give that plaintiff multiple chances to correct deficiencies in its arguments or the record.

*Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017); *see also Devex Corp. v. GMC*, 667 F.2d 347, 363 (3d Cir. 1981). Similarly, the Federal Circuit has explained that judgment as a matter of law of no damages, without a new damages trial, may be appropriate when there is

Before addressing whether Dr. Jackson's motion for a damages trial should be granted at this time, I must first determine whether it is appropriate to certify the liability judgment under Rule 54(b).

**2. Appellate Review Prior to Damages Trial**

In a case involving multiple claims, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . if the court expressly determines that there is no just reason for delay." FED. R. CIV. P. 54(b). NuVasive has requested that I do this and briefed its argument (D.I. 559 at 14–17), but NuVasive has not actually filed a motion to that effect. Perhaps that is because I suggested as much after the jury returned the verdict in the patent trial. (Tr. 998:21–999:24).

In considering whether to enter a Rule 54(b) judgment, courts use a two-step analysis. *W.L. Gore & Assocs., Inc. v. Int'l Med. Prosthetics Rsch. Assocs., Inc.*, 975 F.2d 858, 861–62 (Fed. Cir. 1992). The Court must first decide, as a matter of law, whether a judgment is final. *Id.* If the judgment is final, the Court must determine whether, in its discretion, there is any just reason for delay. *Id.*

**a. Whether There Is a Final Judgment**

A judgment "includes a decree and any order from which an appeal lies." FED. R. CIV. P. 54(a). The Federal Circuit's jurisdiction is generally governed by the final judgment rule of 28 U.S.C. § 1295(a)(1). Under that rule, "a party may not take an appeal 'until there has been a decision by the district court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1308

---

insufficient evidence offered at trial to support a damages award. *Rex Medical, L.P. v. Intuitive Surgical, Inc.*, 156 F.4th 1289, 1301 (Fed. Cir. 2025).

(Fed. Cir. 2013) (en banc) (quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 373 (1981)). There are certain exceptions to that rule, however, including 28 U.S.C. § 1292(c)(2). Section 1292(c)(2) provides that the Federal Circuit has jurisdiction over a judgment "which would otherwise be appealable to the . . . Federal Circuit and is final except for an accounting." *Robert Bosch*, 719 F.3d at 1310. The Federal Circuit has held "that 28 U.S.C. § 1292(c)(2) does confer jurisdiction on this court to entertain appeals from patent infringement liability determinations when a trial on damages has not yet occurred." *Id.* at 1320.

Notwithstanding *Bosch*, Dr. Jackson argues that a judgment is not final when there is an unresolved issue of ongoing royalties. (D.I. 548 at 7–8). As dicta in *Bosch*, the Federal Circuit noted that "were a traditional accounting proceeding before a special master to be held to determine an appropriate remedy under § 284, it would include the determination of . . . a reasonable royalty." *Id.* at 1315–16. The court further noted, "These are the same determinations that are made in a modern damages trial." *Id.* at 1316. Since its decision in *Bosch*, the Federal Circuit has issued an unpublished decision concluding that the determination of ongoing royalty constitutes "accounting" such that interlocutory review is available. *See Cave Consulting Grp., LLC v. OptumInsight, Inc.*, 2017 U.S. App. LEXIS 6089, at *4–8 (Fed. Cir. Mar. 31, 2017). The *Cave Consulting* opinion explained that it diverged from two previous non-precedential opinions in large part due to the understanding of interlocutory jurisdiction and "accounting" that subsequently developed in *Bosch*. *Id.* at *7 (citing *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 515 F. App'x 882 (Fed. Cir. 2012) and *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 346 F. App'x 580 (Fed. Cir. 2009)). I see no reason to diverge from the Federal Circuit's post-*Bosch* analysis in *Cave Consulting*. Thus, an appeal would lie from the judgments in this case once the only thing left to decide are the "accounting" issues. In its present posture, the judgments that I

have entered qualify (or could be easily made to qualify) as final judgments for purposes of Rule 54(b).[33]

**b. Whether There Is Just Reason for Delay**

To determine whether there exists any just reason for delay, the Third Circuit has set forth five factors:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; [and] (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 203 (3d Cir. 2006).

As to the first factor, the adjudicated claims—including those from the contract trial and the patent infringement trial—address liability for patent infringement, while the unadjudicated issues address damages. Although the unadjudicated issues depend on the finding of infringement, there is nothing in the unadjudicated issues that would change the liability determination. This type of relationship favors certification of partial final judgment under Rule 54(b). *See InterDigital Communs., Inc. v. ZTE Corp.*, 2016 WL 3226011, at *2 (D. Del. June 7, 2016).

Second, NuVasive has expressed an intent to appeal the infringement finding in this case. NuVasive has stated, "The need for appellate review will not be mooted by further proceedings; the infringement judgment will be appealed regardless." (D.I. 559 at 16). Thus, there is no

[33] I am not sure that I even need to make a Rule 54 analysis. In *Bosch*, there was no discussion of Rule 54 by the Court. The *Bosch* dissent noted that the trial court had relied upon Rule 54(b). But if, as *Bosch* held, the Court has jurisdiction over judgments that are final except for the determination of damages, I think it would follow that Rule 54 would only be needed if there were unresolved claims or multiple defendants, neither of which is present here.

question of whether the liability issues will be appealed; there is simply a question of when. The second factor favors certification under Rule 54(b).

Third, liability for patent infringement has been conclusively determined. Therefore, there is no "possibility that the reviewing court might be obliged to consider the same issue a second time." *Berckeley*, 455 F.3d at 203. The third factor favors certification under Rule 54(b).

Fourth, there are no claims or counterclaims that could result in a set-off against the liability judgment. Thus, the fourth factor, therefore, favors certification under Rule 54(b).

Last, the relevant miscellaneous factors in this case relate to judicial efficiency. NuVasive argues that certification under Rule 54(b) will save costs and promote judicial efficiency. (D.I. 559 at 16–17). Dr. Jackson argues that moving forward with the damages trial now will facilitate a quicker advancement of the case and streamline any appeals. (D.I. 548 at 3–5). "Given the substantial reversal rate of liability determinations on appeal, the whole expense of a damages trial is often wasted." *Bosch*, 719 F.3d at 1316. Resolving questions of infringement liability, which necessarily implicates the resolution of the contract issues, will prevent litigating unnecessary damages questions and will mitigate the risk of needing to address damages multiple times after appeal(s). In addition to reducing costs for the parties, this will reduce the use of judicial resources for both the District Court and Court of Appeals. Therefore, the fifth factor favors certification under Rule 54(b).

Upon consideration of the Third Circuit's factors, I conclude that there is no just reason for delay. I therefore direct entry of judgment for patent infringement as set forth above.[34] As such,

---

[34] As noted, no party has actually moved for certification of any judgment under Rule 54(b). NuVasive's argument against Dr. Jackson's motion for a damages trial depends upon the certification of the earlier judgments. Dr. Jackson had a fair opportunity to respond to NuVasive's arguments on certification. The parties should meet and confer about what needs to be done to put the case in position for an appeal, including the entry of a judgment from which an appeal can be

Dr. Jackson's motion for a damages trial and for equitable relief is denied with leave to renew after the appeal is decided.

## IV. CONCLUSION

An appropriate order will issue.

---

taken. There exists right now a Final Judgment from the contract trial (D.I. 385) and the Trial Verdict from the patent trial (D.I. 537). It is possible that an additional document is needed in regard to the patent trial.